# CASES DETERMINED

IN THE

# SUPREME COURT

OF THE

## STATE OF MISSOURI

AT THE

OCTOBER TERM, 1908.

*(Continued from Volume 217)*

THE STATE ex inf. HADLEY, Attorney-General, v. STANDARD OIL COMPANY, of Indiana, WATERS-PIERCE OIL COMPANY and RE-- PUBLIC OIL COMPANY, Corporations.

In Banc, March 9, 1909.

1. **JURISDICTION: Quo Warranto: Supreme Court.** The Constitution, in giving the Supreme Court power to issue, hear and determine "writs of *quo warranto*," included proceedings on information in the nature of a *quo warranto*, and thereby gave the said court jurisdiction to hear and determine such civil proceedings.

2. **————: ————: Criminal Action: Combinations in Restraint of Trade.** The laws of the State authorize and direct the Attorney-General to institute civil proceedings in the Supreme Court by information in the nature of *quo warranto* against any corporation to annul its charter and forfeit its franchises whenever it has by misuser, non-user or usurpation of powers, so conducted itself as to violate the laws of its being, the anti-trust statutes or the criminal laws of the State; and the Supreme Court has jurisdiction to hear and determine such civil proceedings, nor can the Supreme Court be ousted of its jurisdiction by the fact that the corporation's conduct is violative of the crim-

218 Sup.—1       (1)

inal laws of the State, nor càn the corporation justify or defend upon any such plea. The court has no original jurisdiction over a proceeding that is essentially a criminal prosecution, but the proceeding upon information in the nature of a *quo warranto* to oust the company of its franchises for a violation of the anti-trust statutes, and to impose penalties on it if it is found guilty, is a civil one, and of that the Supreme Court has jurisdiction, and in determining it it is immaterial whether the corporation has also been guilty of a crime which would subject it to prosecution upon indictment before a court and jury.

3. ———: ———: ———: ———: Abuse of Franchise: Statutory Construction. Articles 1 and 2 of chapter 143, Revised Statutes 1899, are to be, read together, and as *in pari materia*, and section 8971 is to be treated prospectively and construed with section 8978, and when both articles and both sections are construed together, as one act, section 8978 is express authority for holding that corporations which enter into agreements to regulate prices or to control or limit trade are guilty of misuse, abuse and usurpation of power, notwithstanding that section fixes penalties and provides a mode of procedure for its violation. Those sections are not in derogation of the common law, but are intended to be in aid thereof, and remedial in their purpose; and although heavy losses may result to the corporation by a forfeiture of its charter and the imposition of penalties, yet they should be construed and enforced according to the plain intention of the Legislature.

4. COMBINATIONS IN RESTRAINT OF TRADE: Misjoinder of Parties: Several Corporations. One corporation may be joined with another as defendants in a suit in the name of the State on information in the nature of a *quo warranto* to oust them of their franchises upon a charge of abuse or usurpation of corporate powers.

5. ———: Sufficiency of Information: To Maintain Prices. An information which does not charge defendants with forming a combination to maintain prices, but only with combining to regulate, control and fix prices, is sufficient. While sections 8965 and 8966, Revised Statutes 1899, prohibit a combination to maintain prices, and do not prohibit combinations to fix, regulate and control prices, section 8978 does in express terms prohibit such combinations, and all these statutes should be construed together, as one act, and when that is done there is no room for niceties of meaning between "to maintain prices" and "to fix, regulate and control prices."

6. ———: ———: General Allegations. An information in *quo warranto* to oust a corporation which contains general allegations of the facts constituting the misuser, non-user or usurpation, is sufficient. The State is not required, as in an in-

dictment in a criminal prosecution, to allege and prove in detail the facts constituting the mode and manner in which defendants have violated the law against combinations in restraint of trade or the usurpation of powers not granted by their charters.

7. ———: Constitutional Statutes: Different Punishment. The anti-trust statutes are not unconstitutional because they provide that an individual violating them may be punished by fine and imprisonment and a corporation by fine and forfeiture of its charter. There is no such difference in the punishments prescribed as renders them invalid.

8. ———: ———: Equal Protection of the Laws. Nor are said statutes in conflict with the Fourteenth Amendment in denying to corporations the equal protection of the laws. That provision of the Constitution does not prevent legislation which embraces all persons or things that naturally belong to the same class and are similarly situated and upon whom it must operate equally and uniformly. If the statute affects all corporations violating it alike it does not deny to any the equal protection of the laws.

9. ———: ———: ———: Discrimination Against Labor. The anti-trust statutes do not deny to corporations the equal protection of the laws for that they embrace commodities only and do not include labor, which may also become the subject of a combination. That is no such discrimination against property as makes the statutes unconstitutional.

10. ———: ———: Due Process of Law: Production of Books: Or, Striking Out Pleadings. Section 8984, Revised Statutes 1899, providing that when corporations, charged to be in a combination in restraint of trade, do not produce their books and papers ordered produced by the court, the court, upon motion, shall strike out their pleadings and render judgment of ouster against those in default, does not deny to them due process of law, and is not unconstitutional. It gives them a right to a hearing according to the law of the land, and is in keeping with similar statutes applicable to all litigants.

11. ———: ———: Production of Papers: Self-Incrimination. The corporations that have violated anti-trust statutes are not entitled to a discharge in the ouster proceeding because they were compelled by the process of the court to produce books, documents and other testimony against themselves. The statute grants immunity from prosecution to all witnesses who testify in compliance with the order of the court. Nor does the Constitution interfere with the power of the court to compel the production of documentary evidence under a subpoena *duces tecum*.

12. ———: ———: ———: ———: Corporations. An individual may lawfully refuse to answer incriminating questions un-

less protected by an immunity statute, but there is a distinction between individuals and a corporation. A corporation is a creature of the State, which has a reserved right to investigate its contracts and find out whether it has misused its powers, and it has no constitutional right to refuse to produce its books and papers in court for an examination in the trial of a proceeding against it brought by the State; nor can an officer in charge of the corporation charged with a violation of the statute plead the criminality of the company as a refusal to produce its books.

13. ————: ————: **Interstate Commerce.** The clause of the U. S. Constitution giving Congress power to regulate trade among the States, does not prohibit the State, through statutes forbidding pools, trusts and combinations in restraint of interstate trade and the decrees of its courts, from forfeiting the charter of a corporation organized under its laws, or from revoking the license to do business in this State of a corporation organized under the laws of another State, when such company violates those statutes. The State can forfeit the charter of a domestic corporation or revoke the license of a foreign corporation, for a misuser or non-user or abuse of the powers granted or an usurpation of powers not granted, whether the corporation is engaged in interstate or intrastate commerce.

14. ————: ————: **Impairment of Contracts.** Nor are the anti-trust statutes void for that they violate the clause of the U. S. Constitution providing that no State shall enact any law that will impair the obligations of a contract. That law has no application to a license issued by the State to a foreign corporation to do business therein, for the reason that, when it accepted the license, it impliedly agreed to transact such business only as a domestic corporation might.

15. ————: ————: ————: **License Antedating Statute.** Nor are its legal rights affected by the fact that its license was issued before the anti-trust statutes were enacted, for these statutes are an exercise of the police powers of the State, and no State can contract away its police powers. The power to govern men and things is inherent in government, and the State always has the reserved right to compel all persons, whether natural or artificial, to so conduct themselves as not to injure others.

16. ————: ————: **Unreasonable Restraint of Trade.** There is nothing in either the State or Federal Constitution that prevents the enactment of statutes prohibiting the making of all contracts in restraint of trade, whether reasonable or unreasonable. Anti-trust statutes are not unconstitutional because they prohibit the making of all contracts in restraint of trade, those that are reasonable, as well as those that are unreasonable and unjust; those of Missouri do that, but they in no manner denounce as illegal any trade contract which has a legitimate purpose for its object, and which only incidentally stifles trade.

State ex inf. v. Standard Oil Co.

17. ————: ————: ————: **Unrestrained Power to Contract.** There is no such thing in civilized society as an unrestrained power to contract. Every holder of property, however. absolute and unqualified his title, holds it under the implied liability that his use of it shall not be injurious to others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. Statutes prohibiting pools, trusts and combinations in restraint of trade are bottomed upon those police powers which are inherent rights of sovereignty; and legal regulations and restraints imposed upon the use of property and the right to contract in reference thereto do not deprive the owner of his property or contract-rights without due process of law.

18. ————: **Abatement of Suit: Corporation: Withdrawal from State.** Under ordinary circumstances any defendant in a suit may abate the same as to him by voluntarily doing all the things which the pleadings in the cause pray the court to compel him to do; but the confession must be as broad as the charges and must not amount to a colorable dismissal. A judgment of ouster is only an incident to a suit brought by the State charging a foreign corporation licensed to do business in this State with entering into an unlawful pool, trust and combination with other corporations in restraint of trade and to fix and maintain prices on commodities handled by them, to the great damage of the people; and such foreign corporation cannot abate the suit as to it and avoid the penalty for an abuse of its franchise, by withdrawing from the State after the suit is instituted and filing an unaccepted withdrawal with the Secretary of State.

19. ————: **Community of Interest: Stock Held by Trustee or Another Company: Control of Business: Evidence of Conspiracy.** Where the information does not charge that a trustee was appointed or a holding corporation was organized for the purpose of taking over the stock of the three respondent corporations, and does not charge that the holding company was vested with power to and did conduct and carry on the business of the three respondents, it will not be held that such placement of stock and business management constituted, as a matter of law, a trust and combine in restraint of trade within the meaning of the anti-trust statutes; but evidence that such trustee or holding company held or owned the stock of the three respondents and controlled their business is competent as tending to establish the charge of the information that the three respondents unlawfully and fraudulently entered into a conspiracy, combine and agreement in restraint of trade in violation of the anti-trust statutes.

20. ————: **Division of Territory: Between Dealers.** The respondent Standard Oil Company of Indiana was a manufacturer

of the products of petroleum, and also a large dealer, both at retail and at wholesale; and the respondent Waters-Pierce Oil Company was a dealer only. The two companies divided the State by a zigzag line running from the Mississippi River to Kansas and beyond, and agreed that the Indiana Company should sell oil only north of the line and the Waters-Pierce only south of it, and the Indiana Company bound itself to sell, as a refiner, exclusively to the Waters-Pierce in the territory south of the line and the Waters-Pierce bound itself to purchase exclusively from the Indiana Company, and that neither of said companies would sell to any other dealer except at retail prices. *Held*, that neither company is to be considered only as a manufacturer, but as dealers, and the agreement as to the division of territory and as to exclusive sales was in violation of the anti-trust statutes.

21. ———: ———: Breadth of Statutes: Articles of Necessity. The anti-trust statutes of Missouri declare that all contracts in restraint of trade are null and void; and they make no distinction between articles of prime necessity and other articles.

22. ———: Rebates: Stifling Competition: Power of Legislature. The Legislature possesses the power to enact laws to prevent the giving of rebates from the prices at which a commodity is sold by a dealer when the purpose of such rebates is to secure the trade of a competitor and to stifle competition and as a means by which to control, fix and maintain prices; and has done so in its anti-trust statutes, and the giving of rebates by a combination of dealers in the commodity, with that purpose as its object, is in restraint of trade, and the combination or pool is in violation of the statutes.

23. ———: ———: ———: Purpose: How Shown. The evidence shows that the three respondent oil companies, all parts of another parent company, through their agents, acquired information from railroad agents of the amount of oil sold in the various towns of the State by independent companies, and to whom, and by this means and a persistent system of espionage over the business of the independent companies they acquired perfect knowledge of their business, and then by a system of rebates from the prices at which they sold oils to the customers of the independent companies they acquired and held from eighty-five to ninety-eight per cent of the aggregate oil business of the State, and by the same means they fixed and maintained the prices at which all oils were sold in the State. *Held*, that the rebate system was maintained for the purpose of stifling competition and to fix prices, and tends to show there was a combination between respondents which is violative of the anti-trust statutes.

24. ———: Formed in Another State. Where the unlawful pool, trust or combination in restraint of trade was formed in a

foreign State or country, the parties to it, if they attempt to do business in this State in pursuance thereof, can be punished under the laws of this State. It is wholly immaterial where the unlawful conspiracy was entered into, or by what means it was formed, if it concerns commodities which as a matter of fact are sold in this State by the conspirators. They are in that case punishable in this State, whether the unlawful combination was formed here or elsewhere.

### By WOODSON, J., as to Compliance With Decree.

25. **ORDER TO DISSOLVE COMBINATION: Proof: Resolution.** Where by the decree of the court all three respondents were found guilty of entering into a combination and pool to fix, control and maintain the prices of oil in this State, and the domestic respondent was fined fifty thousand dollars, and in addition its charter was forfeited, but this was suspended upon condition that it immediately cease all connections with the other respondents and all other companies in maintaining said combination and that it furnish the court with satisfactory evidence of its compliance with this judgment and of its intention to cease all connections with its co-respondents and all other companies and persons and on or before a date named file the proofs of its willingness to comply with the judgment, sufficient proof of its compliance with the judgment is not made by its payment of the fine and the filing of a resolution adopted by its board of directors declaring that it "does hereby accept the terms and conditions" of the judgment "and does hereby express its willingness to abide by the same." The purpose of the suit was to break up the trust and the combination between the respondents and the Standard Oil Company of New Jersey, which is not and could not be made a defendant, but which controls the business and policy of all of the respondents by its ownership of all the stock of the two respondent foreign corporations and a majority of the stock of the respondent domestic corporation; and that resolution does not show that the domestic corporation has dissolved its connection with this parent company, or that the pool and combination in restraint of trade of which it was found to be a party has been dissolved.

26. ————: **Effect of Decree.** The decree forfeiting the charter of the domestic respondent took away its life and dissolved the relation between it and the parent company and its subsidiary corporations, the other respondents, and to permit the domestic respondent alone to do business in this State so long as a majority of its stock is owned by this parent company or so long as the parent company has the power to control and manage its business, is to fail to break up the "Oil Trust," and is to restore to the parent company the power to continue the unlawful trust and combination and to fix, control and maintain the prices of oils throughout the entire State; and the decree

should be so modified as to permit the domestic respondent to show, within a time named, by indisputable proof, that all stock relations and business connections with it and the parent company and its subsidiary companies have been dissolved in good faith, and in default of such showing the writ of ouster should go.

## Quo Warranto.

WRIT OF OUSTER AWARDED.

*Herbert S. Hadley,* Attorney-General, *John Kennish* and *Rush C. Lake,* Assistant Attorneys-General, and *Elliott W. Major,* Attorney-General, substituted for *Herbert S. Hadley,* for informant.

(1)   The ownership by the Standard Oil Company of New Jersey of the stock of the Republic Oil Company and the Standard Oil Company of Indiana, and over two-thirds of the stock of the Waters-Pierce Oil Company, tends to show the existence of a trust, combination, understanding and agreement among respondents, and also shows the method   or   form   in which such a trust, combination, understanding and agreement was accomplished and by which it was made effective.   State ex inf. v. Oil Co., 194 Mo. 124; State ex inf. v. Insurance Co., 152 Mo. 1; State ex inf. v. Packing Co., 173 Mo. 356; State ex inf. v. Tobacco Co., 177 Mo. 13; Finck v. Granite Co., 187 Mo. 244; Brewing Co. v. Belinder, 97 Mo. App. 64; Walsh v. Assn. of Plumbers, 97 Mo. App. 280; Lead Co. v. Paint Co., 80 Mo. App. 247; Froelich v. Benefit Assn., 93 Mo. 383; Northern Securities Co. v. U. S., 193 U. S. 197; Pipe and Steel Co. v. U. S., 85 Fed. 764; Railroad v. Searles, 37 So. 939; State v. Oil Co., 49 Ohio St. 137; People v. Gas Trust, 130 Ill. 268; People v. Distilling Co., 156 Ill. 448; Harding v. Glucose Co., 182 Ill. 551; Richardson v. Buhl, 77 Mich. 632; Nebraska v. Distilling Co., 29 Neb. 700; People v. Refining Co., 54 Hun 354, 2 L. R. A. 1; Texas v. Oil

Co., 15 L. R. A. 598; Coal Co. v. People, 214 Ill. 421;
Bishop v. Preserves Co., 48 Am. St. Rep. 317; 2 Cook
on Corporations, sec. 503; 20 Am. and Eng. Ency. Law,
846; Noyes' Intercorporate Relations, sec. 294; Eddy
on Combinations, secs. 620, 621 and 622; Beach on
Trusts, chapters 158 and 167. (2) It is not necessary
to show the existence of a trust, combination or agree-
ment in restraint of trade and competition by direct
evidence. It may be shown by facts, circumstances and
conditions which indicate the existence of a combina-
tion, trust and agreement in restraint of trade and com-
petition. State ex inf. v. Oil Co., 194 Mo. 124; State ex
inf. v. Insurance Co., 152 Mo. 1; State ex inf. v. Pack-
ing Co., 173 Mo. 356; State ex inf. v. Tobacco Co., 177
Mo. 13; Lead Co. v. Paint Co., 80 Mo. App. 247; Pipe
and Steel Co. v. U. S., 85 Fed. 764; Coal Co. v. People,
214 Ill. 421. (3) The existence of a trust, combination
or agreement by which trade and competition may be
limited and restricted is unlawful. To entitle the
State to a judgment in this case, it is not necessary
to show that trade and competition were in fact lim-
ited or restrained by the existence of the combination,
trust and agreement among respondents. It is the
power, by reason of such combination, to restrict
trade and competition which the law prohibits
and condemns. State ex inf. v. Oil Co., 194
Mo. 124; State ex inf. v. Insurance Co., 152 Mo. 1;
State ex inf. v. Packing Co., 173 Mo. 356; State ex inf.
v. Tobacco Co., 177 Mo. 13; Brewing Co. v. Belinder,
97 Mo. App. 64; Walsh v. Assn. of Master Plumbers,
93 Mo. App. 280; Lead Co. v. Paint Co., 80 Mo. App.
247; Northern Securities Co. v. U. S., 193 U. S. 197;
Pipe and Steel Co. v. U. S., 85 Fed. 764; Oil Co. v.
State, 19 Tex. Civ. App. 1; Coal Co. v. People, 214 Ill.
421; Nebraska v. Distilling Co., 29 Neb. 700; Richard-
son v. Buhl, 77 Mich. 632; Nestor v. Brewing Co., 161
Pa. St. 473; Ellis v. Inman Co., 131 Fed. 182; Builders'
Assn. v. Niezwoski, 95 Wis. 129; Coal Co. v. Coal Co.,

68 Pa. St. 173; United States v. Freight Assn., 166 U. S. 290; Railroad v. Searles, 37 So. 939; Beach on Trusts, ch. 167. (4) The agreement for the division of trade territory and the division of trade territory between the Waters-Pierce Oil Company and the Standard Oil Company was itself unlawful, because in restraint of trade and competition. It is also a fact and condition which tends to establish the existence of the combination and trust. State ex inf. v. Oil Co., 194 Mo. 124; State ex inf. v. Insurance Co., 152 Mo. 1; Brewing Co. v. Belinder, 97 Mo. App. 64, Northern Securities Co. v. U. S., 193 U. S. 197; Pipe and Steel Co. v. U. S., 85 Fed. 764; Oil Co. v. Adoue, 15 L. R. A. 598; Oil Co. v. Nanemaker, 142 Ind. 560; Coal Co. v. Coal Co., 68 Pa. St. 173. (5) The existence and operation of the Republic Oil Company deceived and misled the public into the belief that it was an independent and competing company of each of the other respondents; this was unlawful and had the effect of limiting and restraining trade and competition. Its existence and operation also tended to establish the existence of the combination and trust. Pipe and Steel Co. v. U. S., 85 Fed. 764; Craft v. McConnoughy, 79 Ill. 346; More v. Bennet, 15 L. R. A. 361; State ex inf. v. Tobacco Co., 177 Mo. 13. (6) The acts, plans and purposes of the members and officers of a corporation in its organization and the management of its business are in law the acts, plans and purposes of the corporation itself, and if such acts, plans and purposes are in violation of the law against combinations and trusts, the corporation thereby becomes guilty and subject to its penalties. State ex inf. v. Tobacco Co., 177 Mo. 13; Lead Co. v. Paint Co., 80 Mo. App. 247; Northern Securities Co. v. U. S., 193 U. S. 197; Pipe and Steel Co. v. U. S., 85 Fed. 764; Nebraska v. Distilling Co., 29 Neb. 700; Richardson v. Buhl, 77 Mich. 632; People v. Refining Co., 54 Hun 354, 2 L. R. A. 1; Railroad v. Searles, 37 So. 939; Noyes' Intercorporate Relation, sec. 294;

Eddy on Combinations, secs. 620, 621, 622. (7) Under the provisions of our Anti-Trust Statute, all combinations, contracts, agreements or understandings in restraint of trade and competition are unlawful. A contract or agreement in restraint of trade made prior to the enactment of this law, but not in violation of the principles of the common law, became illegal upon the enactment of our Anti-Trust Statute. After the enactment of this law, those participating in such contract or agreement, would occupy the same position as if the contract had been created after the enactment of the Anti-Trust Statute. Finck v. Granite Co., 187 Mo. 244; Pipe & Steel Co. v. U. S., 85 Fed. 764; U. S. v. Freight Assn., 166 U. S. 290; U. S. v. Traffic Assn., 171 U. S. 505.

*H. S. Priest* and *J. D. Johnson* for respondent Waters-Pierce Oil Company; *Charles Nagel* of counsel.

(1) There is no evidence to sustain the charge that the Waters-Pierce Oil Company combined or confederated with the Standard Oil Company of Indiana or the Republic Oil Company, or any other company, to fix and maintain the prices or limit the products of petroleum in the State of Missouri. (2) The Waters-Pierce Oil Company, being sued as a corporation, is only answerable for what it has done as a corporation. It is in no wise responsible for the ownership of its stock, nor answerable for the conduct of its shareholders, provided that conduct is not so expressed as to become in fact or in law its corporate act. Com. v. Water Co., 47 Atl. 843, 119 Pa. St. 569; People v. Refining Co., 18 Am. St. Rep. 843, 121 N. Y. 582. (3) The Supreme Court has no jurisdiction of this case by *quo warranto.* (a) It is a criminal prosecution; (b) The statutes under which it is instituted provides the mode of procedure and appoints the forum in which it is to be conducted, and this is ex-

clusive of all other modes. *Quo warranto* cannot be used as a criminal procedure. To so use it would violate the constitutional provisions relating to the mode of instituting and trying criminal charges. State v. Hardin, 1 Ired. (N. C.) 49; State v. Jockey Club, 98 S. W. 539. This is a proceeding to ascertain, first, whether an offense has been committed under the Anti-Trust Statute, and, if so, to inflict the forfeiture imposed by section 8971. This section inflicts forfeiture of corporate rights and franchises upon domestic corporations and banishment upon foreign corporations doing business in this State under license. The forfeiture or banishment depends entirely upon the innocence or guilt of the respondents. The forfeiture or banishment is only a punishment prescribed for guilt. One domestic and two foreign corporations are joined as respondents. The former derives all its corporate franchises from this State; the two latter derive none whatever. The only community of interest which justifies a joinder of the domestic with the foreign corporations must lie in the agreement and combination charged in the information, otherwise there is a clear misjoinder of defendants, because neither has or can have any interest whatever in the charter of the other. They are only joined because they are alleged to be joint malefactors under the Anti-Trust law. No corporation can be joined with another corporation when charged by common law proceeding in *quo warranto* for an abuse or usurpation of corporate rights, because such a charge relates entirely to the individual contract between it and the State. People v. DeNiel, 15 Mich. 164; Vance v. Gaylor, 25 Ark. 32; Com. v. Turnpike Co., 5 Cush. (Mass.) 509. Whatever name may be given to the character of the proceeding, it is essentially criminal in all the definitions of criminal prosecution. Cancemi v. People, 18 N. Y. 136; Harger v. Thomas, 44 Pa. St. 136; Ely v. Thompson, 10 Ky.

74; Pardee v. Smith, 27 Mich. 43; Com. v. Certain Intox. Liquors, 127 Mass. 452; Com. v. Certain Intox. Liquors, 80 Mass. 375; Rex v. Lawrence, 43 U. C. Q. B. 164; Com. v. Jones, 10 Bush (Ky.) 725; Reg. v. Richardson, 1 Burr. 517; 3 Dill., Mun. Corp. sec. 251; 23 Am. and Eng. Ency. Law, 632. Again, the right to determine the innocence or guilt of persons charged with the infraction of this law, by *quo warranto,* is not given by the statute. The same statute which creates the crime provides for a procedure both to punish and to restrain. Such being the case, the procedure thus pointed out is exclusive of all others. Secs. 8968, 8979; State v. Huffschmidt, 47 Mo. 76; U. S. v. Pipe Co., 85 Fed. 282; Steamship Co. v. McGregor, L. R. App. Cas. 1892. (4) The information does not state facts sufficient to constitute a violation of the statute. It does not state whether the prices were fixed by an agreement, a trust or a pool. Nor does it show whether the alleged contract was incidental to a principal valid contract, what its duration or terms were, nor whether it was of such a character as made it violative of those elements condemned by the common law and hence within the scope of the statute. The information merely expresses the opinion of the Attorney-General. The information must so state the facts as that, when proven, the court by applying them to appropriate legal principles, will be able to say whether they constitute a contract within the prohibitions of the statute. It should state acts, not words; facts, not opinions. U. S. v. Cruikshank, 92 U. S. 542; U. S. v. Simonds, 96 U. S. 360; U. S. v. Carll, 105 U. S. 611; U. S. v. Britton, 107 U. S. 655. (5) The statute is in violation of the first section of the 14th Amendment to the Federal Constitution. While the statute denounces the same acts, whether committed by individuals or individuals and corporations, it imposes upon corporations a greater and different punishment from that imposed upon individuals. Authorities, supra. (6) The division of

territory between the Standard Oil Company of Indiana and the Waters-Pierce Oil Company is not a violation of the statute. It is not so shown by the averments of the information. Contracts of this character are not in restraint of trade or diminution of competition within the meaning of those words as understood at the common law. Phillips v. Cement Co., 125 Fed. 594; Tobacco Co. v. Whitwell, 125 Fed. 454; Wickens v. Evans, 3 Younge & Jervis 327; Hearn v. Griffin, 2 Chitty 407; Gale v. Reed, 8 East 79; National Benefit Co. v. Hospital Co., 47 Minn. 272; Stearns v. Barrett, 1 Pick. 443; Collins v. Lock, L. R. 4 App. Cas. 674; Wood v. Hart, 70 N. W. 53; Authors' and Newspapers' Ass'n v. O'Gorman, 147 Fed. 620; Pingrey on Extra. and Ind. and Interest. Cont., sec. 317. (7) The defendant, having been compelled by the process of this court to produce testimony against itself, must be discharged in this proceeding. (8) The law under which this proceeding is conducted is in violation of the fourteenth amendment to the Constitution of the United States, in that it discriminates against corporations, as between corporations and natural persons, as to punishment and mode of procedure in ascertaining the guilt of offenses under said law. (9) It appears from the report of the Master that the ownership of the stock of this respondent by the Standard Oil Company of New Jersey obtained before the law under which this proceeding is had was enacted, and the law could not be so retroactive as to affect or destroy this property status without infringing the provisions of article 1, section 10, of the Constitution of the United States and the fourteenth amendment thereto, and for like reason, by this proceeding, the minority shareholders could not be deprived of their interest in respondent, because of any act of the Standard Oil Company of New Jersey in which they were not a participant and which they could not legally prevent. (10) The act is unconstitutional in that it imposes a double penalty

upon corporations—one a fine and the other forfeiture of charter, in violation of the provisions of the Constitution of this State and of the United States.

*Alfred D. Eddy* and *Frank Hagerman* for respondents Republic Oil Company and Standard Oil Company of Indiana.

(1)  1.  The gist of the charge is that respondents were in a conspiracy. Such only is the offense. State v. S. Oil Co., 194 Mo. 154. The pleading proceeds upon the erroneous idea that it was not only necessary to charge the combination, but also the overt acts done pursuant thereto. The rule is that the conspiracy is the offense, the overt acts but proof thereof. 6 Am. and Eng. Ency. Law (2 Ed.), 843, 844. Therefore, in determining what the issues are we must be governed by the charge of the combination, the overt acts pleaded being unnecessary either as elements of the offense or as a matter of pleading. Never, unless the statute so requires, is it necessary to plead an overt act. 4 Ency. Pl. & Pr., 716, 717; U. S. v. Gardner, 42 Fed. 831; People v. Arnold, 46 Mich. 273; State v. Straw, 42 N. H. 394. This is a civil proceeding at common law (State ex rel. v. Loan & Investment Co., 142 Mo. 325), and there is no provision of the statute requiring an overt act to be pleaded. Hence, none need be pleaded, and any such allegation is surplusage. 2. Tested by these rules, we turn to the information. It charges that there was a combination (a) to fix, regulate and control prices; (b) to control and limit the trade; (c) to control, limit and prevent competition; (d) to deceive and mislead the public into the belief that respondents were independent competitors, when they were not so in fact. This is apparent by the allegations of the complaint. 3. It is true that the information says that by the combination prices were fixed and maintained, trade controlled and limited, competition

prevented, and the public deceived, and that there was a division of territory "in pursuance of said pool, trust or combination." So, there was the allegation that the respondents hold themselves out as independent and competing companies when they are not such in fact. But this was limited by the averment that it was "under and by virtue of said" combination. And the fact is averred that the Indiana Company sold oil only to respondents. Yet, this is limited by the averment that it was an act "done in compliance with" and "in the enforcement of said combination." Therefore, after all, the issues in this case are limited to the four specific charges made and heretofore stated, and not to the overt acts alleged to exist, which might or might not be evidence in support thereof. 4. The result is precisely the same if we treat the allegations as to overt acts the same as specific enumerations of the particular methods by which the alleged combination was created, because in such instance general allegations are limited by the specific averments. McMananee v. Railroad, 135 Mo. 447. 5. Since the charge is of a conspiracy to defraud (State v. Standard Oil, 194 Mo. 154), the rules of pleading in cases of fraud should be applied. Reed v. Bott, 100 Mo. 66. No such specification of details was made. The information does not show how or in what manner the combination was formed. The overt acts pleaded do not sufficiently show these details. They show what was done under the combination, not how the combination was effected. For this reason alone the information is insufficient. Manifestly there was no allegation of a combination to limit trade or competition in the manner provided by the statute. (2) The prosecution here under the Anti-Trust Act must be limited to the offenses prohibited by Secs. 8965 and 8966, R. S. 1899, because a violation of section 8978 cannot be redressed in an ouster proceeding in this court. 1. Section 8965 prohibits combinations (a) to regulate or fix prices, and to maintain them

when so fixed, or (b) to fix or limit the quantity of any article to be manufactured or sold. It goes no further. It cannot be tortured into meaning anything more. 2. Section 8966 only prohibits combinations to lessen competition by dealing in one article under an arrangement that no other competing article shall be dealt in. Such is the plain meaning of the statute to be gathered from its terms. 3. This proceeding can only be prosecuted under sections 8965 and 8966, and such was the contemplation of the Legislature, because *quo warranto* or ouster proceedings were only authorized for a violation of article 1 of chapter 143, of which sections 8965 and 8966 are a part. This is manifest from section 8971. 4. It therefore follows that under article 1 there can be no prosecution of any charge made in the information, except for a combination to regulate or fix prices, or to maintain them when so fixed, or to lessen competition under an arrangement that no other competing article shall be dealt in. The information, however, charges combinations other than those prohibited by sections 8965 and 8966. To repeat, those sections only prohibit combinations (a) to regulate or fix prices, or to maintain them when so fixed; (b) to fix or limit quantities; (c) to lessen competition in a certain specified way. The information, however, charges in addition to a combination to fix prices, combinations (d) to control and limit trade; (e) to control and prevent competition generally, and (f) to pretend that respondents were competitors when they were not so in fact. The State evidently assumed that section 8978 applied to this proceeding to oust, because while much of the information departs entirely from the prohibitions and language of the statute, yet much of it mingles with other language words found in that section. Section 897ᴅ does not go as far as the information, for it only prohibits combinations (a) to regulate, control or fix prices, or to maintain them when so

fixed; (b) to fix the amount or limit the quantity; (c) to control or limit trade; and (d) to limit competition by refusing to buy from or sell to another because not a party to the combination. But a violation of the section is only a violation of article 2, chapter 143, Revised Statutes 1899, which can be prosecuted in the circuit court alone, the purpose of the article being declared to be "to provide an additional remedy for the control and restraint of pools, trusts and conspiracies in restraint of trade and unlawful combination." That this view is correct plainly follows a reading of sections 8979 to 8982 inclusive. 5. Thus, taking section 8979, it is plainly seen that the combinations prohibited are only as stated. 6. That the Legislature creating the offense limited the prosecution of the case in the circuit court plainly appears from a like reading of sections 8980 to 8982, inclusive. 7. It is a rule that *quo warranto* will never lie where a plain remedy exists by the ordinary form of civil procedure. High on Extraordinary Legal Remedies, sec. 617; State ex rel. v. Wilson, 30 Kan. 675; State ex rel. v. Francis, 88 Mo. 557; State v. Vail, 53 Mo. 111; State v. Townsley, 56 Mo. 107. (3) There was no combination to regulate, control or fix prices. 1. The allegations of the information as to prices are only that there was a combination to regulate, control and fix prices. No allegation is made that there was any combination toward maintaining the price or the stability thereof. While the combination to control prices is averred, yet neither section 8965 nor 8966 makes it an offense to control prices. All that in this regard prohibited is a combination to regulate or fix prices, or to maintain them when they have been by such combination so fixed. Prices can be controlled by the magnitude of the business, or the facilities afforded to conduct the same. This would be no violation of law. Whitwell v. Tobacco Co., 60 C. C. A. 290, 125 Fed. 454. The price might be controlled without a combina-

tion to regulate or fix, so they might be maintained
without any combination to fix them.  In neither of
such instances would the law be violated.  The statu-
tory offense as to maintaining prices is simply that
there shall be no combination to maintain such prices
as have been previously fixed by some combination.
If not so fixed by such a combination, there is no offense
in maintaining a price.  Business could not be done
upon any other principle, because there would be guilt
from the mere fact that each merchant charged the
same price for any commodity.  This thought need
not, however, be pursued, because the information does
not charge a combination to maintain prices.  The
allegation as to controlling prices is beyond the con-
demnation of the statute.  Hence, neither the question
of maintaining nor controlling prices is in the case.
It follows that the simple issue as to prices is whether
there was a combination to regulate or fix them, or to
maintain them after they had been so fixed by such
combination.  2.  As to whether there was or was not a
combination to regulate or fix the prices depends upon
the proof, which must be clear.  State ex inf. v. Tobac-
co Co., 177 Mo. 37.  3.  The question, then, is presented,
whether the proofs warrant a finding of any agreement
to regulate or fix the price of oil.  Upon this subject
we submit that neither the giving of rebates, nor any
other alleged improper business methods of any re-
spondent, nor the common ownership of stock, is any
reason for saying that there is a combination.  4. There
was no direct proof of any combination or any ar-
rangement to regulate or fix prices.  Every officer who
was in a position to know anything of the situation
testified that there was no such combination.  Upon
this state of the proof no reasonable contention could
be made that there was any agreement or combination
to fix prices.  (4)  There was no combination to con-
trol or limit trade.  1.  As already shown, the only
prohibition against combining to control or limit trade

is found in section 8979, article 2, chapter 143, and the exclusive remedy for a violation of that section is in the circuit court under sections 8980 to 8982. The statute is to be construed strictly and is not to be expanded by construction. State ex rel. v. Associated Press, 159 Mo. 467; State ex inf. v. Cont. Tob. Co., 177 Mo. 37. Nothing in the entire article gives countenance to the view that it was ever intended by the Legislature to create an offense for which any penalty could be imposed except that specifically therein mentioned. For this reason alone no inquiry can be here made as to any combination to control or limit trade. 2. If, however, the provisions of section 8978 were enforcible in *quo warranto,* still a general combination to control trade is not prohibited. Nothing more is alleged in the information. The prohibition is not against controlling trade or limiting competition in any way whatsoever, but only the manner specified. This restriction was necessary because to say generally that there should be no combination to control trade or limit competition would be unconstitutional. So it has been decided in In re Grice, 79 Fed. 644; Insurance Co. v. Cornell, 110 Fed. 816. 3. If, however, the question were in the case, it is manifest there is no reason for saying that there was any combination to limit trade, because every effort made was to extend it. The only question would be whether there was a combination to control the trade in oil. This does not mean that it was illegal to get all the business that could be obtained by legal means. For instance, rivals in business can go into partnership (In re Grice, 79 Fed. 627); or individuals or corporations can, even to prevent competition, buy out one another, all of which might result in control of the trade in any particular commodity. U. S. v. Joint Traffic Ass'n, 171 U. S. 567; Dolph v. Troy Laundry Mach. Co., 28 Fed. 555; State ex inf. v. Tobacco Co., 177 Mo. 32; Gates v. Hooper, 90 Tex. 563; Oakes v. Water Co., 143 N. Y. 430; U. S. v. North-

ern Securities Co., 193 U. S. 197. So the statute is not violated if a producer or manufacturer limits his vendee to a prescribed territory (Phillips v. Cement Co., 61 C. C. A. 19, 125 Fed. 593), or fixes a limit to the price at which he shall sell, or the persons who shall handle his product (Whitwell v. Tobacco Co., 60 C. C. A. 290, 125 Fed. 454; Fowle v. Park, 131 U. S. 88; Ellman v. Carrington, 2 Ch. 275; Com. v. Grinstead, 111 Ky. 203; Long v. Towl, 42 Mo. 545), or give the vendee an exclusive right to sell (Walsh v. Dwight, 40 App. Div. 513, 58 N. Y. Supp. 91), or an exclusive right to furnish a commodity to a certain person (Ferris v. Brewing Co., 155 Ind. 539, 58 N. E. 701; Catt v. Towle, L. R. 4 Ch. 654), or appoint one an exclusive agent for his commodity (Newell v. Meyendorff, 9 Mont. 254; Trap Rock Co. v. Brown, 61 N. J. L. 536; Fuller v. Hope, 163 Pa. St. 62). So one can, to hold or obtain business, give secret rebates. In the consideration of the questions of the legal right to give rebates and to make a territorial division, many other illustrations are given of instances where arrangements apparently tending to control trade have been upheld as valid. 4. There was no combination or agreement of any kind between any of the respondents. If any combination can be found, it could only exist from the fact that the common ownership of the stock made it possible to conduct and control the business in the way of which complaint is made. If this be true, the combination was between the stockholders (who should be proceeded against as in Duke v. People, 44 N. Y. Supp. 336), and not between the corporate respondents. (5) There was no combination to control, limit or prevent competition. 1. The charge in the information is that there was a combination to control, limit and prevent competition. This charge is broader than the statute. Section 8966 does not prohibit combinations to control or prevent any competition, nor even' to limit general competition. The prohibition is only against com-

binations to lessen competition in a specific way; that is to say, by dealing in one article under an arrangement that no other competing article should be dealt in. Rivals in business can go into partnership; one competitor can sell out to, or go into the employ of another, and any such transaction would lessen the competition, yet not violate the statute. So the giving of rebates, and other business practices criticized by the State, but not prohibited by law, would not justify a finding of guilt under section 8966. 2. Section 8978 does not apply because it is part of article 2, chapter 143, to be enforced alone in the circuit court. The Legislature intended no other penalty. It is no part of article 1. 3. But if section 8978 could be here enforced, it has no application, because a combination to limit all kinds of competition is not prohibited. The combination prohibited is only one "to limit competition in such trade, by refusing to buy from or sell to any other person or corporation any such article or thing aforesaid, for the reason that such other person or corporation is not a member of or party to such pool, trust, combination, confederation, association or understanding." No such charge is made. No testimony was offered tending to show any such offense. 4. Any combination to control competition as between the stockholders of the different respondents could not be enforced in this proceeding, but could only be enforced in a proceeding against those thus combining, that is to say, the stockholders. 5. The only circumstance from which it can be claimed there was a combination to lessen competition between any of the respondents is the territorial division. Walsh v. Ass'n of Master Plumbers, 97 Mo. App. 288. (6) The alleged combination to deceive and mislead the public into the belief that respondents were separate, distinct, competing corporations, when they were not such in fact. 1. If there had been an agreement among all respondents that the Republic Company should operate

as an independent competing company when it was not such in fact, this would have been no violation of any statute, nor any actionable conspiracy at common law. The most that could be contended would be that, if unlawful, the Republic Company was misusing its franchise, but just how, has never been shown. 2. There is not, however, the slightest foundation for the statement that there was ever any agreement or combination among the respondents to so use the Republic Company. The Waters-Pierce Company manifestly never had any connection with the acquisition of the Republic Company. If there was any agreement or understanding to so use the Republic Company it was among other corporations or individuals who are not in court. If any such so arranged or combined and this was a violation of law, they should be proceeded against, and not the corporation so used. People v. Duke, 19 Misc. 292, 44 N. Y. Supp. 336; United States v. Northern Securities Co., 193 U. S. 197. The common ownership of stock does not change the corporate capacity of the corporations, and since the respondents are, as corporations, authorized to do business here, the only question is, as decided in State ex inf. v. Tobacco Co., 177 Mo. 1, whether, as legal corporate entities, they entered into a combination. 3. The proof wholly fails to show that those actively conducting the business of the Republic Company knew how it was organized or who owned its stock, but it does show that they conducted it as a separate, distinct corporation. It was successfully run, operated and managed with the idea of holding the brands and good will of the S., S. & T. business and increasing the same. 4. That the Standard Oil interests had the legal right to buy out S., S. & T. is unquestionable. Trenton Potteries Co. v. Olyphant, 58 N. J. Eq. 507; Oakes v. C. W. Co., 143 N. Y. 430. That it had a right to form the Republic Company as a corporation to take the business, good will and property, is beyond the pale of discussion. State ex inf. v. Tobac-

co Co., 177 Mo. 32. The good will of S., S. & T. was a valuable property right. 14 Am. and Eng. Ency. Law (2 Ed.), 1085, 1086; Cruttwell v. Lye, 17 Ves. Jr. 335; 2 Eddy on Combinations, sec. 657. 5. The simple question, then, is, in the absence of any statute so re- quiring it, was any offense committed in not disclosing the fact that the stock was owned by the Standard Oil interests? The whole value of the good will de- pends upon holding the business of the former owners. To say that the purchaser must disclose the name of its stockholders would destroy the very thing pur- chased. (7) The giving of rebates and other methods of obtaining advantages. At common law rebates are lawful. Without statute prohibiting them, the grant- ing of rebates, especially in a private business, is in no wise illegal. Mogul Steamship Line (21 Q. B. Div. 544), affirmed in the Court of Appeal (23 Q. B. D. 598), and in the House of Lords (L. R. App. Cas. 1892, 25); Lough v. Outerbridge, 143 N. Y. 283; Walsh v. Dwight, 40 App. Div. 513; In re Greene, 52 Fed. 116; In re Corning, 51 Fed. 211; In re Terrell, 51 Fed. 213; Ex parte Benson, 18 S. C. 38; Cowden v. Pacific C. S. S. Co., 94 Cal. 470; Whitwell v. Cont. Tob. Co., 125 Fed. 461, 60 C. C. A. 290. (8) 1. It is claimed that an arrangement for a division of territory is an illegal combination. This is not the case of two independent merchandising companies dividing a State for selling purposes, one agreeing not to sell where the other did. The Indiana Company (a Standard Oil interest) was the producer of all oil sold by the Waters-Pierce Com- pany. Practically all of it was refined by the Indiana Company. If the latter had confined itself to refining, and then limited one purchaser to selling in the north- ern half of the State and another to the southern half, according to the authorities, no difficulty would attend the situation. So, if the Indiana Company appointed different agents with exclusive agencies in different parts of the State with no right to invade the territory

of another. Can it make any difference that in the northern half of the State its purchaser sells to jobbers and it refrains from so doing, while in the southern half it sells directly to jobbers? The case is then in one aspect this: The producer of the oil permits its customer to sell, while it does not, directly to jobbers in one part of the State, and in the other part it sells to the jobbers direct. The arrangement for a territorial division arose as part of the good will of a business transferred to a corporation. If common stock ownership does, as the State claims, cut any figure, then it is in favor of the arrangement, because if the owner of the producing company could direct the agencies through which it sold, it could own one company to sell at one place and another at another place. It would be but the equivalent of the owner selling in both places. This arrangement does not encroach upon the law. Phillips v. Cement Co., 61 C. C. A. 19, 125 Fed. 593; Oregon Steam Navigation Co. v. Windsor, 20 Wall. 64; Whitwell v. Tobacco Co., 60 C. C. A. 290, 125 Fed. 459; Dueber v. Watch Co., 14 C. C. A. 14, 66 Fed. 643; Vandeweghe v. Brewing Co. (Tex. Civ. App.), 61 S. W. 526; Central Shade-Roller Co. v. Cushman, 143 Mass. 353, 9 N. E. 629; Park & Sons Co. v. Nat. Druggist Ass'n, 54 App. Div. 223, 66 N. Y. Supp. 615; Fowle v. Park, 131 U. S. 88; 1 Eddy on Combinations, sec. 244; Cohen v. Envelope Co., 56 N. Y. Supp. 588; Ontario Salt Co. v. Merchants Salt Co., 18 Grant's Ch. 540. 2. In sales of good will, the English rule seems to be that it is perfectly legitimate to restrain the seller from selling in any territory which was covered by the business whose good will was sold. The rule has been applied where the agreement not to sell in certain territory covered the entire area of a country as Great Britain. Underwood v. Barker, 1 Ch. 300; Nordenfeldt v. Ammunition Co., A. C. 535. The whole of the United States. National, etc., Co. v. Haberman, 120 Fed. 415. The District of Columbia. Godfrey v. Roselle, 5 App.

D. C. 299. Several States of the Union. Swigert v.
Tilden, 110 Ia. 650; Trenton Potteries Co. v. Olyphant,
58 N. J. Eq. 507. Within 1500. Harrison v. Refining
Co., 53 C. C. A. 484. Or 200 miles of Chicago. Eller-
man v. Railroad, 49 N. J. Eq. 217. The whole of one
State. Oregon Nav. Co. v. Windsor, 20 Wall. 64;
Paragon Oil Co. v. Hall, 7 Ohio C. C. 240. And the
entire United States, except Nevada and Montana.
Diamond Match Co. v. Roeber, 106 N. Y. 473. So a
contract not to compete in catching certain kinds of
fish, or manufacturing products therefrom, along the
Atlantic Seaboard was held to be valid. Fisheries Co.
v. Lennen, 116 Fed. 217. That a territorial restriction
in the sale of a good will did not violate the Anti-Trust
Act was decided in Gates v. Hooper, 90 Tex. 563, 39
S. W. 1079, the opinion in which case was quoted with
approval in State ex inf. v. Tobacco Co., 177 Mo. 36.
3. The following are other illustrations of restraints
which are not invalid as lessening competition or af-
fecting trade: An exclusive right to furnish beer to a
public house (Catt v. Tourle, L. R., 4, Ch. 654); the
sole right to buy or sell goods of a manufacturer
(Brown v. Rounsavell, 78 Ill. 592; Weybolt v. Fashion
Co., 80 Ill. App. 67; Schwalm v. Holmes, 45 Cal. 665;
Walsh v. Dwight, 40 App. Div. 513; Crystal Ice Mfg.
Co. v. San Antonio Brewing Assn., 8 Tex. Civ. App.
1); to write plays for one theatre (Morris v. Coleman,
18 Ves. Jr. 437); not to work for any one but the cove-
nantee (Gale v. Reed, 8 East 80); or to publish an
advertisement of only one article of a given class (God-
dard v. American Queen, 27 Misc. N. Y.
482, 59 N. Y. Supp. 46). Contracts between
dealers and retail customers fixing the price
at which certain articles are to be sold, have
been held valid. Ellman v. Carrington, 2 Ch. 275;
Commonwealth v. Grinstead, 111 Ky. 203; Long v.
Towl, 42 Mo. 545. A seller or manufacturer may ap-
point an exclusive agent. N. Y. Trap Rock Co. v.

Brown, 61 N. J. L. 536; Fuller v. Hope, 163 Pa. St. 62; Newell v. Meyendorff, 9 Mont. 254. A contract by a railroad company for the exclusive use of certain sleeping cars (Railroad v. Pullman Palace Car Co., 139 U. S. 79) has been upheld; likewise as to a contract for exclusive custom (Ferris v. Brewing Co., 155 Ind. 539; 58 N. E. 701). (9) The common ownership of stock does not mean common control, nor violate the statute. 1. A corporation is a distinct entity, and its rights as such must be determined. Pullman Palace Car Co. v. Railroad, 115 U. S. 587; Higgins v. Lansingh, 154 Ill. 358; White v. Land Co., 18 Tex. Civ. App. 637; Railroad v. Cochran, 43 Kan. 234; Porter v. Co., 120 U. S. 670; Humphreys v. McKissock, 140 U. S. 304; Jessup v. Railroad, 36 Fed. 741; Am. Pres. Co. v. Norris, 43 Fed. 714; Bank v. Const. Co., 97 Ga. 7; Parker v. Hotel Co., 96 Tenn. 252; State ex inf. v. Cont. Tob. Co., 177 Mo. 37; State ex inf. v. Standard Oil Co., 194 Mo. 124. 2. Stockholders who enter into a combination can as such be proceeded against. People v. Duke, 19 Misc. 292, 44 N. Y. Supp. 336. They are not, however, made parties here, as was done in United States v. Northern Securities Co., 193 U. S. 197. Hence, the sole question is whether these respondents as corporate entities have entered into any combination of the kind alleged. 3. There is nothing in the former opinion, State ex inf. Hadley v. Standard Oil Co., 194 Mo. 124, contrary to this view or that expressed in State ex inf. v. Tobacco Co. 177 Mo. 37.

*Herbert S. Hadley,* Attorney-General, *John Kennish* and *Rush C. Lake,* Assistant Attorneys-General, and *Elliott W. Major,* Attorney-General, substituted for *Herbert S. Hadley,* for informant in reply.

(1) The contention that the Supreme Court has no jurisdiction to hear and determine this case for the reason that it involves

an inquiry as to whether the respondents have done acts which were in violation of provisions of the statute for which other penalties are prescribed, is one which is so entirely in conflict with the decisions and the well established practice in this State for over half a century that only the ability of the counsel asserting it justifies its discussion. The jurisdiction of the Supreme Court in *quo warranto* cases is conferred by article 6, section 3, of the Constitution of the State in the following language: "It shall have power to issue writs of *habeas corpus, mandamus, quo warranto, certiorari* and other remedial writs, and to hear and determine the same." The jurisdiction thereby conferred in *quo warranto* has been construed by the Supreme Court to mean jurisdiction of an information in the nature of a *quo warranto*. State ex rel. v. Stewart, 32 Mo. 373; State ex rel. v. Vail, 53 Mo. 97; State ex inf. v. Equitable Loan and Inv. Co., 142 Mo. 325. In this case the information charged that the respondents, by reason of a violation of the laws of this State, had been guilty of a perversion and usurpation of franchise, and for that reason asked for the forfeiture of the charter of the corporation. The statute prescribing the manner in which the business of such company should be conducted made a violation of the law a misdemeanor, punishable by fine, and also gave to the Attorney-General the right to institute an injunction suit to restrain such company from doing business, and "for the dissolution of such association and the settling and winding up of its affairs, or for any and all of said remedies." Secs. 1385, 1392, and 1393, R. S. 1899. Yet, notwithstanding this amplitude of statutory proceedings and penalties for a violation of these provisions, the court held that the jurisdiction of this court to declare a forfeiture of the corporation for doing that which amounted to a breach of its contract with the State was "beyond the power of the Legislature to take away." This declaration of law is in harmony with

the general' rule as it has been announced by other courts and text-book writers. High, Ex. Leg. Rem., secs. 647, 648, 649; State v. City of Savannah, R. M. Charlt. 250; Williams v. Bank of Illinois, 6 Ill. 667; Clark & Marshall, Priv. Corp., sec. 314b; State ex rel. v. Gas Co., 153 Ind. 486; State ex inf. v. Delmar Jockey Club, 200 Mo. 34; Turrett v. Taylor, 9 Cranch 51; 2 Spelling, Ex. Rlf., secs. 1513, 1812; People v. Dispensary Co., 7 Lans. (N. Y.) 504; 5 Thomp. on Corp., pp. 6615-16; 10 Cyc. 1281; Angell & Ames, Corp., sec. 774. In the light of these authorities, we take it that there can be no serious question of the jurisdiction of the court in a proceeding in the nature of an information in *quo warranto* to forfeit the charter of a corporation for a misuse, abuse, usurpation or perversion of franchise, even though the acts constituting such misuse or usurpation of franchise may violate statutory laws of the State for which other penalties are imposed.   A violation of section 8978 constitutes an abuse of franchise and the basis of an action of forfeiture.   Since this jurisdiction exists by virtue of the Constitution, it is beyond the power of the Legislature to impose penalties for a violation of its statutory enactments, which shall exclude the jurisdiction of the Supreme Court to revoke the charter of a corporation when an essential contract between the State and the corporation has been violated.   State ex inf. v. Equitable Loan & Inv. Assn., 142 Mo. 325; State ex inf. v. Delmar Jockey Club, supra; State ex inf. v. Armour Pack. Co., 173 Mo. 356. This is not a criminal proceeding, and there is no misjoinder of parties.   State ex inf. v. Equitable Loan & Inv. Assn., supra; State ex inf. v. Delmar Jockey Club, supra.   The misuse, abuse and usurpation of franchise on the part of the respondents consist in their joint or combined acts and offendings, and as the ''pleadings and procedure are subject to the rules applicable in strictly civil causes,'' a joinder of those jointly offending is proper.   State v. Kupferle, 44 Mo.

154. Under the provisions of the Code, Secs. 598 and 602, R. S. 1899, misjoinder of parties is waived unless raised by demurrer. Bensieck v. Cook, 110 Mo. 173. This is the general law and applies with equal force to proceedings in *quo warranto,* which are governed by the rules relating to pleadings in civil cases. 15 Ency. Pl. & Pr., 763, 764. (2) The second proposition urged by counsel for the respondents relates to the construction and constitutionality of the Anti-Trust Laws of the State and particularly as to whether the provisions of section 8966, prohibiting combinations and agreements "designed or made with a view to lessen or which tend to lessen" competition, is a constitutional exercise of the police power of the State. These propositions are as thoroughly established by the decisions of this court against the contention of the respondents as is the question of jurisdiction just considered. State ex inf. v. Firemen's Fund Ins. Co., 152 Mo. 1; State ex rel. v. Brew. Co., 104 Tenn. 715; Waters-Pierce Oil Co. v. State, 19 Tex. Civ. App. 1; State ex inf. v. Cont. Tob. Co., 177 Mo. 1; U. S. v. Northern Securities Co., 193 U. S. 197; State ex inf. v. Standard Oil Co., 194 Mo. 148; Jacobson v. Mass., 197 U. S. 38; Heim Brew. Co. v. Belinder, 97 Mo. App. 64; U. S. v. Joint Traffic Assn., 171 U. S. 505; U. S. v. Mo. Freight Assn., 166 U. S. 209. Our anti-trust laws are declaratory and in aid of the common law. State v. Williams, 8 Tex. 265; State ex inf. v. Standard Oil Co., 194 Mo. 124; U. S. v. Traffic Assn., 166 U. S. 290; Brewery Co. v. Belinder, 97 Mo. App. 64. (3) It is contended by counsel for respondents that the sufficiency of this information should be tested by the rules applicable to a criminal indictment. Counsel for the respondents have cited no authorities in support of this contention for the sufficient reason that the authorities are to the contrary. While a proceeding by information in the nature of a *quo warranto* was at one time a criminal proceeding, it was regarded as a civil proceeding long prior to

the fourth year of James I, the period of the common law which is in force in this State. State ex rel. v. Loan Co., 142 Mo. 325; State ex inf. v. Delmar Jockey Club, 200 Mo. 34. It is only necessary, in a proceeding to forfeit the charter of a corporation by reason of a misuse or abuse of franchise, that the information should "set forth with reasonable certainty" the charge upon which the forfeiture is asked. 2 Spelling on Extra. Legal Remedies, secs. 1851, 1853, 1855; City of Dallas v. State, 74 Tex. 371; People v. Railroad, 12 Mich. 389; U. S. v. Gardner, 42 Fed. 831; 4 Ency. Pl. & Pr., 713; Com. v. Eastman, 1 Cush. 190; State v. Parker, 43 N. H. 84; People v. Saunders, 25 Mich. 119; Hazen v. Commonwealth, 23 Pa. St. 363; Landringham v. State, 49 Ind. 186; Hazen v. Com., 23 Pa. St. 364; Cole v. People, 84 Ill. 216. And where the combination is for a purpose which is unlawful at common law, the purpose of the combination may be set out in such manner as to show that it is unlawful. Rex v. Ecckles, 3 Doug. 337; Rex v. Parnell, 14 C. C. C. 508; King v. Gill, 2 B. & A. 204; Pettibone v. United States, 148 U. S. 197; U. S. v. Gardner, 42 Fed. 829; State v. Crowley, 41 Wis. 271; State v. Brady, 107 N. C. 822; Hazen v. Com., 23 Pa. St. 355; Com. v. Shedd, 7 Cush. 514; State v. Kreach, 40 Vt. 113; State v. Ripley, 31 Me. 386; Com. v. Eastman, 1 Cush. 189; Alderman v. People, 4 Mich. 414; Lambert v. People, 9 Cowen 578; State v. Loser, 104 N. W. 337. (4) In the discussion of the law and the facts in this case, counsel for the respondents undertake to separate each part of the combination and trust, and each method or plan of doing business in furtherance thereof, from each other. Then they proceed to a consideration of the legality of each part and phase of the combination, and each of the different acts, agreements and things done in furtherance thereof for the purpose of showing the legality of the same when considered separate and distinct from each other. This, we contend, is unwarranted and un-

fair. The combination is alleged to exist for the purpose of regulating, controlling, fixing and maintaining prices, of controlling and limiting trade, of controlling, limiting and preventing competition, of deceiving and misleading the public into the belief that respondents were competing corporations, when they were not. The information alleges the existence of but one combination and understanding. Counsel for the respondents undertake to discuss the question upon the theory that a different combination is alleged for each of the purposes therein disclosed. Following this line of argument, counsel for the respondents discuss the division of trade territory, the purchase and sale of oil, the part played by the Republic Oil Company, the giving of rebates and other methods of competition and the common ownership of stock as if they were separate and distinct from each other. This, we also contend, is unwarranted and unfair. The charge as to the existence of the combination and the purposes for which it was formed, the understandings and agreements, and the acts and things done in furtherance thereof, and that contribute to promote its effectiveness, must all be considered together in determining whether the combination and trust has been proved to exist. State ex inf. v. Firemen's Fund Ins. Co., 152 Mo. 1; State ex inf. v. Armour Packing Co., 173 Mo. 356. The evidence shows that there was a combination to fix and maintain prices. 1. The denials of the managing officers of those companies that there was a combination or understanding for this purpose, are not to be accepted in the face of the actual fact that such a result was accomplished and that the power existed at all times by reason of the combination and trust among respondents to regulate, fix, control and maintain prices. The potential power of the combination to accomplish such a result is condemned and prohibited by the law to the same extent as the actual accomplishment of such a result. State ex. inf. v. Insurance Co., 152

Mo. 1; State ex inf. v. Packing Co., 173 Mo. 356; Finck v. Granite Co., 187 Mo. 244. 2. There was a combination to control and limit trade. That which results in a control and limitation upon competition also controls and limits trade. Heim Brew. Co. v. Belinder, 97 Mo. App. 76. 3. The combination limited and prohibited competition. The fact that the Republic Oil Company, as is conceded by counsel for the respondents, did not compete with either the Standard Oil Company or the Waters-Pierce Oil Company, necessarily prevented competition among the respondents in the sale of oil in this State. That this was the result of the combination goes without saying. The deception practiced upon the public by the relation existing between these companies also tended to control, limit and prevent competition. The purchase by the Waters-Pierce and the Republic of the oil that they sold from the Standard Oil interests also tended to control, limit or prevent competition in the purchase and sale of oil. The common stock ownership and common control of the business of these three respondents necessarily tended to control, limit and prevent competition. The motive for competition thereby ceased to exist. 4. It was unlawful for respondents to pretend to be competitors when they were not. U. S. v. Standard Oil Co., supra. 5. The giving of rebates was a part of the plan and purpose of the combination. Bishop's Crim. Law, sec. 230. 6. The territorial division. Chicago Gas Light Co. v. People's Gas Light Co., 121 Ill. 530; State v. Portland Natural Gas Co., 153 Ind. 483; Phillips v. Cement Co., 125 Fed. 594; Hopkins v. United States, 171 U. S. 592; Anderson v. United States, 171 U. S. 616. 7. The ownership of a controlling interest in the stock of respondents by the Standard Oil Company of New Jersey. State v. Oil Co., 49 Ohio St. 137; State ex inf. v. Jockey Club, 200 Mo. 34; 1 Morawetz on Corp., secs. 1, 227, 231; Taylor on Priv. Corp., secs. 49, 51. Counsel for the respondents contend that while

the ownership of a controlling interest in the stock of
the three respondents by the Standard Oil Company of
New Jersey gave to it the power to control the conduct
of their affairs, yet that such stock ownership was not
unlawful. Plainly the power of control of three com-
panies that might otherwise be competing interests
necessarily "tends to lessen competition," and such a
tendency is as much within the condemnation of our
statute and decisions as is the result itself. Sec. 8966,
R. S. 1899; State ex inf. v. Insurance Co., 152 Mo. 1;
State ex inf. v. Packing Co., 173 Mo. 356; Finck v.
Granite Co., 187 Mo. 244. The Standard Oil Company
of New Jersey, being engaged in the business of refin-
ing and selling the products of petroleum, did not have
the right to own any stock, much less all the stock, of
the Republic Oil Company, a corporation engaged in
the business of refining and selling products of petrol-
eum. State ex rel. v. Bank, 197 Mo. 600; Goodland v.
Bank, 74 Mo. App. 367; Hotel Co. v. Furniture Co., 73
Mo. App. 135; Ollesheimer v. Thompson Mfg. Co., 44
Mo. App. 185. And the fact that the Standard Oil Com-
pany of New Jersey was authorized to own stock in
other companies, did not make it lawful for it to do so
in this State or make it lawful for a corporation in this
State to have its stock owned by this New Jersey Com-
pany. Lead Co. v. Paint Co., 80 Mo. App. 247. The
Standard Oil Company of New Jersey not only own-
ed a controlling interest in the stock of the Republic
Oil Company, but also owned a controlling interest in
the stock of the Waters-Pierce Oil Company and the
Standard Oil Company of Indiana, all of which but for
that common ownership would have been independent
and competing companies. Noyes on Intercorporate
Relations, sec. 292; Railroad v. Kentucky, 161 U. S.
698; McCutcheon v. Capsule Co., 71 Fed. 787; Railroad
v. Collins, 40 Ga. 582; People v. Chicago Gas Trust, 130
Ill. 268; Hardin v. Am. Glucose Co., 182 Ill. 615; Dis-
tilling Co. v. People, 156 Ill. 448; Northern Securities

Case, 120 Fed. 725. That the ownership of a majority of the stock of two or more corporations by another corporation constitutes control when the inquiry is whether a combination or trust has been formed to prevent competition, is clearly the doctrine of the cases heretofore cited, and is clearly announced in: Farmer's Loan & Trust Co. v. Railroad, 150 N.Y.410; Pearsall v. Railroad, 161 U. S. 646; United States v. Northern Securities Co., 193 U. S. 327.

## STATEMENT.

WOODSON, J.—This is an original proceeding in the nature of *quo warranto,* instituted in this court on March 29, 1905, by the Attorney-General, to forfeit the charter of the Waters-Pierce Oil Company, which will hereafter be called the Waters-Pierce Company, and to revoke the licenses to do business in this State of the Standard Oil Company of Indiana, which will hereafter be called the Indiana Company, and that of the Republic Oil Company of New York, which will hereafter be styled the Republic Company; and to enjoin and prohibit all of them from doing business in this State, on the ground that they have forfeited their charters and licenses to do business in this State by the exercise and usurpation of powers not granted or authorized thereby, in that they have formed and entered into a pool, trust, combination or conspiracy in restraint of trade and against the laws of the State, known as the anti-trust statutes.

Respondents vigorously contend that the information does not state facts sufficient to constitute a cause of action against them; and that the evidence disclosed by the record fails to establish the charges contained in the information.

Those contentions necessarily call for a consideration of the pleadings, and an extensive review of the

.evidence, which covers three thousand pages of printed matter.

Omitting the formal parts, the information, answers and reply are as follows:

"Comes now Herbert S. Hadley, Attorney-General of the State of Missouri, who prosecutes this suit in behalf of the State of Missouri, and causes the court to understand and be informed that the Standard Oil Company, one of the respondents herein, is now, and at all times mentioned herein was, a corporation duly organized and existing under and by virtue of the laws of the State of Indiana, for the purpose of engaging in the business of refining petroleum and buying and selling the products thereof; that it is now, and at all times herein mentioned was, authorized to do business in the State of Missouri, having complied with the laws of this State authorizing and permitting foreign corporations to do business herein; and at all times herein mentioned was engaged in the business of selling naphtha, benzine, gasoline, kerosene, lubricating oil and other products of petroleum in the State of Missouri, and that recently it has established, and is now conducting, a refinery in this State, for the purpose of refining petroleum; that the Republic Oil Company is a corporation duly organized and existing under and by virtue of the laws of the State of New York, for the purpose of carrying on the business of refining petroleum and buying and selling the products thereof, and is now, and at all times herein mentioned was, authorized to do business in the State of Missouri, having complied with the laws of this State authorizing foreign corporations to do business in this State; and at all times herein mentioned was engaged in the business of buying and selling the products of petroleum in certain parts of the State of Missouri; that the Waters-Pierce Oil Company is now, and at all times herein mentioned was, a corporation duly organized

under and by virtue of the laws of the State of Missouri
for the purpose of refining petroleum and buying and
selling the products thereof, and at all times herein
mentioned was engaged in the business of buying and
selling the products of petroleum in certain parts of
the State of Missouri.

"Your informant further informs the court that
the said Standard Oil Company, Republic Oil Com-
pany and the Waters-Pierce Oil Company, between the
—— —— day of —— —— —, 1901, and the 29th day of March,
1905, created, entered into and became members of a
pool, trust, agreement, confederation, combination and
understanding among themselves, and each other, to
regulate, fix and control the prices to be paid by retail
dealers and others in the State of Missouri for naphtha,
benzine, gasoline, kerosene, lubricating oil and other
products of petroleum offered for sale or sold in the
State of Missouri, and to control and limit the trade in
naphtha, benzine, gasoline, kerosene, lubricating oil
and other products of petroleum in the State of Mis-
souri; and to control, limit and prevent competition
in said business of buying and selling naphtha, benzine,
gasoline, kerosene, lubricating oil and other products
of petroleum in the State of Missouri, between them-
selves and others engaged in like business, and to de-
ceive and mislead the public into the belief that said
respondents were separate and distinct corporations,
each pursuing an independent business as legitimate
competitors in the purchase and sale of said products
of petroleum; and that said respondents have by said
pool, trust, agreement, confederation, combination and
understanding, fixed and maintained the price of naph-
tha, benzine, gasoline, kerosene, lubricating oil and
other products of petroleum sold and offered for sale
by them in this State, and have controlled and limited
the trade in said products in this State, and have pre-
vented and destroyed competition in the purchase and

sale of said products of petroleum in the State of Missouri, and have deceived and misled the public into the belief that they, the said respondents, were separate and distinct corporations, each pursuing an independent business as legitimate competitors, when, in fact, the said respondents, had entered into and were members of said pool, trust, agreement, confederation, combination and understanding, all to the great detriment and damage of the purchasing public and the people of Missouri.

"And your informant further states that in the pursuance of said pool, trust, agreement, confederation, combination and understanding so entered into by said respondents as aforesaid, for the accomplishment of the objects and purposes aforesaid, the territory of the State of Missouri has, by said respondents, been divided up between the Standard Oil Company and the Waters-Pierce Oil Company; and that the said Standard Oil Company, according to said agreement so entered into by said respondents, as aforesaid, has agreed not to sell, and does not sell, said products of petroleum in the State of Missouri in a territory therein lying for the most part south of the Missouri river, which said territory is, by said agreement, assigned to said Waters-Pierce Oil Company; and that said Waters-Pierce Oil Company, according to said combination, confederation, agreement and understanding as aforesaid, has agreed not to sell, and does not sell, any of said products of petroleum in certain territory in the State of Missouri lying mostly north of the Missouri river, which said territory is, by said agreement, assigned to Standard Oil Company; that the said Republic Oil Company, according to said combination, confederation, agreement and understanding, so had by respondents as aforesaid, sells oil in different parts of the State of Missouri, in territory in which, by said agreement, the Standard Oil Company does not sell,

and in which, by said agreement, the Waters-Pierce Oil Company does not sell, but that the purpose and object accomplished under said agreement through the sale of oil by the said Republic Oil Company is to supply oil to such retail dealers therein, and others, who by reason of prejudice against said Waters-Pierce Oil Company or said Standard Oil Company, or from other reasons, refuse to trade with either of said respondents in their respective territories; and the further object accomplished by said Republic Oil Company, under said agreement, confederation, combination and understanding so had by respondents as aforesaid, in selling oil in each of said territories, is to enable said respondents, in the accomplishment of the purpose of said pool, trust, agreement, confederation, combination and understanding, to crush out competitors in the sale of the products of petroleum by temporarily reducing the price thereof through sales made by said Republic Oil Company.

"But your informant further states that no actual competition exists in the sale of said products of petroleum, between said Republic Oil Company and the Standard Oil Company in that territory in the State of Missouri assigned to said Standard Oil Company, according to said agreement, confederation, and understanding, and that no actual competition exists in the sale of said products of petroleum between said Republic Oil Company and the Waters-Pierce Oil Company in that territory in the State of Missouri assigned to said Waters-Pierce Oil Company, according to said combination, confederation and agreement.

"Your informant further informs the court that each and all of said respondents appear to the public in this State as separate and distinct corporations, pretending to pursue an independent business as legitimate competitors in the purchase and sale of such products of petroleum, when, in fact, there exists said secret agreement, combination, pool, trust and under-

standing by and between said respondents by which they control the price of said products of petroleum sold in the State of Missouri and prevent competition in the price thereof among themselves and crush out and destroy competition from others; and that said respondents, under and by virtue of said pool, trust, combination, agreement and understanding, so maintained and entered into by them, deceive and mislead the public, and are deceiving and misleading the public into the belief that they are separate and distinct corporations pursuing an independent business as legitimate competitors.

"Your informant further causes the court to be informed and to understand that the said Standard Oil Company is engaged in the business of refining petroleum, and has, at Whiting, Indiana, and near Kansas City, Missouri, and at other points, large oil refineries wherein said products of petroleum hereinbefore mentioned are made and produced from the refining of petroleum; that by virtue of the understanding, combination, confederation and agreement so made and entered into by said respondents as aforesaid, and in addition to the other objects and purposes thereof, and in addition to the other acts of said respondents done in compliance therewith and in the enforcement thereof, said Standard Oil Company has agreed to sell, and sells said products of petroleum in the State of Missouri only to the Waters-Pierce Oil Company and the Republic Oil Company and through itself, and the said Waters-Pierce Oil Company and Republic Oil Company have, by said agreement, agreed to buy, and do buy, said products of petroleum only of the Standard Oil Company.

"Your informant further states that said respondents herein, by reason of said combination, pool, trust and understanding, and the acts done in furtherance and in pursuance thereof, as herein stated, have been able to control and supply, and do control and supply,

to the retail dealers and to the general public in the State of Missouri, from eighty-five to ninety per cent of all the naphtha, benzine, gasoline, kerosene, lubricating oil and other products of petroleum offered for sale and sold for general consumption in the State of Missouri; and that by virtue of said pool, trust, agreement, combination, confederation and understanding so entered into by said respondents as aforesaid, and by reason of the acts herein before described, so done by said respondents in pursuance of and in the enforcement of said pool, trust, agreement and understanding, they have been able to control, and do control, the prices of the products of petroleum in the State of Missouri, and they do prevent, and have prevented competition among themselves in the purchase and sale of the products of petroleum in the State of Missouri; they have secured control of the oil business and of the purchase and sale of oil in the State of Missouri and have limited the trade therein and have driven out competition in said business, and that said combination, confederation, pool, trust and understanding so entered into and maintained by said respondents as aforesaid, and said acts and methods done and performed by said respondents in pursuance and in furtherance thereof, have deprived, and do deprive, the public of free, full and wholesome competition in the sale of the products of petroleum, to the great damage and detriment of the purchasing public and the people of Missouri.

"Informant further states that by reason of the monopoly and control of the oil business in the State of Missouri so had and maintained by said respondents as aforesaid, and the prevention of competition in the purchase and sale of said products of petroleum as aforesaid, in the manner and by the means aforesaid, and by reason of the deception so accomplished by said respondents upon the general public whereby it is caused to believe that said respondents are independ-

ent corporations engaged in a competitive business, and by reason of the acts of said respondents, as herein stated, said respondents are now wilfully and unlawfully maintaining an illegal agreement, combination, pool, trust and understanding, and are now unlawfully and illegally fixing and controlling the prices, in the manner aforesaid, for the products of petroleum sold in the State of Missouri; and by reason of the premises, said respondents have since the — day of ———, 1901, and up to the present time, grossly offended against the laws of this State and wilfully and flagrantly abused and misused their rights, authority and franchises, and have wilfully and unlawfully assumed and unlawfully and wilfully usurped authorities and privileges not granted to said corporations by the laws of Missouri, by entering into and becoming a member of said trust, combination, confederation, agreement and understanding as aforesaid; and in pursuance of the aforesaid agreement, combination, trust, confederation and understanding so made and maintained as aforesaid, respondents are now, in the State of Missouri, unlawfully and wilfully, monopolizing, regulating, fixing, maintining and controlling the price to be paid by retail dealers and others in the State of Missouri for the said products of petroleum, and unlawfully limiting the trade and competition in the purchase and sale of said products of petroleum, and are now unlawfully and wilfully deceiving and misleading the retail dealers in said products of petroleum and the general public into the belief that said respondents are independent or competing corporations, and that the acts and agreements of the respondent corporations, as herein set forth, constitute a wilful and malicious perversion of the franchise granted to said corporations by the State of Missouri, and an illegal and wilful usurpation of privileges and authorities not granted to said

respondents by the State of Missouri, to the great and permanent injury of the public.

"Wherefore, your Informant, prosecuting in this behalf for the State of Missouri, prays that the respondent corporations, and each of them severally, be excluded from all corporate rights and privileges under the laws of the State of Missouri, and that their franchises, rights, authority, license and certificate to do business under the laws of the State of Missouri be declared forfeited, and that each and all of them be ousted from their several corporate franchises, privileges, license and authority to do business under the laws of this State."

Afterwards, to-wit, on the 11th of April, 1905, the respondent Standard Oil Company filed its separate answer and return to said order to show cause, which, omitting caption, is as follows:

"Now comes said respondent and, for answer and return to the information of the Attorney-General in the above entitled cause, avers:

"1. The Standard Oil Company of Indiana, one of the respondents herein, is now and was at all times herein, a corporation duly organized and existing under and by virtue of the laws of the State of Indiana, for the purpose, among others, of engaging in the business of refining petroleum, and buying and selling the products thereof; and is now, and at all times mentioned in the information was, authorized to do business in Missouri, having complied with the laws of the State authorizing and permitting foreign corporations to do business therein, and having a license from the State authorities so to do; it was at all the times mentioned in the information engaged in the business of selling naphtha, benzine, gasoline, kerosene, lubricating oil and other products of petroleum in the State of Missouri, and was, by its articles of incorporation and  the license and authority aforesaid, authorized so to do; it recently established and is now conducting

a refinery in Jackson county, Missouri, for the purpose of refining petroleum, having expended many thousands of dollars in the construction thereof.

"The Republic Oil Company is a corporation duly organized and existing under and by virtue of the laws of the State of New York, for the purpose, among others, of carrying on the business of refining petroleum and buying and selling the products thereof, and is now, and at all times mentioned in the information was, authorized to do business in this State, having complied with its laws authorizing foreign corporations to do business therein, and having obtained and now holding a license from the proper authorities of the State for such purposes; at all times herein mentioned it was engaged in the business of buying and selling the products of petroleum in this State, as it was authorized to do by its articles of incorporation, by the laws of the State, and by the license aforesaid.

"The Waters-Pierce Oil Company is now, and all the times mentioned in the information was, a corporation duly organized and existing under and by virtue of the laws of the State of Missouri, for the purpose, among others, of refining petroleum, and buying and selling the products thereof; and at all the times herein mentioned was engaged in buying and selling the products of petroleum in Missouri.

"Each and every other allegation and averment in the information is denied.

"The respondent never made or entered into any agreement, confederation, combination, pool or understanding with the other respondents, or either of them, of any kind or character. It did not at any time create, enter into or become a member of any pool, trust, agreement, confederation, combination, pool or understanding with the other respondents, or either of them, of any kind or character. It did not at any time create, enter into or become a member of any pool, trust, agreement, confederation, combination or understand-

ing, with either or any of the other respondents to regulate, fix or control the price to be paid by retail dealers or others in Missouri for naphtha, benzine, gasoline, kerosene, lubricating oil or any or either of them or any other product of petroleum in Missouri, or to control or limit the trade in naphtha, benzine, gasoline, kerosene, lubricating oil, or any or either of them, or any other product of petroleum in Missouri, or to control, limit or prevent competition in said business of buying or selling naphtha, benzine, gasoline, kerosene, lubricating oil, or any or either of them, or any other product of petroleum in Missouri between the respondents or others engaged in like business, or deceive or mislead the public into any false belief as to respondents being separate or distinct corporations; each pursuing an independent business as legitimate competitor in the purchase or sale of said products of petroleum. This respondent has not, by any pool, trust, agreement, confederation, combination or understanding with the other respondents, or either of them, fixed or maintained the prices of naphtha, benzine, gasoline, kerosene or lubricating oil, or any or either of them, or any other product of petroleum sold or offered for sale by it, or either of them, in this State, nor controlled or limited the trade of said products in this State, nor prevented or destroyed competition in the purchase or sale of said products, or any or either of them, in this State, nor deceived or misled the public into any false belief as to respondents being separate and distinct corporations, or pursuing an independent business as legitimate competitors; and never has this respondent, with either of the other respondents, entered into or become a member of any pool, trust, agreement, confederation, combination or understanding.

"This respondent has not, in pursuance of any pool, trust, agreement, confederation, combination or

understanding, entered into with either of the other respondents for the accomplishment of any object or purpose, divided the territory of the State of Missouri between the Standard Oil Company and the Waters-Pierce Oil Company. The Standard Oil Company has not, according to any agreement entered into by respondents, agreed not to sell, or does not sell any of said products in this State in a territory therein lying for the most part south of the Missouri river, nor is such territory, by any agreement, assigned to respondent, the Waters-Pierce Oil Company; nor has the Waters-Pierce Oil Company, according to any combination, agreement, confederation or understanding, agreed not to sell, and does not sell any of said products in certain territory in Missouri, lying mostly north of the Missouri river, nor is any such territory, by any agreement, assigned to the Standard Oil Company. It is not true that the Republic Oil Company, according to any combination, confederation, agreement or understanding, had by the respondents, or any of them, sells oil in different parts of the State in territory in which, by any agreement, the Standard Oil Company does not sell and in which, by any agreement, the Waters-Pierce Oil Company does not sell.

"It is not true that the purpose or object accomplished by any agreement or otherwise through the sale of oil by the Republic Oil Company is to supply oil to such retail dealers in the State, or others who, by reason of prejudice or otherwise, against the Waters-Pierce Oil Company, or the Standard Oil Company, or for any other reason, refuse to trade with either of said respondents in said alleged territory or territories. It is not true that the Republic Oil Company accomplishes the object under any agreement, confederation, combination or understanding in selling oil in either of the alleged territories aforesaid so as to enable the other respondent in the accomplishment of the purposes of any pool, trust, agreement, confedera-

tion or understanding, to crush out competitors in the sale of petroleum, by temporarily reducing the price thereof through sales made by the said Republic Oil Company, or otherwise.

"It is not true that no actual competition exists in the sale of the products of petroleum between the Republic Oil Company and the Standard Oil Company in any territory in the State of Missouri, or according to any agreement, confederation or understanding; and it is not true that no actual competition exists in the sale of products of petroleum between the said Republic Oil Company and the Waters-Pierce Oil Company in any of said alleged territory, or according to any combination, confederation or agreement.

"It is true that each and all of said respondents are separate, and distinct corporations, but it is not true that either makes any false pretenses to pursuing an independent business as legitimate competitors in the purchase or sale of said products, nor that there in fact exists any secret agreement, combination, pool, trust or understanding by or between the said respondents, or either of them, by which they control the prices of the products of petroleum sold in Missouri, or prevent competition in the prices thereof among themselves, or crush out or destroy competition from others.

"It is not true that respondents, or either of them, under and by virtue of any pool, trust, combination, agreement or understanding, maintained or entered into by them, deceive and mislead the public, or are deceiving or misleading the public into the belief that they are separate and distinct corporations pursuing an independent business as legitimate competitors when they are not such in fact.

"It is true that said Standard Oil Company of Indiana is engaged in the business of refining petroleum, and has, at Whiting, Indiana, and near Kansas City, Missouri, large oil refineries wherein said pro-

ducts of petroleum are made and produced from the refining of petroleum; but it is not true that by virtue of any understanding, combination, confederation, or agreement made or entered into by respondents, or any of them, or in addition to other objects or purposes, or in addition to any other act of any respondent done in compliance with any such combination, understanding, confederation or agreement, or in the enforcement thereof, that the Standard Oil Company has agreed to sell, or sells said products of petroleum in the State of Missouri, only to the Waters-Pierce Oil Company and to the Republic Oil Company and through itself, or that said Waters-Pierce Oil Company or the Republic Oil Company has, by any such agreement, agreed to buy, or does buy said products of petroleum only from the Standard Oil Company.

"It is not true that respondents, or either of them, by reason of any combination, pool, trust, or understanding, or any acts done in furtherance or in pursuance of any combination, pool, trust or understanding, have been able to control the supply, or do control and supply to the retail dealers and to the general public in the State from eighty-five to ninety per cent, or any other per cent of all the naphtha, benzine, gasoline, kerosene, lubricating oil, or other products of petroleum offered for sale or sold for general consumption in the State.

"It is not true that by virtue of any pool, trust, agreement, combination, confederation or understanding entered into by respondents, or by reason of the acts done by them in pursuance or in the enforcement of any pool, trust, agreement or understanding, that respondents, or either of them, have been able to control, or do control the prices of the products of petroleum in the State, or that they do prevent or have prevented competition among themselves in the purchase or sale of the products of petroleum in Missouri, or that they have secured control of the oil business, or

of the purchase or sale of oil in the State, or have limited the trade therein, or have driven out competition in said business.

"It is not true that any combination, confederation, pool, trust or understanding has been entered into or maintained by respondents, or either of them, or that any acts or methods done or performed by them, or either of them, have deprived or do deprive the public of free, full or wholesome competition in the sale of the products of petroleum.

"It is not true that any damage or detriment has occurred or is occurring to the purchasing public or the people of Missouri by any act of the respondents, or either of them. It is not true that by reason of any monopoly or control of the oil business in Missouri, or by the prevention of competition in the purchase or sale of the products of petroleum, or by reason of any deception accomplished by respondents or otherwise, the said respondents, or either of them, are now wilfully or unlawfully or otherwise maintaining any illegal agreement, combination, pool, trust or understanding, or are now unlawfully or illegally fixing or controlling the prices of the products of petroleum sold in the State. It is not true that respondents or either of them have, since the —— day of ——, 1901, and up to the present time, or at any time grossly or otherwise offended against the laws of this State, or wilfully or flagrantly or otherwise abused or misused their rights, authority or franchises, or have wilfully or unlawfully or otherwise assumed, or unlawfully, wilfully or otherwise usurped authorities or privileges not granted to corporations by the laws of Missouri, by entering into or becoming a member of any trust, combination, confederation, agreement or understanding. It is not true that in pursuance of any agreement, combination, trust, confederation or understanding made or maintained, the respondents are

now in this State unlawfully, wilfully or otherwise monopolizing, regulating, fixing, maintaining or controlling the prices to be paid by retail dealers or others in the State of Missouri for the said products of petroleum, or unlawfully limiting the trade or competition in the purchase or sale of such products, or unlawfully, wilfully or otherwise deceiving or misleading the retail dealers in such products, or the general public into any false belief of any kind. It is not true that any act or agreement of the respondents constitutes a wilful, malicious or other perversion of the franchise granted to respondents by this State, or an illegal, wilful or other usurpation of privileges or authorities not granted to respondents by the State, and it is not true that there is or has been, by any act of respondents, any injury to the public.

"Wherefore, respondent asks to be dismissed with costs."

And on the same day, the respondent Republic Oil Company filed its separate answer and return in response to said order to show cause which, omitting the caption, is as follows:

"Now comes said respondent and, for answer and return to the information of the Attorney-General in the above entitled cause, avers:

"1.   The Standard Oil Company of Indiana, one of the respondents herein, is now and was at all times herein, a corporation duly organized and existing under and by virtue of the laws of the State of Indiana, for the purpose, among others, of engaging in the business of refining petroleum, and buying and selling the products thereof; and is now, and at all the times mentioned in the information was authorized to do business in Missouri, having complied with the laws of the State authorizing and permitting foreign corporations to do business therein, and having a license from the State authorities so to do; it was at all the times mentioned in the information engaged in the business

of selling naphtha, benzine, gasoline, kerosene, lubricating oil and other products of petroleum in the State of Missouri, and was, by its articles of incorporation and the license and authority aforesaid, authorized so to do; it recently established and is now conducting a refinery in Jackson county, Missouri, for the purpose of refining petroleum, having expended many thousands of dollars in the construction thereof.

"The Republic Oil Company is a corporation duly organized and existing under and by virtue of the laws of the State of New York, for the purpose, among others, of carrying on the business of refining petroleum and buying and selling the products thereof, and is now, and at all times mentioned in the information was authorized to do business in this State, having complied with its laws authorizing foreign corporations to do business therein, and having obtained and now holding a license from the proper authorities of the State for such purposes; at all times herein mentioned it was engaged in the business of buying and selling the products of petroleum in this State, as it was authorized to do by its articles of incorporation, by the laws of the State, and by the license aforesaid.

"The Waters-Pierce Oil Company is now, and at all times mentioned in the information, was a corporation duly organized and existing under and by virtue of the laws of the State of Missouri, for the purpose, among others; of refining petroleum, and buying and selling the products thereof; and at all the times therein mentioned was engaged in buying and selling the products of petroleum in Missouri.

"Each and every other allegation and averment in the information is denied.

"This respondent never made or entered into any agreement, confederation, combination, pool or understanding with the other respondents, or either of them, of any kind or character. It did not at any time create, enter into or become a member of any pool, trust,

agreement, confederation, combination or understanding with either or any of the other respondents to regulate, fix or control the price to be paid by retail dealers or others in Missouri for naphtha, benzine, gasoline, kerosene, lubricating oil, or any or either of them, or any other product of petroleum in Missouri, or to control or limit the trade in naphtha, benzine, gasoline, kerosene, lubricating oil, or any or either of them, or any other product of petroleum in Missouri, or to control, limit or prevent competition in said business of buying and selling naphtha, benzine, gasoline, kerosene, lubricating oil, or any or either of them, or any other product of petroleum in Missouri between the respondents or others engaged in like business, or deceive or mislead the public into any false belief as to respondents being separate or distinct corporations; each pursuing an independent business as legitimate competitor in the purchase or sale of said products of petroleum. This respondent has not, by any pool, trust, agreement, confederation, combination or understanding with the other respondents, or either of them, fixed or maintained the prices of naptha, benzine, gasoline, kerosene or lubricating oil, or any or either of them, or any other product of petroleum, sold or offered for sale by it, or either of them, in this State, nor controlled or limited the trade of said products in this State; nor prevented or destroyed competition in the purchase or sale of said products, or any or either of them, in this State, nor deceived or misled the public into any false belief as to respondents being separate and distinct corporations, or pursuing an independent business as legitimate competitors; and never has this respondent, with either of the other respondents, entered into or become a member of any pool, trust, agreement, confederation, combination or understanding.

"This respondent has not, in pursuance of any pool, trust, agreement, confederation, combination or

understanding, entered into with either of the other respondents for the accomplishment of any object or purpose, divided the territory of the State of Missouri between the Standard Oil Company and the Waters-Pierce Oil Company. The Standard Oil Company has not, according to any agreement entered into by respondents, agreed not to sell, or does not sell, any of said products in this State, in a territory therein lying for the most part south of the Missouri river, nor is any such territory by any agreement assigned to respondent, the Waters-Pierce Oil Company; nor has the Waters-Pierce Oil Company, according to any combination, agreement, confederation or understanding, agreed not to sell, and does not sell, any of said products in certain territory in Missouri, lying mostly north of the Missouri river, nor is any such territory, by any agreement, assigned to the Standard Oil Company. It is not true that the Republic Oil Company, according to any combination, confederation, agreement or understanding, had by the respondents, or any of them, sells oil in different parts of the State in territory in which, by any agreement, the Standard Oil Company does not sell and in which, by any agreement, the Waters-Pierce Oil Company does not sell.

"It is not true that the purpose or object accomplished by any agreeement or otherwise through the sale of oil by the Republic Oil Company is to supply oil to such retail dealers in the State, or others who, by reason of prejudice or otherwise, against the Waters-Pierce Oil Company, or the Standard Oil Company, or for any other reason, refuse to trade with either of said respondents in said alleged territory or territories. It is not true that the Republic Oil Company accomplishes the object under any agreement, confederation, combination or understanding in selling oil in either of the alleged territories aforesaid so as to enable the other respondents in the accomplishment of the purposes of any pool,

trust, agreement, confederation or understanding, to crush out competitors in the sale of petroleum, by temporarily reducing the price thereof through sales made by the said Republic Oil Company or otherwise.

"It is not true that no actual competition exists in the sale of the products of petroleum between the Republic Oil Company and the Standard Oil Company in any territory in the State of Missouri, or according to any agreement, confederation or understanding; and it is not true that no actual competition exists in the sale of products of petroleum between the said Republic Oil Company and the Waters-Pierce Oil Company in any of said alleged territory, or according to any combination, confederation or agreement.

"It is true that each and all of said respondents are separate and distinct corporations, but it is not true that either makes any false pretenses to pursuing an independent business as legitimate competitors in the purchase or sale of said products, nor that there in fact exists any secret agreement, combination, pool, trust or understanding by or between the said respondents, or either of them, by which they control the prices of the products of petroleum sold in Missouri, or prevent competition in the prices thereof among themselves, or crush out or destroy competition from others.

"It is not true that respondents, or either of them, under and by virtue of any pool, trust, combination, agreement or understanding, maintained or entered into by them, deceive and mislead the public, or are deceiving or misleading the public into the belief that they are separate and distinct corporations pursuing an independent business as legitimate competitors, when they are not such in fact.

"It is true that said Standard Oil Company of Indiana is engaged in the business of refining petroleum, and has, at Whiting, Indiana, and near Kansas City, Missouri, large oil refineries wherein said products of

petroleum are made and produced from the refining of petroleum; but it is not true that by virtue of any understanding, combination, confederation, or agreement made or entered into by respondents, or any of them, or in addition to other objects or purposes, or in addition to any other act of any respondent done in compliance with any such combination, understanding, confederation or agreement, or in the enforcement thereof, that the Standard Oil Company has agreed to sell, or sells said products of petroleum in the State of Missouri, only to the Waters-Pierce Oil Company and to the Republic Oil Company and through itself, or that said Waters-Pierce Oil Company or the Republic Oil Company has, by any such agreement, agreed to buy, or does buy said products of petroleum only from the Standard Oil Company.

"It is not true that respondents, or either of them, by reason of any combination, pool, trust or understanding, or any acts done in furtherance or in pursuance of any combination, pool, trust or understanding, have been able to control the supply, or do control and supply to the retail dealers and to the general public in the State from eighty-five to ninety per cent, or any other per cent, of all the naphtha, benzine, gasoline, kerosene, lubricating oil or other products of petroleum offered for sale or sold for general consumption in the State.

"It is not true that by virtue of any pool, trust, agreement, combination, confederation or understanding entered into by respondents, or by reason of any of the acts done by them in pursuance or in the enforcement of any pool, trust, agreement or understanding, that respondents, or either of them, have been able to control, or do control the prices of the products of petroleum in the State, or that they do prevent or have prevented competition among themselves in the purchase or sale of the products of petroleum in Missouri, or that they have secured control of the oil business,

or of the purchase or sale of the oil in the State, or have limited the trade therein, or have driven out competition in said business.

"It is not true that any combination, confederation, pool, trust or understanding has been entered into or maintained by respondents, or either of them, or that any acts or methods done or performed by them, or either of them, have deprived or do deprive the public of free, full or wholesome competition in the sale of the products of petroleum.

"It is not true that any damage or detriment has occurred or is occurring to the purchasing public or the people of Missouri by any act of the respondents, or either of them. It is not true that by reason of any monopoly or control of the oil business in Missouri, or by the prevention of competition in the purchase or sale of the products of petroleum, or by reason of any deception accomplished by respondents or otherwise that said respondents, or either of them, are now wilfully or unlawfully, or otherwise maintaining any illegal agreement, combination, pool, trust or understanding, or are now unlawfully or illegally fixing or controlling the prices of the products of petroleum sold in the State. It is not true that respondents, or either of them, have, since the — day of ——, 1901, and up to the present time, or at any time grossly or flagrantly or otherwise abused or misused their rights, authority or franchises, or have wilfully or unlawfully or otherwise assumed, or unlawfully, wilfully or otherwise usurped authorities or privileges not granted to corporations by the laws of Missouri by entering into or becoming a member of any trust, combination, confederation, agreement or understanding. It is not true that in pursuance of any agreement, combination, trust, confederation or understanding, made or maintained, the respondents are now in this State unlawfully, wilfully or otherwise monopolizing, regulating, fixing, maintaining or controlling the

prices to be paid by retail dealers or others in the State of Missouri for the said products of petroleum, or unlawfully limiting the trade or competition in the purchase or sale of such products, or unlawfully, wilfully or otherwise deceiving or misleading the retail dealers in such products, or the general public into any false belief of any kind. It is not true that any act or agreement of the respondents constitutes a wilful, malicious or other perversion of the franchises granted to respondents by this State, or an illegal, wilful or other usurpation of privileges or authorities not granted to respondent by the State, and it is not true that there is or has been, by any act of respondents, any injury to the public.

"Wherefore, respondent asks to be dismissed with costs."

After the conclusion of the testimony in this case, to-wit, on February 11, 1907, the respondents, the Standard Oil Company and the Republic Oil Company, filed a second amended answer, in which the following additional defenses were pleaded:

"2. The information herein is based upon the alleged violation of the provisions of each of sections 8965, 8966, 8967, 8968, 8971, 8972, 8978 of the Revised Statutes of Missouri of 1899, and seeks to enforce the provisions of each of said sections. Each of said sections is unconstitutional and void, for each of the following reasons:

"(a). It violates the fourteenth amendment to the Constitution of the United States, wherein it is provided that no State shall deprive any person of life, liberty or property without due process of law, nor to deny to any person within its jurisdiction equal protection of the laws, nor make or enforce any law which shall abridge the privileges and immunities of citizens of the United States.

"(b). It violates the provisions of section 8, article 1, of the Constitution of the United States, which

gives to Congress the power to regulate commerce with foreign nations and among the several States and Indian tribes, in which commerce respondent is engaged.

"(c). It violates section 10 of article 1 of the Constitution of the United States, which provides that no State shall pass any *ex post facto* law, or law impairing the obligations of contracts.

"(d). It violates section 4, article 2, of the Constitution of the State of Missouri, providing that all persons shall have a natural right to life, liberty and the enjoyment of the gains of their industry.

"(e). It violates the provisions of section 30, article 2, of the Constitution of the State of Missouri, providing that no person shall be deprived of life, liberty or property without due process of law.

"(f). It violates section 53 of article 4 of the Constitution of the State of Missouri, which forbids the Legislature from granting to any corporation, association or individual any special or exclusive right, privilege or immunity.

"(g). It prohibits all barter and commerce, by prohibiting any two or more persons from agreeing upon either the present or future price of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining or any article or thing whatsoever as between themselves, whether the same tends to the prejudice of the public interest or not, whether in restraint of trade, whether reasonable or unreasonable under the circumstances and limitations of such fixing of prices of said commodities, without regard to the relation of the parties to such agreement or their purposes, and in each of such respects violates each of the foregoing provisions of the State and Federal Constitutions.

"(h). It arbitrarily discriminates as between the vendors and purchasers of such articles, in that it prohibits two or more vendors from agreeing among

themselves to establish a reasonable price for such articles of merchandise, but does not prohibit the purchasers from agreeing to fix a price at which they may purchase said articles, and tends to assure, and does assure, to purchasers such prices as may be established by unhealthy and ruinous competition, but does not assure to the vendors protection or the right to protect themselves, by agreement or otherwise, against ruinous rates established either by unwholesome or unhealthy competition or the combination of purchasers, and in each of such respects violates each of the foregoing provisions of the State and Federal Constitutions.

"(i).  It grants special privileges to the buyers of products of the character mentioned therein, by combination or otherwise, while denying to the manufacturers or vendors of the same right to protect themselves against such combination, or assuring themselves of the means of realizing a reasonable profit for their capital, labor and skill, and in each of such respects it violates each of the foregoing provisions of the State and Federal Constitutions.

"(j).  It arbitrarily discriminates between different classes of products and between labor and capital, between different kinds of insurance companies, and between different kinds of insurance, and also between different classes of persons, and in each of such respects violates each of the foregoing provisions of the State and Federal Constitutions.

"(k).  It applies to commodities and not to labor and other matters which may be the subject of combination, and thereby discriminates arbitrarily.

"Wherefore this respondent asks to be dismissed with costs.

"3.  Respondent re-avers each and every allegation set forth in division 2 of this return, and further respectfully shows that the informant claims that under the laws of this State and the construction of the

statutes the respondent in a *quo warranto* proceeding cannot attack the constitutionality of an act of the Legislature, the provisions of which are invoked and sought to be enforced in said *quo warranto* proceedings, without admitting a violation of the said statute. And the informant claims that this court has so decided in the case of State ex inf. Crow, Attorney-General, v. Firemen's Fund Insurance Company, 152 Mo. 1. If any such contention be so maintained, or any such rule be so made, or any such statute be so construed, it will and does result in the State depriving this respondent of its property without due process of law, and will and does deny to respondent the equal protection of the laws, all contrary to the provisions of the fourteenth amendment to the Constitution of the United States, hereby and herein invoked.

"Wherefore respondent asks to be dismissed with costs.

"4.  If this be or is intended to be an action to dissolve or annul an unlawful combination or conspiracy, as it appears to be from the averments of informant, or to directly enforce the provisions of any of sections 8965, 8966, 8967, 8971, 8972 or 8978 of the Revised Statutes of Missouri of 1899, then this court has no jurisdiction of such action, for that no original jurisdiction is conferred upon it by the Constitution of this State, or by the statutes thereof, and hence this proceeding does not constitute due process of law, and is in violation of the fourteenth amendment to the Constitution of the United States, the provisions of which are hereby invoked.

"Wherefore respondent asks to be dismissed with costs.

"5.  Among other things, the relief sought in this case and the penalties prescribed by chapter 143 of the Revised Statutes of Missouri of 1899, upon which this action is based and to enforce which statutory provision this action is instituted, is that none of the

property purchased, owned, held and used by the respondent within the State of Missouri can hereafter be used by any person, whether it be the respondent or a successor or assign thereof, for any purpose, without incurring the penalties prescribed in section 8972. Upon the faith and in the reliance of the certificate granted to it by the State of Missouri, to do business in the said State, as averred in the information, this respondent, long prior to the enactment of said chapter 143 or of those portions thereof sought to be enforced and which lie at the base of this proceeding, invested large sums of money in the acquisition of real estate at various points in said State, and expended still larger sums of money in erecting thereon structures and appliances suitable for the conduct of the business it was authorized to do in said State under the certificate aforesaid. Said property is peculiarly adapted to the business of this respondent, and is not valuable to any appreciable extent for any other business or purpose whatsoever, and if the same cannot be used by this respondent or its successors or assigns for the purpose for which it was bought and constructed, and for which it is valuable and suitable, as aforesaid, the value thereof would be almost wholly destroyed, to-wit: at least to the extent of 90 per cent thereof. Wherefore, the respondent says that the provisions of said section 8972, above mentioned, are in violation of sections 4 and 30 of article 2 and section 53 of article 4 of the Constitution of Missouri and of section 8 of article 1 of, and the fifth and fourteenth amendments to the Constitution of the United States, each and every provision of which this respondent now hereby expressly invokes in its behalf, for that the effect of said statutes and of the enforcement thereof by granting the relief prayed by the present cause will be to deprive the respondent of its said property and its use without due process of law, to deny to this respondent the equal protection of the law, and to

deprive it of life, liberty and property without due process of law, deprive respondent of the natural right of life, liberty and the enjoyment of the gains of its own industry, grant special and exclusive rights, privileges and immunities to others and interfere with respondent continuing to buy and sell products in and ship products as articles of commerce to and from foreign nations and different States. Said properties are used in the conduct of interstate commerce, so that the prohibition of the use thereof operates as a regulation of interstate commerce and as a restraint upon commerce among the several States and territories and with the District of Columbia, within the meaning of the act of Congress of July 2, 1890, which act of Congress, by the express terms of the Constitution of the United States, constitutes a part of the supreme law of the land, having been passed by Congress by virtue of the power granted by the Federal Constitution. Said section 8972 is a part and parcel of an entire and complete system and the unconstitutionality of the above mentioned provision destroys the entire chapter, or at least the article on which this action is based.

"In complying with the laws of this State and in obtaining certificates and licenses to do business therein, as mentioned and set forth in the information, respondent paid money to the State of Missouri, which has been held and used by the said State, and on the faith of the statutes authorizing it to do business and the licenses issued, as stated in the information, respondent invested large sums of money in the State of Missouri. The licenses and rights to do business so granted by and acquired under the laws of Missouri were without any right or reservation on the part of the State to amend, alter or repeal the same. Among other rights thereby granted by the State to the respondent was one to make any and all reasonable contracts and agreements. No other kind of a contract

was ever made by this respondent. Each of the provisions of sections 8965, 8966, 8967, 8968, 8971, 8972 and 8978 of the Revised Statutes of Missouri of 1899 impaired the obligations of the contracts made as aforesaid with the State of Missouri, whereby the provisions of section 10 of article 1 of the Constitution of the United States are violated.

" Wherefore respondent asks to be dismissed with costs."

And on the 14th day of April, 1905, the respondent, Waters-Pierce Oil Company, filed its separate answer, which, omitting caption, is as follows:

"Now comes Waters-Pierce Oil Company, one of the respondents herein, and for its separate answer and return to the information of the Attorney-General in the above entitled cause, and to the writ issued thereon, states that it is true, as alleged in said information, that said Waters-Pierce Oil Company is, and at all times in said information was, a corporation duly organized and existing under and by virtue of the laws of the State of Missouri, and that at all times in said information mentioned it was engaged in the business of buying and selling the products of petroleum; and that by warrant and authority of said laws of the State of Missouri, and its due organization thereunder, this respondent holds, uses and exercises its corporate rights, privileges and franchises in this State.

"And further answering, Waters-Pierce Oil Company denies that between the — day of ——, 1901, and the 29th day of March, 1905, or at any time, it created, entered into or became a member of a pool, trust, agreement, confederation, combination or understanding with the Standard Oil Company and the Republic Oil Company, or either of them, for any of the purposes which are in said information set forth; or that it, Waters-Pierce Oil Company, has in any manner

been guilty of any of the things which are in said information alleged or charged against it.

"And further, said Waters-Pierce Oil Company denies each and every allegation and charge in said information which is directed against it, Waters-Pierce Oil Company, and which is not herein specifically admitted.

"Wherefore, this respondent asks to be dismissed with costs."

And afterwards on the 3d day of May, 1905, the court made and entered in the cause an order appointing Robert A. Anthony special commissioner, to take testimony on the issues thus joined, said order being as follows:

"Now at this day, it appearing to the court from the pleadings in the above entitled cause, that the issues of fact are joined therein, therefore, upon motion and request of Herbert S. Hadley, Attorney-General, that a special commissioner be appointed by the court to take the testimony upon the issues joined in said case, it is ordered by the court that Robert A. Anthony, Esq., of Fredericktown, Missouri, be and he is hereby appointed special commissioner to take testimony upon the issues joined in said cause, with full power and authority to issue subpoenas, compelling the attendance of witnesses, the production of papers, books and other documents, to issue attachments therefor, and to hear and determine all objections to testimony and to admit or exclude the same in the same manner and to the same extent as this court might in the trial of the case before the court, and to report the testimony, with his findings of fact thereon, to this court with convenient speed, provided that such report shall be filed by the first day of the October term, 1905, unless further continued for good cause; exceptions to the findings of fact so made by said special commissioner to be filed by either party so desiring within ten days after the filing of the commissioner's report and findings."

While the main facts of the case are virtually un-disputed, yet the deductions and inferences to be drawn therefrom are so numerous and vital to the final disposition of the cause; and the contentions of oppos-ing counsel are so radically different regarding same, that, taken in connection with the large pecuniary in-terests involved and the great importance of the result. of the suit to the entire people of the State, ·in our judgment, they justify us in setting out the substance of the evidence.

The printed record in this cause fills three large volumes and covers about three thousand pages; the relator's printed abstract thereof fills two large vol-umes of about five hundred pages each, and with com-mendable energy and industry, characterized by a spirit of justice and fairness, the Master has carefully prepared a terse yet a full abstract of the evidence in a printed volume of two hundred and twenty pages, which is conceded to be substantially correct and which is substantially as follows:

## RELATOR'S EVIDENCE.

**A. L. STOCKE**  testified in substance as follows: Lives in St. Louis and his business is that of secre-tary of St. Louis Oil Company, a corporation located in St. Louis and selling both refined and lubricating oils. Says he first began his connection with the oil business in 1878 and continued with same company up to pres-ent time.  He classes illuminating oils into standard white, prime white, water white and headlight.  Says the quality varies by the fire and gravity tests.  Lubri-cating oils are determined according to color and vicios-ity and gravity tests.  Each company has its own name for different grades of oils.  There is more illu-minating oil sold than lubricating oil.

Says his company has three solicitors on the road selling oils besides himself.  He does all kinds of work

connected with his company. Says he sells in Missouri, Southern Illinois, Arkansas and sometimes in Indian Territory. He has personal charge of his trade and is familiar with the business.

Says he knows the Waters-Pierce Oil Company, knows Mr. Ackert, the local manager, and Mr. H. Clay Pierce. His understanding is that Pierce is the president of that company. The Waters-Pierce Oil Company was in business before his company was. The Standard Oil Company has had no plant in this city (St. Louis) since his company has been doing business. That company has done no business in St. Louis since he has been here. Some years ago that company had a plant in East St. Louis, and it may be there now. Says that some eight or nine years ago he tried to buy oil from the Standard plant in East St. Louis, but they refused to sell him.

Says his company purchases all its oil from independent refineries in Pennsylvania and Ohio, and that it is shipped in tank cars. This oil comes to his company from the East and is then distributed around through his territory.

The Waters-Pierce Oil Company has a tank station in East St. Louis and it sells oil there.

Says he sells in Hannibal, Missouri, and meets the Standard Oil Company there. Also sells in Jefferson City and meets the Waters-Pierce Oil Company there, but has never met the two companies selling oil in the same place.

Says the Union Tank Line Company cars are cars made for shipping oil in bulk.

Schofield, Shurmer & Teagle was a firm in the oil business here when he began business. It was a competing company with the Waters-Pierce Oil Company and with his company. As a competitor it was more friendly with his company than with Waters-Pierce Oil Company. In 1901 Schofield, Shurmer & Teagle was bought out by the Republic Oil Company, and then the

relations between his company and the Republic were changed. Says the Republic was not friendly, but made "terrible drives" at his business, soliciting the business that the Waters-Pierce could not take away.

Witness says that neither the Republic Oil Company nor the Waters-Pierce Oil Company solicit the business of the other. When the Republic began business it began to get oil in Union Tank Line cars. The Waters-Pierce Oil Company got their oil in those cars and in their own cars. Says also that Waters-Pierce Oil Company has pipes across the river which gives them an advantage of from $15 to $20 a car.

Says that his company never got oil in Union Tank Line cars.

His company sells oil in all States where the freight rates will permit. That his company is independent and has always been a competitor of the Waters-Pierce Oil Company.

He gets prices, or fixes prices, by cards sent out by the Waters-Pierce Oil Company. Says that in 1895 his company opened its plant which they maintain in the city. Oil was then selling for twelve cents per gallon and by reason of competition with the Waters-Pierce it got as low as three and a half cents. This was in 1896 or 1897. In 1896 or 1897 he had a talk with H. Clay Pierce, who was then president of the company. This was when the price was so low. He wanted to do something to better the conditions and had an agreement he wanted to make with me. He wanted us to sell exclusively in the Waters-Pierce territory, but witness refused to make any kind of agreement.

The Waters-Pierce and Republic do a majority of the business in St. Louis. The Waters-Pierce has its station at Thirteenth and Gratiot streets in this city, and there has been no change since 1895, except by way of improvement. They did business in 1897 under the same name they are doing business under now.

In 1901 his company was running eight or nine wagons. His trade in the city is with retail dealers, manufacturers and consumers of every description except to families. His illuminating oil and gasoline are delivered by tank wagons. The lubricating oils are sold in barrels and packages. His drivers for the last four years have also been solicitors and he does soliciting himself. He has supervision of the tank wagon deliveries. The Republic Oil Company, he thinks, runs four wagons.

Says the information that the Republic and Waters-Pierce Oil Companies did not solicit the trade of each other came from his drivers of tank wagons and from interviews with customers.

Since Republic began business he thinks the Waters-Pierce Oil Company operated about twenty-five tank wagons in the city.

Says his company is now running eleven wagons. Has tankage capacity for three hundred thousand gallons of refined oil and about twenty thousand gallons of lubricating oil. In 1895 when he started in business his capacity was about one hundred thousand gallons.

Witness A. L. Stocke identifies a number of postal cards sent out by the Waters-Pierce Oil Company, giving quotations on the prices of coal oil, gasoline and naphtha, on the following dates: Feb. 6, 1905; Dec. 19, 1898; Jan. 9, 1905; Jan. 18, 1899; April 19, 1905; June 12, 1905; Sept. 28, 1903; Nov. 27, 1899; Sept. 8, 1899; Sept. 4, 1899; Nov. 28, 1898; Jan. 17, 1899; March 13, 1899; Feb. 6, 1905; Jan. 9, 1905, being exhibit "B" to "P" inclusive.

**H. J. COHN** testified in substance that he now works for George P. Jones & Co., an independent dealer in illuminating and lubricating oils, located in the city of St. Louis. He is a traveling salesman for that firm and sells oils mostly in the territory in Missouri where the Waters-Pierce Oil Company sells. He has been connected in the oil business for the past thir-

teen or fourteen years, and is now twenty-nine years old. He began work for the Waters-Pierce Oil Company as an office boy at Marshall, Texas; afterwards he was assigned to keep records of iron barrels; then became utility man; then a relief agent; and was then made a salesman for by-products for about a year. He was brought to Missouri and connected with the Missouri division in February, 1900, and was made salesman and auditor for the Missouri division. By the Missouri division he means the territory in Missouri in which the Waters-Pierce Oil Company sold oil. His duties were to check up stations and sell goods, to take stock of local agents, and to see that the stock and money was right. He worked for the Waters-Pierce Oil Company in Missouri until the fall of 1902, and says that as such salesman and auditor he became familiar with its business and manner of doing business in Missouri.

The witness explains a map of the State of Missouri offered in evidence, indicating thereon a line dividing a territory between the Waters-Pierce and Standard Oil Companies. The Waters-Pierce did not sell in the Standard Oil territory, nor did the Standard sell in the Waters-Pierce territory.

During the time he worked for the Waters-Pierce Oil Company it obtained its oil from the Standard Oil Company, from Whiting, Indiana, and which came in Union Tank Line cars. Says he did not get oil from any other oil company while he was with them. Schofield, Shurmer & Teagle were in business for about a year in the Waters-Pierce territory after he began to work for them. This firm was succeeded by the Republic Oil Company, and the tank station of Schofield, Shurmer & Teagle was removed from Springfield shortly after the Republic succeeded them.

During the time he worked for the Waters-Pierce Oil Company, C. M. Ackert was manager of the Missouri division, Finlay or Pierce was president, J. P.

Gruett was treasurer, and C. M. Adams was secretary. Says that Mr. Ackert, manager of the Missouri division, told him at one time that Stein, the Standard Oil auditor, checked up the account of the Waters-Pierce Oil Company in St. Louis.

The Republic Oil Company was not very aggressive as a competitor and they quit doing business at Springfield. They were doing business in the Waters-Pierce territory out of St. Louis. The Republic sold oil in the name of palacine.

When he began working for the Waters-Pierce Oil Company he received instructions as to their territory and the Standard Oil territory, and was told not to sell oil in the Standard territory. Orders received from parties in the Standard Oil territory were not filled by the Waters-Pierce Oil Company. Says he heard of a break over the line at Linn Creek by a Standard agent, and Mr. Adams assured him it would not happen again.

At one time when he reported that the Republic was under-selling the Waters-Pierce Oil Company to Mr. Ackert, he was told that he need not fear further lower prices.

The Waters-Pierce Oil Company did not sell oil across the Mississippi in Illinois, but it did sell in Arkansas. The Waters-Pierce had a system by which they got information of shipments of oil into their territory by independent companies. This information was furnished to the witness while he was on the road as auditor and salesman.

Many of the agents of the Waters-Pierce Oil Company were also station agents. In the territory he now sells in for George P. Jones & Co., the Waters-Pierce Oil Company, the St. Louis Oil Company and J. D. Street & Company also sell. Street & Company, however, sell only lubricating oils. George P. Jones & Co. get their oils from independent refineries in Pennsylvania and Ohio. That he quit the service of the

Waters-Pierce Oil Company in the fall of 1902. He estimates that the Waters-Pierce Oil Company was selling in the Missouri territory covered by it, from eighty-five to ninety per cent of all the oils. The prices at which the Waters-Pierce Oil Company sold, varied at different points, caused by competition and different freight rates. These variations ranged from one to three cents per gallon. When he quit the service of the Waters-Pierce Oil Company competition was less than when he began, owing, he says, to the fact that Schofield, Shurmer & Teagle had gone out of business. In order to get the business where there was competition, the Waters-Pierce Oil Company would reduce prices, and they got it in most instances.

Some merchants were prejudiced against the Waters-Pierce Oil Company, and would not buy from them at any price.

The only tank stations now maintained in the Waters-Pierce territory by other companies are at Springfield and Joplin, where Wilhoit has stations, and other companies maintain stations in St. Louis.

There have recently been large discoveries of oil wells, but this has not affected the prices.

Says the Waters-Pierce salesman tells his customers of goods he sells them before they reach the consumer.

He was instructed as to competitive shipments, to go see the parties to whom they were shipped, get the prices and who made the shipment, and get the business back again. At one time he was instructed to tell the Desloge people at Desloge, Missouri, who had bought oil from independent companies, that the oil was Waters-Pierce oil, and that the Waters-Pierce Oil Company could sell it cheaper. He afterwards found out that the oil was not Waters-Pierce oil. It was his custom to tell customers every day such things as these.

The Standard Oil Company sometimes sold oil in the Waters-Pierce territory, but billed by the Waters-Pierce Company. A complete record of all the outside shipments into the Waters-Pierce territory was kept, and when such shipments were made, they were charged up against the agent who had charge of that place, and his attention called to the shipment.

The trade products of petroleum are gasoline, naphtha, coal oil, paraffine wax and various other by-products. Of the oil sold, illuminating oils amount to about 65 per cent and lubricating oils to about 35 per cent.

There is a great deal more competition in the sale of lubricating oils than in the sale of illuminating oils, because lubricating oils are usually sold direct to the consumer, while illuminating oils are sold to the merchant and retailers.

While he was with the Waters-Pierce Oil Company most of the oils came from the East, and while the Texas oil fields were in existence during that time, he does not know that any oils came from that field.

Says that he came to Missouri and began work with the Waters-Pierce Company, February 1, 1900, and worked for them continuously in that territory until October 1, 1902.

If this investigation is successful, that is, if the Waters-Pierce Oil Company should be ousted from Missouri, his company will suffer by it; for the reason that his company is the only competitor of the Waters-Pierce that amounts to anything, and in case of ousting the Waters-Pierce there will be more competition.

He won't tell how much oil George P. Jones & Co. sell, because he don't want the Waters-Pierce Oil Company to know. He gave General Hadley a statement beforehand of what he knew.

Now says that the Waters-Pierce Oil Company

tried to injure his reputation since he quit them, and also states that the ousting of that company would enable him to make a very nice living. He places this statement on the ground that he could do so because he is the best salesman in St. Louis and could better hold his own among competitors.

In order to compete with the Waters-Pierce, a man must know their weaknesses before he can overcome the restrictions which they have placed around the independent dealers. Says that George P. Jones & Company have no tank stations in Missouri nor outside, and they receive their oil in wood barrels. This company buys from independent companies in Pennsylvania and Ohio. Occasionally his company got oil from the Republic Oil Company in St. Louis, and sometimes lubricating oils from the Waters-Pierce, in order to "fill in" when his company ran short.

Says that he expressed a wish that his company would not buy oil from the Standard Oil Company or Waters-Pierce Company or any of the allied companies of the Standard. Says that a tank station is a place where large tanks are prepared to receive oil out of tank cars, and from these tanks the oil is drawn out into tank wagons and distributed by the drivers to the customers.

Illuminating oils were usually distributed to merchants and other retail dealers, while lubricating oils were usually distributed to the consumer.

He says that a tank car usually holds about 6,000 gallons. While he was with the Waters-Pierce Oil Company his work was not in the city of St. Louis, but outside in the State of Missouri.

He further explains that rural routes are sometimes established from tank stations, where a driver goes into the country, or adjacent country towns, and delivers oils. While he was working for the Waters-Pierce a man by the name of Wilhoit had a tank station at Joplin. That the Waters-Pierce had a great

many tank stations at various towns throughout the Missouri territory. There was a tank station at De-Soto, Piedmont, Poplar Bluff, Joplin, Springfield, Webb City, and many other places. He says that tank stations or warehouses were erected by the Waters-Pierce Oil Company wherever the town was large enough to justify, and customers were supplied from these sources.

Its largest sales of oil were made from tank stations. Says that as agent and auditor of the Waters-Pierce Oil Company he audited the accounts of agents all over the Missouri territory and sometimes sold oils. Especially was it his duty to visit customers who were dissatisfied and try to bring them back to the Waters-Pierce. He says that oils are higher when sold in good barrels than when sold in iron barrels.

He says that no other company except the Waters-Pierce, outside of St. Louis, Joplin and Springfield, have tank stations or own or operate tank wagons, or use milk cans or iron barrels, unless it be Mr. Lohman at Jefferson City.

Says the Waters-Pierce Oil Company has no tank stations outside of its own territory.

There were two other men, Sutton and Chamberlain, who sold for the Waters-Pierce Oil Company at the same time he did, and in the same territory. They made the smaller towns, did some checking and auditing, and did more soliciting than he.

He gives the names of quite a number of companies competing with the Waters-Pierce Oil Company in the sale of lubricating oils. Says there was more or less competition in every town in lubricating oils, but very little competition in the sale of illuminating oils. The Waters-Pierce Oil Company did a very much larger business in the sale of illuminating oils than it did in the sale of lubricating oils. The only companies dealing in illuminating oils, outside of the city of St. Louis, were St. Louis Oil Company and Wilhoit, dur-

ing the time he was with the Waters-Pierce Oil Company. The rule was, when he was with the Waters-Pierce Oil Company, that he found no ˙ competition along the line in the sale of illuminating oils.

Oils shipped in iron barrels were classed with fourth-class freight and wood barrels were classed third-class freight, which made the freight on the wood barrels higher.. Says that he thinks that if there was more competition in the oil business there would be a decline in prices. That prices are less in towns and cities where the Waters-Pierce has competition.

**MAYWOOD MAXON** testified in substance as follows:

He now lives at Decatur, Illinois, and is forty-nine years old. He has been in the oil business since he was eighteen. He began his connection with the oil business with Cochran-Lymans & Co., of Cincinnati, Ohio. This was an oil company. He was promoted shortly after going into this company, became shipping clerk, and afterwards traveling salesman. This company sold oils of the Standard Oil Company, and Alex McDonald was a partner in it. He, Alex McDonald, was also president of the Consolidated Tank Line Company, and later, president of the Standard Oil Company of Kentucky, and a member of the executive committee of the Standard Oil Company of New Jersey. This latter company has its offices at No. 26 Broadway, New York, and the Standard Oil Company of Kentucky had a representative at 26 Broadway, New York, a vice-president. He stayed with Cochran-Lymans & Co. until the spring of 1880, then went with the Peoria Tank Line Company at Peoria, Illinois. The firm of Alex McDonald & Company were owners of this company. He handled the Standard Oils and he was traveling salesman for it. Afterwards he became manager of the Iowa Tank Line Company, at Davenport, Iowa.. This company sold the oils of the Standard Oil Company solely. This was in 1883, and McDonald was one of the principal owners of this company. This company was absorbed and sold out to the Consoli-

dated Tank Line Company in 1884, and he became the manager of that company. It did business in Missouri, and had its general offices in this State at Hannibal, and a tank station at Kansas City. A man by the name of Swain was in charge of the business of this company at Kansas City, and a man by the name of Drake was also connected with it. Alex McDonald was president of the Consolidated Tank Line Company in 1884. This company continued to do business in Missouri until 1892, when it was succeeded by the Standard Oil Company of Indiana. The Consolidated Tank Line Company in Illinois, Indiana and Ohio were taken over by the Standard Oil Company of Kentucky, and Alex McDonald became president of this company. At this time, the witness, in 1892, became connected with the Standard Oil Company of Kentucky.

Mr. L. J. Drake was the original owner of the Iowa Tank Line Company, and when later the company was taken over by the Consolidated Tank Line Company, Drake became general manager. When the Consolidated Tank Line Company went out of business in 1892, Drake became the general manager of the Standard Oil Company of Indiana, and is still connected with that company.

When witness went with the Standard Oil Company of Kentucky, in 1892, he took a position in Illinois and there he came in contact with the Waters-Pierce Oil Company. The latter company sold in East St. Louis and Belleville. He ceased his connection with the Standard Oil Company in May, 1894.

He knew the firm of Schofield, Shurmer & Teagle, and also the Republic Oil Company.

During the year 1902, somewhere during the months of November or December, by direction of Mr. C. T. Collings, vice-president of the Standard Oil Company of Kentucky, the witness went to see Mr. Finlay at St. Louis, the president of the Waters-Pierce Oil Company, to talk over with him the territorial lines in Illinois between the Standard Oil Company of Ken-

tucky and the Waters-Pierce Oil Company. The Republic Oil Company was also involved. Says the Republic Oil Company had been selling in his territory in Illinois.

During the course of his conversation with Mr. Finlay in the offices of the Waters-Pierce Oil Company in St. Louis, witness says: "I made a remark to Mr. Finlay, that I could not understand why the Republic Oil Company, a friendly interest to Standard Oil and Waters-Pierce, should name the prices they were naming in Illinois, after Mr. Collings had explained to me that they were in business and being operated for the purpose of securing trade that was antagonistic to the regular oil interests." Mr. Finlay replied that I was certainly mistaken in regard to the prices that I named, for the manager of the Republic Oil Company reported to him regularly, and he fixed the prices that the Republic Oil Company made.

The Republic was selling oil in Illinois at this time, and getting its oils from St. Louis.

Says that his company, the Standard Oil Company of Kentucky, reported to No. 26 Broadway, New York.

Mr. Drake had office No. 1002 at 26 Broadway, and he was president or vice-president of the Standard Oil Company of Indiana. During the years 1901 and 1902 Mr. Drake had offices at Chicago with the Standard Oil Company of Indiana.

The oils handled by the Standard Oil Company of Kentucky and Illinois came mostly from the Standard Oil Company at Whiting, Indiana, where a refinery was operated by the Standard Oil Company of Indiana.

Mr. Drake, at 26 Broadway, looked after the Standard Oil interests of Indiana and was a member of some committee. This was L. J. Drake.

The Standard Oil Company of Kentucky also had an office at 26 Broadway, New York.

Says he knew Mr. Stein, who was traveling auditor for the Standard Oil Company, under Wade Hampton, chief auditor of Standard Oil interests.

### Cross-examination:

Witness says he is president of the Standard Oil Company of Illinois, which was organized and is operated as an exploration company; that is, it is doing no commercial business, but takes and holds leases and prospects for oil.

Says he has not a friendly feeling for the Standard Oil Company of Kentucky, because he considers that they did not treat him right.

The Peoria Tank Line Company got all its oil from Standard Oil Company of Ohio. Alex McDonald was president of this company.

Witness made reports to J. R. White, general manager, and some to Silas H. Payne of Cleveland, Ohio.

James McDonald is general manager of the European interests of the Standard Oil Company.

The Iowa Tank Line Company got its oils from the Standard Oil Company of Ohio.

Up to the year 1887 the Consolidated Tank Line Company got its oils mostly from the Standard Oil Company of Ohio.

Says he first went to Decatur, Illinois, with the Consolidated Tank Line Company, and then remained with the Standard Oil Company of Kentucky when it bought out the former company in 1892.

Alex McDonald was the first president of the Standard Oil Company of Kentucky. He was afterwards succeeded by C. M. Pratt. Mr. Pratt was president of the Standard Oil Company as late as last year.

Says that upon his visit to St. Louis to see Mr. Finlay, and after a short talk with him, Mr. Ackert

and another gentleman came in and they talked over in a general way the territorial lines in Illinois between the Waters-Pierce Oil Company and the Standard Oil Company of Kentucky. They did not come to an understanding, and finally agreed that the matters would have to be referred to New York. Says Mr. Drake, vice-president of the Standard Oil Company of Indiana, was at one time general manager of the Consolidated Tank Line Company.

GEORGE U. HENDRICKS: Lives in St. Louis and is now clerk at the City Hall in the street department. Lived in St. Louis all his life. He is acquainted with Mr. Finlay and points him out in the courthouse.

He began work for the Waters-Pierce Oil Company in 1880 at the age of 12 years, began as a messenger, in which capacity he worked for about three and one-half years, and then he went into the sales department in St. Louis. William H. Waters was president when he first went to work for the company in 1880, afterwards H. Clay Pierce became president. He went into Mr. Pierce's office when he was vice-president. He filled the various positions of mail clerk, office boy, clerk in freight department, change of routing and checking freight bills. After Mr. Pierce became president he continued in that position until about 1900 or 1901. This company reincorporated in this State in 1900 on account of some Texas troubles. Says he continued to work for the company until October 31, 1904.

When new company was incorporated in 1900 there was no change in place of business. The same officers were maintained, same stationery was used, same brands of oil were sold, and same tank stations were maintained. The property of the old company was taken over and used by the new company. With a few exceptions the same officers and same employees were retained.

The brands of the Waters-Pierce Oil Company were eupion, prime white and refined oil and they used

wood and iron barrels. (It is here admitted by counsel.)

The refined oils of the Waters-Pierce Oil Company came principally from Whiting, Indiana, both before and after the incorporation of the company of 1900.

Both before and after the new company was incorporated oils were shipped in Union Tank Line cars. W. P. O. cars were also used. These were cars belonging to the company. The new company sold in the same territory as the old and there was no change in the traveling men. The stationery, letter-heads, bill heads, etc., were the same before and after May 29, 1900, except they were stamped, "Incorporated May 29, 1900." The banking was done at the same place and the same attorney was employed.

Prior to May, 1900, reports were made from the St. Louis office of the Waters-Pierce Oil Company to Howard Page at 26 Broadway of the outgoing business. After May 29, 1900, these reports were made to R. H. McNall, commercial agent of Waters-Pierce Oil Company, located at 26 Broadway.

In August, 1904, Mr. Andrew M. Finlay became vice-president.

The reports made to 26 Broadway were the same in form before and after May 29, 1900; 26 Broadway is a building in New York known as the Standard Oil Building.

He identifies map of State offered in evidence showing territory in which Waters-Pierce Oil Company sold oil and in which the Standard Oil Company of Indiana sold oil, and says that it is correct.

Says that orders received by Standard Oil Company from persons living in Waters-Pierce territory were sent to Waters-Pierce Oil Company and filled by it, and that orders received by it from Standard territory were sent to the Standard Oil Company to be filled. This was of weekly occurrence,

He often consulted the map kept in the office of the Waters-Pierce Oil Company to find out in what territory a place was located in order to determine where to send the order. There was a division line drawn on this map with a blue pencil and the same map was used before and after May 29, 1900.

The Union Tank Line cars are made for transporting oil in bulk and contain on an average about 5,000 gallons.

A man by name of Stein, an auditor of the Standard Oil Company, checked up the books of the Waters-Pierce Oil Company and so did one Baccus, who was also a Standard Oil auditor, and who came with Waters-Pierce about the time Tinsley came.

The correspondence from 26 Broadway, New York, showed signatures of other men in the building, as coming from their departments. He saw such signatures on letters relating to rates and tonnage. The initials "H. E. F." were on some of the letters and stood for H. E. Felton who was with Mr. Page. Says he heard conversations between Felton and Finlay concerning freight arrangements and saw correspondence with 26 Broadway concerning the same matters.

Where there was no tank station, shipments of oils into the territory were made in barrels.

The Waters-Pierce Oil Company used its own cars mostly when distributing oils in its territory, but most of the oils shipped to it from the refineries came in Union Tank Line cars. Cars from the east were usually unloaded in East St. Louis and piped over.

The reports to Howard Page at 26 Broadway gave a record of all car-loads shipped from St. Louis to Missouri territory and also included the package shipments.

When an auditor from the East came to audit the accounts, it was general talk in the office that he was a

Standard Oil auditor. Baccus, a Standard Oil auditor, audited the books early in 1904, and became connected with the Waters-Pierce Oil Company in the fall of 1904.

He knew before hand that Standard Oil auditors were coming to audit the accounts by letters that came from 26 Broadway, and he also heard Pierce, Finlay and Ackert say they were coming. During the time he was with the company these auditors from 26 Broadway came once a year and audited the accounts of Waters-Pierce Oil Company.

**CHARLES F. HATFIELD:** Is now National Secretary of Woodmen's Modern Protective Association. He lives in St. Louis.

Prior to November, 1904, he worked for Waters-Pierce Oil Company as freight claim agent in the St. Louis office. He resigned his position with the company because he could make more money at something else. He was with the company in the same position since 1890.

He first met H. Clay Pierce in Cleveland, Ohio. He was then private secretary for Colonel Thompson, who was afterwards vice-president of Standard Oil Company of Ohio. He was afterwards with Colonel Thompson as his private secretary at 26 Broadway, New York. This place is usually known as Standard Oil Company headquarters. While there he learned that one Stein was a traveling auditor of the Standard Oil Company. Says he left New York in 1889.

Between 1886 and 1889 there was some correspondence between Colonel Thompson and Waters-Pierce Oil Company relative to trade territory. Says he saw a map at 26 Broadway showing division of trade territory in Missouri.

His work with Waters-Pierce Oil Company in St. Louis began June 1, 1890, and ended November 1, 1904.

Says he saw a similar map to the one at 26 Broadway in the Waters-Pierce offices in St. Louis, showing division of trade territory. The map at 26 Broadway was sent there for Col. Thompson to decide a point in difference between the Waters-Pierce Oil Company and the Consolidated Tank Line Company. Thompson was a director in both companies and what he said about such questions settled the matter. The map he saw at 26 Broadway was sent to the Waters-Pierce Oil Company at St. Louis. The one he saw at St. Louis looked like the same one he saw in New York. It was a Rand-McNally map and had a zigzag line across it.

**EDWARD VON HARTEN:** Lives in St. Louis and has lived there since 1891. He is now with the Southwestern Oil Company, a company located in St. Louis, which was organized in March, 1905. It is an independent company. H. C. Jungling and Charles M. Polk are associated with him.

He became connected with the Waters-Pierce Oil Company in 1883 at Houston, Texas, as local agent. In 1884 he went to Little Rock, Arkansas, as manager of the State and stayed there until 1891. Neither the Standard Oil Company of any place, nor the Consolidated Tank Line Company sold oils in Texas or Arkansas while he was there.

In 1891 he went to St. Louis with Waters-Pierce Oil Company, and had charge of the city sales of refined oils, that is, naphtha and burning oils. He had three or four salesmen under him and looked after all the sales in the city. The company had a tank station in St. Louis, also one at Carondelet, East St. Louis, Granite City, and Webster. The Standard Oil Company, though he does not know which one, has a tank station in East St. Louis. He continued with Waters-Pierce Oil Company until December 31, 1904, in the same position. During this time the Standard Oil Company did not sell oil in St. Louis to the trade. Some of the oils of Waters-Pierce came from Whiting, Indi-

ana, but he does not know much about where the oils came from because he had nothing to do with the buying. During his time with the Waters-Pierce Oil Company illuminating oils were sold by Schofield, Shurmer & Teagle, International Oil Works, and St. Louis Oil Company, in tank wagons. These companies were all competitors. The International afterwards became passive so far as competition was concerned. After the Republic Oil Company succeeded Schofield, Shurmer & Teagle, the Waters-Pierce Oil Company still tried to get the business of the Republic. Says the International Oil Works made reports to the Waters-Pierce Oil Company.

The Waters-Pierce Oil Company and the International Oil Works together sold about 85 per cent of illuminating oils in the city of St. Louis. The St. Louis Oil Company and the Republic Oil Company did about the same amount of business, with a little advantage in favor of the Republic Oil Company.

**H. C. JUNGLING:** Lives in St. Louis. Began working for the International Oil Works in St. Louis in 1890—worked for them about a month and a half and then began work for the Waters-Pierce Oil Company and worked for that company as city salesman in St. Louis until April, 1905. During this time oil was also sold in the city by Schofield, Shurmer & Teagle, St. Louis Oil Company and International Oil Works. His business was to sell oil and to see customers, and to see that the tank-wagon drivers were doing their duty and properly serving the customers. He made reports to the city manager of the business. He sometimes gave rebates as against the other companies.

The Republic Oil Company succeeded to the business of Schofield, Shurmer & Teagle in 1901. Says he gave rebates to one customer of the Republic. When the Republic gave concessions to a customer they met them, but he says this happened only once. It was not a frequent practice to give rebates to customers of

Schofield, Shurmer & Teagle, but when they wanted their customers they went after them. Says he had instructions to get business of St. Louis Oil Company by giving rebates. Had some instructions as to Schofield, Shurmer & Teagle. These rebates were paid at the end of each month. Says he had no instructions to gives rebates to customers of Republic Oil Company.

Says, on cross-examination, that he gave rebates to one customer of the Republic Oil Company. This was a large dealer who was buying from three companies. Says he solicited the customers of Republic Oil Company the same as others, but was not told to make any concessions to get their business. Says he tried to get business away from all other companies, including the Republic.

Says he never gave rebates, or made concessions unless he was told to do so. When he gave rebates to customers he got their business.

**L. C. LOHMAN:**    Lives at Jefferson City, Missouri, has resided there for fifty-four years and is a merchant there doing a general business. As such merchant he handles kerosene and gasoline oils and bought and sold such oils as a jobber. For about two years past the Waters-Pierce Oil Company has been selling all the oils in Jefferson City. At different times during the last thirty years he has sold oils in opposition to the Waters-Pierce Oil Company in Jefferson City.

Says he knew the firm of Schofield, Shurmer & Teagle, and did some business with them and this firm did business in Jefferson City. The Republic Oil Company has never done business in Jefferson City. The Standard Oil Company never did business in Jefferson City. He wrote to the Standard Oil Company once and they gave him quotations, but refused to sell him because that was Waters-Pierce territory. He wrote to them at Cleveland, Ohio. The replies to his letters are lost and he cannot find them. This was a long time ago—fully twelve years ago. The

Waters-Pierce was then selling in Jefferson City and has continued to sell ever since.

He at various times bought from the Waters-Pierce Oil Company and sometimes bought their oils from jobbers and druggists from whom he could get it cheaper. This oil he bought in this way he sold in opposition to the Waters-Pierce Oil Company. He also bought oils from other companies. Schofield, Shurmer & Teagle, St. Louis Oil Company and some companies in Ohio. His oils were shipped to him originally in wood barrels and when the rates were made less on iron barrels he had some of these made. Later he had oil shipped in tank cars and filled his barrels from them until the railroads refused to ship to him in tank cars unless he would build tanks to store the oil in.

When he was buying oils from the Waters-Pierce Oil Company, auditors came to check up his accounts about once a year.

In about 1896 or 1897, when he was representing an independent company he sold oil as low as seven cents a gallon. When he would get a car of oil and it reached East St. Louis, the Waters-Pierce Oil Company would put the price down and keep it down until his car was sold out.

Sedalia is sixty-four miles from Jefferson City.

Says he got the last oil from independent dealers or refineries in about 1896. Since that date no other company except the Waters-Pierce Oil Company has sold oil in Jefferson City.

Letter introduced from A. A. Lasar, manager of Waters-Pierce Oil Company at St. Louis, to Mr. Geo. S. Tyler, C. & A. Ry. Co., St. Louis, dated September 20, 1897, complaining that this road permitted a competitor at Jefferson City to receive shipments over this road and fill packages on switch at Cedar City, after he had been refused such shipments by M., K. & T. Ry. and Mo. Pac. Ry.

Also a letter from A. M. Finlay, vice-president of

Waters-Pierce Oil Company, to Geo. S. Tyler, A. G. F. A., C. & A. Ry., St. Louis, Mo., dated October 15, 1897, complaining of shipments of tank cars of oil consigned to Cedar City and quoting a rule in "Tank Line Hand Gauge Book No. 3," reading as follows:    "Petroleum and its products in tank cars will be delivered only when consigned to parties at points at which they have proper unloading and storage facilities, and when shipments in tank cars are sent to parties who have not such facilities, the shipments will be returned to shippers at their risk and expense."

Says he thinks Schofield, Shurmer & Teagle did no business in Jefferson City after 1897.

The rate war when oil went down to seven cents a gallon was between him and Waters-Pierce Oil Company and continued through 1896 and part of 1897.

When he wrote to the Standard Oil Company at Cleveland, Ohio, about twelve years ago for quotations on prices, they quoted him oil at about two cents less on the gallon than he was getting it from the Waters-Pierce.

**J. S. WILLIS:**    Resides at Jefferson City, and is rate clerk of the Missouri Railroad and Warehouse Commission. Has held that position since June 25, 1903. His business as such rate clerk is "to keep a record of the tariffs filed with the commission by the railroads and to check those tariffs to see that they do not exceed the statutory limitation." The schedules of the different railroads are filed with the commission and he checks up such schedules to see that they comply with the law. Says he is familiar with the rate records and knows how to find the rate from one point to another. Also he knows the distances from one point to another from the printed distance tables filed with the commission. Says he has prepared and has with him a memorandum or tabulated sheet made from the records in his office showing distances and freight rates from Kansas City and St. Joseph to various points.

Says that oils shipped in less than carload lots is fourth class and carload lots fifth class, when there is no special commodity rate published less than fifth class. Prior to April 1, 1905, oil shipped in wood barrels went as third class and paid a higher freight rate than oil in iron barrels, which was carried as fifth-class freight. On April 1, 1905, the commission placed oil in wood barrels in fourth class with oil in iron barrels. Tabulated statement prepared by witness showing freight rates on oils in carload lots and less than carload lots and miles from St. Louis to different points in Missouri in one column and from Kansas City to different points in Missouri in the other column.

The classification of oils in wooden barrels in third class and in iron barrels in fourth class prevailed for many years prior to April 1, 1905. Carload lots is oil in tank cars and has never been classified higher than fifth class freight. This is according to the Western Classification, which has been adopted by the Board of Commissioners. The schedules offered in evidence as applied to oils shipped in wooden or in iron barrels or in less than carload lots, places wooden barrels in fourth class, whereas, prior to April 1, 1905, wooden barrels were in third class and the rate was higher.

LETTER from A. M. Finlay, president of Waters-Pierce Oil Company, dated May 29th, 1900, "To Managers, Agents and Representatives of the Waters-Pierce Oil Company," stating that the Waters-Pierce Oil Company organized May 7th, 1878, was dissolved on May 28, 1900, and notifying employees that their services would terminate on May 31, 1900. Also stating that the company had sold and would transfer all its property to the Waters-Pierce Oil Company, organized May 29, 1900, which said property the employee was directed to hold for the new company.

LETTER from H. C. Pierce, president of Waters-Pierce Oil Company, dated May 29, 1900, directed to

Mr.————, giving same information as contained in the foregoing letter and employing the person to whom the letter was directed as an employee of the new company at the same salary.

The foregoing letters were admitted to be copies of letters sent out to all the representatives of the Waters-Pierce Oil Company.

**GEORGE P. JONES:** He is in the oil business and lives and does business in St. Louis. Sells both lubricating and illuminating oil. Been in the oil business for twenty-five years. He was formerly in the firm of Speer, Jones & Company, which did business in Kansas City. They ceased business in Kansas City about 1889. In Kansas City they met in competition Consolidated Tank Line Company, Schofield, Shurmer & Teagle and National Oil Company. Did not meet the Waters-Pierce Oil Company there. Their main business was here with a branch office in Kansas City. When in Kansas City they got their oils from Eastern independent refineries, the same as they did in St. Louis.

From 1883 to 1889 they met dozens of companies in competition in St. Louis, but most of them sold only lubricating oils. The only company selling illuminating oil then, and yet in business, is the Waters-Pierce Oil Company. The St. Louis Oil Company started since 1889. Says he gets his oil from Pennsylvania and Ohio.

Says the Standard Oil Company succeeded the Consolidated Tank Line Company at Kansas City. The Republic Oil Company succeeded Schofield, Shurmer & Teagle in 1901. The last firm named was a competitor of his and of the Waters-Pierce Oil Company. Says he knows Schofield, Schumer & Teagle were more aggressive against everybody than the Republic in their line of doing business. The International Oil Works, located in St. Louis, was aggressive up to the time it was supposed to have sold out to the Waters-Pierce Oil Company.

He sells illuminating oil only in Illinois and Missouri and only in sections of Missouri. Says he cannot compete at points near Kansas City because of freight rates.

JOSEPH A. BUSE: Lives in St. Louis and is vice-president of the George Henseler Oil Company. It is an independent company. Sells lubricating oil principally. Furnishes illuminating oil only on orders. Sells oil in a number of States. Has no dividing line of business and does not refuse to sell to any one. Gets oil from the East in carload lots and has no pipe lines.

He formerly worked for the Waters-Pierce Oil Company. Was employed by them in their works in St. Louis at Thirteenth and Gratiot streets until about five years ago, when he became a city salesman in St. Louis. The company had about thirty storage tanks at Thirteenth and Gratiot running from fifty to four hundred barrel-capacity, fifty gallons to the barrel. The oils came from the East and the company had a pipe line across the Mississippi river through which oil was received. Oil was shipped out to various points from these storage tanks. Oils not received through the pipe line were received in Waters-Pierce tank line cars and Union Tank Line cars. When he became a city salesman there was quite a number of companies selling oil in the city, but most of them confined their sales to lubricating oils. The International and Schofield, Shurmer & Teagle sold illuminating oil.

Says he ceased work for the Waters-Pierce Oil Company the 1st day of March, 1905.

Said he made reports on every company he found selling their customers and he was told to keep on soliciting the trade. He was city salesman of lubricating oil and knew of customers who had made contracts for oils in the East which was furnished here by the Waters-Pierce Oil Company. Says he saw letters concerning contracts made in the East for oils to be furnished by Waters-Pierce Oil Company in St.

Louis—these letters were written to Mr. McNall, commercial agent of Waters-Pierce Oil Company, at 26 Broadway, New York. As to customers who had contracts made in the East he was told to call on them and see that the goods the Waters-Pierce Oil Company was furnishing were giving satisfaction and deliveries were made promptly and see that they were pleased and satisfied.

McNall of New York would write about these contracts made in the East; he would see the letters and would then be told to call on the person or firm having the contract. He says McNall was commercial agent of the Waters-Pierce Oil Company.

He was a salesman for lubricating oils only and sold principally to manufacturing establishments. He now does not remember whether letters received from McNall were on Waters-Pierce Oil Company or Standard Oil Company letter-heads.

GEORGE WACKERLIN: Lives in St. Louis and has been in the retail grocery business for sixteen years. Buys and sells coal oil. Buys from Waters-Pierce Oil Company. Schofield, Shurmer & Teagle tried to sell to him. The Republic Oil Company succeeded the last named firm. The Republic Oil Company never tried to sell him. He is also buying from St. Louis Oil Company and Southwestern Oil Company.

CHARLES W. RIPPE: Lives in St. Louis and has been in the general merchandise business there for twenty-five years. Buys and sells coal oil. Bought from Waters-Pierce Oil Company and International Oil Works up to a few weeks ago. Is now buying from Southwestern Oil Company and International. The firm of Schofield, Shurmer & Teagle tried to sell him, but the Republic Oil Company never did.

MANUEL CYTRON: Has been in the grocery business by himself for a year and a half. He buys from the Republic Oil Company; the Waters-Pierce Oil Company does not try to sell him.

He is in business in St. Louis. Says there is a large number of grocery stores which handle oil. He has never been solicited by any other company except the Republic.

**JACOB CYTRON:** Is in the grocery business in St. Louis and as such buys and sells coal oil and gasoline. He first dealt with Waters-Pierce Oil Company, then with Schofield, Shurmer & Teagle, they having offered inducements, and since that firm went out he has been buying from the Republic Oil Company. Since he has been buying from the Republic Oil Company, the Waters-Pierce has not tried to sell him. No company has solicited his trade since he has been buying from the Republic.

Where he is now he sells about twenty gallons each of coal oil and gasoline a month. When he and his brother were together on Seventh street they sold about one hundred and fifty gallons of oil a week.

**INCORPORATION WATERS-PIERCE OIL COMPANY:** Copy of articles of incorporation of Waters-Pierce Oil Company, filed with Secretary of State May 7, 1878. Capital stock one hundred thousand dollars. Incorporators, William H. Waters, St. Louis, Mo.; Henry C. Pierce, St. Louis, Mo.; Horace A. Hutchins, Cleveland, Ohio; Frank D. Carley, Louisville, Ky.; and William P. Thompson, Parkersburg, West Virginia.

Statement of increase of capital stock from one hundred to four hundred thousand dollars. Shows a meeting of the stockholders of Waters-Pierce Oil Company, at St. Louis, Mo., on June 13, 1882, and present, in person or by proxy, William H. Waters, representing four hundred shares; F. D. Carley, representing two hundred shares; H. A. Hutchins, representing one share; W. P. Thompson, representing one share, and George H. Vilas, M. R. Keith and George F. Chester, trustees, representing three hundred and ninety-eight shares.

The increased capital of $3,000,000 was subscribed as follows:

Chess-Carley Co., 600 shares........$60,000
Wm. H. Waters, 1,200 shares ......120,000
Trustees Standard Oil Trust, 1,200
     shares ......................120,000

**A. H. GARDNER:**   Lives in Kansas City, Missouri, and has resided there for nearly thirteen years. Prior to coming to Kansas City he lived near Cleveland, Ohio, and Denver, Colorado. He was with the Excelsior Refining Company at Cleveland, Ohio, one year. Then he was with the Continental Oil Company at Denver, Colorado. Left Denver in November, 1892, and came to Kansas City, where he became connected with the National Oil Company.

The Continental Oil Company sold both lubricating and illuminating oils, but did not sell in Missouri. It sold in Colorado, New Mexico and Montana. It was not a competing oil company of the Standard. Its reports were made to Mr. Tilford in New York.

National Company not connected with Standard Oil Company. This company gets its oil from Pennsylvania and Ohio, or from the National Refining Company. He came here in 1892 and has been at this place as manager of National Oil Company ever since. When he first came to Kansas City the companies doing a general oil business were Consolidated Tank Line Company, Schofield, Shurmer & Teagle, and National Oil Company; they were the only companies selling illuminating oil. There were other companies selling lubricating oils.

In 1901 Schofield, Shurmer & Teagle went out of business and transferred to Republic Oil Company. Harry Teagle was the representative of  Schofield, Shurmer & Teagle when he first came to Kansas City. The Standard Oil Company at Kansas City has had several managers since he came—Pratt, Davis, Mayer and Crenshaw.   Crenshaw was afterwards general

manager of Standard Oil Company, with headquarters at Chicago.

Schofield, Shurmer & Teagle and National Oil Company were independent companies. There was sharp competition between those companies and between each of them and the Standard Oil Company.

Shortly after he went to Kansas City the Consolidated Tank Line Company was changed to the Standard Oil Company. The only change was in the name of the company; the same office, same brands of oil, same tank wagons, same managers and same employees generally.

When the Republic Oil Company began business it went after customers of National Oil Company, but not after those of the Standard Oil Company.

In August, 1902, his company began a rate war with the Republic and the two companies began to cut prices against each other, during which time the Standard Oil Company maintained its prices. Says that when he found that Standard Oil Company was maintaining prices his company went after their customers and forced the Standard to sell cheaper or lose customers. This fight continued for about two months.

Then Mayer met him at the Baltimore Hotel and told him that Walter Teagle, president of the Republic, and Crenshaw, general manager of Standard Oil Company, would be at Kansas City on a certain date and would see him and fix matters satisfactorily, and for him not to go out and reduce prices on outside trade. Crenshaw came, called him up and wanted him to go with him and meet Teagle. Crenshaw said he expected Walter Teagle out there, but he could not come and that he (Crenshaw) would have to handle the matter himself. Crenshaw told him that Teagle felt that he was not being recognized, that Mayer seemed to be the only man who had a voice in the matter. Says Crenshaw told him he had everything fixed with Teagle and that there would be no more trouble. That those

rebate contracts made by the Republic Oil Company were very foolish and if he, Crenshaw, had known of them they would not have been made. There were contracts made by Teagle, manager of the Republic Oil Company at Kansas City, with certain customers to furnish them for a certain time at a certain fixed price. Then Crenshaw asked him to go up to the Coates House to meet and talk with Henry Teagle, manager at Kansas City. He agreed to go. They went and met Teagle and Crenshaw would not let Teagle talk business. They talked awhile upstairs in the house, then witness and Crenshaw went downstairs and had a private talk. In this conversation says Crenshaw told him he had to sell "palacine" and get fourteen cents for it and Mayer will sell it under the name of eocene and only get eleven cents for it. Witness says he told Crenshaw that he never would give him any rest as long as they had the Republic in there to do their fighting, and Crenshaw told him that he expected Walter Teagle to be there to handle Henry Teagle, but it was all thrown on him, and that what they did that day and the conversation, etc., he didn't want repeated or anything said about it. This conversation with Crenshaw was in August, 1902, at Kansas City, Missouri.

Schofield, Shurmer & Teagle had a tank station at Springfield, Missouri, and he met them there; also met the Waters-Pierce Oil Company there, but did not meet the Republic Oil Company or Consolidated Tank Line Company.

Says his company has a dividing line with the Hannibal Company, because it is a company openly selling the products of the National Refining Co., which facts are advertised by letter-heads, cards and in other ways.

He never meets the Standard Oil Company and the Waters-Pierce Oil Company doing business in the same territory.

Says that after the Republic Oil Company succeeded Schofield, Shurmer & Teagle at Springfield, Missouri, the tank section there was discontinued.

The company he is manager of, the National Oil Company, was incorporated May 6, 1890.

The products of the National Refining Company are handled by several different companies and each of them are assigned separate and distinct territory. The National Oil Company at Kansas City has a prescribed territory, and the other companies do not sell in their territory. These facts are advertised in various ways.

Says his company had no arrangements with Schofield, Shurmer & Teagle, but that they were friendly and at the same time tried to get each other's business.

Says after the Republic Oil Company was formed, his company objected to it principally because they cut and made prices and got business for the Standard Oil Company while the Standard maintained prices. Says the Republic Oil Company started a war on his company first in August, 1902, and they run the price down from thirteen to eight cents, which was not stopped until Crenshaw came there to settle it after about three months. Says it was settled by the manager of the Standard coming there and giving to the manager of the Republic instructions to do away with any further scrapping, with the understanding that the National Oil Company would let the contracts of the Republic alone until they expired.

Says he told Crenshaw that his company would not let up on them as long as they kept the Republic there and he has had that feeling ever since and has kept after them.

Says he gave Mr. Lake, who called to see him, what information he could prove that the Republic Oil Company was a Standard Oil interest and not an independent company.

Says he is friendly with Mayer and Cochran.

Says they look upon the Republic Oil Company as a harder competitor than the Standard because it goes out after business that the Standard doesn't chase after, or such business as the Standard cannot get.

In regard to his conversation with Crenshaw in August, 1902, says Crenshaw told him he had seen Teagle of the Republic and arranged everything with him.

About six weeks after this rate war trouble, Henry Teagle, manager of the Republic, left and he was succeeded by Cochran.

**W. N. DAVIS:** Lives in Kansas City and has been connected with the Keystone Oil Company in that city for the past seven years. Prior thereto he was with the Interstate Oil Company in that city for about ten years. These companies sold lubricating oils mostly. They had no prescribed territory and sold anywhere they could. The Keystone handles various oils of independent refining companies wherever they can be bought. Such refineries are located in Pennsylvania, Ohio, West Virginia and various other centers. The Keystone comes in contact with all the companies doing business in the State. They never meet the Waters-Pierce Oil Company and Standard Oil Company selling in the same territory, either in Missouri or other places.

Says he was local manager in Kansas City of the Consolidated Tank Line Company prior to about seventeen years ago. As such he made reports to the general offices, then located at Cincinnati. Also while with the Consolidated he made reports to Silas H. Payne, manager of the lubricating department of the Standard Oil Company, at 26 Broadway, New York.

Alexander McDonald was president of the Consolidated Tank Line Company.

218 Sup—7

The consolidated got some of its oils from Whiting, Indiana, and from other points. This company sold oil only in a prescribed territory. His description of that territory, or the line dividing its territory, corresponds with that given on the map introduced in evidence.

Says while he was with the Consolidated he built a station at Joplin, in Jasper county, which was afterwards turned over to the Waters-Pierce Oil Company. This was about 1887.

Tanks at tank stations were built according to the conditions, sometimes they were small horizontal tanks and where more storage capacity was required, they were vertical.

While with the Consolidated they got information of competitive shipments from receiving clerks of railways and through a man employed for that purpose. A special record of this information was kept and salesmen were notified and were expected to see that no more competitive oil was sold to a consumer.

The Consolidated had a forwarding station in East St. Louis, where various lines of goods were kept, and when they were needed in a hurry at any particular station they were forwarded in carloads from there—this was rather a small station. The company did not sell oil in East St. Louis at that time. We sold no oil in what was known as Waters-Pierce territory.

Alexander McDonald was afterwards located at 26 Broadway, New York, and was a member of the executive board of the Standard Oil interests.

There was much more competition in the sale of lubricating oil than in the sale of illuminating oils.

Says that in his opinion the Standard Oil Company and Republic Oil Company sell in what is known as Standard territory from ninety to ninety-five per cent of the illuminating oil sold and they do a much larger per cent of this business than in sales of lubricating

oils.   These companies do from twenty-five to thirty per cent of the lubricating business.

As a reason for there being less competition in the sale of illuminating oil witness says:   The facilities of the Standard Oil Company are such that very few independents could raise the money to successfully compete against them.   In all towns from fifteen hundred inhabitants up they have got tank stations established and they furnish oil in bulk, while the independents would be forced to ship in barrels.   Another advantage is by shipping in tank cars they save about thirty per cent on freight rates. ᐧThen their system of dealing in tank wagons is such that the trade don't want to buy in barrels when they can possibly buy in bulk, and in order to compete with the Standard it would require vast sums of money.   And further, to compete successfully you couldn't localize yourself.   You would have to spread over the same territory and do business in the same manner, and it is a well-known fact that no combination of independents could raise that amount of capital.   Lubricating oil is handled differently—it is handled in packages and is sold directly to the consumer.

There has been large discoveries of oils adjacent to Kansas City recently and a refinery has been established at Sugar Creek by the Standard Oil Company.

Never knew of any except Standard Oil Company using Union Tank Line cars for shipping oil.

**EDWARD P. PRATT**: Has lived in Kansas City, Missouri, since 1892.   Is now engaged in real estate, fire insurance, loans and investment business in that city as a member of firm of Pratt & Thompson, and has been in that business for eight or nine years.   About the year 1886 he was connected with the Des Moines Oil Tank Line at Des Moines, Iowa, which was an independent company.   The firm of Schofield, Shurmer & Teagle were interested in that company.   In 1890 it

sold out to Consolidated Tank Line Company. He then became manager of the Consolidated at that place. Then in 1892 he came to Kansas City as a manager of the Consolidated Tank Line Company, and had charge of the regular territory allotted to the Kansas City station which consisted of a part of Missouri and a part of Kansas. The St. Joseph office of the Consolidated had charge of the northern parts of Missouri and Kansas, and their office had charge of the central portion of Missouri and southern portion of Kansas. The Waters-Pierce Oil Company had charge of the southern portion of Missouri. Says he remembers the line dividing the territory of the Consolidated and Waters-Pierce. His company did not sell in Waters-Pierce territory, nor did Waters-Pierce Oil Company sell in his territory, nor did they sell in the same place anywhere. Says there was a map in the office showing the territorial lines. Identifies the line on map introduced in evidence as "Exhibit A" as the dividing line between the two companies. In April 1892, the Consolidated Tank Line Company was succeeded by the Standard Oil Company of Kentucky. Says he continued until the latter company was succeeded by the Standard Oil Company of Indiana in about 1896. The territory in which oil was sold remained just the same under all three of the companies. The business was carried on under all three companies in the same way and by the same officers and same brands of oil—there was some change in the officers when the change was made to the Standard Oil Company of Indiana.

As manager of the Kentucky Company he reported to Cincinnati, and as manager of the Indiana Company he reported to Chicago, Illinois. Mr. L. J. Drake was the general manager of all three of the companies during his connection with them. Says the Standard Oil Company of Indiana also took charge of the St. Joseph office and territory in 1896, and this company

has had charge of the business in both places ever since.

Consolidated Tank Line Company handled in illuminating oils what was called perfection, eocene and caline, and these same brands were continued by the Standard of Kentucky and of Indiana.

When his company received an order from a customer in Waters-Pierce territory, the practice was, if it was urgent, to fill it and report simply the gallonage, and the billing would be done by the Waters-Pierce Oil Company. If it was not urgent, the order itself was referred to the general office. In such cases the collection would be made by the Waters-Pierce Oil Company. Says this same practice was followed by the Waters-Pierce Oil Company when it received orders from Standard territory. Says his traveling salesmen were given instructions as to the territorial line and were told not to go beyond it. Says his company had a tank station in East St. Louis and that oil was shipped from there into Standard territory.

The firm of Schofield, Shurmer & Teagle was competitor of his company and was an independent company.

Shipments of oil to his company came in Union Tank Line cars and reports of these cars were sent to 26 Broadway, New York, to Silas H. Payne. The reports were made the same by all three of the companies during his connection with them. His company got oil from Whiting, Indiana, and Cleveland, Ohio.

Under all three companies he had an arrangement with clerks in railroad freight offices by which he got information of shipments of oil to independent companies. This information was given to traveling salesmen and station agents so that they might see the person to whom the shipments were made and stop the shipments or get the business in some way even by making prices to secure it.

The only competitors his company had in the sale of illuminating oil were Schofield, Shurmer & Teagle and National Oil Company, but there were other competitors in the sale of lubricating oil.

Says his company did from ninety to ninety-five per cent of the illuminating oil business.

Annual report of Standard Oil Company filed in office of Secretary of State, November 29, 1892, reporting for both Consolidated Tank Line Company and Standard Oil Company for year preceding June 1, 1892.

Says they also had a map in the office at Kansas City showing division of territory between that office and the one at St. Joseph.

Also says that orders coming to his territory from St. Joseph territory were transferred to the St. Joseph office and that office would transfer to the Kansas City office to be filled an order coming to it from the Kansas City territory. The object was for the proper territorial agency to get credit for the sale.

The East St. Louis station was maintained because saving in freight could be made by making shipments from there to certain points in the territory.

The tank car reports that were sent to Silas H. Payne, 26 Broadway, showed receipts of cars, giving the number and when they were unloaded. Payne was manager of the Union Tank Line Company. These cars are regular railroad cars with immense tanks on them for receiving oil.

What is meant by "charging" competitive shipments to agents is that each agent would have his territory, which he was expected to look after, and if it was found that these shipments went into his territory, his attention was called to the matter so that he could report to the company as to why those shipments went into his territory and as to how we would get rid of the competition.

As to the system of getting information of competitive shipments through railroad employees he never heard of independent companies following the practice.

Never knew of oil being shipped in Union Tank Line cars to any other than Standard interests.

When he began with Consolidated Tank Line Company it had a plant at Armourdale consisting of about a dozen tanks for receiving, storing and distributing oil and gasoline in bulk. The Standard of Kentucky took over this plant. When the Kentucky company began it had about a dozen wagons, by means of which it distributed oil to the retailers throughout the city, by filling the tank wagons at the tank station, driving the wagons to the place of business of the purchasers, the retailers, and transferring by means of open measures or buckets from the wagon into the storage tanks of the merchants. During his connection with the companies the tank station at Armourdale was increased and another station was built at Twentieth and Harrison streets in Kansas City. The tank capacity was very large. This increase took place under the Kentucky company and was a material increase. The Harrison Street station consisted of three tanks, about one thousand barrels to the tank. After this last station was built the number of tank wagons was reduced because the source of supply was shortened. The business had very largely increased in gallonage before he left, caused by increase in population and consumption. When he began in 1892 a large per cent of oils was handled in barrels and when he quit the large per cent was being handled by tank stations and wagons. The bulk business had very largely increased.

During the time he was with these companies Schofield, Shurmer & Teagle in Kansas City sometimes had two and sometimes three wagons, and the National Oil Company about the same number, but they never increased their wagons or tank stations. The independent companies from 1892 to 1896 did not have the

facilities to do the amount of business that was done by the Standard. They did the amount of business their facilities enabled them to do.

When he first started in 1892 there were about twelve tank stations in the territory and when he quit there were about forty. There was a large increase in the tank stations. Says he ran tank wagons at all stations to distribute oil to dealers and to surrounding towns. The average tank wagons for the forty stations was about two, or something like eighty in all. This increase in stations and wagons did not necessarily represent increase in volume of business, because the same places were supplied before by barrel shipments. The tank wagon delivery is more economical to the company and more satisfactory to the consumer. The trade prefers this kind of delivery.

During this time the independents also sold at these points where he had tank stations, but they shipped mostly in barrels, but at some of them they had tank stations. The National Oil Company had one wagon at Wichita and one at Topeka, and the Hannibal Oil Company had one at Hannibal, but they made no increase of their tank wagons. His company had two wagons at each of those places. These tank wagons were built from a motive of economy—there was more money in running tank stations. Profits were increased and trade held better and the trade was increased by such means.

Says that the brand of the Waters-Pierce Oil Company called "eupion" corresponded to the brand of the Standard called "eocene."

GEORGE W. MURRSER: He resided in Kansas City, Missouri, for twenty years and is now travelling salesman for the Interstate Oil Company, which sells only lubricating oil. It is located in Kansas City and sells oil there and elsewhere. He was with L. D. Mix Oil & Naphtha Company from 1889 to 1892 in said city, which only sold lubricating oil. Then the Standard

Oil Company bought the latter company out and he went with the Standard and took charge of their specialty department. In 1895 he became a salesman for the Standard and sold illuminating oil and continued in that position until 1897, when he severed his connection with the company.

While with the specialty department of the Standard until the fall of 1892 he worked under Mr. Stanley of Cincinnati, who was manager of that department when it was wiped out, and he worked under and reported to Mr. Pratt, the local manager.

Said he sold specialties in Standard territory in Missouri and all of Kansas and Nebraska.

The Standard Oil territory in Missouri was that section of the State with an irregular line running from Hannibal in a southwest direction down, including Moberly, Boonville, Sedalia, Clinton, Nevada and striking the State of Kansas at the lower border of Barton county. That part of the State north and west of this line was Standard territory. After the specialty department was wiped out Nebraska and the St. Joseph part of the territory was taken away from the Kansas City territory.

The company at St. Joseph was the same and sold the same brands. He identifies the line on map introduced in evidence as the dividing line between the Standard Oil and the Waters-Pierce Oil Company. There was a map in the office showing the division line and maps were furnished traveling salesmen so they would not cross the boundary.

The standing of a salesman was determined by the amount of goods he sold monthly and competitive shipments into his territory were taken into consideration. They were informed as to competitive shipments and instructed to get that trade and prevent outside shipments. They were authorized to cut prices and give other kinds of inducements in order to prevent competitive sales.

The information to the Kansas City office of these outside shipments came through the railroads.

In about 1896 he sold some oil in Jerico, Dade county, Missouri. This was Waters-Pierce territory. In about ten days afterwards he was called into the office at Kansas City and given a "jackin' up" for crossing the line. Says he knew it was not Standard territory, but he took a chance to increase his sales. Says his company lost the amount of the gallonage sold there; that it went to the credit of the Waters-Pierce Oil Company.

In August, 1892, he sold a carload of candles to be shipped to Argentine, Mexico, which was Waters-Pierce territory. Says his company lost that sale because it was Waters-Pierce territory, and it got the profits of the sale.

These specialties came from Cleveland, Ohio, and were shipped sometimes by way of Hannibal—sometimes by way of St. Louis.

These goods were shipped to Kansas City and then sold to points in the eastern part of the State like Hannibal, forty miles from St. Louis.

As an employee of the Interstate Oil Company he sells in both Standard and Waters-Pierce territory, but has never found them selling in the same territory.

The brands of illuminating oil sold by Waters-Pierce Oil Company are eupion and brilliant, and those sold by the Standard are perfection, eocene and ealine.

While he was with Standard Oil Company it sold about ninety per cent of the illuminating oil sold in its territory and about forty-five or fifty-five per cent of lubricating oil. The sales by the Standard Oil Company and the per cent have increased since he worked for it. At the time he was with the company its strongest competitors were the National Oil Company and Schofield, Shurmer & Teagle.

Says the Republic Oil Company when it came into

existence did not make the vigorous fight against the Standard that Schofield, Shurmer & Teagle had.

Says as salesman for the Interstate Oil Company he got along nicely with all competitors except the Standard Oil Company. Does not try to get the business of any competitor except in an honorable way with the exception of the Standard, and he says he goes after their business and tries to get it any way he can— by offering inducements that he will not to customers of the other competitors.

Says, on cross-examination, that the brand of eocene of the Standard Oil Company was eupion of the Waters-Pierce Oil Company, and brilliant of the Waters-Pierce Oil Company was perfection of the Standard.

Says he is not familiar with the tests known as fire, flash and specific gravity.

**GOTTLEIB KUENSTER:** Lives at Maryville, Nodaway county, Missouri, is 68 years old, and has lived there since 1868.

He went into the oil business at Maryville in 1878 —shipped it in carload lots and sold it at different points around. At that time he bought from various places and persons.

In 1881 he made a contract with W. H. Loomis of the Consolidated Tank Line Company at Hannibal, Missouri, and then he bought his oil from him. He continued to buy and sell this company's oil until they sold out to the Standard. Then he continued with the Standard until 1902, when he bought from Hannibal; made no reports because he bought and paid for the oils. Afterwards he had to report to St. Joseph. He made tank-car reports at 26 Broadway, New York— these were Union Tank Line cars—made these reports since 1896, when they built a station and tanks at Maryville; before that he got oil in barrels.

Shortly after the Waters-Pierce Oil Company was organized in 1878 he went to St. Louis and wanted to

buy from them and they told him they could not sell him because it was not in their territory.

**W. J. MERCER:** Has lived in Kansas City, Missouri, for the past two years. Just prior to going to Kansas City he was at Dallas, Texas—there he was connected a part of the time with Atlantic Refining Company of Cleveland and part of the time with Globe Oil Company. During the years 1892 to 1896 inclusive he worked for the Waters-Pierce Oil Company in Texas and Louisiana. He began as warehouseman and worked up to salesman for Waters-Pierce. Has not worked for Waters-Pierce Oil Company since they were ousted in Texas, nor since May 29, 1900. The Standard Oil Company did not sell in Texas, but it did sell at certain points in Louisiana.

After he quit the Waters-Pierce Oil Company he came to Kansas City and went to work for Schofield, Shurmer & Teagle, and worked for them about two years. That company competed for the business of the Standard Oil Company and they operated tank wagons in the city. It had a tank station at Kansas City and Springfield—the latter place was a barreling station. He quit this company in 1898 and it ceased to do business later on.

Since 1898 he has worked for the Interstate Oil Company, Globe Oil Company, National Oil Company and Fidelity Oil Company, and while with them sold oil in both the Waters-Pierce and Standard territory, but never found them selling in competition in the same territory.

The waters-Pierce Oil Company sell as their leading brand of illuminating oil what is called eupion, and brilliant is its lower grade—one high class and the other low grade. The Standard Oil Company sells as their leading brands of illuminating oil what is called eocene, ealine and perfection.

Since Schofield, Shurmer & Teagle quit business

in 1901 he has been to Cleveland and saw that their tanks at that place were being removed.

Says he never worked for the Standard Oil Company or the Waters-Pierce Oil Company in Missouri.

He is now selling oil for the Fidelity Oil Company and sells anywhere he can.

**HENRY D. WHELAN:** Has lived in Kansas City, Missouri, for the past five years. He formerly lived in Louisville, Kentucky. Has been connected with the oil business since 1900.

He was first employed as bookkeeper for Schofield, Shurmer & Teagle. Continued for three months in this position and was then made cashier.

Schofield, Shurmer & Teagle had a station at Springfield, Missouri, and it was one of their best paying stations. It was a tank station and also a shipping station or a distributing point. Also a tank station at Kansas City.

At Springfield they met in competition the Waters-Pierce Oil Company and at Kansas City the Standard Oil Company and National Oil Company.

They, Schofield, Shurmer & Teagle, sold oil in competition with all other companies, and it was an absolutely independent concern. Their oils came principally from Cleveland, Ohio, and some from Pennsylvania.

Says he continued as cashier until they sold out to the Standard Oil Company, about June, 1901, and the business was then continued by the Republic Oil Company. He continued with the Republic Oil Company as cashier and chief clerk and acting manager at Kansas City in the manager's absence. Mr. Cochran was manager for three or four months and was then succeeded by Henry Teagle. Says he continued with the Republic Oil Company until May 1, 1902.

When the change took place from Schofield, Shurmer & Teagle to the Republic Oil Company, the old employees were continued. But as quickly as it could

be done there was a change in the bookkeeping, financial reports, gallonage reports, and all the reports were completely changed. The forms used by the Republic were similar to those used by the Standard.

When with Schofield, Shurmer & Teagle they had a few tank cars of their own, in which oil was shipped to them. They did not use Union Tank Line cars. Soon after the Republic was organized shipments of oil to it came from Whiting, Indiana, and the oil was unloaded into its tanks. On the occasion when a car came and the tanks of the Republic were full a wire came from Cleveland to send it over to the Standard Oil Company, and it was taken by that company.

There were frequent communications between the office of the Republic Oil Company and the office of the Standard Oil Company in Kansas City. Says he talked with Mr. Mayer, manager of Standard Oil Company, himself—these communications related to the market price of tank-wagon oil and gasoline in Kansas City. Mayer would give to the Republic office the information that oil had gone down or up, as the case might be, and this information was followed and acted upon by the Republic. This information was usually given by Mayer over the 'phone.

Mr. Teagle's instructions to salesmen were that he wanted them particularly to go after National Oil Company customers—he wanted the trade that bought National Light oil, White Rose gasoline brands—there were no instructions given to go after the business of the Standard. The National Oil Company was the only other company of any consequence outside the Standard Oil Company and Republic Oil Company selling illuminating oil.

Schofield, Shurmer & Teagle territory was a part of Kansas, a part of Missouri and a part of Oklahoma, and their brands were palacine, I.X.L. gasoline, red cross gasoline and some other grades.

Schofield, Shurmer & Teagle had no division lines,

but sold at points where it was profitable to do so.  In Missouri they sold at St. Louis, Springfield, Kansas City, Sedalia, St. Joseph, Warrensburg, Pleasant Hill, Lamar, Garden City and other points in the State.

Schofield, Shurmer & Teagle never consulted any other company about the changes in prices.  They either made the prices at Kansas City or they came from Cleveland, the head office.

When the Republic Oil Company began business the Springfield station was discontinued.  At one time the Republic was out of gasoline and it got five hundred gallons from the Standard at Kansas City and paid for it.

He has been chief clerk of the National Oil Company since May, 1902, at Kansas City.

Refinery prices of oil fluctuate and as a general rule those prices control the jobbing trade.

While with the Republic he never saw any lists of refining prices.  The only information the Republic has of retail prices came from the Standard.

**A. G. SHIERS:**   Now lives at Marietta, Ohio, is with the Penn Refining Company of Oil City, Pennsylvania, as a traveling salesman.  This is an independent company.  He was with the Republic Oil Company as assistant manager at Kansas City from June, 1902, until December, 1902.  Had been with the same as manager at St. Joseph for a while.  While at St. Joseph the Republic Oil Company and Standard were the only competitors selling oil there.  When he went to Kansas City he found the Standard Oil Company, Republic Oil Company and National Oil Company selling illuminating oil there.

Previous to going to St. Joseph he was with the Argan Refining Company at Marietta, Ohio.  This was at first an independent company, but in about 1899 it became connected with the Standard Oil Company, and it was this year that this company was compelled

to leave the State of Ohio and removed to West Virginia.

He got a position with the Republic Oil Company, through W. C. Teagle, vice-president and general manager, at Cleveland, Ohio.

Says he knew the firm of Schofield, Shurmer & Teagle and that it was an independent and competing company of the Standard Oil Company.

At Kansas City with the Republic Oil Company, Harry Teagle, manager, he had charge of the city business in the lubricating line. He had to look after the tankwagons and also to see after the illuminating sales of oil and gasoline. The brands sold were palacine and water-white gasoline. The Standard Oil Company was selling eocene, perfection and gasoline. Says he had instructions from the manager to make particular efforts on the trade of the National Oil Company. Says he was to get certain customers of the National named and to rebate one cent a gallon if necessary to get them. No instructions to rebate as against the Standard Oil Company. He gave rebates and got the National's customers. Never gave rebates to Standard Oil customers.

Says he was informed that the Republic Oil Company was an independent company and was instructed to make such statements to the trade which he did in good faith.

The rebate system against the National continued, some of it for six months and some for a year, and it precipitated a rate war between the National Oil Company and Republic Oil Company.

Says the Republic Oil Company got its prices, whether an advance or decline, from the Standard Oil Company by telephone there in Kansas City, and part of the oils came from Whiting, Indiana, where the Standard Oil works are located. He knows of no other refinery there.

Says he instructed the tank-wagon salesmen to

represent to the trade that the Republic Oil Company was a competitor of the Standard Oil Company. Where he found prejudice against the Standard he represented that the Republic was an independent company and opposed to the Standard—that the Republic Oil Company was an independent concern handling Pennsylvania goods and had no connection with the Standard Oil Company whatever. Says he thought he was telling the truth.

Says he sold to Standard Oil customers whenever he could, but did not cut prices to get their trade. He was told directly not to rebate any Standard Oil trade by Henry Teagle, the manager.

Says he does not know of the National Oil Company giving rebates, but they came down in their prices to the basis of the rebate.

He says there never is a rate war in the sale of lubricating oils.

In 1901 while at St. Joseph says he got a car of oil that he could not unload because his storage tanks were full, and he was ordered by Mr. Teagle from Kansas City to set it over to the Standard Oil Company, which he did. This car came from Whiting. There was no competition between the Standard Oil Company and Republic Oil Company at St. Joseph. As to the business at Kansas City there was no competition between the two companies except in the sale of lubricating oil; says he went after their business in lubricating oil.

Says as cashier of the Republic Oil Company he found the same system of doing business used by the Standard Oil Company. He knows of Standard Oil Company getting gasoline from Republic tanks at St. Joseph when they ran out. This was not paid for, but a transfer invoice was made.

W. H. HAWKINS: Lives in Kansas City and is now a manufacturer of paints. He was formerly connected with Consolidated Tank Line Company and Standard

Oil Company at Kansas City. He was under both Mr. Pratt and Mr. Mayer as managers. When the change took place to the Standard Oil Company there was no change in the manner of doing business.

Says he was superintendent of tank wagons in that city, and it was his business to see that the Standard got all the business. Most any method that seemed fit was resorted to—rebates were given, perfect tab was kept on other people as to the business they were doing. The object was to get the business away from others. Men were hired to follow other wagons and get a record of amounts sold and to whom.

He began work in 1890 and quit in 1897.

When he found to whom other companies were selling they went around and in order to get the trade away rebates of so much a gallon were given, payable monthly. Towards the end these rebates ran up to about $3,500 a month.

Says they solicited the business of all other companies, but they were especially after the National Oil Company and Schofield, Shurmer & Teagle. These two companies were the strongest competitors.

A complete record of every merchant in the city was kept. All traveling salesmen were fully instructed as to the dividing line between Waters-Pierce Oil Company and Standard Oil Company and to keep out of Waters-Pierce territory.

Says he was with Schofield, Shurmer & Teagle from 1887 to 1890, and that there was a constant war between that company and the Consolidated Tank Line Company. Schofield, Shurmer & Teagle could not do business like the Standard. Prices were made so low that they could not cut them. It was all they could do to meet the prices made by the Standard. The only way they could do business was by arguments, and there were some people who would trade with them anyway and pay them higher prices. Says he never gave rebates for them.

The rebate system of the Consolidated and Standard continued from 1890 to about 1896, when he ceased to be superintendent of tank wagons.

It was the Consolidated Tank Line Company up to 1892—from that date to about 1895 it was the Standard Oil Company of Kentucky, and from the latter date on the Standard Oil Company of Indiana.

Says they rebated some two hundred and fifty customers a month and the rebates amounted to about a quarter of a cent a gallon on the total gallonage. The rebates were large about the time he ceased to be superintendent.

Says that he worked for Schofield, Shurmer & Teagle at St. Joseph prior to 1887 and that they very frequently got a countermand for a car of oil. He found that the Standard would learn when a shipment was made and head the car off and get the order countermanded when they could.

Says "everybody that has worked for the Standard Company were given to understand that they must have the business; that that was the only thing their position or anything else depended on."

Says the Standard Oil Company regularly got information from employees of the railroads about shipments of oil made by competing companies.

Says he saw a map in the office at Kansas City showing the division line between the Waters-Pierce Oil Company and Standard Oil Company, and had heard this line discussed in the office by the managers and salesmen. He has seen the map in the Kansas City office within the last four years and it shows the same division of territory except that it is more complete.

Also, he says they got information of oil shipments to competitors through some employee of the competitor by subsidizing him.

**W. R. STEWART:** Lives at Des Moines, Iowa, and is a traveling man, but has no particular business at pres-

ent. Says he has been connected with the oil business pretty near all his life.

Alexander McDonald was president of the Consolidated Tank Line Company. He was also president of Standard Oil Company of Kentucky. Mr. Drake was connected with Consolidated Tank Line Company, also the Standard of Kentucky and of Indiana.

Says he went with Consolidated Tank Line Company in 1890 and remained with it and the Standard Oil Company of Kentucky and Indiana until 1898.

Chess-Carley Company was located at Louisville, Kentucky, and was an oil Company. This company was succeeded by Standard Oil Company of Kentucky. And about the same time the Consolidated Tank Line Company went out of business.

Frank D. Carley was connected with Chess-Carley Company. He afterwards went with the Standard.

The last he heard of Alexander McDonald he was at 26 Broadway, New York City, the Standard Oil building.

Horace A. Hutchins was connected with the Standard Oil Company at 26 Broadway.

W. P. Thompson was one of the main men of the Standard Oil Company at 26 Broadway.

Says he was general manager of sales department when he was connected with the Standard Oil Company in Missouri. He looked after sales in the territory at Kansas City and St. Joseph. He gave instructions to salesmen.

Since 1898 he has been in the news business, telegraph business, crude oil business, oil producer and telephone.

The only refinery of oil at Whiting, Indiana, is what is known as the Standard Oil Refinery.

**BRUCE PHIPPS:** Lives in Kansas City and has been in the grocery business there eighteen years. Along in 1902 he was buying of the National Oil Company when the Republic Oil Company came along and offered and

paid him a rebate of about one cent a gallon and got his trade. The rebate was paid monthly in cash. The agent, Mr. Shiers, told him that the Republic Oil Company was an independent company. The Standard Oil Company and the Republic Oil Company never rebated to him as against each other. Says he got the rebate from the Republic for about a year.

**W. A. GRACE:** Is now in the grocery business in Kansas City and has been at the same corner for the past six years. He buys oils from the National Oil Company. Says an agent of the Republic Oil Company tried to sell him and when he charged that it was a Standard Oil Company, he (the agent) directly and positively said to him that it was an independent company from the Standard Oil Company. This salesman was Shiers. He wanted to make a contract for six months or a year and give rebate of one cent a gallon, but witness refused to make the contract. National did not give him rebate, but met price fixed by the Republic.

**FERD WEYRICH:** In the grocery business for fourteen years at Kansas City. For the last three years he has been buying oils—buys from Standard Oil Company. Republic has not solicited his trade—never heard of them.

**ISAAC WEINBERGER:** Has been in the grocery business in Kansas City for sixteen years. Bought oil from the Republic Oil Company about three years ago. Mr. Teagle came to him and when he told Teagle that conditions being equal he would not buy of the Republic because it was a Standard Oil Company, Teagle told him it was not so. But Teagle gave him a reasonable rebate and he traded with that Company. He was buying of the National Oil Company at that time. Standard Oil Company did not try to get him away from the Republic. Then the National offered him a better inducement and he went back to them. Says he also got rebates from National and Standard Oil Company, but

got rebates from Standard before Republic began business.

**J. S. WILLIS:** Additional schedule of rates prepared by J. S. Willis, Secretary of Board of Railroad and Warehouse Commissioners.

**CHARLES B. COLLINS:** Lives in St. Louis, Missouri, and has lived here since 1877. He began work for Waters-Pierce Oil Company in 1895 and quit about two years ago, as clerk and messenger in the president's office. When Mr. Pierce would go to New York he would go with him. He, H. Clay Pierce, was president of Waters-Pierce Oil Company. Mr. Pierce moved to New York in about 1901. Mr. Pierce was president until about 1900 and after the reincorporation he was again made president.

Pierce had an office at 25 Broad Street, New York. He was with Pierce in New York as his private secretary. Pierce received checks from the Waters-Pierce Oil Company in payment of dividends at least once a month. Usually immediately after these checks were received a remittance was made—on two occasions to Mr. H. M. Tilford at 26 Broadway, New York. These two remittances were delivered by witness personally. The amount he took to Tilford was about two-thirds of the dividend check received by Mr. Pierce.

Prior to 1900 Mr. Pierce had about one-third of the stock of the Waters-Pierce Oil Company.

When he did not take checks to Tilford, he invariably made out a check amounting to two-thirds of the dividend check with which there was purchased a check made payable to the Seaboard National Bank. An account of these transactions was kept by witness on Mr. Pierce's private book. These transactions continued for about two years. The Seaboard National Bank is in the Standard Oil Building. He received dividends on all the stock of Waters-Pierce Oil Company except five or six shares.

**F. B. NORTHRUP:** Lives in St. Louis, Missouri, and

is now connected with the Northrop Lubricating Oil Company. Has been in the oil business for fifteen years. The principal business of his company is done in St. Louis.

The Standard Oil Company of Indiana has done no business in St. Louis in the last fifteen years. The Waters-Pierce Oil Company and the Republic Oil Company sell oils in St. Louis. His company competes with the Waters-Pierce Oil Company in that city.

**WILLIAM H. BABCOCK:** Lives in St. Louis and is engaged in the oil business in that city with the Crescent Oil & Supply Company. The companies selling oil in St. Louis in the last four years were Waters-Pierce Oil Company, J. D. Street Oil Company, George P. Jones, George T. Mathews & Co., George W. Reid Oil Company, St. Louis Oil Company, Republic Oil Company, formerly Schofield, Shurmer & Teagle, Gregory Oil Company, Mound City Oil Company, his own company and others. These companies all sell more or less of both lubricating and illuminating oils.

Those having tank stations are Waters-Pierce Oil Company, St. Louis Oil Company, Republic Oil Company and International Oil Works. Tank stations are usually used for illuminating oils, gasoline and naphtha.

Standard Oil Company has never done business in St. Louis. Says he sells mostly south and west in Missouri, and meets the Waters-Pierce in competition. Never found the Standard Oil Company and Waters-Pierce Company competing for business in the same place.

Says the business of his company is principally selling lubricating oils. Only sells illuminating oils to accommodate his customers.

**A. S. CALE:** Has been connected with the oil business in St. Louis for about four years and is now with the Mound City Oil & Supply Company. His company has no circumscribed territory, but sells oil anywhere.

Standard Oil Company of Indiana has sold no oil in St. Louis since he has been in business there. Has sold in Missouri at points where the Standard sells and at other points where Waters-Pierce sells, but has never found them both selling at the same place. He sells principally lubricating oils, and all other companies are his competitors.

Says he has bought oils from the Waters-Pierce Oil Company and Republic Oil Company and refineries in the East.

**GEORGE T. MATHEWS:** Is with George T. Mathews & Company, an oil firm that sells lubricating oils in St. Louis. Runs no tank wagons. Does business in several States. Says he is in charge of the business of the firm. Sells in different parts of the State of Missouri. Meets both the Waters-Pierce Oil Company and the Standard Oil Company in competition with them, but has never met the two at the same place. Says his company did business awhile in St. Joseph, Missouri, and there he met the Standard Oil Company and Republic Oil Company. Standard Oil Company does not sell oil in St. Louis. Waters-Pierce Oil Company did not sell oil in St. Joseph.

**C. M. ADAMS:** Is secretary and treasurer of the Waters-Pierce Oil Company located at St. Louis, Missouri. He has resided in this city about twenty-eight years, and has been connected with the Waters-Pierce Oil Company since its first incorporation in 1878. He was book-keeper for the Standard Oil Company at St. Louis for four or five months after he first came to the city, and then it ceased to do business in St. Louis. William H. Cobb was manager for Standard Oil Company while he did business there. It ceased to do business on the organization of the Waters-Pierce Oil Company. The Standard has not done business in a local way in St. Louis since 1878, nor through any company owned by them. It has, however, sold by wholesale to the Wa-

ters-Pierce Oil Company. Waters-Pierce has purchas-
ed the largest part of its oils from the Standard. Oil
now comes from Whiting, Indiana; Franklin, Penn-
sylvania; Beaumont, Texas; Port Arthur, Texas; Neo-
desha, Kansas; Sugar Creek, Missouri—a great many
places. Gets its oil in Union Tank Line cars.

In 1878 he was made secretary of Waters-Pierce
Oil Company, served one year as secretary and was
then made treasurer. Continued as treasurer two
years. Then he was secretary and treasurer for sev-
eral years. He has been secretary or treasurer or both
since the company was organized on May 7, 1878.

On May 29, 1900, there was a reincorporation of
the company and the old company ceased to do busi-
ness. The new company used the same offices and
operated the same properties as the old company; did
business in the same name; sold in the same territory
as far as he knows; there was some change in the of-
ficers, but the subordinates and employees were prac-
tically the same; as far as he knows it was a continua-
tion of the old business; got their oil from the same
source. Mr. Grewett was the first secretary of the new
company—he, witness, was treasurer. Grewett re-
signed during the winter of 1905, and witness became
secretary and treasurer.

The Standard Oil Company doing business here in
1878 was a branch of the Standard Oil Company of
Ohio. Horace A. Hutchins was connected with this com-
pany. W. P. Thompson was afterwards connected with
the Standard Oil Company. Hutchins was in charge
of the sales department of the Standard doing business
here in 1878. W. P. Thompson in 1878 was connected
with the Camden Consolidated Oil Company of Par-
kersburg, West Virginia. The original incorporators
of the Waters-Pierce Oil Company were, as far as he
remembers, Mr. Waters, Mr. Pierce, Mr. Hutchins, Col.
Thompson and Mr. Carley. Hutchins at one time had

an office at 26 Broadway, in connection with the Standard Oil business.

WILLIAM H. MORGAN: His home is in Sedalia, Missouri. Began working for the Standard Oil Company in January, 1898. First began as traveling salesman and then had charge of tank station at Sedalia. He had six counties as his territory. At Sedalia he had the local business and a few outside towns. Had two or three men working under him. He worked for about a year as salesman and two years in charge at Sedalia. Sedalia was under the jurisdiction of the Kansas City office. Mayer was manager at Kansas City most of the time, E. C. Conkling a part of the time.

When he was traveling salesman, Schofield, Shurmer & Teagle were his competitors. Did not meet the Waters-Pierce Oil Company in competition. Also had Schofield, Shurmer & Teagle as competitors at Sedalia and they were very active competitors. Says that when he went to Sedalia as local manager, Schofield, Shurmer & Teagle had fifty per cent of the business and when he left there he had at least ninety per cent of it. Says he worked under instructions from G. W. Mayer, manager at Kansas City, and his instructions were to go into the field and destroy all competition, not to allow competitors to sell a barrel of goods anywhere. The Waters-Pierce Oil Company never sold in the Sedalia Territory, nor did it try to do so, but they sold oil within eighteen miles of Sedalia.

Says he had instructions not to sell in Waters-Pierce territory and he was informed as to the lines, but he did get over the line once down in Hickory county and sold oil in their territory, and was called down for it when he got to Kansas City. Says Mayer told him not to go over the line,—that if he sold stuff there he would get no credit for it. Says at this place where he got over the line his company could put oil there cheaper than the Waters-Pierce Oil Company and at less cost to the merchants.

When oil was shipped into his territory by a competitor it was held against him and he was called on to account for it. ·

He says the Waters-Pierce Oil Company was selling oil one cent a gallon higher just across the line than he was in his territory.

Schofield, Shurmer & Teagle went out of business shortly after he quit the Standard and was succeeded by the Republic Oil Company.

Says at Sedalia gauges were furnished him for the purpose of measuring the oils of his competitors, but he would not use them and they soon went out of use. He does not know whether they were correct or not.

In regard to these gauges he was instructed to use them in extreme cases when other arguments failed, to measure the oil packages of competitors in order to show the purchaser that his barrels were short.

Witness produces a blank report which he used at Sedalia. Reported on this blank monthly to Kansas City. It showed outside oils shipped into his territory by stating date shipped, name of shippers, from what place, name of consignee, destination, name of substation, number of car, number of barrels of refined oils, gasoline and lubricating oils, etc. Says it was his duty to get this information in any way he could. He got the information by going to the railroad stations and examining the packages and talking with the railroad agents.

When these outside shipments were made into his territory he did all he could to get them countermanded and at once began to do all he could to get the customers away from the independent company. He would give rebates and undersell the outsider in order to get the trade.

He produced a letter from Mayer, manager at Kansas City, urging him to begin at once getting orders for future delivery of refined oil. Suggests that as

a good plan to cut off competitors. This letter dated August 11, 1898.

Also a letter from Mayer, dated June 2, 1898, informing him of outside shipments made into his territory, and adding, "I trust you are making a vigorous effort to get this cut off."

Says that following the suggestions contained in the last letter he went to see the people who were purchasers of independent oil, cut prices and got the business by any method he saw fit to pursue. Says he told purchasers the oil was not up to the standard and was short.

Also another letter dated May 20, 1898, to witness, from G. W. Mayer, Kansas City, relating to outside shipments of oil by competitors, especially the Brook Oil Company, and urging him to find out who purchased the oil and to go to work to get their trade.

At Sedalia he sold perfection, the popular oil, eocene, 175 head light and prime white brands of coal oil, and crown gasoline. Says there were five tanks at Sedalia. The highest-priced brand was eocene, the next 175 head light, the next perfection and the cheapest the prime white.

Says he has marketed two and three grades out of the same tank. Says he had instructions to do so.

He did not sell at Tipton—a town twenty-five miles from Sedalia; the Waters-Pierce Oil Company sold there. Says he sold south of Sedalia for a distance of fifty miles. Says he had instructions not to sell at Tipton.

Prior to going with the Standard Oil Company he was a book-keeper for Kellogg Newspaper Company at Kansas City.

After he quit the Standard he went to work for Merchants Oil Tank Line Company at Leavenworth, Kansas, a branch of the National Refining Company. Was with them as traveling salesman for about three years. He had a certain territory that he worked in.

The National Oil Company marketed the same oil from Kansas City in a different territory—they didn't go into the territory of his company nor did his company go into their territory.

After this last service he went into the newspaper business again in Kansas City. Has been with his present company about four months. After quitting the Merchants Company he took a vacation for a year on account of ill health. He is now with the National Refining Company at Hannibal, Missouri, or the Hannibal Oil Company, which is the name of the company doing business there selling the products of the National Refining Company. This company does not sell in territory where the National Oil Company of Kansas City or Merchants Oil Tank Line Company of Leavenworth sells.

Says he was called into the office at Kansas City when he worked for the Standard Oil Company about once a month and was given oral instructions by the manager. His general instructions were to go into the field and by any means crush out competition.

**T. R. HOPKINS:** Now lives in Lawrence County, Missouri, five miles east of Pierce City. He is now engaged in farming and has been for the past two years.

He has been local or station agent for Waters-Pierce Oil Company. He began at Seneca, Missouri, in 1885 or 1886, and at that time he was a barrel agent, selling on commission. Then he came to Joplin and stayed about six months. Then went to Webb City and established an agency there. Then he was sent to Pierce City, established the Pierce City agency there and remained in charge of it for twelve or thirteen years, or up until about two years ago. At Pierce City he had about twenty towns in his territory that he took care of and furnished with oil. He had a tank station at Pierce City. He quit the company on November 15, 1903.

Says he reported and worked under managers of the Missouri division; located at St. Louis—they were Andrew M. Finlay, Mr. Lasar and Mr. Ackert.

When he first began work the name of the company was the same as when he quit. Says that about the time the company had trouble in Texas, agents were discharged, a new company was formed, and they were hired again. Says that he was discharged by the old company in one envelope and hired in the next.

The same business was continued under the new company as under the old company.

Never met the Standard Oil Company in competition. At Webb City he was seven or eight miles from the Kansas line where the Standard Oil Company sold, but it did not cross the line nor did he go into Kansas. Says he was told by the manager that he must not sell oil in Standard territory and that the Standard could not sell in his territory. Mr. Lasar, the manager, had a map which he showed witness, with lines showing the territory between the two companies.

Got his prices at which to sell oils from the St. Louis office.

Says Schofield, Shurmer & Teagle invaded his territory at Monett and Pierce City and they were active competitors of Waters-Pierce Oil Company. He went after the trade of Schofield, Shurmer & Teagle and gave rebates in order to get it. Schofield, Shurmer & Teagle invaded his territory only twice and Wilhoit once at Sarcoxie, but with that exception he had no opposition at Pierce City in the sale of illuminating oil.

Says Mr. Ackert, manager of the Missouri division, gave him to understand that he would have no opposition from the Republic Oil Company when it succeeded Schofield, Shurmer & Teagle.

During the last two or three years of his agency the price of oil in Joplin, Carthage, Webb City and Springfield was from one and a half to three cents less

than in his territory. There was little competition in his territory, but Wilhoit was in the other territory. Says he took this matter up with Mr. Ackert, telling him it was not fair to charge his customers more, and he was told it was none of his business—that there was competition in Joplin and those other places.

Says he received orders for oil from persons in Standard Oil territory. He did not fill them, but sent them to St. Louis, because it was not in his territory. Says that he was told by manager that if he sold anything out of his territory his company would not receive the profit and to send such orders to St. Louis. Also says he received and filled one order which had been sent by a person in his territory to the Standard Oil Company. This order came to him from St. Louis.

Says that about the time Schofield, Shurmer & Teagle sold out to the Republic Oil Company, the general manager at the Harvey House in Monett told him: "We will not be troubled; you need have no fears of the Republic Oil Company."

Says he had orders to get information of all competitive shipments and report them—that he got no information from railroad agents.

While he was at Webb City he got a telegram from St. Louis to look out for a car-load of National Oil before the car got there, and by seeing all his customers beforehand he prevented the sale of the oil. This was about the year 1890.

He states that prior to 1900 he received his salary by checks drawn on the Chatham National Bank of New York. They were made payable to the manager and by him indorsed to witness. Says the checks were dated at New York City. After 1900 his checks for salary were dated at St. Louis and drawn on the Bank of Commerce, St. Louis.

T. C. EBERLY: Lives in Joplin, Missouri, and is in the grocery business and has been for about seven years. Prior thereto he was located at Ausbury, about

fifteen miles from Joplin, in Missouri, but about three-quarters of a mile from the Kansas line. He was in the grocery business at Ausbury for about three years. While there he bought oil from the Waters-Pierce Oil Company agent at Webb City. In about 1895 while at Ausbury he bought some oil from the Standard Oil Company at Pittsburg, Kansas—bought because either it was cheaper or more satisfactory, he does not remember which. Says he got only a few times from Pittsburg because he was in Waters-Pierce territory, and he was told that they could not sell him from Pittsburg; that he would have to buy of the Waters-Pierce Oil Company. Says he was a little nearer Pittsburg than Webb City. Says he got a letter from Standard Oil Company at Kansas City telling him he was in Waters-Pierce territory and they could not sell him.

E. M. WILHOIT: Has lived in Springfield for three years past. Just prior was at Joplin, Missouri, for about five years, and just prior to that lived at Topeka, Kansas, for about four years.

At Topeka, Kansas, he was agent for the Standard Oil Company of Indiana, he thinks, being the same one that did business in Missouri. Says he first began with the Consolidated Tank Line Company—Alexander McDonald, president. He was local agent at Topeka and had the city of Topeka.

Previous to going to Topeka, he traveled for the Standard Oil Company out of Wichita, Kansas. He was with the company in Kansas a fraction over eight years altogether. His company could not sell in Indian Territory only on orders—the Waters-Pierce Oil Company did business there. Says they kept Waters-Pierce Oil Company labels and when oils were shipped into the territory, these labels were placed on the barrels and their billing was on the Waters-Pierce Oil Company at St. Louis— this was while he was with the Consolidated Tank Line Company and Standard Oil Com-

pany in Kansas, prior to 1900.   The labels referred to designated the different brands of Waters-Pierce Oil—this oil was taken out of Standard tanks and such labels placed on the barrels.

When he came to Joplin he went into the independent oil business in his own name; that is, selling refined and lubricating oils in Southwest Missouri.   He now has tank stations both in Joplin and Springfield.   Says he has been a competitor of both the Standard Oil Company and Waters-Pierce Oil Company and in no instance has he met those two companies selling oils in the same territory.   Says he does not know exactly the division line between those two companies, but knows that where one sells the other does not sell.

The oils sold by the Standard at Galena formerly came from Whiting, Indiana, but now come largely from Neodesha, Kansas.   This is also true as to the Waters-Pierce Oil Company at Joplin.

From Joplin to the Kansas line or Galena is about six miles—Standard sells at Galena and Waters-Pierce in Joplin.

Since the action of the Kansas Legislature about a year ago oils have usually been lower in Galena than in Joplin—prior to the action of the Legislature they were higher in Galena than in Joplin.

Says the only time he has seen the Standard tank wagons in Missouri was when they would run short of oil and come to Joplin and get oil from the Waters-Pierce Oil Company's tanks located there—has seen that as many as two or three times.

Says his experience has been that the Waters-Pierce Oil Company or Standard Oil Company base their prices in a locality on their nearest competitor, or upon the presence or absence of competition. When there was competition prices would be lower and increase with the distance from competition.   Says that

218 Sup—9

the fact that the two companies, Standard and Waters-Pierce, were selling near each other did not affect prices—has never known of these companies competing with each other.

When he began the oil business, Schofield, Shurmer & Teagle were selling oils and had tank stations at Springfield, Kansas City, Sedalia and Clinton. He met this firm in competition and they were competitors of the Standard and Waters-Pierce. This firm ceased to do business about 1901 and were succeeded by Republic Oil Company. Soon after, he having heard that Schofield, Shurmer & Teagle had sold out to Standard Oil Company, he went to Springfield with a view of opening up an independent business there. He found that the plant there had been enlarged and painted with the usual Standard red on barns and warehouses. Shortly after his trip to Springfield the plant was dismantled—that is, the plant of Republic Oil Company—and they have had no tank station in this territory since. Shortly after the departure of the Republic, witness established a tank station at Springfield, but that company has sold some oil in this part of the State since, shipping from Kansas City, Sedalia or Clinton. Says the class of trade the Republic Oil Company sells largely is a class of trade that feels loyal to the independent dealer. The Republic made a specialty of looking after that class of trade which demanded a better grade of oil than was handled by Waters-Pierce Oil Company or Standard Oil Company—they handled the old brand, palacine, which was a high grade Pennsylvania oil sold by Schofield, Shurmer & Teagle. Says he finds more competition from the Republic than from Waters-Pierce or Standard, because the Republic is putting out better oil than the other two companies.

In relation to tank stations he says they are hard competitors. The tank competition is hard to overcome. From three to five cents more per gallon can be got at tank stations than by person who sells in barrels.

In regard to the sales of an independent in this territory witness says: ''It depends largely on the sales in bulk of the independent dealer as to what per cent of goods he can market at a profit. If in operating against the Waters-Pierce Oil Company one attempts to get all the business that they might possibly secure they wouldn't last very long in the business; in fact, the price would be made so extravagantly low there would be no profit.'' Says his ''experience has been while with the Standard Oil Company and since operating in opposition to the Waters-Pierce Oil Company, that the independent dealer can market a small percentage of goods in any territory at a profit, and possibly can market their goods at ten or fifteen per cent less than the Standard or Waters-Pierce regular price; but if he increased his volume of business above a certain percentage, say fifteen or twenty per cent, their prices will be cut so low that he will either lose his business or go broke on low prices.'' Says these same conditions existed both in Kansas and Missouri.

Says the Waters-Pierce employees got information of all his shipments out of Springfield except car-load shipments. He knows of no instance where Waters-Pierce employees got his order countermanded.

### On Cross-Examination.

Started to work for Consolidated Tank Line Company in 1889 at Wichita. Stayed there five years and then went to Topeka and stayed there four years. Says he resigned voluntarily, but had had some trouble with the company. Says he left in 1897.

He first started in the independent business at Topeka, run there for about eight months and then went to Joplin. Says he has from three to five thousand dollars invested in his Joplin station and about the same at Springfield. His annual sales are about forty thousand dollars. The business has increased

yearly and grown into that amount.   Having small
means he could only do a limited business and not be-
come antagonistic to the large companies.   Says he
sells under the regular market of the Standard Oil
Company—they do not maintain their regular market
price in this territory.

Says he sells regardless of the prices of the Wat-
ers-Pierce Oil Company—holds his market at what he
can afford.  When prices get so low that he cannot sell
except at a loss, he will not sell—two or three different
times he has locked up his tanks and waited for prices
to come back.   When they get the business they raise
the prices.   To illustrate, he says they have sold in the
Springfield market for nine cents all summer—they
have now advanced to ten cents.   At this point, Joplin,
they have sold at nine cents and a half, and have now
advanced to ten and a half.   Says his price has been ten
cents for several months and is still ten.

Says he sells some Kansas oil, but largely Penn-
sylvania oil, which is superior because better burning
oil.

Palacine, of Schofield, Shurmer & Teagle, was a
Pennsylvania oil and superior to the  Western   oil.
Many customers want the Pennsylvania oil because of
its superiority.   The Republic got trade on the strength
of this brand of oil because it was believed to be an
independent company.

Says he will not say that the Republic Oil Company
is dealing in high-gravity Pennsylvania oil now.   They
built up a reputation while in the name of Schofield,
Shurmer & Teagle on high-gravity Pennsylvania, but
he will not say they are selling that now.

Says his success is not due altogether to the fact
that he handles Pennsylvania oil.   In some places a
cheaper grade of oil is demanded.   There is greater
demand for high-grade oil at Springfield than at Joplin.

He sells in a territory from Springfield southeast
as far as Thayer, as far east as Richland, and west to

Fort Scott. George P. Jones and St. Louis Oil Company sell the same oils and they come down into his territory—they do little this far down because of the excessive freight rates.

As to railroad rates, he says that the roads in the past have granted a low commodity rate on tank cars which has enriched the Standard Oil Company. The rate to the local shipper or small shipper has been excessively high in Missouri, being third class, while the commodity rate is a great deal better than fifth class.

No one in his territory has tank stations except himself and Waters-Pierce Oil Company. There is competition by barrel shipments from many companies but excessive freight rates will not allow them to do much in that way. So far as illuminating oils are concerned he practically has no opposition except from Waters-Pierce Oil Company.

Says that at Springfield, after Republic left there, Mr. Ackert, manager of Waters-Pierce Oil Company, proposed to him that the Waters-Pierce Oil Company buy out his business, let him work for the company and continue to run the business in his name and take care of the dissatisfied trade, but he did not accept the proposal.

Says he operates tank wagons. This system of tank wagons and stations is an advantage to either the operator or consumer. The advantage is, the oil comes on a low commodity rate in carloads, which no dealer can secure in local shipment lots. The rates were forty-five cents a hundred on local shipments from St. Louis to Springfield and sixteen cents a hundred in car-loads. His experience has been it has been to the consumers' interest where there was an independent company operating, and was not to the advantage of the Waters-Pierce or Standard where the independent was operating. They measure the freight rate. For example, the commodity rate in tank cars may be as low to one

point as another, yet if the independent doesn't have
a tank station at that point, their price may be from
one, two, three or five cents a gallon more at that
point where there is no competition than it is where
the .competitor operates with the tank station. It is
much the most convenient way of doing business to
the dealer. And says he could not remain in business
in the city without his station. Both the Standard
Oil Company and the Waters-Pierce handle their oils
in cities by means of the tank stations and wagons.

   **D. M. JOHN:**     Lives at Joplin and is now manager
of the Interstate Oil Company at Joplin.

   From February, 1890, to April, 1898, he sold oil
in Joplin under his own name. Says Mr. Lasar, man-
ager for the Missouri division of Waters-Pierce Oil
Company, asked him to start this business. The Wat-
ers-Pierce agent at this place, Mr. Lyon, furnished him
the money to put up tanks, buy a team and wagons and
all other necessary equipments and he sold oil in his
own name in the city of Joplin. Managed and repre-
sented the business as his own. He was doing a retail
business. After selling illuminating oil this way for
about five years he took charge of a lubricating tank
wagon and delivered to the mines—this was also for
the Waters-Pierce Oil Company, but done in his name.

   He did not go to Galena to sell because he was
told by the agent that he was to sell only in Missouri.
There are mines at Galena, but he did not get there to
sell lubricating oil. When he quit he turned everything
over to the Waters-Pierce Oil Company. Says he was
handling Waters-Pierce oil and selling under their
brands. He turned over to the Waters-Pierce a part
of the proceeds of his sales after deducting his expenses
and salary.

   Since he has been working for the Interstate Oil
Company he tried to buy oil from the Standard at
Galena and they refused to sell to him.

While he was selling for Waters-Pierce Oil Company he got his oils from their tank station and invoices were rendered him.

**W. E. HARMON:**    Lives at Joplin and is now connected with the Missouri Pacific Railroad. From April 14, 1904, to November 1, 1904, he was cashier in the office of Waters-Pierce Oil Company at Joplin under J. H. Lawler, the local agent.

Their territory did not extend across the line into Kansas, but they sometimes shipped oil across and ran the risk of getting caught by the Standard Oil Company. When they were caught the matter was handled from St. Louis. He does not know whether Waters-Pierce Oil Company lost the sales or not.

Says orders came from Standard Oil territory to Waters-Pierce Oil Company for oils. In such cases the orders were generally sent to the nearest Standard agent in the territory from which they came. Says they sometimes got orders which had been sent to the Standard Oil Company by persons living in Waters-Pierce territory and filled them.

Says Waters-Pierce Oil Company got information of competitive shipments about twice a week, and this information was reported to St. Louis.

**A. D. RADER:**    Lives at Cagle, in this State, five miles west of Joplin. Says that in 1895 or 1896 he tried to get the agent at Galena, Kansas, to deliver oil to him at Cagle, but he refused to do so, but sold him oil and he hauled it himself.

**W. L. STEPHENS:** Lives in Joplin, and was formerly a salesman of the Interstate Oil Company—that was about the year 1900, and he was with them fifteen months. He sold in Joplin, Webb City, Oronogo and Galena. He met the Standard in competition at Galena and the Waters-Pierce in Missouri, but did not meet them both in the same place.

**G. J. STEIGERWALD:** Lives in Cleveland, Ohio, and

is now with F. G. Clark Company, wholesale oils, as a traveling representative. Says he sells in middle, eastern, southern, and southeastern, practically everywhere except the extreme west, northwest and eastern sections of the country. Names twelve states that he travels in', including Missouri. This company has refineries located at Warren, Pennsylvania. He sells altogether to the jobbers.

Says he has been in the oil business since 1891 and began with Schofield, Shurmer & Teagle at Cleveland, Ohio.

He next had a position with the Scio Refining Company at Scio, Ohio. The members and employees of Schofield, Shurmer & Teagle were the principal owners of that company. Ben W. Brown was connected with the Scio Company. Witness had general management of the company. His connection ended with this company when it was sold to George B. Wilson on June 1, 1901. Within a few months thereafter this refinery was dismantled. Most of their products had been marketed through Schofield, Shurmer & Teagle.

Then he took a position with the Republic Oil Company at Cleveland, Ohio, as purchasing agent and traffic manager. His duties were chiefly to look after the order and supply department, make general purchasers, look after the movement of tank-car equipment, and incidentally some detail work for general manager. W. C. Teagle was general manager and vice-president. He had been a member of the firm of Schofield, Shurmer & Teagle. Witness went to Cleveland June 3, 1901, with the Republic. It took property of Scio Refining Company also. George B. Wilson was the first president of the Republic Oil Company; L. H. Turrell, secretary, and J. R. Taylor, assistant secretary. The Cleveland Refining Company was also turned over to the Republic Company. The Scio Refining Company's properties were inspected before purchase by Mr. Van Dyke and Mr. Irish of Lima,

Ohio.  Afterwards he learned that Van Dyke was connected with the Solar Refining Company at Lima.  The crude oil which was received under contract at the time the Scio plant was dismantled was turned over to the Ohio Oil Company, a Standard Oil interest.  The unfinished products of the Cleveland Refining Company were loaded into cars and carded to the Standard Oil works at Cleveland.

He remained with the Republic Oil Company until April 15, 1904.  He stayed at the Cleveland office practically all the time—took occasional trips to different parts of the country trying to sell goods or adjusting some matters at stations.  He was familiar in a general way with the business.

W. C. Teagle stayed at Cleveland up to October, 1903, in the position of vice-president and general manager; then he went to New York and became connected with the Standard Oil Company, at 26 Broadway, as member of the export trade committee.

Schofield, Shurmer & Teagle were considered the largest marketers of oil in the country outside of the Standard Oil Company—the largest independent dealer.  They were active and vigorous competitors of Standard Oil Company.

There was no immediate change in the business of the Republic Oil Company after they took over the properties of Schofield, Shurmer & Teagle, Scio Refining Company and Cleveland Refining Company, until a year or a year and a half afterwards; then there was a decided change noticeable.  Instructions were given throughout the territory of the Republic Oil Company to represent it as an independent company—these instructions were given by W. C. Teagle, vice-president and general manager.  They were to solicit the same trade that Schofield, Shurmer & Teagle had, and any other trade that could be secured.  There was what was known as "dissatisfied trade" or "prejudiced trade" that would not deal with the Standard Oil Com-

pany because it was supposed to be a monopoly. The verbal instructions given were to the effect that they were to canvass chiefly the high class trade demanding better oil in quality than the ordinary trade marketed and to represent themselves as active competitors of the Standard Oil Company, and to get trade handled chiefly by people outside of the Standard Oil Company.

Republic Oil Company made reports as to its business to 75 New street, New York City— C. L. Nichols, president. He succeeded George B. Wilson as president. 75 New street is the back entrance to 26 Broadway, or the Standard Oil Building, New York City.

He was called to 26 Broadway in relation to a proposition offered by the Standard Oil Company. With reference to his proposition he saw W. C. Teagle and W. E. Beamas, who was a member of the export trade committee. Says he met a Mr. Wilson and a Mr. Taylor there. Nichols became president in the early part or 1902.

Says he has seen letters written or signed by George B. Wilson on letterheads of Republic Oil Company, New York. At the time of his visit to New York, Wilson was in the office of L. J. Drake in Standard Oil building. Drake was a member of the domestic trade committee. He was once connected with the Standard Oil Company of Indiana, at Chicago.

Says his trip to New York about taking a position with Standard Oil Company was in 1903, and he went on a telegram.

When Teagle left Cleveland for New York, one W. E. Judd, of Winnipeg, Manitoba, became general manager.

When, in 1903, he wanted to quit the Republic Oil Company, it was getting its oil chiefly from Standard Oil Company's refineries at Cleveland, Lima, Franklin and Whiting.

All orders for oil were placed directly from Cleveland—no orders were made through 75 New Street.

All stations in Missouri taken over by the Republic were continued for a time and then the one at Springfield was dismantled.

In a general way says he is familiar with the territory of the Waters-Pierce Oil Company. He never found that company and the Standard Oil Company selling in the same territory.

The territory of the Republic Oil Company was practically co-extensive with that of the Standard Oil Company.

Louis H. Turrell was secretary and treasurer of the Republic Oil Company at Cleveland from June 1, 1901, to the end of the year.

One Mr. Hardcastle worked for Republic at Cleveland. He came from Standard Oil Company at Albany, New York. When he quit he went back to the same company.

A Mr. Hart, chief clerk of the accounting department of the Republic, was formerly connected with Standard Oil Company of Indiana.

The word "transfer" as used in the business meant being transferred from one office to another or from one position to another, and the same term is sometimes used between kindred interests or affiliated interests.

L. J. Drake, Jr., came from Standard Oil Company to the Republic while he was there. When Turrell left he went with Standard Oil Company at Sioux City, Iowa.

Cleveland Refining Company of Cleveland belonged to the Teagle family. It was a marketing field and sold to Schofield, Shurmer & Teagle. Cleveland Refining Company plant was dismantled in July and August, 1901, and the Scio plant in September and October, 1901.

When the Republic Oil Company first began business they went out after all business in sight regardless of whom it belonged to, and this continued for

about a year and a half, or until restrictive instructions were issued, which meant that the agents were told that where the business belonged to Standard Oil Company no active effort was to be made to get it. Both the general manager and witness gave such instructions. Says the Waters-Pierce Oil Company's business was treated just the same as the Standard's business.

Says he left the Republic Oil Company without any feeling against anyone and there had been no trouble.

States that he would say the Republic Oil Company was more aggressive in competing with the Waters-Pierce than it was with the Standard Oil Company. The station at Springfield was removed in order to remove competition from that territory. Just before this station was moved Mr. Teagle had been to 26 Broadway and immediately on his return instructions were given to remove it.

The Republic Oil Company procured Pennsylvania refined oils from the independents for nearly two years. Then instructions were given to place practically all orders for Pennsylvania refined oil with the Atlantic Refining Company at Franklin, Pa., which is a well-known Standard Oil refinery.

Local agents or field managers were very often called to Cleveland and there they were instructed by the manager.

Says he thinks the Republic managers at St. Louis were given more leeway than some other managers, so that they could get more business at that point, regardless of whom it belonged to.

He was present at field managers' meeting at Cleveland when instructions were given by the general manager. Mr. Heyer was present at those meetings. General instructions were given and different questions were brought up for the good of the business. At the last meeting there were instructions given relative to respecting the business of the "largest competitors"

and following up the outside high class business, or dissatisfied trade.

Says there is more competition on the lower grades of oils. The independent refineries are chiefly located in the Pennsylvania oil regions and have to cater more to the trade demanding high grade goods. As the Standard Oil Company handles mostly low grade goods, the independents are forced into the high class.

At the time the Republic started in business he received orders or instructions from New York to place orders for certain grades of refined oils with various Standard Oil refineries and in a general way gave the shipping directions by which they were to be routed. These orders came from the president of the company, who was located in the Standard Oil building, New York City.

The Pennsylvania oil is superior to the western products.

At the beginning they bought practically all of their Pennsylvania oils from independent refineries. During the course of the year, after the expiration of six or eight months, they placed at least twenty per cent with the Atlantic works, a Standard interest, and before he left they bought their entire requirements of Pennsylvania oil from the Atlantic.

Low grades are manufactured largely by Standard Oil Company, and in order to retain gallonage and keep out competition, they will reduce the price on those particular grades so low as not to leave any profitable margin to independent jobbers; that is, over and above the cost to the independent jobbers from the independent refineries.

The refinery of his company is located at Warren, Pennsylvania, and sells as wholesale jobbers only. They sell at points in Missouri to the independent dealers only.

At a field managers' meeting, held in February, 1904, at Cleveland, when Heyer of St. Louis was pres-

ent, the president instructed them all that they were to canvass, make particular efforts in increasing trade on palacine oil and go particularly after the trade that would demand high-grade goods in preference to the ordinary oils on the market, and to make particular efforts against like jobbers in their territory. At this meeting the president stated that it was unnecessary to longer deny the identity of the Republic.

W. W. WATERS: Edits a newspaper at New Madrid, Missouri. In the spring of 1902 he ordered a gallon of oil for a gas engine he had in his office from the Standard Oil Company, and directed the letter to that company at St. Louis, Missouri. In due course of the mails he got a reply to his letter from Waters-Pierce Oil Company at St. Louis, merely stating that they did not sell in quantities of less than ten gallons and that he could perhaps get it from their local agent. The Standard Oil Company does not do business in Southeast Missouri, but the Waters-Pierce Oil Company does business there.

H. R. KNOLLENBERG: Lives in St. Louis and is a travelling salesman for Mound City Oil & Supply Company, and has been with that company for about seven years. He was traveling salesman for Waters-Pierce Oil Company from 1893 to 1898 in Missouri, Indian Territory and some points in Arkansas. His business principally was to look after the lubricating oil business, and he sold to anyone he could. He never met the Standard Oil Company selling in the territory he sold in, but met other companies in competition. He was told as to territory how far he could go and where not to go. Says Waters-Pierce Oil Company business was divided up into territories, such as Missouri division, Texas division, and Mexico division.

H. R. KNOLLENBERG—recalled: Prior to going with the Waters-Pierce Oil Company he worked for Vacuum Oil Company, Rochester, New York. He sold for this company in the southern part of Illinois and south-

eastern part of Missouri. In Illinois he met in compe-
tition the Standard Oil Company and in Missouri the
Waters-Pierce Oil Company. Vacuum Oil Company
went into the Standard Oil Company about 1893.
When this occurred he was working under an annual
contract which had ten months to run. During that
ten months he worked a portion of the time in Illinois
and a portion of the time in Missouri, but his salary
was paid by Waters-Pierce Oil Company to the amount
of his contract. Reports of oil he sold in Illinois were
made to Standard Oil Company, outside of Belleville,
and oils sold there were reported to Waters-Pierce Oil
Company. It had that territory. Reports of sales
made in Missouri were made to Waters-Pierce Oil
Company. All the papers and records of Vacuum Oil
Company at its office in St. Louis were taken to the
office of Waters-Pierce Oil Company. The business of
Vacuum Oil Company in Illinois was transferred to
Standard Oil Company and its business in Missouri
was transferred to Waters-Pierce Oil Company, but
the name of Vacuum Oil Company was discontinued.
But says all his work during the ten months his con-
tract had run was done under Mr. Lasar, manager of
the Missouri division of Waters-Pierce Oil Company,
both in Missouri and Illinois. Says that Vacuum oil
was lubricating oil and the company handled no illu-
minating oil. Says Mr. Lasar instructed him when he
sold in Illinois to make his report to the agent of
Standard Oil Company at East St. Louis.

SAMUEL LEDERER: Now lives in St. Louis. In about
1897 he was in Dexter, Missouri, and was manager of
the general store of Lederer & Richter. They bought
and sold the oils of Waters-Pierce Oil Company.
Waters-Pierce was the only company selling oil there
then. A gentleman came there representing some other
company and made up a car-load lot among the mer-
chants and shipped it in there. Says he notified the
Waters-Pierce agent, and he said his company would

stand by his firm if they would stand by the Waters-Pierce, and we agreed to do so. Says he was then paying fourteen cents for prime white, and this new oil was sold to the merchants for twelve cents. His firm dropped oil to ten cents and it kept on coming down until it sold at five cents. There was no more competitive shipments there after this car.

CERTIFIED COPY of annual report of Republic Oil Company, of 75 New street, New York City, to State of Michigan, showing its condition for the year 1901. Shareholders: George B. Wilson, 3,000 shares; Walter C. Teagle, 150 shares; James R. Taylor, 200 shares; Charles L. Nichols, 150 shares. Officers: C. L. Nichols, president; W. C. Teagle, vice-president; W. T. McKee, secretary and treasurer; J. R. Taylor, assistant secretary.

CERTIFIED COPY of annual report of Republic Oil Company, of 75 New street, New York City, to State of Michigan, showing its condition for year 1902. Same shareholders and officers.

CERTIFIED COPY of annual report of Republic Oil Company, of 75 New street, New York City, to State of Michigan, showing its condition for year 1903. Same shareholders and officers.

CERTIFIED COPY of annual report of Republic Oil Company, of 75 New street, New York City, to State of Michigan, showing condition for year 1904. Same officers and stockholders, except that W. S. Judd takes the place of W. C. Teagle.

CERTIFIED COPY of annual report of Standard Oil Company, of Whiting, Indiana, to State of Michigan, showing its condition for year 1902: Stockholders: W. H. Tilford, H. H. Rogers, J. D. Archbold, C. M. Pratt, J. A. Moffett, F. R. Barstow, H. M. Flagler, William Rockefeller, G. W. Stahl and W. P. Cowan. Officers: W. H. Tilford, president; J. A. Moffett, vice-president; G. W. Stahl, secretary and treasurer. All are directors except Stahl.

CERTIFIED COPY of annual report of Standard Oil Company, of Whiting, Indiana, to State of Michigan, showing its condition for year 1903: Stockholders: E. T. Bedford and Walter Jennings are substituted for William Rockefeller and H. M. Flagler. Officers same as above.

CERTIFIED COPY of annual report of Standard Oil Company, of Whiting, Indiana, to State of Michigan, showing its condition for year 1904. Same stockholders. Same officers, except that J. A. Moffett became president and W. P. Cowan vice-president.

CERTIFIED COPY of Articles of Incorporation of Republic Oil Company as they appear on file in the office of Secretary of State of Missouri. Showing: Capital stock to be $350,000, and $60,000 of same invested in Missouri. Organized under laws of New York State on June 4, 1901. The capital stock was divided into 3,500 shares of $100 par value each. The shareholders were George B. Wilson, New York City, 3000 shares; F. A. Turrell, New York City, 300 shares; James R. Taylor, Mount Vernon, New York, 200 shares.

CERTIFIED COPY of Articles of Incorporation of the Standard Oil Company of Indiana as they appear in the office of the Secretary of State in Missouri. Filed in said office of Secretary of State of Missouri, January 21, 1897, and certificate to do business issued on that date. Shows that the company incorporated on June 11, 1889, under the laws of Indiana. Signed by A. M. McGregor, George H. Vilas, W. H. Tilford, F. R. Barstow and W. P. Cowan, and acknowledged in New York City, all except Cowan, who acknowledged in Illinois, and the same parties made directors. On September 7, 1899, James A. Moffett was vice-president.

**CERTIFIED COPIES** of Articles of Incorporation of Waters-Pierce Oil Company, filed in the office of the Secretary of State of Missouri, on May 29, 1900. Showing that the company was organized on May 28, 1900, with a capital stock of $400,000, divided into four thousand shares of the par value of one hundred dollars each. Shareholders: Henry Clay Pierce, 3,996 shares; Andrew M. Finlay, one share; John P. Gruett, one share; Charles M. Adams, one share; John J. Johnson, one share, all of St. Louis, Missouri. The same parties are named as the first board of directors.

**CERTIFIED COPY** of Charter of Consolidated Tank Line Company, as same appears in the office of the Secretary of State of Missouri, filed July 3, 1891. Organized and incorporated under the laws of Ohio on January 18, 1878; capital stock $200,000, each share of the par value of $100. Signed by Alex. McDonald, Eugene Zimmerman and James McDonald.

**CERTIFIED COPY** of Charter of Standard Oil Company of Kentucky as it appears on file in the office of the Secretary of State of Missouri. Filed May 10, 1892, and affidavit of retirement from the State filed January 21, 1897. Incorporated under the laws of Kentucky on October 7, 1886. Incorporators: W. H. Tilford, New York; W. T. Jordan, Louisville, Kentucky, and L. T. Rosengartner of Louisville. Capital stock, $600,000—one hundred dollars par value of each share. Directors W. H. Tilford, Geo. H. Vilas, H. H. Rogers, J. D. Archbold and W. P. Thompson. Officers: W. H. Tilford, president; Geo. H. Vilas, vice-president; W. T. Jordan, secretary; L. T. Rosengartner, treasurer. Amendment thereto on April 1, 1902, increasing stock to one million dollars, and C. M. Pratt was president at that time.

**STATE V. STANDARD OIL COMPANY,** 49 Ohio State Reports, 137.

**STATE V. STANDARD OIL COMPANY,** 61 Ohio State Reports, 520.

**FRANK R. NORTHRUP:**    Now lives at Des Moines, Iowa.   In 1892 he began the oil business with Schofield, Shurmer & Teagle in Iowa.   Went to St. Louis in September, 1893, with same firm.   Began in St. Louis as their chief clerk and then became their manager in 1896 and continued as manager up to 1901.   Republic Oil Company succeeded Schofield, Shurmer & Teagle, and he became manager at St. Louis of the Republic and continued with them there until July, 1902; then he went to Chicago and became manager of Republic there.

In St. Louis, Waters-Pierce Oil Company had tank stations both in that city and East St. Louis.   The firm of Schofield, Shurmer & Teagle were active competitors of Waters-Pierce.   Met the Standard Oil Company in Illinois and at Hannibal, but did not meet that company in St. Louis.   Schofield, Shurmer & Teagle had tank stations in Missouri at St. Louis, Kansas City, St. Joseph, Springfield and Clinton, and sold anywhere in Missouri that they could get customers. Never found the Standard Oil Company and Waters-Pierce Oil Company doing business in the same territory in Missouri.   The firm of Schofield, Shurmer & Teagle was the principal competitor of the Standard and Waters-Pierce in Missouri—it was the largest and most aggressive.   They sold to Republic Oil Company on June 1, 1901.   A brother of R. P. Tinsley of Standard Oil Company came to inspect inventory.   Walter Teagle, who had been with the old firm, continued with the Republic Oil Company.

Letter sent to witness at St. Louis, dated June 12, 1901, signed by Republic Oil Company, W. C. T., denying newspaper reports that Schofield, Shurmer & Teagle had sold to the Standard, and alleging that the business of Schofield, Shurmer & Teagle and Cleveland Refining Company had been consolidated and would be continued under the name of Republic Oil Company, and authorizing him as manager to con-

vey such information to his customers along the line suggested as he thought proper.

When Republic Oil Company began business there were some changes made in methods of keeping books. Says this company was left an independent firm; they were to do no cutting as to the companies called their "competitors," that is—Waters-Pierce Oil Company. He followed the prices made by Waters-Pierce Oil Company. Other companies were designated "independents" and he was to get right after them and get every bit of their business, and he could use his own discretion in dealing with them. Says he got the major portion of his oils from Whiting, Indiana, the Standard Oil Refinery, and the shipments of oil to his company were billed as gallonage only. Says after he got started in it all came from Whiting.

His instructions to salesmen were to show them Mr. Teagle's letter stating that his company was not connected with the Standard Oil Company, in order that they might communicate the information to the trade.

While in St. Louis with the Republic he reported to Cleveland, but while with that company at Chicago he reported to W. C. Teagle at 75 New street.

L. H. Turrell, before he became connected with Republic Oil Company, was connected with Standard Oil Company at Des Moines. Then he was at St. Joseph, and afterwards became secretary of Republic. He was with the Republic only a short time and then went to Dubuque with the Standard Oil Company.

Knew Von Harten, who was manager of tank wagons in St. Louis, while he was with the Republic Oil Company there. His company (Republic) ran six tank wagons in St. Louis and had six tanks. Von Harten was in the habit of calling on him in a social way and would inform him a day or two ahead when there there would be a change in the price of oil. Witness would then follow their prices. This continued during

all the time he was manager of the Republic Oil Company in St. Louis.

Says he established the business in Chicago for Republic Oil Company; the Standard was doing business there. At that place says he had instructions to get business from independents and be very careful about competitors' business, and by "competitor" says he means the Standard Oil Company. But says they also had to get after the business "competitor" in order to make some showing.

Says about the time of sale of business of Schofield, Shurmer & Teagle to Republic Oil Company, Ed Shurmer and a Standard Oil man from Louisville came to St. Louis and looked over the property in order to see what it was.

Both the Standard Oil Company and Waters-Pierce Oil Company had tank stations in East St. Louis.

Says Schofield, Shurmer & Teagle at St. Louis sold in certain towns and places—his traveling man would be instructed where to go. His traveling men's territory was staked out on maps and reference would be made to that to find where they went. The major portion of the oils sold by this firm came from Cleveland—got some from Corn Planter Refining Company and some from other places. Their leading brand was palacine.

The Waters-Pierce Oil Company in St. Louis sent out to the trade and dealers regularly card lists of prices which were followed by all the oil dealers there. His information from Von Harten was received in advance of sending out these cards. Says he had no agreement with Von Harten—he would simply tell him what the prices were to be and he would follow them. When with Schofield, Shurmer & Teagle he would not be notified in advance, but would have to find out the prices of Waters-Pierce. When with last named firm they were forced to follow price of Waters-Pierce and when

with the Republic he had instructions to follow their prices. These instructions came from Mr. Teagle.

**F. E. LYMAN:**    Worked for Consolidated Tank Line Company and Standard Oil Company of Kentucky from 1891 for two years. Reported to Kansas City office. While there he was instructed as to territory of Waters-Pierce Oil Company and told to forward orders received for oil from their territory to them at St. Louis, Missouri.

**CERTIFIED COPY** of annual report of Standard Oil Company of Indiana to State of Michigan for year 1905. Stockholders as follows: John D. Archbold, New York, 1801 shares; F. Q. Barstow, New York, 1,001 shares; W. P. Cowan, Chicago, one share; J. A. Moffett, New York, 1,489 shares; C. M. Pratt, New York, 1,701 shares; H. H. Rogers, New York, 2,001 shares; Geo. W. Stahl, Chicago, two shares; W. H. Tilford, New York, 2,001 shares; E. T. Bedford, New York, one share; Walter Jennings, New York, one share. Officers: J. A. Moffett, president; W. P. Cowan, vice-president; Geo. H. Stahl, secretary and treasurer.

**CERTIFIED COPY** of annual report of Republic Oil Company, to State of Michigan, for year 1905. Stockholders: Frank Wilson, Orange, N. J., 3,000 shares; C. L. Nichols, Plainfield, N. J., 150 shares; W. E. Judd, Cleveland, Ohio, 150 shares; J. R. Taylor, Mt. Vernon, N. Y., 200 shares. Officers: C. L. Nichols, president; W. E. Judd, vice-president; W. T. McKee, secretary and treasurer; J. R. Taylor, assistant secretary.

**W. T. McKEE:**    Lives at Cleveland, Ohio, and has lived there since 1902. Prior thereto he was an accountant, and traveling most of the time for Wade Hampton, who was general auditor of Standard Oil Company, with his offices at 26 Broadway, New York. He audited books of station agents and managers wherever he was sent. In January, 1902, he became secretary and treasurer of Republic Oil Company and

still holds that position.  C. L. Nichols is the president of the company.

Cleveland, Ohio, is the distributing office of Republic Oil Company, but the home office is at the office of the president at 75 New street, New York.

While he was traveling auditor under Wade Hampton he audited the books of Standard Oil Company at Kansas City as well as those of Waters-Pierce Oil Company at St. Louis.

**STOCK BOOK** of Republic Oil Company produced and offered in evidence.  This book has been kept at 75 New street, New York City, the home office.

Stock book shows:

No.

Cert. Shares.

Originally
Issued to:

1  3,000      George B. Wilson
2  300        Louis H. Turrell
3  200        James R. Taylor

Now Held by:

Frank Wilson

(150—)  C. L. Nichols
(150—)  W. E. Judd

James R. Taylor

Frank Wilson is assistant to W. G. Rockefeller, who is treasurer of Standard Oil Company of New Jersey.

C. L. Nichols became president of Republic Oil Company in 1902, and is still president.  Prior thereto he was connected with Mr. Drake, who was in charge of some department at 26 Broadway.  James R. Taylor is at 26 Broadway, but he does not know his connection there.

When he went to Cleveland, W. C. Teagle was vice-president and general manager of Republic Oil Company.  He is not connected with Republic now, but is at 26 Broadway.  W. E. Judd is located at Cleveland,

Ohio, and gives his entire time to the Republic Oil Company.

It is here admitted by Mr. Eddy of counsel for Standard Oil Company and Republic Oil Company that the stock held in the Republic Oil Company by W. E. Judd, Frank Wilson and J. R. Taylor is held for the Standard Oil Company of New Jersey.

Says he audited the books of Waters-Pierce Oil Company eight or nine years ago. Audited them twice —once alone, and once he assisted C. W. White, who worked under Wade Hampton, and both times under the direction of Hampton. Has not audited the books of that company since.

LOUIS H. TURRELL: Lives at Detroit, Michigan; is a public accountant. He went there in October, 1903. Was at Dubuque, Iowa, from March, 1902, to October, 1903. Prior thereto he lived at Cleveland, Ohio, and he was there from June, 1901, to January, 1902. He was at St. Joseph, Missouri, from July, 1892, to 1901, when he went to Cleveland. And prior to that was at Des Moines, Iowa. At Des Moines he was with Standard Oil Company and became connected with that company in November, 1890. Alexander McDonald was president of that company. He was with Standard Oil Company at St. Joseph, also. The headquarters were changed while he was at St. Joseph from Cincinnati, Ohio, to Chicago, Illinois. L. J. Drake was the general manager at Chicago. He started in at St. Joseph as cashier and was chief clerk when he left. He left St. Joseph and went to New York City to become an incorporator in a new company. Went at the request of his superiors. Went to 26 Broadway and met J. A. Moffett, who told him a deal was on foot for the purchase of Schofield, Shurmer & Teagle and Cleveland Refining Company by Standard Oil Company. If the deal went through he wanted him to go to Cleveland, and look after the accounting end of the business, and that he, witness, would be secretary and treasurer

of the new company and one of the directors. Then, after this conversation, he went to Cleveland. At Cleveland he was first informed that the Federal Oil Company had been formed and that he was one of the directors, and he commenced arrangements to install a system of accounting for the new company. Shortly after he was called back to New York City and saw Mr. Moffett, who told him the deal had been closed and asked him to go see Mr. Dodd, their attorney, and Mr. Bemis. Dodd showed him the articles of incorporation of Republic Oil Company, and asked him to sign his name to them in the name of F. A. Turrell, that having been written in the body of the paper, which he did. This was not his name, and he had never used these initials, but he was told that it would make no difference. James R. Taylor and George R. Wilson were seen by him at this time.

Mr. Dodd in a general way cautioned him to remember that he was an officer of Republic Oil Company, and that he was not supposed to know much outside of that. He was asked during this visit if any one at Cleveland, Ohio, knew him as a Standard Oil man, and he replied that he was a perfect stranger there.

Says he did not acknowledge the articles of incorporation before Doremus, notary public, as certified.

Says the allegation in the articles of incorporation that he resided in New York City is a mistake, as he never lived there—had lived at St. Joseph, Missouri, for nine years immediately prior thereto.

George B. Wilson, one of the incorporators, was chief clerk of the Standard Oil Company of New York, and he met him at 26 Broadway. James R. Taylor was private secretary to H. M. Tilford, who was connected with Standard Oil Company as a member of the domestic trade committee.

Shortly after Republic Oil Company was organized, the stockholders held a meeting at 26 Broadway in H. M. Tilford's room. Says but little was done—

they did what Mr. Tilford directed to be done. They elected officers: Wilson, president; Taylor, assistant secretary, and himself secretary and treasurer. Held another meeting of the directors—they were all directors. Mr. H. M. Tilford was always present and directed what was to be done. No outside person except Mr. Tilford was present.

Says he paid nothing for the three hundred shares of stock held by him. Does not know what salaries Wilson and Taylor got. As a member of the board of directors he never knew of any money being paid in by the original incorporators.

When he went to Cleveland the second time as secretary and treasurer of Republic Oil Company he made arrangements to install an accounting system.

The firm of Schofield, Shurmer & Teagle had been active competitors of Standard Oil Company at St. Joseph. He also learned that they had a tank station at Kansas City and Springfield.

When Republic Oil Company began business, two men were sent out by Wade Hampton from New York to make an inventory of the properties. Hampton was general auditor of Standard Oil Company. Their inventory was to be the basis on which a settlement was made with Schofield, Shurmer & Teagle.

The Republic purchased at the same time the properties of Schofield, Shurmer & Teagle, Cleveland Refining Company and Scio Refining Company.

When final settlements were made for those properties part was paid in cash and part by notes.

Says they were given to understand that they must not use the same forms of accounting as the Standard and were instructed to represent that the Republic Oil Company was an independent company. Such instructions were given him by James Moffett, H. M. Tilford and W. E. Bemis.

Mr. Bemis suggested that he get a Standard Oil man to help him install a system of accounting, and

he got Mr. Hart of the Standard Oil Company of Chicago. Also sent him H. C. Hardcaster from Standard at Albany to help install a system of keeping record of stock.

All communications to the president of the company were addressed to 75 New street, New York City —the back entrance to 26 Broadway.

C. L. Nichols was chief clerk of Walter Jennings, who was a member of the domestic trade committee at 26 Broadway.

R. P. Tinsley was at the head of the accounting department at 26 Broadway.

When he left Cleveland in January, 1902, he went to Sioux City, Iowa, with Standard Oil Company, and reported to Chicago. Mr. Nichols, president of Republic, wrote him a letter requesting him to go to Sioux City.

Says his certificate of stock in Republic Oil Company was not kept in his possession. It was at the home office, 75 New street. When he went to Sioux City he was requested to cancel his stock certificate.

Letter from C. L. Nichols to witness, dated February 14, 1902, requesting him to sign as secretary certain certificates of stock, and to sign an assignment in blank of one in his name. The certificates were inclosed in the letter and were returned by witness to Nichols after he had complied with Nichols's request.

Says the general instructions to employees of Republic Oil Company were to go after the trade on high-class grades of oil and not to interfere with regular Standard Oil business. They were to push the sale of palacine over and above everything else. The hardest competition was on high-grade oil. Any trade the Standard was enjoying without trouble they were to let alone—they were to work for the class of trade the Standard could not get or had difficulty in getting. The Republic was to go after the independents as

hard as it could.  Another object was to go after ·a class of trade that was prejudiced against the Standard.

Shortly after the Republic Oil Company was organized, the Cleveland Refinery and Scio Refinery were dismantled and were not operated any more.

During the time he was with the Republic, he got oils from Standard Oil Company at Cleveland, Standard Oil Company at Whiting, Atlantic Refining Company at Franklin, Pa., and some through a broker at Oil City.  Oil would be ordered through the Cleveland office or through the president at 75 New street.

Whenever he went to 26 Broadway and wanted to see Mr. Tilford, he would always find Mr. Taylor in his office and through Taylor. he would get to see Tilford.  Never met the president, Wilson, except when they held board meetings.

When Nichols became president a cash statement was reported to him at 75 New street.  Saw Nichols when he would go to 26 Broadway, in Walter Jennings's office, as ·his chief clerk.

Mr. Tilford was at first the directing agency of the Republic and after Nichols became president then Jennings took his place—Tilford's place.

While Wilson was president he would see Tilford .about the business of the company, and when Nichols became president he would see Jennings about its business.

As a general thing those in authority located at 26 Broadway had no title.  ·

The domestic trade committee was located at 26 Broadway and had charge of the sale of oils in the United States.  It was divided up and each member had a territory to look after and reports from that territory were made to him.

Concerning the accounting department of the Republic Oil Company, he consulted with the men at 26 Broadway.

While at St. Joseph, working for the Standard Oil Company, the first head office was at Cincinnati, then it was changed to Chicago. The company with head office at Chicago was Standard Oil Company of Indiana. Prior to that he cannot say positively whether the company was of Kentucky or Ohio. There was nothing on letter-heads or vouchers to indicate what State the company was organized in—just "Standard Oil Company."

Says P. C. Crenshaw, general manager at Chicago, requested his resignation. Gave no reason other than it had become necessary to let some one out of prominence. He had no trouble with the company. His feeling against the company was not real good in view of such treatment.

Says he communicated with General Hadley and offered his services to testify. The reason he did this, he says, was because he learned from the newspapers that there was a misunderstanding in regard to the incorporation of the Republic Oil Company. He considers also that it was a duty that he owed the public to testify.

Says that in May, 1901, at St. Joseph, he heard the manager there, Seth C. Drake, talking over the long-distance 'phone with L. J. Drake at Chicago. Seth Drake turned from the 'phone and wanted to know if he was willing to go to New York and become one of the incorporators and directors in a *sub rosa* company they were forming. He answered "yes," and shortly after went to New York and became an incorporator of Republic Oil Company.

At the time the articles of incorporation were signed, Moffett spoke of the address of witness being New York and remarked that it was all right, nobody would know the difference.

Says he does not know how or when Wilson became president of the Republic, nor did he know that

he had been made secretary and treasurer until he was notified of the fact by Mr. Moffett.

When he was with Standard Oil Company at St. Joseph it got its oils from Whiting, Indiana.

Virgil P. Kline, an attorney at Cleveland, Ohio, was a Standard Oil attorney and transacted the legal business of the Republic. Witness says he was referred to him by Attorney Dodd at 26 Broadway.

**CHARLES W. SCHOFIELD:** Has lived in Cleveland, Ohio, for twenty-six years. He was a member of the firm of Schofield, Shurmer & Teagle, but not an active member. He was not interested in the Cleveland Refining Company nor Scio Refining Company. In the sale of the properties of the firm to Republic Oil Company, John Teagle represented the firm. He made one trip to New York during the negotiations with John Teagle. There they saw with reference to the sale Alexander McDonald—met him at the Waldorf. Says he had some talk with McDonald about the sale. A proposition was submitted to McDonald but he does not know whether that was the one accepted or not. Afterwards, he was advised that the properties were sold—that the trade was made.

**DANIEL SHURMER:** Lives in Cleveland, Ohio. He was formerly a member of the firm of Schofield, Shurmer & Teagle. The members were W. C. Schofield, Daniel Shurmer, Charles Schofield and John Teagle. Says he was an active member of the firm and was superintendent of works and looked after outside business. John Teagle was office man. They did business all through the West. Says his firm was not connected with Standard Oil Company—they sold oil in competition with that company and sold anywhere they could. They quit business in 1901. He and Teagle had control of Cleveland Refining Company and Scio Refining Company. In the sale of the properties of Schofield, Shurmer & Teagle, Cleveland Refining Company and Scio Refining Company, the firm was repre-

sented by John Teagle, who went to New York and made the deal there.

**ED. SHURMER:** Lives at Cleveland, Ohio, and is a son of Daniel Shurmer. He was connected with the firm of Schofield, Shurmer & Teagle. Sale of the properties of Schofield, Shurmer & Teagle took place in the spring of 1901. Prior to the sale he went to New York City with C. W. Schofield, and had a talk with Alexander McDonald at the Waldorf concerning the sale of the firm properties. Says sale was made before he heard of Republic Oil Company.

**JOHN BURROWS:** Had lived in Oklahoma City, Oklahoma, for the past twelve years. He is now engaged in the wholesale oil business and has been connected with the oil business for about twenty-five years. He began with Waters-Pierce Oil Company in St. Louis about twenty-four years ago. Then he was sent to Mississippi by that company to buy and inspect rosin and turpentine. Got pay part from Waters-Pierce Oil Company and part from Chess-Carley Company, and when that company went out of business got a part from Standard Oil Company. Went south in 1883 and was there eight years and these salary payments were made that way during those eight years. Then he was sent to Texarkana, Texas, as local agent for Waters-Pierce Oil Company. Then he was sent to Sulphur Springs, Texas, in same position, and then into Old Mexico, representing the same company. Next, in about 1893, he went to Oklahoma City and took charge of the business of Waters-Pierce Oil Company.

On two occasions tank stations were put up at Oklahoma City in opposition to Waters-Pierce, but they did not last long. Waters-Pierce Oil Company put the price of oil down so low that they could not stay—put it down below cost.

The Anti-Trust Oil Company came in prior to 1900, and he received instructions from Denison, Texas, the headquarters of his territory, to put oil

down from day to day. He received no instructions from St. Louis, Missouri and all his reports were made to Denison.

At Texarkana he reported to Little Rock, Ark., the headquarters of that division.

At all points where he worked he was instructed to spot the oils of competitors and make reports to division headquarters of all outside oils shipped into his territory.

Since 1900 there has been no competition in Oklahoma territory except in lubricating oils. The Standard Oil Company has done no business in that territory that he knows of.

Says while in Texas his station business was audited by three different auditors, from Little Rock, Arkansas, from Waters-Pierce Oil Company, St. Louis, and from Standard Oil Company, 26 Broadway, New York City.

At Oklahoma City the same method was not pursued—most of the auditing was done by auditors from St. Louis, but there has never been a regular checking up of the office.

Republic Oil Company never sold oil in his territory.

Since 1900 has received letters at Oklahoma City addressed to Standard Oil Company. At first he forwarded them to Denison, Texas, headquarters. He was instructed to open such mail and fill orders for oil if any was wanted.

Says he received instructions that the International Harvester Company of Chicago would furnish him with labels to be put on certain oils and shipping instructions from them. He was to charge the gallonage of oils to home office account of Standard Oil Company. He was furnished by International Harvester Company with printed bills of lading, shipping tags, etc., and the oils were furnished and shipped accordingly by witness. The gallonage was charged to home office

at Denison, Texas, account Standard Oil Company.

Letters produced showing witness was discharged because of unsatisfactory services, although he claims he resigned. Also a letter produced written by him in which he asks to be reinstated. Denied that he had asked to be reinstated.

Says he wrote Hadley about his knowledge because Mr. Ebie, the local manager, had threatened to fight his business. Says he thought if he was going to fight him he would retaliate.

During the time he was with Waters-Pierce Oil Company at Oklahoma he got the majority of his oils from Whiting, Indiana. It came in tank cars, either W. P. O. cars or U. T. L. cars. The oil was not paid for by his station. They sold prime white and crown gasoline.

[The testimony of this witness is largely hearsay and incompetent and is so colored by his feeling against the Standard Oil Company and Waters-Pierce Oil Company, as to greatly weaken it.]

J. A. BROWN: Now lives in Kansas City, Kansas. Says he was with Waters-Pierce Oil Company at Newkirk, Oklahoma, for about eleven years. He was agent then for them. This is about eight miles from Kansas line. His competition while there was from the National Oil Company, which sold some oil there. Had no competition with Standard Oil Company. He did not sell or solicit trade in the State of Kansas—he had been instructed to not sell there and these instructions were still in force when he quit on October 1, 1904. He received orders which had been sent to Standard Oil Company by persons living in his territory and filed them. Most of these were received in the early part of his agency. These letters would come to him direct from the point to which they were sent at times and at other times from the head office

218 Sup—11

at Denison. Denison was then the head office of his territory, and he reported there. About two years ago the head office was changed to Oklahoma City, and then he reported there. Most of his oils and gasoline came from Whiting, Indiana—in later years some came from Corsicana, Texas. Sold eupion and crown gasoline. Standard never came into his territory. They had a station twelve miles away from Arkansas City, Kansas.

E. T. HATHAWAY:   Lived at Oklahoma City since 1904. He began service with Waters-Pierce Oil Company, June 1, 1878, at Denison, Texas. Prior thereto he had been with Chess-Carley Company at Louisville, Kentucky. Was at Denison until 1904, where the headquarters of Oklahoma Territory were moved to the latter place. The Standard Oil Company has not had any tank stations in Texas or the Oklahoma division since he has been with the Waters-Pierce, and he has done no business to any extent in those places. Standard Oil Company has stations at Arkansas City and Wichita, Kansas. Waters-Pierce Oil Company did not sell in Kansas where Standard sold.

When Waters-Pierce Oil Company was reorganized in May, 1900, he was discharged by the old company and at once re-employed by the new company. There were no changes made in the business methods. Says everything went along just the same. He, as manager at Denison, discharged all his employees and re-employed them. No loss in salaries or pay of employees.

As manager he gave agents instructions to sell in their territory and no further.

Says he knows they filled orders for the International Harvester Company, charging the goods to the St. Louis office.

His orders for oil all went to St. Louis, and the oil was shipped sometimes from Whiting, Indiana, and sometimes from Corsicana, Texas.

In regard to International Harvester Company, says that he knew nothing about the arrangement of the St. Louis office. He simply filled the orders and charged the goods to Waters-Pierce Oil Company, St. Louis.

Says some orders from his territory to Standard Oil Company for oil were sent to his office and filled by the proper agent and collections made for same.

His division consisted of a part of Texas, Oklahoma and part of Indian Territory. The division was divided up into agencies and each agent was assigned a certain territory, and all got their oil through orders to the head office of the division, and all accounted and reported to him.

J. W. WAGNON:    Lives at Oklahoma City, and is in the real estate business. He quit the Waters-Pierce Oil Company in November, 1904, and had worked for that company twenty-five years prior to that time. For about ten years of the time he was assistant manager.

Never knew of Standard Oil company selling in Waters-Pierce territory. He was in the office at Denison, Texas, which was the division office, as assistant division manager. In August, 1904, the division office was moved to Oklahoma City, and he went to the latter place.

He says that Burrows was a hard worker and a faithful employee, and that his discharge was caused by Mr. Wheeler, who was investigating the division at that time and was temporarily the higher authority. He was assistant to general manager in St. Louis.

A. C. EBIE:    Lives in Oklahoma City since October, 1904. He is manager of the Oklahoma division of Waters-Pierce Oil Company. Prior to coming here he was employed by Standard Oil Company at Newark, New Jersey.

A. V. Jockel came to Oklahoma City in December, 1904—he knew Jockel in Newark.

When witness was in Newark he was chief clerk

of Standard Oil Company at that place—that was Standard Oil Company of New Jersey.

When he came here he made application for employment by Waters-Pierce Oil Company to Mr. McNall, at 26 Broadway, New York City. He is commercial agent of Waters-Pierce Oil Company.

The Republic Oil Company does no business in Oklahoma Territory.

After seeing Mr. McNall he next saw Mr. Finlay, president of Waters-Pierce Oil Company, in St. Louis. He also met Mr. R. P. Tinsley in St. Louis, whom he had seen in his office at Newark, and once at 26 Broadway, Tinsley had an office there but he does not know what his title was, but thinks he was connected with the accounting department. Jockel had been employed in the same office as witness at Newark.

Says he comes in competition with. Standard goods in northern border of his territory, but they have no tank station in the territory. Says he recognizes that company as a competitor when it ships goods into his territory. Says there were some carloads shipped into his territory by Standard—at least so reported to him as being Standard goods.

Gets his goods from Neodesha, Whiting and Chaison, but does not know what refineries are located at those points, but orders for goods are sent to St. Louis office.

Says they have confined their territory and agents and solicitors do not go outside, but they have not issued any instructions not to. Says it would not be advisable to ship Oklahoma test goods into Kansas; their goods seldom pass inspection here, and he sells a higher grade of goods, judging from shipments coming in and are rejected by the deputy inspector—the test is higher in Oklahoma than in Kansas.

Says Jockel worked about two months here under witness and was then relieved because he was generally unsatisfactory, found to be negligent, untruth-

ful so far as his general report was concerned regarding his work, and he could not give bond.

. Says his arrangements to go to Oklahoma City were made and agreed on with Mr. McNall, including salary.

When he saw R. P. Tinsley in St. Louis, on his way to Oklahoma, he was acting as vice-president of Waters-Pierce Oil Company. C. P. Ackert is the general manager of Waters-Pierce Oil Company.

Says all his reports are made to the office in St. Louis.

Admitted that orders for oil from Standard Oil Company territory sent to Waters-Pierce agencies were transmitted to Standard Oil Company, and orders for oil from Waters-Pierce territory to Standard Oil Company agencies were transmitted to Waters-Pierce Oil Company, and when such orders were so received by Waters-Pierce Oil Company they were filled and that company collected for the oil.

It is admitted that reports on forms offered in evidence were made to R. H. McNall, commercial agent at Waters-Pierce Oil Company at 26 Broadway, New York City.

**C. M. ADAMS:**    Stock book of Waters-Pierce Oil Company produced. Adams, as secretary, says it is his duty to issue stock whenever a transfer is made, sign it and attach the seal.

He is also treasurer of the company, and, as such, looks after its finances. As such secretary and treasurer he attended to remittances, payments of bills, signing checks and various things of that sort.

Says they purchased oils from Standard Oil Company of Indiana, Galena Signal Oil Company of Franklin, Pennsylvania, Atlantic Refining Company of Philadelphia, and paid for all the oils so purchased. Says orders for oils were made direct to the refineries. The orders went out from his office.

As to bills due the Atlantic Refining Company, a charge was made and the checks sent to Mr. Howe, at 26 Broadway, New York City, he being some officer of the company located there.

When the question of salaries came up it was the custom for the vice-president, secretary and treasurer to get together, make recommendations and send them to the president, if he was not here.

Says he went to 26 Broadway about two years ago by request, but does not remember who requested him. Says he discussed various matters there concerning the Waters-Pierce Oil Company with Mr. Moffett and Mr. Tilford.

W. F. Taylor, an attorney at New York City, is a director of Waters-Pierce Oil Company. Has seen M. M. VanBuren, who is a stockholder. Of the four thousand shares of stock of Waters-Pierce Oil Company, 2,747 shares stood in the name of M. M. VanBuren in March, 1905.

STOCK BOOK of Waters-Pierce Oil Company offered in evidence. Capital stock $400,000. Cert. 1 for 1,000 shares, one hundred dollars each, dated June 1, 1900, to H. C. Pierce; assigned to M. M. VanBuren, June 24, 1904; on back two $10 U. S. stamps cancelled September 4, 1900. Cert. 2 for 1,000 shares, one hundred dollars each, dated June 1, 1900, to H. C. Pierce; assigned to M. M. VanBuren, June 24, 1904; on back two $10 U. S. stamps cancelled September 4, 1900. Cert. 3, for 748 shares, one hundred dollars each, dated June 1, 1900, to H. C. Pierce; assigned July 12, 1904, 746 shares to H. C. Pierce, one share to R. P. Tinsley, and one share to Walter F. Taylor. U. S. stamps cancelled June 1, 1900, and U. S. stamps cancelled September 4, 1900.

Says the assets of the old company were purchased from the stockholders by the new company and paid for out of the earnings of the new company.

Both Mr. McKee and Mr. Backus came out and

audited the books of Waters-Pierce Oil Company, but while they were doing so they were employees of that company.  When they got through and were paid off they ceased to be employees of the company.

Stock of Waters-Pierce Oil Company March 29, 1905, was owned as follows:

Andrew M. Finlay, 1 share.

John D. Johnson, 1 share.

C. M. Adams, 1 share.

R. P. Tinsley, 1 share.

H. C. Pierce, 1,248 shares.

M. M. VanBuren, 2,748 shares.

Owned June 1, 1900:

Andrew M. Finlay, 1 share.

John D. Johnson, 1 share.

C. M. Adams, 1 share.

J. P. Gruett, 1 share.

H. C. Pierce, 3,996 shares.

Stock book of Waters-Pierce Oil Company prior to May 29, 1900, produced and witness Adams examined in regard to it.

Witness says that up to 1892 the trustees of Standard Oil Trust held 2,747 shares of stock of Waters-Pierce Oil Company, and then that amount was issued to Standard Oil Company of New Jersey—the old certificate to the trustees being cancelled.

When the old Waters-Pierce Oil Company was dissolved on May 29, 1900, Standard Oil Company of New Jersey held 2,747 shares of its 4,000 shares of stock.

When the capital stock of old Waters-Pierce Oil Company was increased in 1882, from $100,000 to $400,000, the Standard Oil Trust, for the first time, became owners of stock.

Letter from M. M. VanBuren to C. M. Adams, dated July 1, 1904, directing him to make dividend checks on stock standing in his name payable to Seaboard National Bank, New York City, and since that time he has complied with Mr. VanBuren's request.

Receipt from H. C. Pierce for dividend on 3,994 shares of Waters-Pierce Oil Company stock, dated June 16, 1904, amounting to $99,850.

Receipt No. 33, dated July 7, 1904, from M. M. VanBuren, by Seaboard National Bank for $68,650, being a dividend receipt on stock held by VanBuren.

Has been with Waters-Pierce Oil Company since its organization in May, 1878. It has been doing business in the same parts of Missouri since, but the volume of the business has been very greatly increased. The number of warehouses, tank stations and agencies have been very largely increased in this State and elsewhere. Its facilities have been greatly increased and improved. The company operates no refineries in United States, but manufactures axle grease and lubricating oils in St. Louis. It has three petroleum refineries in the Republic of. Mexico. Company also deals in naval stores, such as turpentine, rosin and tar.

The company purchases the largest part of refined oils handled in this country from Standard oil Company at Whiting, Indiana. Lubricating oils also come from there and from Galena Signal Oil Company at Franklin, Pennsylvania. Also says they buy oils from points in Texas, Neodesha, Kansas, and Sugar Creek, Missouri, and Atlantic Refining Company, Philadelphia, and Eclipse Works, Franklin Pennsylvania. Says he orders supplies of crude oil for Mexico from Atlantic Refining Company, Philadelphia, and they are shipped to Mexico by tank steamers. In Mexico they have a refinery at Tampico, one at Vera Cruz and one at the City of Mexico. For supplies for the various divisions in this country requisitions are made through the St. Louis office. For these oils invoices are sent to St. Louis and paid from there.

The company keeps its bank accounts with National City Bank, New York, and Bank of Commerce, St. Louis. Eastern bills for crude oil and supplies are generally paid through the New York bank. Gener-

ally paid field agents by drawing a check for full amount of pay roll and have the bank draw checks in name of division manager who would indorse them to the parties entitled. This would be New York exchange. The agent at Joplin was paid in that way.

McNall was employed as commercial agent of Waters-Pierce Oil Company some three or four years ago. His duties are principally to buy crude oil and all kinds of supplies for Mexico, and to see to the shipping of them.

Says Sugar Creek refinery and Neodesha refinery are Standard Oil refineries. Doesn't know that the Texas refineries belong to Standard Oil Company. As to Atlantic Refining Company does not know its ownership; but pays for oils bought from it to its agent at 26 Broadway, New York.

Orders that go to McNall are mostly for goods other than oil and gasoline.

Says there was no dividend declared or paid by the Waters-Pierce Oil Company in the year 1901.

ANDREW M. FINLAY:    He is vice-president of Waters-Pierce Oil Company. His connection with this company began in May, 1878. He is a brother-in-law of H. C. Pierce. First began as manager at Marshall, Texas. For the last eighteen years he has been connected with the company in St. Louis. When he first came to St. Louis he became superintendent of divisions—next became vice-president. Became a stockholder in 1890. The company formed in 1878 was dissolved in May, 1900, and a new company organized under the same name. The business was conducted the same as before, except there was some change in the officers. He owned a share of stock in the old company and got one in the new company. As far as he knew the trouble in Texas was why the old company dissolved.

Says Mr. VanBuren, Mr. Adams, Mr. Pierce and himself became stockholders in the new company, but

does not know the date on which VanBuren became a stockholder, but thinks it was about a year ago.

Up to 1904 he was vice-president and general manager of the company. Says he had correspondence with 75 New street. Says he may have been asked to come to 26 Broadway by Mr. Tilford and Mr. McNall. He went there, but cannot fix the time, and saw both those gentlemen—that was three years ago.

[It is clear from this witness's evasive answers to questions that he, as vice-president and general manager of Waters-Pierce Oil Company, communicated with H. M. Tilford, at 26 Broadway, New York City, relative to salaries of officers and employees of said company.]

Says memorandums of changes in salaries were sent to Mr. McNall, commercial agent, at 75 New street, for his general information and because he asked for it.

Prior to 1900 the company had no representative at 26 Broadway, New York City. Mr. McNall's duties were to purchase supplies for Waters-Pierce Oil Company.

Says they made accounting reports and sales which had to do with buying goods to Mr. McNall. That reports on forms offered in evidence were made to McNall in order to aid him in discharging his duties, but further on adds that he did not know the purpose of furnishing such reports. These reports related to sales of oils, profits, tank-wagon deliveries, cost of barreling and marketing, stable expenses, home office expenses, rents, taxes, special salaries—in short, every detail of the business, as will appear from the form of reports in evidence.

**ANTHONY V. JOCKEL:** Lives in Brooklyn, New York. In 1904 he was bookkeeper for Standard Oil Company at its office in Newark, New Jersey.

At that time R. P. Tinsley was located at 26 Broadway. He received reports and transfers between other companies and Newark branch of Standard Oil Com-

pany.  R. B. Backus was with R. P. Tinsley.  They left soon after he went with Standard Oil for St. Louis, and went with Waters-Pierce Oil Company.

He knew R. H. McNall at 26 Broadway, who represented Waters-Pierce Oil Company.  Prior thereto he had been with Pratt Oil Company, located at that place.  Says he changed from one company to the other about the time Tinsley and Backus went to St. Louis.

A. C. Ebie was chief clerk of Standard Oil Company at Newark while he was there.  One W. R. King was an officer of Standard Oil Company at 26 Broadway.

Mr. Ebie, during the year 1904, through E. E. Young, Mr. King and Mr. McNall, was transferred to the Waters-Pierce Oil Company.  Mr. Young was manager of the Newark branch of Standard Oil Company. Mr. Ebie went to Oklahoma City, Oklahoma, and took charge of business of Waters-Pierce Oil Company.

Witness was also transferred to the same place as Mr. Ebie.  In November, 1904, Mr. Young sent him to 26 Broadway, New York City, to consult Mr. King. Mr. King introduced him to Mr. McNall.  He and Mr. McNall came to terms and agreed.  Before he left he was instructed by both Mr. Young and Mr. McNall never to mention the fact that he had known of or had been employed by Standard Oil Company.

Says he stopped at the St. Louis office of Waters-Pierce Oil Company and was instructed by Mr. Tinsley to bring up the Oklahoma office to a level with the Newark office, and to put in force the forms of reports used in the East.  Also gave him about the same instruction that he received before leaving Newark as to keeping close-mouthed.

Says he was at Oklahoma about two months. Standard Oil Company did not sell in Oklahoma territory, but the Waters-Pierce Oil Company carried a stock of Standard lubricating oils, but the packages were changed to Waters-Pierce barrels.

Says Waters-Pierce Oil Company, through its agents, claimed to be a competitor of the Standard Oil Company.

Says there were two other oil companies selling in that territory and that the Waters-Pierce Oil Company, at certain points, sold oils at a loss as against them.

**H. C. HARDCASTLE:**    Now lives in New York City. Became connected with Standard Oil Company in the accounting department in 1891.   Continued there for about eight years, and then went to Cleveland, Ohio, where he worked for Republic Oil Company.

He went to Republic Oil Company at Cleveland, through Walter Jennings, who was on the domestic trade committee of Standard Oil Company at 26 Broadway.   Says he went to see Jennings at 26 Broadway, and he told him he wanted witness to take a position with a subsidiary company.   Then Jennings took him up to the office of W. H. Tilford at same place and Tilford told him they had  just  absorbed  Schofield, Shurmer & Teagle and reorganized it under the name of Republic Oil Company, and wanted to know if he would go to Cleveland to work for the latter company. Salary was agreed on and he was told by Tilford that when he went there it was not to be known that he was ever connected with the Standard Oil Company.

He found that C. L. Nichols was president of Republic Oil Company, who had been secretary to Walter Jennings, Nichols kept an office at 26 Broadway.   Walter C. Teagle was then vice-president of Republic Oil Company—he is now located at 26 Broadway, and is a member of the export trade committee of Standard Oil Company.

W. T. McKee was auditor for Republic Oil Company.  He was, prior thereto, an auditor of Standard Oil Company.

Says field managers got general instructions from the Cleveland office to represent to the trade that the

company was independent and a competing company of the Standard Oil Company.

Says he made a trip through the States in which Republic Oil Company sold oils, including Kansas City, and St. Louis, to install its stock system employed, in the State of New York and other States, by Standard Oil Company.

Reports of business of Republic Oil Company were made to C. L. Nichols, 75 New street, New York City, being the rear entrance to 26 Broadway.

He stayed with Republic Oil Company about four months. Says during that time business continued in the same way as above described and Nichols continued as clerk to Jennings.

Says he knew R. P. Tinsley, who was agent of domestic trade department of Standard Oil Company, before he went with Waters-Pierce Oil Company. Mr. Backus was a traveling auditor of Standard Oil Company before he went with Waters-Pierce Oil Company.

When he left Cleveland he went back to Albany, New York, with Standard Oil Company. Stayed there about a month and then with Atlantic Refining Company. From there, after a very short time, he went back to Albany. He finally resigned from Standard Oil Company—he was asked to do so.

L. J. Drake finally took the place of Walter Jennings as a member of the domestic trade committee. Same Drake who was connected with Standard at Chicago.

Just before going with Republic Oil Company at Cleveland he also had a talk with R. P. Tinsley, agent of domestic trade committee, Wade Hampton, general auditor of Standard Oil Company, and George W. Wythe, all at 26 Broadway. Tinsley put him in charge of Mr. Warner, who had charge of books down there, to show him how to run home office end of bookkeeping; in other words, to conduct the bookkeeping department

of Republic Oil Company the same as that employed by Standard Oil Company. Hampton cautioned him not to mention the fact that he was connected with Standard Oil Company.

Says there were three traveling auditors of Standard Oil Company transferred to Republic Oil Company to get together the valuation of the stock of the latter company. After they got through they were reinstated by Standard Oil Company.

**HOWARD PAGE:** He has an office at 26 Broadway and is connected with foreign department of Standard Oil Company of New York. Was once connected with Union Tank Line Company, which owned cars for rent to other companies, and had an office at 26 Broadway. He was vice-president of that company. Says they rented cars to Waters-Pierce Oil Company, which had some cars of its own. Standard Oil Company of Indiana also used cars—U. T. L. cars. Says this company received reports from all companies using its cars as to their receipt, movements, etc.

Says he was formerly connected with Chess-Carley & Company. He was also connected with Standard Oil Company of Kentucky. Then he went with Standard Oil Company of New York. He was connected with this latter company and Union Tank Line Company at the same time and both had offices at 26 Broadway.

**A. V. JOCKEL:** While passing through St. Louis on his way to Oklahoma City, as testified, he met at Waters-Pierce headquarters, Tinsley, Backus, Gruett, C. P. Ackert, Mr. King and Mr. McKee. Met Mr. McKee in office of Mr. King, who received reports from all Waters-Pierce branches or divisions. He was connected with the auditing of stock reports. McKee was instructing a new auditor whom they were about to send out to audit a division or station.

Says he had known Mr. Tinsley at 26 Broadway, when he was located there. Before Tinsley went out to

St. Louis and while he was at 26 Broadway, he was agent who received reports from all branches of Standard Oil Company divisions.

Says he wrote to General Hadley in October, 1905, that he had information. This was after he read about the case in the papers.

Says he worked at Newark, New Jersey, for six months as book-keeper and was at Oklahoma City ten weeks. This was the full time he worked for any of the respondents. Says at Newark he got $624 a year, and at Oklahoma City $1,200. Mr. McNall told him what his salary would be—no one else.

Was charged at one time with appropriating $100 from a company, but he was not convicted. On account of this charge the American Surety Company would not bond him at Oklahoma City, and he had to resign his position there.

**WILLIAM H. D. READ:**     Lives at Whitehall, Maryland. Is a farmer. He was traveling auditor for Standard Oil Company from 1895 to 1902. He was employed by Wade Hampton and he was paid by him monthly, and reported to him at 26 Broadway, New York City.

While he was with Wade Hampton he audited the books of Waters-Pierce Oil Company at St. Louis, twice, at the direction of Hampton, the present Wade Hampton. On these two occasions he reported to the auditor in charge of auditing at 26 Broadway; the first time it was W. T. McKee, and the second time Charles T. White.

During the time he was working for Hampton he made occasional trips to 26 Broadway. Audited books of Waters-Pierce Oil Company in the years 1897, 1898, or 1899.

**FRANCIS D. CARLEY:**     Lives in White Plains and has no business at present. He was in the oil business in Louisville, Kentucky, from 1866 to 1886. He was first with the firm of Chess, Carley & Co., and later

with Chess Carley Co., a corporation, and was engaged in the business of refining and selling the products of petroleum in all the southern states east of the Mississippi river.

He became a stockholder in Waters-Pierce Oil Company in 1884 to 1886. The Chess-Carley Co. also became a stockholder in Waters-Pierce Oil Company in about 1883. All this stock he sold to some one at 26 Broadway in about 1887. The Chess-Carley Co. then went out of existence and Standard Oil Company of Kentucky succeeded it.

H. A. Hutchins, who was a director of Waters-Pierce Oil Company, was located at Cleveland and had something to do with the distribution of oils in the western states for Standard Oil Company.

Col. Thompson, a director in Waters-Pierce Oil Company, at one time was connected with 26 Broadway.

Says after he became connected with Waters-Pierce Oil Company it got nearly all of its oil from Standard Oil Company.

Says sometime in the '80's he bought individually the M., K. & T. Tank Line, consisting of a few oil tank cars run over the M., K. & T. Ry. He sold this line and took pay in Waters-Pierce stock—this was an individual transaction.

Established facilities by a good merchant selling oil in a locality gives him almost complete control.

**ALBERT A. SMITH:** Says he is a stenographer. He worked as such in the department of W. E. Bemis at 26 Broadway from May, 1903, to June 30, 1905. Bemis was at one time on the domestic trade committee and later on some committee with Howard Page. He was also head of the statistical department, and, as such, received reports from all over the world concerning the petroleum business. Says as stenographer he took dictations of many letters to Republic Oil Company and Waters-Pierce Oil Company concerning the gen-

eral conduct of the business. Says he took these dictations while in the office of Mr. Bemis and this continued during the whole time he was there. The dictations were made by various persons and on different branches of the business. They were first turned over to Mr. Wilson and then sent in to be signed by Mr. McNall; that is, letters to Waters-Pierce Oil Company. Letters to Republic Oil Company were sent to the office of C. L. Nichols to be signed. Both McNall and Nichols had offices in the building. Nichols was in office with L. J. Drake and McNall in office with W. H. Tilford.

Up to a short time before he left when a letter would be written to Republic Oil Company or Waters-Pierce Oil Company a carbon was made and kept in the office of Bemis. The name of the company would appear on the carbon—one would be sent with the letter to be signed and one kept in the office, but the names of the company would not appear on the carbon.

He was discharged from his position with Standard Oil Company, but refuses to give the reasons. Says he became a witness in this case because he thought he could give some good valuable testimony against the Standard Oil Company.

Says letters written by him to Waters-Pierce Oil Company were on letter-heads of that company, and letters written to Republic Oil Company by him were on the letter-heads of that company.

**HENRY H. ROGERS:** He is a stockholder in Standard Oil Company of Indiana, but is not familiar with the details of the oil business in Missouri.

M. M. VanBuren is a son-in-law of John D. Archbold.

H. M. Tilford has an office at 26 Broadway, and is connected with the Continental Oil Company.

J. A. Moffett is president of Standard Oil Company of Indiana.

218 Sup—12

Gives a list of officers and directors of Standard Oil Company of Indiana for years 1903, 1904, 1905.

Walter C. Teagle is connected with the foreign business of Standard Oil Company at 26 Broadway.

Moffett has an office at 26 Broadway.

It is here admitted by counsel for respondents that a majority of the stock of the Republic Oil Company and Standard Oil Company of Indiana, and all the stock of Waters-Pierce Oil Company standing in the name of M. M. VanBuren, was held during the time laid in the information for Standard Oil Company of New Jersey.

Says he had had conversations in a general way about the business of Waters-Pierce Oil Company between January, 1901, and March, 1905, these conversations were with some of the oil people.

Says he heard of McNall in Mr. Tilford's office at 26 Broadway.

**WILLIAM G. ROCKEFELLER:** Lives in New York and is assistant treasurer of Standard Oil Company of New Jersey, and has held that position for about five years. W. H. Tilford is treasurer. H. M. Tilford is a brother of W. H. Tilford, and he also has an office at 26 Broadway.

Has known R. H. McNall for past thirty years. He is at 26 Broadway, but does not know what position he holds. Has seen him at 26 Broadway for a good many years, but never knew just what position he held.

Has known H. M. Tilford at 26 Broadway for ten years, but never knew what position he held there. Never heard of McNall until his name was mentioned in taking these depositions.

Witness has an office at 26 Broadway, and the Standard Oil Company of New Jersey does business there. Says he thinks his uncle, John D. Rockefeller, is one of the vice-presidents of that company.

He has met Mr. Moffett, who has an office at 26 Broadway.

Says Frank Wilson is employed in the office of witness as bookkeeper of the Standard Oil Company of New Jersey.

Says he knew a George D. Wilson who was formerly a bookkeeper, and he was succeeded by Frank Wilson.

**JOHN D. ARCHBOLD:** Lives in New York City, and is one of the vice-presidents of Standard Oil Company of New Jersey. He is also a director in the Standard Oil Company of Indiana.

John D. Rockefeller is president of Standard Oil Company of New Jersey, and has been since its organization. This company refines petroleum, but it does not operate wells. It has refineries at Bayonne, New Jersey, but has no others that he knows of.

M. M. VanBuren is the son-in-law of the witness. VanBuren has no active connection with the oil business and is not connected with any of the companies.

The offices of Standard Oil Company of New Jersey are at 26 Broadway. Also, the Standard Oil Company of Indiana has an office there.

While John D. Rockefeller is the nominal head of Standard Oil Company of New Jersey, for the past ten years he has had no active personal relationship with the business. And while he has an office at 26 Broadway, he is seldom there. He has not of late years attended the meetings of the company.

Witness says that he has, perhaps, in later years, been the most active man connected with Standard Oil interests. Others who have been actively connected with him are: Barstow, Moffett, Jennings, Bedford and many others.

H. M. Tilford is as familiar as any one else with the oil business in the Central West, including Missouri.

There are committees at 26 Broadway composed of men actively connected with the oil business. With us, says witness, they are known as experts in their various lines. Says there are a number of people who are connected with the domestic trade administration in the *various companies* but, not being a member, he cannot tell how they operate. And there is a committee which looks after the *foreign* trade.

The Galena Oil Company and Atlantic Refining Company both have offices at 26 Broadway.

Says he has been at 26 Broadway since the building was first built, some fifteen years ago.

From 1892 to 1900 the Standard Oil Company of New Jersey had 2750 shares of stock in Waters-Pierce Oil Company. Prior to that time the same stock had been held by Standard Oil Trust. And since May, 1900, this same stock has been held by Mr. VanBuren.

Says the total productions of petroleum in United States for January, 1906, was 345,000 barrels, of which the Standard Oil interests produced 45,000 barrels.

Of the production in Kansas and Indian Territory Standard produces one-eighth or one-ninth of the crude.

Says there is a refinery capacity in this country competitive to the Standard Oil Company enough to do the entire business of the country. Standard Oil interests also have enough refining capacity to do the business and do get seventy-five per cent of the whole —that is, the sales.

Says there are competitive refineries at all points where oil is refined.

Heard about the dissolution of the old Waters-Pierce Oil Company and supposed it was because of the trouble in Texas.

Knew Horace A. Hutchins, W. P. Thompson and Frank B. Carley, who were directors in Waters-Pierce Oil Company down to 1885, and they were at the same time connected with Standard Oil Company.

In 1885 Carley was succeeded by W. H. Tilford, who was also connected with Standard Oil Company.

D. S. Coles, who appears as a director of Waters-Pierce Oil Company in 1887, was formerly connected with Standard Oil Company.

Silas H. Payne, who appears as a director of Waters-Pierce Oil Company in 1889, was and is also a Standard Oil man.

G. F. Gregory, who appears as a director of Waters-Pierce Oil Company in 1890, was also connected with Standard Oil Company.

Witness says he does not personally know of the connection of the foregoing named persons with Waters-Pierce Oil Company, but is assuming that such facts are properly stated by counsel.

C. M. Pratt, in 1891, was also connected with Standard Oil interests.

The original Standard Oil trustees were John D. Rockefeller, William Rockefeller, H. N. Flagler, Charles Pratt, W. G. Warden, Ben J. Brewster, J. A. Bostick, O. M. Payne and John D. Archbold, in 1882.

R. P. Tinsley, prior to 1904, was connected with Standard Oil interests at 26 Broadway. Tinsley is still in the employ of the Standard Oil Company.

**WADE HAMPTON:** He is general auditor of Standard Oil Company of New Jersey and Indiana, and is located at 26 Broadway.

He has never been the general auditor of Waters-Pierce Oil Company, but some of his staff were employed by that company, but did not report to him. He directed auditors from his staff to go to St. Louis and audit for Waters-Pierce Oil Company under employment by that company, and report to its secretary. These auditors, while auditing the accounts of Waters-Pierce Oil Company, were on its pay rolls and not on his. When they had finished they were again placed on his pay rolls.

When these auditors would go to St. Louis he would notify the secretary. That was the understanding he had with the directors that they should be employed because they preferred Standard Oil auditors.

He audited the books of the Standard Oil Company of Indiana because he was its general auditor. He had nothing to do with the Republic Oil Company.

Says he thinks a copy of auditor's report of Waters-Pierce Oil Company was sent to 26 Broadway to some one.

Prior to June 1, 1900, reports of the audit of books of Waters-Pierce Oil Company were sent to him at 26 Broadway, he passed on them and then submitted them to some one who represented the Standard Oil Company's ownership.

McNall was formerly connected with the Pratt Works office at 26 Broadway, and afterwards changed and went into the office of H. M. Tilford, where he has been for several years past.

Letter dated February 8, 1901, from Wade Hampton to J. P. Gruett, vice-president Waters-Pierce Oil Company, saying to him that Mr. Conrey would arrive on Monday to audit the books and general accounts of St. Louis office. This language occurs: "For reasons which you will undoubtedly appreciate, it is best that Mr. Conrey be considered an employee of your company during his examination. Therefore, kindly enter his name on your pay-roll from the date of his arrival at $191.67 per month; also kindly pay what expense he is under from the time he left New York."

Letter from Hampton to J. P. Gruett, dated November 7, 1902, marked "Personal," notifying him that C. W. Norman would be there to audit the books and accounts of the general office of Waters-Pierce Oil Company, and that he would be assisted by Henderson and Higgs. Directions to place Norman on pay-roll at $2,500 per annum.

Another personal letter from Hampton to Gruett, dated November 12, 1902, advising him to place Henderson and Higgs on the pay-roll of the Waters-Pierce Oil Company at $1,800 per annum, as well as to pay their expenses from the time they started to St. Louis.

Says that in all cases where auditors were sent to audit the accounts of Waters-Pierce Oil Company, it was done in the manner indicated in those letters—this was after May 29, 1900.

R. B. Backus was an auditor working under him.

Letter from Hampton to Gruett, dated November 10, 1903, notifying him that he was sending R. D. Backus to audit the books and accounts of the general office of W. P. O. Co., and directing Gruett to place Backus on pay roll at $3,000 per annum and expenses.

Letter from Hampton to Gruett, dated December 10, 1903, notifying him that Wm. Waller would arrive to assist Mr. Backus in auditing books of Waters-Pierce Oil Company, and directing that he be placed on pay-rolls at $2,100 per annum, and to pay his expenses from Decatur, Illinois.

Says they ought to have had a plant record of Waters-Pierce Oil Company at 26 Broadway, because they were largely interested in that company, but he does not know what they had. Says construction reports of Waters-Pierce Oil Company were addressed to him, but he did not handle them. This was prior to 1900. One Mr. Barker had charge of plant records. He was in the office of witness, but afterwards moved to that of Clark.

Letter dated September 8, 1899, from Hampton to Gruett, relating to construction reports of Waters-Pierce Oil Company, which had been sent to Hampton at 26 Broadway.

Letter dated October 20, 1899, from Hampton to Gruett, relating to plants and construction matters in Mexico.

G. A. Stein and H. H. Stein worked for him as traveling auditors. Says he possibly directed them to audit the accounts of the old Waters-Pierce Oil Company. He had about fifty or sixty men working under him—traveling auditors. If they audited since 1900 they did so on communication from him to go to St. Louis, but they would not be under his direction after they got there—they did not report to him. Before 1900 the report of such auditing would be sent to witness. After 1900 such reports were made to Pierce, but some one at 26 Broadway had a copy.

Says he heard that both Backus and Tinsley went with Waters-Pierce Oil Company in 1904.

Prior to going with Waters-Pierce Oil Company, R. P. Tinsley had a position at 26 Broadway as agent of Standard Oil Company of New York, Atlantic Refining Company and Standard Oil Company of New Jersey. He was succeeded by H. C. Arnold, who is still agent.

Mr. Nichols of 26 Broadway is assistant to Mr. Drake, who is connected with Standard Oil Company of Indiana, and he is a member of domestic trade committee.

The import of Mr. Hampton's testimony is that prior to May 29, 1900, he as general auditor had his traveling men audit the accounts and books of the general office of Waters-Pierce Oil Company, the result of their work was reported to him and he paid for the services of the auditors. After May 29, 1900, he directed his traveling auditors to audit the accounts and books of the general office of Waters-Pierce Oil Company, he further requested and directed that they be placed on the pay-rolls of that company at a salary fixed by Hampton, which was done, and while the result was not reported directly to him, yet a copy of such result reached 26 Broadway, New York City. These audits were made in the way described by Hampton each year after May 29, 1900.

**HARRY EGBERT PLATT**: Lives in New York City. Went with Standard Oil Company at 26 Broadway about February, 1902, or 1903. Was first employed as clerk by Union Tank Line Company. W. H. Tilford was president of that company. First he was under Mr. Cook and then was transferred to Mr. Tilford's office. Worked for that company about six months.

When he went in Mr. Tilford's office he was paid by Standard Oil Company of New Jersey.

Union Tank Line Company operated cars throughout the United States for several companies which had offices at 26 Broadway.

Says Waters-Pierce Oil Company had W. P. O. cars and Union Tank Line Company got reports of the movements of these cars. Republic Oil Company, Waters-Pierce Oil Company and Standard Oil Company of Indiana all reported as to cars.

R. H. McNall had a desk in same office with H. M. Tilford. C. L. Nichols was in office of Mr. Drake.

Says while he was in Tilford's office cash reports were received from Waters-Pierce Oil Company. Such reports were received daily by Mr. McNall, and were sent to the comptroller's office, in a different room. During the time he was in this office for over two years this system continued.

Also McNall in that office, who was commercial agent, received marine reports from Waters-Pierce Oil Company and reports of "sales and deliveries of refined oils." The last report mentioned was sent to Mr. Bemis's office, who was statistical agent of Standard Oil Company. Reports of "marine sales" were sent down to Marine Oil department, which was in charge of Mr. Bedford.

Appropriations for construction and building of Waters-Pierce Oil Company were also sent to the office he was in and were passed on by a committee. The action of the committee would be communicated by Mr. McNall to the St. Louis office, with instructions.

Also matters relating to advance in salaries of Waters-Pierce Oil Company were sent to that office and passed on by the same committee.

Letter from H. M. Tilford to J. P. Gruett, dated August 20, 1900, acknowledging receipt of comparative statement of sale of refined oils, naphtha and gasoline, as well as tank-wagon sales of refined oils, by Waters-Pierce Oil Company.

Letter from L. D. Clarke, comptroller, to J. P. Gruett, St. Louis, enclosing notes and instructions relating to analysis of business.

Admitted that W. F. Taylor is the personal attorney of M. M. VanBuren, and became a stockholder and was elected and served as a director of Waters-Pierce Oil Company at request of Standard Oil Company of New Jersey.

**H. M. TILFORD:**    Lives in New York and is connected with Continental Oil Company and Standard Oil Company that does business on the Pacific Coast. Continental Oil Company does business in Colorado, Wyoming, Utah and that section. He is president of Continental Oil Company and has his office at 26 Broadway. It is the Standard Oil Company of Iowa that does business on the Pacific Coast. He is not connected with Standard Oil Company of New Jersey.

Says he held a share of stock and was director in Waters-Pierce Oil Company from 1892 to 1900, and knew something of the business and where it sold oil during that time.

Letter from A. M. Finlay, vice-president and general manager of Waters-Pierce Oil Company, to H. M. Tilford, dated June 22, 1903, advising Tilford why he could not make a trip to New York at that time to see him.

Says that at different times he met Finlay, Gruett and Adams at 26 Broadway, New York City.

Has known R. H. McNall for fifteen years—he was first connected with the Pratt works at 26 Broad-

way, a Standard Oil interest. Then McNall went into witness's office as his assistant. Then McNall became commercial agent for Waters-Pierce Oil Company and had a desk in witness's office and is still there. McNall continued to assist him but not to the same extent.

Says he knew of the troubles the Waters-Pierce Oil Company had in Texas prior to 1900 and that there was a re-incorporation of Waters-Pierce Oil Company in 1900. Also knew that the same business previously done by that company and the same properties that were used by them were continued by the new company. Says he was paid for his stock on re-incorporation— over the sum of $900.

W. E. Bemis is located at 26 Broadway and is connected with the export business and keeps statistical reports of Standard Oil interests.

Says Room No. 1209 at 26 Broadway is the general entrance to his office, that of W. H. Tilford and R. H. McNall.

Letter from H. M. Tilford to J. P. Gruett, vice-president Waters-Pierce Oil Company, dated August 20, 1900, acknowledging receipt of comparative statement of refined oils sold by that company. Witness thinks he saw the statement referred to in the above mentioned letter.

Says McNall, although his desk is still in witness's office, has not been there since last November, and he does not know where McNall is. Been no reports from Waters-Pierce Oil Company coming there since McNall left that he knows of. Says McNall did submit some reports to him that he got from Waters-Pierce Oil Company. It was McNall's duty to attend to any business for Waters-Pierce Oil Company in New York.

Letter from J. P. Gruett to R. H. McNall, dated July 3, 1902, sending him a list of salaries of Waters-Pierce Oil Company.

State ex inf. v. Standard Oil Co.

He knew R. P. Tinsley at 26 Broadway was simply an agent before he went with Waters-Pierce Oil Company at St. Louis.

Letter from R. H. McNall to J. P. Gruett, secretary Waters-Pierce Oil Company, dated July 9, 1902, notifying him that "account formerly handled by Walter Jennings, agent, will hereafter be handled by R. P. Tinsley," agent, of same address.

Letter from R. H. McNall to J. P. Gruett, secretary W. P. O. Co., dated June 25, 1903, in relation to receiving a salary list of Waters-Pierce Company.

Admitted that cash statements (daily) sent to McNall by Waters-Pierce Oil Company, together with other reports, were shown to him.

Letter from R. H. McNall to J. P. Gruett, dated August 4, 1903, relative to dividend notices of Waters-Pierce Oil Company, in which McNall remarks that he seldom sees the cash statements sent to him.

Letter from R. H. McNall to S. Johnson, St. Louis (who was connected with lubricating department of Waters-Pierce Oil Company), dated March 24, 1904, giving him the prices at which to sell crude scale wax.

Letter from R. H. McNall to J. P. Gruett, written by H. M. Tilford, dated February 15, 1902, criticising the report of profits made during the year 1901 by Waters-Pierce Oil Company on sales of "fuel oil" and rosin.

Letter from R. H. McNall to J. P. Gruett, written by H. M. Tilford, dated February 18, 1902, asking a statement showing the names of the banks where Waters-Pierce Oil Company had an account.

Letter from R. H. McNall to A. M. Finlay, dated December 12, 1904, advising him that hereafter in writing to him at 26 Broadway to furnish copies, without date or signature, for purpose of distribution outside of McNall's office.

Letter from R. H. McNall to J. P. Gruett, dated August 4, 1902, telling him that the only code books he could find there of W. P. O. Co. were H. M. Tilford No. 415, which he was using, and H. W. Doremus No. 607.

**HARRY C. ARNOLD:**   Lives in New York City and is an accountant for Standard Oil Company at 26 Broadway. Has been an accountant for about three years. Prior to that he was an assistant to R. P. Tinsley.

. Tinsley was in the accounting department of both Standard Oil Company of New York and that of New Jersey and the Atlantic Refining Company.

C. L. Nichols is in Mr. Drake's office and he knows that he was president of Republic Oil Company.

Knows McNall, who was first with the Pratt Works and then assistant to Mr. Tilford.

Letter from H. C. Arnold to R. P. Tinsley, dated October 11, 1904, referring to the services of Mr. Preston for Waters-Pierce Oil Company, Preston being regularly employed by witness at 26 Broadway. Also referring to tank-wagon sales record sent by witness to W. P. O. Co.

Says that while Preston was working for Waters-Pierce Oil Company he was paid by that company.

Letter from R. H. McNall to J. P. Gruett, secretary W. P. O. Co., St. Louis, dated December 2, 1902, asking him to make and send a statement showing total number of employees of Waters-Pierce Oil Company for a year, together with total amount paid them for one year.

Letter from McNall to Gruett, dated December 17, 1903, asking him to send a copy of by-laws of Waters-Pierce Oil Company.

**H. CLAY PIERCE:**   Lives in St. Louis, Missouri, is fifty-seven years old, and is a stockholder in the Waters-Pierce Oil Company. He is not nor never has been a stockholder in Standard Oil Company of In-

diana, nor Republic Oil Company, nor Standard Oil Company of New Jersey, nor in the so-called Standard Oil Trust. Never owned stock in any oil company other than Waters-Pierce Oil Company. Neither the Standard Oil Company of Indiana nor the Republic Oil Company own any stock in Waters-Pierce Oil Company.

Standard Oil Company of New Jersey owns 2747 shares of Waters-Pierce Oil Company stock, held for it by M. M. VanBuren.

He, witness, owns 1,250 shares of Waters-Pierce Oil Company stock.

Waters-Pierce Oil Company organized originally in 1878 with a capital of one hundred thousand dollars. Waters-Pierce & Company subscribed for forty per cent; Horace A. Hutchins and William P. Thompson subscribed for forty per cent, and Chess-Carley & Company for twenty per cent. First officers: William H. Waters, director and president; H. Clay Pierce, director and vice-president; Charles M. Adams, secretary and treasurer; Horace A. Hutchins and William P. Thompson and Francis D. Carley, directors. Afterwards, the trustees of Standard Oil Trust purchased the forty per cent belonging to Hutchins and Thompson and the twenty per cent belonging to Chess-Carley Company. He, witness, purchased the interest of William H. Waters in the remaining forty per cent. "So that when on May 29, 1900, the first Waters-Pierce Oil Company was liquidated the assets were distributed in these proportions."

He refused to place his stock in the Standard Trust.

Under agreement by all parties interested he controlled and directed the policy and operations of Waters-Pierce Oil Company until February, 1900, when on acount of ill health he elected Andrew M. Finlay, his brother-in-law, president.

Says the liquidation of the first Waters-Pierce Oil Company resulted because an inexperienced agent,

located in Texas, had, without the knowledge of the officers of the company, entered into a contract of minor importance in violation of the laws of that State.

Following the trouble in Texas, he being told by a prominent citizen of that State that no corporation controlled by Standard Oil Company would be tolerated there, he explained the situation fully to the executive committee of the Standard Oil Company, and they agreed that he should organize a new company, the stock of which he should hold, and that he should manage and control the company absolutely free from any dictation or direction of the Standard Oil Company. Says this agreement was kept and the Standard Oil Company made no attempt to interfere with his management up to the spring of 1904.

But in the spring of 1904, they, Standard Oil Company, transferred the stock which had been in his name to M. M. VanBuren and began in other ways to assume a control over the affairs and operations of the company. Upon protest by him that this was a violation of the agreement, the control of the company was again committed to him; and his son, Clay Arthur Pierce, is now president of the company and is conducting it as an independent business.

When Waters-Pierce Oil Company was organized in 1878 it was then agreed with the Standard Oil Company of Ohio, the only one then in existence, that Waters-Pierce Oil Company would continue to sell oil and confine its operations to the territory in which Waters-Pierce & Company sold, which embraces the territory in which the corporation now sells.

He says the map offered in evidence showing divisional line is not correct. Described the line in a general way as beginning at a point just south of Hannibal, on west bank of Mississippi river, and thence running according to county lines southwest to the western border of Missouri, bordering upon Kansas,

a short distance south of Fort Scott—that is, Waters-Pierce territory was south of this line in Missouri. The other territory was Arkansas, Indian Territory, Oklahoma, Texas, all of Louisiana west of Mississippi and Republic of Mexico. There has been no change in the territory since it was established.

Waters-Pierce Oil Company has obtained its refined oils almost exclusively from Standard Oil Company and its allied interests since its incorporation in 1878.

Waters-Pierce Oil Company has not manufactured refined oils in United States, but has manufactured lubricating oils. It was engaged as a merchant in United States almost exclusively. It manufactured refined and other oils in Mexico and obtained all its crude petroleum for such manufacturing purposes from Standard Oil Company.

The present company succeeded to an established business of the old Waters-Pierce Oil Company and it has confined itself exclusively to building up the business within the same territory.

The gross sales of Waters-Pierce Oil Company in United States and Mexico for year 1902 were 2,677,362 barrels of oil of fifty gallons a barrel. Says they could not have procured this oil from all other sources other than Standard Oil Company. Waters-Pierce Oil Company is not interested nor never has been in any oil wells or oil producing properties in the United States.

Says he personally has been engaged in the oil business in the territory in which his company sells for thirty-seven years.

Says he has managed the business of the various interests commencing with W. H. Cobb & Co. and followed by H. C. Pierce & Co., Waters-Pierce & Co., Waters-Pierce Oil Company organized in 1878, and Waters-Pierce Oil Company organized in 1900, down to the present time, with the exception of a short interval.

All the first directors selected in 1878 continued as such up to the annual meeting in 1885, when W. H. Tilford took the place of Carley. W. H. Tilford was succeeded by H. M. Tilford in 1888. In 1889 Silas H. Payne succeeded H. M. Tilford. A. M. Finlay succeeded Waters in 1890, in which year Pierce purchased Waters's interest.

In the year 1890 he (witness) became president of Waters-Pierce Oil Company and Finlay vice-president.

G. F. Gregory succeeded W. H. Tilford as a director in 1890.

In 1891 the directory consisted of himself, Finlay, H. M. Tilford, Payne and C. M. Pratt; none of whom lived in St. Louis, except Pierce and Finlay, who alone were actively engaged in the management of the company.

In 1892 the directory changed so as to include C. M. Adams and J. P. Gruett, who both resided in St. Louis. This directory continued until the dissolution of the old Waters-Pierce Oil Company.

In the new company the first directors were: H. C. Pierce, Andrew M. Finlay, C. M. Adams, J. P. Gruett and J. D. Johnson, which directory continued without change until the spring of 1904, when W. F. Taylor and R. P. Tinsley took the places of J. D. Johnson and J. P. Gruett.

Since the organization of the new company its affairs and policies have been managed by the officers and directors and by the executive committee, composed of the heads of the departments of the company.

The Waters-Pierce Oil Company has never made or entered into any agreement or understanding with any of the respondents to fix or maintain the price at which any of the products of petroleum should be sold upon the market.

Says he is very sure that Waters-Pierce Oil Company could not have obtained more than a very small per cent of its total output from other sources than the Standard Oil Company of New Jersey and Indiana and their allied interests.

Mr. Pierce describes at length and in detail the equipments and facilities for transporting and marketing the products of petroleum in the territory of his company, and gives the origin, growth, and improvements in such equipments and facilities as established by him representing the Waters-Pierce Oil Company.

His company has never tried to extend its territorial limits since it was established in 1878.

Says he established tank station in East St. Louis and laid several pipe lines under the river connecting with it, through which the oil is conveyed to St. Louis, Missouri, in order to save the great expense of transporting same oil across in cars.

Says the equipments and plants of the company are worth in the neighborhood of five million dollars.

Says he has sold oil long ago at a dollar a gallon and in recent years as low as four and five cents.

Says the price of the refined product to the consumer depends on price of the crude, its proximity to place of manufacture, marketing point, etc.

The Waters-Pierce Oil Company in the United States occupies the position of merchandising the manufactured products of petroleum. In the Republic of Mexico from the crude petroleum purchased of Standard Oil Company it manufactures and sells practically all the products of petroleum sold in that country.

A refinery was erected by Standard Oil Company at Sugar Creek, Missouri, about three years ago, which is comparatively large. Says the oils produced in Kansas are much inferior to the oils from which the Whiting products are manufactured.

Says there are not nor has there ever been any

competitors of Waters-Pierce Oil Company equipped
equal to it for handling and selling refined oils. ·

Says Waters-Pierce Oil Company has sold from
ninety to ninety-five per cent of all the oil in its terri-
tory, and that such large percentage of sales over its
competitors was due entirely to the better facilities af-
forded by it to the consumer than the competitor could
furnish, and its policy of close and prompt attention
to business.

Says their best brand of oil, eupion, is manufac-
tured for the company in this country by the Standard
Oil Company.

Says he has not discussed the question of the di-
vision of territory with anyone since the present Wat-
ers-Pierce Oil Company was organized.

He says that a fair estimate of the value of the as-
sets and good will of the company is forty-five to fifty
million dollars.

There are four thousand shares of stock of the
company and he owns thirty-one and a half per cent of
the stock.

Says the tangible assets of the company, not in-
cluding good will, are worth in the neighborhood of
twelve million dollars.

They have trade marks for all kinds of oils,
greases and other products that they handle.

Denies any combination, confederation, agree-
ment, express or implied, as charged in the informa-
tion, with any company.

### Cross-Examination.

Standard Oil Company of Indiana has not to his
knowledge competed with Waters-Pierce Oil Company
in Missouri, nor has it sold oil in Waters-Pierce terri-
tory except in some few instances—one instance .he
mentions at Lamar, Missouri.

Says he, as president, did not deem it expedient to
go beyond the territory which had· been established
for twenty-eight years and do business in Kansas City,

and did not do so because the original Waters-Pierce Oil Company agreed it would confine its operations to the territory in which it and its predecessors had transacted its business—so agreed with Standard Oil Company of Ohio.

Three, four or five months after the incorporation of the new company he transferred to Mr. Garth, cashier Mechanics National Bank of New York, sixty-eight and one-half per cent of Waters-Pierce stock, and made the transfer because it was understood he would do so. This stock was transferred in blank, and in June, 1904, a formal assignment of it was made to M. M. VanBuren—on the books of the company. This was the first time he had known or heard of VanBuren.

Prior to June, 1904, he received the dividends on all the stock and transferred a part of them to Seaboard National Bank at the request of one of the Tilfords, who was connected with the Standard Oil Company. This was either W. H. Tilford, or H. M. Tilford, who had an office at 26 Broadway.

Says the shares assigned by him to Mr. Garth of the Seaboard National Bank were paid for by Mr. Garth—they were delivered to him shortly after the re-incorporation of the new Waters-Pierce Oil Company. He did not know Garth, but was told he represented Charles Pratt of Standard Oil Company. Says he was told by his attorney, J. D. Johnson, that an arrangement was made with counsel for Standard Oil Company for him to transfer 2,748 shares of stock to Pratt —this was stock in the new company, and his understanding was it belonged to Standard Oil Company. In other words, the Standard Oil Company continued to hold in the new Waters-Pierce Oil Company the same interest it had held in the old company.

All dividends on the 2748 shares coming into his possession were immediately transferred to the Seaboard National Bank of New York City for Standard Oil Company.

In 1890, when he purchased the interest of Waters for the first time, the proportion of ownership stood— Standard Oil Company 2,750 shares and Pierce 1,250 shares, and practically that same division has existed up to the present time.

Says that since the organization of the new company the stock of Standard Oil Company has stood in his name so that he might exercise absolute control of the company and that was the object of putting it in his name. Yet soon after the organization he signed blank transfer of stock amounting to 2,748 shares and delivered it to Mr. Garth.

Says he had absolute control and management of Waters-Pierce Oil Company from June 1, 1900, up to the spring of 1904.

When this stock was transferred to M. M. Van-Buren in 1904, the Standard Oil Company began to assume control by ousting his directors and substituting those of its own selection, sending men here to manage the company, sending men into its territory, and did everything that would follow a changed condition of affairs.

Says all the Standard Oil interests from 1878 on had agreed with him that he should have absolute control of Waters-Pierce business in its territory.

Says the auditors of the Standard Oil Company audited the books of Waters-Pierce Oil Company as often as it saw fit to do so, but auditors of Standard did not audit such books between 1900 and 1904. Says Standard Oil auditors did audit books of Waters-Pierce Oil Company during the year 1904 and fore part of 1905.

Says old Waters-Pierce Oil Company employed several Standard Oil employees at 26 Broadway to render certain special services in New York, such as buying supplies for the Mexico business. The old company made regular reports to the various heads of

departments of Standard Oil Company at 26 Broadway.

After the organization of the new company the system was changed and all reports were sent to R. H. McNall, 26 Broadway. The change was made in order to simplify the work. It had grown to such dimensions that it was found better to have a man at 26 Broadway through whom all the New York work could be done. Instead of this company reporting to various departments of Standard Oil Company all that was done through McNall. McNall had been chief clerk to H. M. Tilford and continued in his office.

Says about the same reports were made and sent to McNall as had been formerly sent to Standard Oil Company, and these reports embraced results of transactions and operations of Waters-Pierce Oil Company.

Says Mr. McNall was furnished by way of reports anything and everything that he asked for as the representative of the Standard Oil Company and its various heads. The different heads of the Standard Oil Company of New Jersey at 26 Broadway were in the habit of asking information of Waters-Pierce Oil Company officers through McNall and as that company was a majority stockholder, he very readily instructed the various heads of the departments of the Waters-Pierce Oil Company to send such information as was asked for.

Dividends of Waters-Pierce Oil Company have run from six to seven hundred per cent per year.

Gives reasons in full why Waters-Pierce Oil Company has not engaged in the refining business in the United States.

Says he thinks Standard Oil Company has sold to others than his company in this territory—names Republic Oil Company and George P. Jones & Co., who bought as jobbers from Standard, but does not know of other companies.

Says Standard has tank station in East St. Louis and sells there in competition with Waters-Pierce Oil Company.

Says that Waters-Pierce Oil Company purchased the Schofield, Shurmer & Teagle plant at Springfield, Missouri, and absorbed it into its own business; that Republic Oil Company did not do business in Springfield. Waters-Pierce Oil Company had no dealings with Republic Oil Company at Springfield or elsewhere.

Waters-Pierce Oil Company owns what is known as International Oil Works in St. Louis, run by Mr. Grenner on a salary paid by his company. It runs as a separate company, has wagons of its own and runs them.

Gives an outline of where Waters-Pierce Oil Company first got its oil, the confined fields of production then and the discoveries in recent years, resulting in more refineries, etc.

Says that the St. Louis Oil Company nor any other oil company doing business in Waters-Pierce territory has equipments for doing business which will in any way compare with those of his company.

Says the new company has not done so large a per cent of the business as the old company because of the discovery of new oil fields adjacent to the territory and because of the increase in number of competing companies. The new company has done from eighty to eighty-five per cent of the business.

Says Schofield, Shurmer & Teagle did a very small business and had very insignificant equipments compared with Waters-Pierce Oil Company.

That he was in St. Louis nearly all the time during the years 1900, 1901, and 1902; that during most of the years 1903 and 1904 he was ill in the East and unable to be in St. Louis.

In February, 1904, A. M. Finlay was made president.

Describes the constant attention he has given the business of Waters-Pierce Oil Company since 1878, whether he was in St. Louis or New York.

Says he knew all the time in a general way that reports were being made to 26 Broadway, but was not familiar with the details.

Says the fact that Standard Oil auditors while auditing the books of Waters-Pierce Oil Company were placed upon the pay-rolls of Waters-Pierce Oil Company was not known to him, and if he had known it he would have protested against it, as he had always understood that the Standard Oil Company was paying for services of its own auditors.

Daily cash statements have always been sent to Standard Oil Company, and he knew they had been sent to McNall.

Proposed raises in salaries were not reported to either Standard Oil Company or McNall—after salaries were raised they may have been reported.

Says R. P. Tinsley came to St. Louis in April, 1904, and assumed charge of the accounting department as successor to Mr. Gruett. He remained until about June, 1905. Tinsley was elected vice-president of Waters-Pierce Oil Company in February, 1904.

Mr. Tinsley never came to St. Louis for the purpose of assuming the management of Waters-Pierce Oil Company. He came through the recommendation of W. H. Tilford, representing the Standard Oil Company, to succeed Mr. Gruett in auditing and accounting department. Mr. Finlay was elected at same time as president to take Pierce's place on account of his failing health. Tinsley at first made no objections to taking charge of the books and accounts as originally intended, but finally he refused to do so, and soon after, Mr. Finlay having to go abroad in order to recuperate his failing health, Tinsley assumed entire charge of the whole business and began to run this his own way. He discharged many experienced employees

and substituted Standard Oil men who were not so efficient and did many things to interfere with the management established by witness.    To this witness protested and Tinsley was finally taken away.    Says he did not protest against the transfer of 2,747 shares of stock to VanBuren, because there was no occasion to protest, but what protest he made was made to Mr. Rogers, Mr. Archbold and W. H. Tilford, because they were the people responsible to him for the keeping of the agreement that was made when the company was organized.

Says when new company was organized he gave his check for four hundred thousand dollars, the par value of all the stock.    When he delivered the 2,748 shares to Mr. Garth, about September, 1900, Garth paid him in money the face or par value of those shares.

Says there was an agreement between him and the executive committee of the Standard Oil Company that he should organize a new company, the stock of which he should hold.    This had reference to the trouble in Texas, and the information given that no company controlled by Standard Oil Company would longer be permitted to do business in that State.

Says that it is quite likely that a dividend of one hundred per cent was paid by Old Waters Pierce Oil Company about May 21, 1900.    Says he remembers that one hundred per cent dividends were paid on other occasions whenever the surplus would permit.

Says when the new company was organized notes were given by it, but he does not remember the details or amounts.    He was given a note—does not remember that it was for $1,227,399—which was afterwards paid by Waters-Pierce Oil Company.

Says the Waters-Pierce Oil Company was managed as an absolutely independent company by him, and any construction or improvement that he or the advisory board or executive committee of Waters-Pierce Oil Company saw fit to make was constructed

without any suggestion or interference from the Standard Oil Company up to the time that he was obliged to relinquish active control because of ill health.

*Relator here rested his case.*

## RESPONDENTS INTRODUCED THE FOLLOWING TESTIMONY:

**CHARLES P. ACKERT:** Age forty-three and lives in St. Louis. In June, 1902, he became general manager of Waters-Pierce Oil Company and has occupied that position since.

In the spring of 1884 he began work for Waters-Pierce Oil Company, as agent at Fort Smith, Arkansas,—remained there five years and then became traveling salesman out of Little Rock. Stayed there about six months and then came to St. Louis and started in as salesman. After being in St. Louis about six months he went to Louisiana division, where he stayed for one year and a half. Then he became manager of the Arkansas division, with headquarters at Little Rock. In June, 1894, he was again transferred to St. Louis as assistant manager of the lubricating department, in which position he remained for five years, or until 1890. Then he held two or three different positions with the company until the dissolution of the old company—he was in the secretary's office at that time.

He began as general manager of the new company when it was first organized. There were some changes affecting merely the title, when in 1902 his title of general manager was restored. He has practically been performing the duties of general manager since the incorporation of the new company.

As general manager he has been in charge of and employed and had the direction of men, conferred with other officers of the company relative to prices, and performed all such duties as generally pertained to such a position. Has general supervisory control over the whole business, receives reports from agents, etc.

H. C. Pierce became the first president of the new company. He was succeeded by Andrew M. Finlay in February, 1904.

Waters-Pierce Oil Company did business in part of Missouri, Arkansas, Indian Territory, Oklahoma, part of Louisiana, all of Texas and all of Republic of Mexico.

This territory has been divided into divisions. The Missouri division, headquarters at St. Louis, with jurisdiction over business in Missouri; Arkansas division, headquarters at Little Rock, comprising all of Arkansas and small portion of Indian Territory; Oklahoma division, comprising the balance of Indian Territory, Oklahoma Territory and Panhandle of Texas; Central Texas division, headquarters at Houston, and East Texas division, headquarters at Shreveport, embracing all of Texas and that part of Louisiana lying west of Mississippi river; Republic of Mexico division, headquarters in city of Mexico, including all the Republic. A manager is in charge of each division, who looks after the business of marketing oil in that division under the jurisdiction of the general office. All agents and employees of a division are under the direction and control of the division manager, who in turn is under the direction and control of the general manager. The home office of the company, headquarters of general manager, is in Bank of Commerce building, St. Louis, Missouri.

The company has numerous plants where stocks of oil are carried throughout its territory—the largest plant is at Thirteenth and Gratiot streets, St. Louis.

The plant at St. Louis is used for storage of oils, refined and lubricating, in bulk, and a warehouse for the manufacture of grease and the storage of all barrel oil. There are sixty storage tanks there for the storage of refined oils, gasoline, lubricating and linseed oil. Also carries therein stock of axle grease, castor oil and paraffin wax, and manufactures iron barrels and tank

wagons. This is the storage plant for the city of St. Louis, as well as the distributing plant for all points in the Missouri division, and from which oils are shipped to other divisions.

The company has a pumping station in East St. Louis. Pipe lines connect with that station, from which oil is pumped across the river into storage tanks in St. Louis.

Says St. Louis and vicinity, including Granite City, has about sixty-five tanks, large and small, of capacities running from two hundred-and-fifty-barrel tank to five-thousand-barrel tank.

At tank stations oil is received in tank cars and pumped into storage tanks. From these storage tanks it is delivered to customers either by tank wagons or iron barrels or milk cans. Refined oils and gasoline are handled exclusively by means of storage tanks wherever the trade can be reached from the tanks, and they have tank stations in all towns of any importance. Lubricating oil is also handled from storage tanks to some extent. They have tank wagons at tank stations. There are fifty-four stations in Missouri division where tank wagons are used for the purpose of delivering oil to merchants. This is outside of St. Louis, and there are thirty-two tank wagons.

The Missouri division includes all places in Missouri except city of St. Louis, East St. Louis, St. Louis county, Granite City, Carondelet and Webster.

There are 419 tank stations in the United States and Mexico and two hundred and sixty-six wagons operated at them.

Quite a number of tank stations are operated where tank wagons are not used because the trade does not justify the expense. At these points deliveries are made in cans. The oil is transported principally in tank cars. The Waters-Pierce Oil Company owns 104 tank cars and has 148 under lease from Union Tank Line Company.

The cars above referred to are not used in the transportation of oil from the northern refineries. ·Oils purchased from such refineries are transported in Union Tank Line cars. These cars come from Neodesha, Sugar Creek, Whiting, and Franklin (all Standard Oil refineries). The company keeps a record of these cars, of their arrival at and departure from the agency to which it is consigned. Reports of such movements are made to Union Tank Line Company—to H. R. Payne. This is done for the purpose of keeping trace of the cars. It also keeps such a record of its own cars in order to know at all times where they are, but its own cars are not reported to Payne or any one else.

In Missouri there are thirty-seven agencies where there are no tank stations, and in the whole territory, including Mexico, there are 251 agencies outside of tank station agencies. Wherever there is an agency or tank station it is sufficient to supply the trade at that point.

Witness explains fully how oils are distributed from a tank station by means of tank wagons. How the oil is delivered to the merchant just as he needs it, and measured to him at his place of business, thus saving the inconvenience, extra cost and loss from use of wooden barrels.

Tank wagon drivers are solicitors, and they have soliciting agents besides.

Explains can-wagon delivery from tank station.

Tank wagons usually run in the country in capacity from three hundred and fifty to five hundred and fifty gallons, and in the city of St. Louis larger, some running to a thousand gallons. They are usually made in three compartments.

Says they did forty-three per cent of their business during 1895 in Missouri by tank wagon and can delivery. By means of this kind of delivery there is

no loss by evaporation to the customer, because his oil is measured to him at the time he gets it.

They also distribute oil to interior and small points by means of iron and wooden barrels and iron drums.

The percentage of leakage in iron barrels or iron drums is very small. There is always more or less leakage in wooden barrels. Customers don't want oil in wooden barrels when they can get it in iron barrels or delivered from tank wagon or can. The customer loses when he buys in wooden barrels by leakage and evaporation, but he does not lose by the other modes of delivery. Says they charge from one and a half to two cents more per gallon for oil delivered in wooden barrels, to cover cost of barrel and barrelling.

Says their agents and tank wagon drivers are instructed to see that everything is entirely satisfactory to the customer; that wagons are going around often enough; that customers don't run out of oil; if there are complaints of any nature to investigate them, and to go after any new trade.

Some twelve or fifteen salesmen outside of agents and tank wagon drivers are employed in the Missouri division.

Says the same methods of selling oil and furnishing the trade were established twenty-two years ago. Their equipment has been enlarged according to the growth of the territory.

Says their tank stations, wagons and equipments for handling and selling their products have increased from fifteen to twenty per cent since 1900.

In St. Louis, the St. Louis Oil Company, Bell Oil Company and Republic Oil Company are competitors and operate tank wagons in the city of St. Louis. E. M. Wilhoit, a competitor, has a tank station at Springfield, Joplin and Aurora. There are other competitors operating tank stations in Missouri. No other dealers distribute oil in cans in Missouri, nor in iron

barrels. The only other company except Waters-Pierce Oil Company using iron barrels is Wilhoit.

Tanks for use by merchants in their stores are furnished by Waters-Pierce Oil Company practically at cost.

George P. Jones sells refined oils and lubricating oils, but most of the other companies doing business in Missouri, except as above mentioned, sell lubricating oils only.

Claims that the large percentage of the trade secured and held by Waters-Pierce Oil Company is due to their superior facilities for handling and delivering the products of petroleum.

Says of barrel deliveries in Missouri only about 15 per cent has been wood barrels.

The total monthly pay-roll of the company is about $83,000 a month, and for the Missouri division about $6,000 per month.

Waters-Pierce Oil Company handles and sells refined oils, gasolines, lubricating oils, turpentine, linseed oil, cottonseed oil, castor oil, animal oil, grease, parrafin wax, candles, grocers' tanks, oil consuming devices and fuel oil.

Their refined oils, gasoline and lubricating oils, are purchased from Standard Oil Company. The other products handled are brought from various other sources.

Described the business in Republic of Mexico, how the crude petroleum is purchased from Standard Oil Company, shipped there by steamer, refined in that country, etc.

Says that of all the various products of petroleum sold by Waters-Pierce Oil Company in 1905, the total amount in gallonage was 70,842,846 gallons and that the gross receipts in dollars from such sales were $14,781,621. That of refined oils, gasoline and lubricating oils they sold during the year 1905, 61,439,000 gallons.

Their tankage capacity in Missouri is one hundred and fifteen storage tanks with a capacity of 25,834 barrels, not including St. Louis. St. Louis city has ninety-seven tanks, holding 55,000 barrels. In all the divisions there are 1,040 storage tanks, holding 253,541 barrels.

Says on December 31, 1905, the company had in stock in its various storage places 10,646,349 gallons of oils and 5,843,548 pounds of grease, parrafin wax, etc., representing the average stock carried by the company. They figure on carrying at all times from thirty to forty days' supply.

That in the last twenty-two years, the time he has been with the company, there has been a gradual decrease in the price of the products of petroleum.

Claims that the company has gradually reduced the price, due to increased production to some extent, but largely to increase in their facilities for handling and selling oils.

Outside the city of St. Louis in the Missouri division, he thinks they had 85 per cent of the sales of oils. Says they have secured that percentage of the sales by their tank wagons, tank stations, cans, iron barrels, agents and salesmen, the quality of oils they have furnished and by their superior facilities over competitors.

Says that Bell Oil Company, which has only been in operation seven or eight months in St. Louis, runs some five or six wagons; Republic Oil Company three, and St. Louis Oil Company some eight or ten. Republic Oil Company began five or six years ago with about the same number of wagons; St. Louis Oil Company some ten or eleven years ago with less, and have gradually increased their number of wagons. Waters-Pierce Oil Company since its organization in 1900 has operated from twenty-five to thirty wagons in St. Louis city, according to the season.

The only tank wagons run by competitors in Missouri division are owned by Mr. Wilhoit—two at Springfield, one at Joplin and one at Aurora.

Says that since he has been general manager of the company the price at which products should be sold have been fixed by the officers of the company, based on cost, marketing expenses, freight, etc.

Standard Oil Company fixes the price of oils that his company buys, and as that price varies so the selling price must vary also, according as it may be an advance or decline.

Explains card quotation of prices of oils. Says these card quotations of prices were sent out regularly to all the trade.

Says the president, vice-president and himself fixed the price of oils and communicated these prices to all the division managers, who in turn communicated with all agents and salesmen and they with the trade and customers in the division.

Republic Oil Company began to do business in St. Louis three or four years ago. He never knew that it was owned by the Standard Oil Company of New Jersey, and he did not know but that it was an entirely independent company. Says Waters-Pierce Oil Company has been a very active competitor of the Republic Oil Company—in fact, just as much so as of the old firm of Schofield, Shurmer & Teagle. Claims that Republic Oil Company has done business all through the Missouri division. Says instructions to the salesmen of Waters-Pierce Oil Company have been to go after the business of the Republic Oil Company the same as any other competitor. Says he has not been acquainted with the officers of Republic Oil Company in St. Louis—only that he met Mr. Heyer, local manager of that company, just for a minute three or four years ago. He never had any conversation with the officers of that company in relation to the prices at which oil

218 Sup—14

should be sold. Neither the Standard Oil Company of Indiana nor Republic Oil Company has ever had anything to do in fixing the prices at which Waters-Pierce Oil Company sold oils.

Waters-Pierce Oil Company has no relations with Standard Oil Company of Indiana except that of purchaser.

His instructions were that reports should be made wherever prices were being cut by competitors, and if it was considered that their business could not be otherwise held, instructions were given to meet the cuts in prices. Says his company never cut below the price of competitors, that with its facilities it could hold its own at equal prices. That they have in many instances been able on account of their facilities to maintain prices at from one-half to one cent higher than competitors. That they have, instead of lowering the price to meet a cut, in many instances given allowances or rebates in order to meet a cut.

In the Missouri division his company sells prime white and eupion. There are different grades of gasoline according to the purpose for which they are used.

Waters-Pierce Oil Company sells all the oil it can and has no understanding or agreement with anybody to restrict the quantity sold.

Says he met Maywood Maxon in his office in December, 1902. Denied the statements attributed by Maxon to Finlay—they were not made in the presence of witness.

### Cross-Examination.

Says that he has always known that the Standard Oil Company of New Jersey owned stock in Waters-Pierce Oil Company—that is, for past twenty years. Says he is not quite sure whether he knew that Standard Oil Company owned a controlling interest or not. He knew that reports were being made by Waters-

Pierce Oil Company to Standard Oil Company.  He knew reports were going, showing the extent and nature of the business of Waters-Pierce Oil Company, the amount of oil sold, profits, etc. These reports were made from the office of the secretary.  There were also cash statements sent to 26 Broadway daily, made by the treasurer, Mr. Adams.

Referring to the visit of Maxon, says he knew he came over to see about territorial lines between Standard Oil Company of Kentucky and Waters-Pierce Oil Company.

He knew the same Standard Oil Company was doing business in Missouri from which they purchased oils at Whiting, Indiana.  He knew what cities the Standard was selling in Missouri, and that they had tank stations.  The Waters-Pierce Oil Company has no tank stations in this State where the Standard has them.  The Standard Oil Company of Indiana does not sell in his territory in Missouri.  Says his agents and salesmen reported all competitive business or companies in the territory.

Says he has heard that reports were also made to his company of competitive business by employees and agents of railroad companies.

Says that when they heard of a carload shipment into their territory they would write their agent, ask him what was the matter and tell him to reduce prices.  The agent would try to get the order countermanded.

The Waters-Pierce territory has not changed in Missouri, so far as he can remember, since he came to Missouri with the company.

Schofield, Shurmer & Teagle was an active competitor of his company and had no connection with the Standard Oil Company that he knows of.  They, S. S. & T., had tank stations at St. Louis and Springfield and did business in the same way the Waters-Pierce Oil Company did, as far as he knows.  Republic Oil Com-

pany succeeded Schofield, Shurmer & Teagle, and the tank station at Springfield was then removed.

Waters-Pierce Oil Company purchased the tank stations and equipments of International Oil Works at St. Louis, and continued to do business by that company and in that name. It has been a competitor of his company. After it was purchased it continued to do business just as before, and it continued to be a competitor of Waters-Pierce Oil Company and tried to get its business.

Says he understood the Republic Oil Company was owned by Standard Oil Company of New Jersey, and that that company owned a majority of the stock of Waters-Pierce Oil Company, yet the Republic and Waters-Pierce companies were competitors and each trying to get the trade of the other.

International Oil Works gets its oil from the tanks of Waters-Pierce Oil Company in St. Louis.

Says McNall, as commercial agent, does not buy oils, but buys equipments, engines, boilers, etc.

Waters-Pierce Oil Company has never sold in Kansas City, but he cannot give the reason why. Standard Oil Company has not sold in St. Louis because the Waters-Pierce Oil Company sells there.

He cannot tell why his company did not sell oil at Sedalia or go over the territory lines in other places.

Says he knew the line dividing the territory of Waters-Pierce Oil Company and Standard Oil Company of Indiana, and that it was understood that his company would not sell beyond that line. He understood that the Standard was prepared to take care of the business over the line—that it has established tank stations, wagon deliveries, etc., and that the field was already covered. He understood that a line in Missouri had been agreed on between Waters-Pierce Oil Company and Standard Oil Company. Says their agents and salesmen were advised as to the territorial

line and advised not to go beyond it, nor to sell any oils in Standard Oil territory.

Formerly, orders received by his company, or its agents, for oil from persons residing in Standard territory, were referred to Standard Oil Company to be filled.

Says he heard the Standard Oil Company was a stockholder in Waters-Pierce Oil Company before he became general manager.

Up to two or three years ago the question of fixing salaries was referred to 26 Broadway, but is not referred there now. Referred there for approval or disapproval.

He says that he knows reports were made to 26 Broadway relative to construction matters—constructions completed and contemplated—that is, the expenditures for building tank stations, equipments, etc.

Now says the difference in price of oil in bulk and in wooden barrels was from two to three cents per gallon. This difference about covers the cost of wood barrels.

Says prices are fixed on basis of cost, freight and fixed expenses. Freight rates may be the same to given points, and yet oil higher at one of the points because of different conditions—more oil might be handled at one place than another. Does not seem to think that competition cuts a very great figure in fixing prices.

Says his company gets no quotations from independent refineries. No jobbers or other oil companies sell Standard Oil products in this territory except Waters-Pierce Oil Company.

Says they handle no oils in Texas in Union Tank Line cars. All the Texas refineries belong to Standard Oil Company.

Says they supply from eighty-five to ninety per cent of the population with oil in the Missouri terri-

tory—the balance furnished by independent dealers—for past four years.

The price of crude oil is fixed by Standard Oil Company.

Says oil has been up and down in price in the last eight years, but the tendency has been to get lower.

During the last five or six years there have been large discoveries of petroleum in Texas, Kansas and Indian Territory, yet he says oil is higher now in St. Louis than it was five years ago. The price in the country would be the same, with expenses of marketing included. Says prices of Waters-Pierce Oil Company have been fixed on basis of price of oil as billed to it by Standard Oil Company.

Prices are fixed by his company to make a profit of from one to two cents a gallon.

During the last two or three years crude oil at Neodesha or Sugar Creek has ranged from fifty to seventy cents per barrel of forty-two gallons—says he knows nothing about the cost of refining.

Prime white oil quoted in 1899 at three cents less than in 1905 by Waters-Pierce Oil Company—witness says he cannot explain this.

Although his company manufactures axle grease, it sells none to Standard Oil Company in Missouri. His company does not sell same brand of axle grease as Standard Oil Company, because his company manufactures its own axle grease, but does handle considerable of the same lubricating oils, for the reason that most of this oil is purchased from Standard Oil Company, at least that sold in United States.

He admits that oils have increased in price in the last seven or eight years.

Claims that the facilities and conveniences of Waters-Pierce Oil Company enable them to get from one to two cents more per gallon than competitors, and that because of their facilities competitors had to

follow their prices. When a competitor cuts prices they may meet the cut, but never go below—it is not necessary.

Admits that competition in Joplin has an influence in making prices lower there than in Jefferson City, where there is no competition.

Says the reason oil was one and a half cents cheaper in Jasper, Missouri, than in Joplin, Missouri, in August, 1906, was because the Standard Oil Company went in there and cut their prices and they had to meet the cut. Says he knows of no other point in Missouri where these two companies have come in competition and caused a reduction in price.

Gasoline is quoted two cents higher in Jefferson City than Joplin, which, he says, may be due to the fact that there are a great many more people in Joplin and much more of that oil is sold there. The tankage capacity at Joplin is two or three times greater than at Jefferson City.

*Tabulated Statement.*

In the Missouri division the Waters-Pierce Oil Company has 116 tanks of 1,292,622 gallons capacity and run 32 tank wagons.

In the St. Louis division, including stations in East St. Louis and Illinois, the Waters-Pierce Oil Company has 93 tanks with a capacity of 2,951,170 gallons, and 51 tank wagons.

In all the divisions there are 431 tank stations, 1281 tanks, with a total capacity in gallons of 21,495,089.

In all the divisions there are 154 tank-wagon agencies, 266 tank wagons at tank-wagon stations, and 27 can-wagon agencies.

Says that coal oil is usually higher in winter than in summer and gasoline is usually higher in summer than in winter, but he cannot give the reason for this.

Schedule of prices of prime white oil in St. Louis for month of January and August, 1901, to 1906, inclusive.

Also schedule of prices for stove gasoline in St. Louis for same months and years. Showing that each of those products was from two to three cents higher in 1906 than in 1901 and that they both gradually increased in price during those years.

Says their commercial agent in New York, R. H. McNall, would send them quotations of Standard Oil Company prices, by which they know the price they were paying for oil.

Says he advises the St. Louis manager and Missouri division manager of the advance or decline in the price of oil, and they prepare and have printed cards and send out to the trade.

Now says that there is more coal oil consumed in winter than in summer and more gasoline consumed in summer than in winter, and that this increased and decreased consumption has an influence on prices.

Says the principal business of the commercial agent of Waters-Pierce Oil Company in New-York is to purchase crude oil and supplies for the business in Mexico.

The old Waters-Pierce Oil Company did business in the same territory that the present company has been doing business in since its organization. All the improvements and new stations have been established within those lines.

Says the St. Louis Oil Company, Republic Oil Company, Bell Oil Company, and Wilhoit ship in car-load lots; but, having no iron barrels, they distributed to the trade not reached by tank wagons, in wood barrels, which leak and cause questions of adjustment to come up. After a customer buys a few times that way he goes back to his company, which ships to him in iron barrels or cans, and there is no leakage.

CYRUS L. ACKERT: He is the manager of the Missouri division of Waters-Pierce Oil Company with offices at St. Louis.

He began work for the old company January 15, 1890. He continued to work for that company until May 29, 1900, when he was employed by the new company, and has worked for it since. He began with the present company as assistant manager to A. A. Lasar, which position he held until April 15, 1901, when he became manager, and has held that position since, with the exception of the time from December, 1904, to September 15, 1905, when he was in charge of the city business in St. Louis of Waters-Pierce Oil Company. Mr. V. H. Crandall was manager of Missouri division while he was in charge of city sales, who had been his assistant and is still acting as such.

Been no change in the Missouri division lines inside the State of Missouri since the new company was organized.

His duties as manager of Missouri division have been looking after marketing goods, attending to correspondence and directing the agents and salesmen. Has full charge of all the business. Agents and salesmen made daily reports to him of sales and he in turn reported to the general manager and the accounting department. He has had from eighty-five to ninety-five agents under him at different times. He fixed no prices but got instructions as to such matters from the general manager. Says a schedule of prices is made out one each month and kept at his office. Any changes during the month were noted on these schedules and embraced in a new schedule next month. Identified monthly schedules beginning with April 1, 1901, to and including 1905. He does not know on what basis the selling prices were fixed, as only the selling price was furnished him and he knew nothing about the cost price.

When it was reported to him that some competitor was cutting prices at a given point he would take the matter up with the general manager with recommendations as to what price should be made. If approved, he would notify the agent of the reduction and the current schedule would be altered accordingly. Changes of this kind occurred frequently.

Says his instructions have always been to get as much as he could, and he has held a large percentage of the business at higher prices than other people have quoted. Never gave instructions to cut prices below those of a competitor, because their facilities were such that they could hold the business at equal prices. In the city division the schedule of prices was kept in the shape of cards, because it was only one agency. The city division included St. Louis, part of St. Louis county, East St. Louis, Granite City and Madison. All changes of prices came from the general manager, and the trade was notified by postal cards.

Schofield, Shurmer & Teagle were succeeded by Republic Oil Company in 1901. Both companies had plants, storage tanks and warehouses at Springfield and St. Louis. There were also small agencies at Lockwood and Versailles—warehouses where they handled goods in wooden barrels only. Several months after Republic Oil Company began business its station at Springfield was moved away and that agency discontinued. The warehouse at Versailles has been discontinued for a year or more, and the one at Lockwood about thirty days ago.

Says Republic Oil Company was the strongest competitor they had in the Missouri division and their methods were the same as Schofield, Shurmer & Teagle. Republic Oil Company also sold oil in St. Louis when he was in charge of city division. They were strong and aggressive competitors.

Says that St. Louis Oil Company, George P. Jones

& Company, E. M. Wilhoit, National Refining Company or Hannibal Oil Company were competitors in the Missouri division, and six or eight other companies selling mostly lubricating oils. There was no difference between the competition of these companies and Republic Oil Company.

Says the Waters-Pierce Oil Company pursued the same course against all companies in the territory as it did against the Republic Oil Company. Says Republic Oil Company cut their prices down the Mississippi in and tributary to St. Genevieve, St. Mary and Perryville. Says that company got most of that trade for two or three years by cutting prices from one to two cents a gallon. Down in that county, there then being no railroads reaching those points, winter supplies of oil were purchased and shipped by boat, and the Republic got a good share of the business for three falls. He does not remember of any other specific instance where they cut prices in other places, but says they did do so. Says he had no positive information that the Standard Oil Company was back of the Republic Oil Company, but he surmised it and made inquiry of Mr. Heyer, the manager, and was turned down pretty cold. Says that he had no agreement with any representative of the Republic Oil Company relative to the prices at which oils should be sold in Missouri, nor in relation to the quantity of oil that should be sold in Missouri. Says he had instructions from his superior to go after the business of the Republic Oil Company just the same as any other company, and he repeated these instructions to his agent. Says Republic Oil Company, besides cutting prices, had two salesmen traveling out of St. Louis all the time, trying to get the trade, and that company had solicitors in St. Louis all the time, besides the tank wagon drivers, soliciting trade.

Says T. R. Hopkins, their agent at Pierce City, and who testified at Joplin in this case, was discharged about two years ago by V. H. Crandall, his assistant. Hopkins and other agents were paid by New York exchange twice a month—that is, checks drawn by Bank of Commerce on New York Bank. They were made payable to witness. This was done to save exchange charges to the agents. He never had any conversation with Hopkins at Harvey House, in Monett, and denies the statements made by Hopkins.

Says they always tried to get at the quantity of oil being sold by their competitors. This information was reported by their agents and salesmen. They had some railroad agents as their local agents in small places, but they were not employed to furnish information of competitive shipments. The information as to amount of oil sold was for statistical purposes and for general purposes of information as to the amount of business done by both Waters-Pierce Oil Company and its competitors. It was never used for the purpose of getting orders placed by competitors countermanded, or cutting prices.

H. C. Pierce is a first cousin of witness, and C. P. Ackert is a brother, and Andrew M. Finlay is a brother-in-law of H. C. Pierce—Pierce married Finlay's sister.

*Cross-Examination.*

Referring to price schedules made up monthly, they were changed when conditions warranted. Sometimes there would be a general change in the market and at other times local conditions, such as cutting by competitors, would cause a change. Whenever a competitor made a cut in prices they made a reduction sufficient to get the business. Reductions at local agencies indicate competition. When competition came into an agency and reduced prices, they reduced them, but did not do so unless a reduction was first made by a competitor.

Waters-Pierce Oil Company gets its oils from Whiting, Neodesha, Franklin, Cleveland and other places.

At Joplin, Wilhoit has a tank station with a capacity of about fifty thousand gallons—not as large as Waters-Pierce. Wilhoit runs one tank wagon there. Waters-Pierce Oil Company runs two tank wagons and three dray wagons there. Wilhoit's facilities there are practically the same as Waters-Pierce. Says they can hold the larger part of the trade there as against a man with equal facilities. Says he thinks the trade would rather deal with Waters-Pierce Oil Company than an independent, even though the facilities are the same. Claims that their oil is better—more uniform in quality. Says oil for Joplin comes from Neodesha, at least the most of it. Formerly, up to two years ago, it was shipped there from St. Louis and Whiting.

At Jefferson City they got their oil from Kansas and Whiting. Formerly it was shipped there from St. Louis and Whiting.

Oil in iron barrels is quoted the same as in bulk, but it is more in wood barrels because the barrel is sold to the customer while the iron barrel remains the property of the company.

Accounts for lower prices in Joplin than Jefferson City, in 1901, because there was much more oil sold in Joplin, consequently it cost less a gallon to handle it. He cannot explain why it was that the following month in same year oil was eight and a half cents in Jefferson City and nine cents in Joplin.

When Republic Oil Company bought out Schofield, Shurmer & Teagle he heard it rumored that it belonged to the Standard Oil Company.

Admits that he sometimes made concessions or gave rebates.

Says he has always gone after the business of the International Oil Works just the same as any other company.

Says that from what he saw he assumed that International Oil Works belonged to Waters-Pierce Oil Company.

As to the sales of oils by Republic Oil Company at St. Genevieve, Perryville and other river points in 1903 and for two years following, says he went to see Heyer, the manager of that company, in relation to the matter, and Heyer would give him no satisfaction—intimated that it was none of Ackert's business. Never tried to see the Republic people before or after about the sale of oil.

There were no fixed or quoted prices at St. Genevieve or Perryville. The prices at those points were based on the St. Louis price, whatever that might have been, and Republic cut under it.

Says they got some information from railroad clerks as to competitive shipments, but got no formal reports from them. But they had blanks which were filled out from such information by their own agents. This information was for statistical purposes.

### Re-direct Examination.

Up to the time this suit was brought, he says, there was very little prejudice among the merchants and trades people against the Wates-Pierce Oil Company.

Says the policy of the company has been to please and satisfy its customers. They get the best local men for agents, and are very particular to see that merchants are supplied with a good quality of oil and that they get full measure. Ninety per cent of their sales being bulk deliveries or deliveries in iron barrels, the full amount in gallonage sold is always delivered.

Says, in his judgment, ninety per cent of the oils sold by his company in the Missouri division is delivered by tank wagons and in iron barrels and ten per cent in wood barrels.

The Standard Oil Company did not compete with his company.

**EDWARD VON HARTEN:** Was originally employed by old Waters-Pierce Oil Company at Houston, Texas, in 1882, as agent. He now has charge of refined oil department of that company at St. Louis, where he has been for a year and two months. After leaving Houston he became manager of Arkansas division, headquarters at Little Rock. From 1891 to 1904 he was manager at St. Louis of city department of sales of refined oils. In December, 1904, he went into business for himself.

Republic Oil Company succeeded Schofield, Shurmer & Teagle in June, 1901. F. B. Northup was first manager of Republic Oil Company in St. Louis and continued as such for about a year. That company first operated three or four wagons in St. Louis and increased to five. There was active competition between Republic Oil Company and Waters-Pierce Oil Company. He had charge of city trade and sales by tank wagons and had charge of tank-wagon drivers and solicitors. There were about thirty tank wagons. Drivers of tank wagons were also solicitors. Each wagon would have its route and the driver was to solicit all the trade on that route.

Says their competitors in 1901 were St. Louis Oil Company, International and Republic. These companies have continued, and later the Bell Oil Company came in as a competitor in February, 1905. Tank-wagon drivers and solicitors were instructed to solicit the trade of all those companies alike.

Says Republic Oil Company at one time cut prices by giving rebates. They did not meet the rebates, but tried in other ways to get the trade—he was instructed from the office to avoid making cuts and concessions in this instance. They went to other customers of the Republic and told them of the rebates to certain customers, and by those means prevented them making

further cuts. They took no other steps, but let the Republic take part of the trade.

Changes of prices were announced to the retail grocery trade by postal notifications and to the wholesale grocers and other jobbers cards giving prices in barrels. Tank-wagon prices went to all users of oil— the other cards to wholesale grocers and oil dealers, which included competitors.

The other oil companies usually followed the prices quoted by Waters-Pierce Oil Company.

Says he has always been on friendly terms with all the managers of oil companies in St. Louis. Sometimes sells them oil.

He was in the habit of telling Northrup, or any other manager, that changes in the prices of oil were contemplated before the change took effect or before cards were printed, if he was asked about it. Such information has frequently been given by 'phone to Republic Oil Company, St. Louis Oil Company and other companies.

No company, other than the Waters-Pierce Oil Company, has issued quotations of prices since he has been in St. Louis, and are generally followed by the other companies.

Had no agreement of any kind with any manager of Republic Oil Company or any one else to fix the price of oil in St. Louis.

Says he knew nothing about the Republic being owned by Standard Oil Company—only that it was rumored that it belonged to the Standard.

After leaving the Waters-Pierce Oil Company, in December, 1904, he incorporated the Southwestern Oil Company. He did not confer with Mr. Pierce nor anyone connected with Waters-Pierce Oil Company relative to the organization of his company, nor did any person connected with that company have any interest in his company. His company began operations in June, 1905, and in August following he sold out to

Waters-Pierce Oil Company and went back to their employ.

Says he was present when Maywood Maxon called at the office in St. Louis. Denies that Finlay was present, and he heard no conversation between Maxon and Finlay, but says Maxon, as agent of Standard Oil Company at Decatur, Illinois, was there to adjust some difficulty about certain places in Illinois, where both companies had been selling. Says they did not come to an understanding and both companies continued to sell as before. Says he was not present during the entire conversation, which was between Maxon and Ackert.

While he was with the Southwestern Oil Company he bought all his oil from independent refineries. He handles oils of the National Refining Company. In the three months this company ran they built up a good trade, which was increasing when he sold out.

Says that before the institution of this suit he was constantly hearing that Republic Oil Company belonged to Standard Oil Company. Also says he heard the same of Waters-Pierce Oil Company.

Says he knew the Waters-Pierce Oil Company did not sell in Standard Oil Company territory, and *vice versa.*

Waters-Pierce Oil Company bought out the International Oil Works in about 1895. From that time it has continued to do an independent competing business and was competing for the business of the Waters-Pierce Oil Company. It got its oil during all this time from Waters-Pierce Oil Company. Says he saw reports of sales made by this company to Waters-Pierce Oil Company. It is still a competitor of Waters-Pierce Oil Company.

Says Republic Oil Company sells about the same grade of oils as his company, but under different brands, and that both companies claim to sell oils of

equal grades in every way, but at times, says his company has claimed their oil to be the better.

Says that his competitors nearly always followed the prices of his company up or down.

In 1894 or 1895 Waters-Pierce Oil Company had quite a war with St. Louis Oil Company when oil sold as low down as three and a half cents per gallon.

Says he does not know how the prices of Waters-Pierce Oil Company are fixed. They are furnished by C. P. Ackert, the general manager.

Now says that he does not contradict Northrup as to his statement that Northrup got information from him before prices were printed and sent out to the trade.

His company sells in St. Louis brands known as "eupion," their high grade, and "150 prime white" coal oil, their low grade.

Republic sold what they called "palacine" as their high-grade, but he does not know the name of their low-grade oil.

International Oil Works sells "magic light" as high grade, and a lower grade oil.

Says his company has sold a great deal of oil at five cents.

**VICTOR H. CRANDALL:** He is assistant manager of the Missouri division of Waters-Pierce Oil Company. He began work for that company in March, 1889, as ledger clerk. After about a year he was made cashier at El Paso, Texas, for the company. He has held his present position since the new company was organized.

A. A. Lasar was first manager of Missouri division under new company. In 1901 he was succeeded by C. L. Ackert. Witness became manager of that division on December 1, 1904, and continued to act as such until December 15, 1905, when Mr. Ackert again became the manager and witness assistant.

He knew T. R. Hopkins, agent at Pierce City, and in November, 1903, witness discharged him, because he

was having blacksmith work for his farm done and charged to the company.

Says while he was manager, Heyer, manager of Republic Oil Company, called him up over the 'phone and asked him about prices at two points, and he gave him the prices—never had any other conversation with him.

As assistant manager he visited the territory, looked after the sales, whom they were selling and whom they were not, the percentage of business they were getting, had charge of the salesmen, made contracts, and had general supervision of the field work.

His instructions to agents as to Republic Oil Company were the same as those given about any other competitor—that is, to go after the business. Says as to St. Louis territory, the Republic Oil Company was the most aggressive competitor they had—it had two salesmen working out of St. Louis. St. Louis Oil Company periodically sent out one man. Republic Oil Company sold much more oil in the Missouri division than St. Louis Oil Company. He remembers the Republic Oil Company cutting prices down the river at St. Genevieve or Perryville, but does not remember any other specific instance. Republic operated the Springfield plant a short time after Schofield, Shurmer & Teagle sold out, and then the plant was removed. Some of their traveling men from Kansas City sold oil in that territory afterwards by barrel shipments. They continued to maintain a barrel agency at Lockwood and Versailles and to supply points around from these agencies. These agencies were supplied from Kansas City or Sedalia. Knows of no instance in the southwestern part of the State where that company cut prices against the Waters-Pierce Oil Company.

When his office was notified of changes in prices, his agents throughout the territory were notified.

Says that both Lockwood and Versailles have been abandoned by the Republic Oil Company.

Schofield, Shurmer & Teagle, before they sold out, had a tank station at Springfield, from which they distributed oil to points around as far as freight rates would permit.

Says he was familiar with the dividing line between the Waters-Pierce Oil Company and Standard Oil Company—the line was respected by each company.

Referring again to sales of oil at St. Genevieve, Perryville and that country, says it was customary for those people every fall to buy a large amount of oil to last through the winter. This was done because the only way to get it shipped was by boat. Schofield, Shurmer & Teagle had also made sales in this territory.

Says his company has stations in that country now, and has got a large per cent of the business—nearly all of it.

Says no other company has an established agency in southeast Missouri except Waters-Pierce Oil Company, while there is a competitive agency in southwest Missouri.

**EDWARD VON HARTEN** (recalled): Says he gave to Northrup the same information as to changes in prices when he was manager for Schofield, Shurmer & Teagle as he did when he was manager for Republic Oil Company, and that Northrup is mistaken when he says that it was different.

Form of construction application which was sent in to the company.

**A. M. FINLAY:** Says he is now vice-president of Waters-Pierce Oil Company and has been since June, 1905; and since that time Clay Arthur Pierce has been president of the company. He became president of the old company in February, 1900, and continued to be such until June 1, 1900; then H. Clay Pierce became president and witness vice-president. He continued as such and H. C. Pierce as president until February, 1904. H. Clay Pierce was elected chairman of board

of directors in February, 1904. R. P. Tinsley was elected vice-president in 1904 and served until June, 1905, and witness was again made vice-president.

Says about six months after Republic Oil Company was organized it was reported that it belonged to the Standard Oil Company, but he had no definite information as to the fact.

He did not know Heyer, manager of Republic Oil Company, nor did he know Northrup, who was also a manager of that company.

Never discussed with anyone connected with the Republic Oil Company or Standard Oil Company the prices at which oil should be sold in St. Louis, or the Missouri territory. The prices at which oil was sold in St. Louis and Missouri division were fixed by the officers of the company. The general manager would be advised and he in turn would advise the division managers, and so on down to the agents and salesmen.

No limitations were placed on any agent of the company designed to limit or reduce the quantity of oil sold by Waters-Pierce Oil Company.

Denied that he told Maywood Maxon that the manager of Republic Oil Company reported regularly to him, as testified to by Maxon. Admits that Maxon came to his office and talked with him briefly, but says that nothing was said about the Republic Oil Company.

Says the competition between the Republic Oil Company and Waters-Pierce Oil Company was very active. His company went after the business of the Republic Oil Company the same as it did other companies.

He first began with Waters-Pierce Oil Company at Marshall, Texas, in 1878. Transferred from there to the City of Mexico. From there to Galveston, and in 1888 to St. Louis, where he has been ever since.

About the time he was sent to St. Louis he became

vice-president of the company, and has held an executive office ever since.

Says the company has sold oil in the same territory ever since the time he came to St. Louis—there has been no extensions or cutting off of territory.

H. C. Pierce was the executive head of the company when he came and has remained such up to the present time, and his control during that time has been absolute.

Witness was told by Pierce to give Mr. McNall at 26 Broadway, New York, any information he might ask for concerning the business. Such reports were made and forwarded under the supervision of J. P. Gruett, who was at the head of the statistical department. McNall became commercial agent of the company at 26 Broadway by Pierce's appointment in the latter part of 1900, and remained in that position until after this suit was brought, when he was succeeded by Walter Rundell. McNall's duties have been buying and shipping goods. McNall was first addressed at 26 Broadway and then, at his request, he was addressed at 75 New street, New York City.

When construction was desired in a division "Exhibit B3" was used as an application blank and sent in to the home office at St. Louis. There it was passed on by the company and the division manager from where it came was advised as to whether it was approved or not. If approved, the construction was made; if not approved, it was not made. This blank was used whenever anything was purchased or built which added to the value of a station or plant. Monthly statements of these applications were sent to McNall at 26 Broadway, at his request. In 1903 instead of sending a statement or abstract of these applications, a copy of the application was sent to him.

Says in June, 1904, R. P. Tinsley presented a certificate of stock for about 2,750 shares and asked that these shares be transferred on the books to M. M. Van

Buren.  The transfer was made after consultation with Pierce and John D. Johnson, attorney for the company.

When the new company was first organized salaries were fixed by Mr. Pierce, and after the executive committee came into existence they were passed on by that body and finally by H. C. Pierce.  They were then put into effect.  Once a year a list of salaries was sent to McNall, commercial agent.

Says he knew of auditors coming from Standard Oil Company and auditing the books of the company; that they were paid by Waters-Pierce Oil Company, by authority of J. P. Gruett, but witness says he did not authorize it.

Company owns about one hundred cars and leases about one hundred and fifty cars from Union Tank Line Company, which are lettered "Waters-Pierce Oil Company."  A complete record of the movement of each car is kept so as to keep track of cars, mileage, etc.  No report of these cars is made to 26 Broadway.  The company gets its oil from the northern refineries in Union Tank Line cars.  It has no interest in these cars.  Says they make no reports of the movements of these cars.

He understood that prior to 1900 the Standard Oil Company of New Jersey by itself or through individuals owned a majority of the stock of Waters-Pierce Oil Company.

Prior to 1900, H. M. Tilford, at 26 Broadway, would take and place orders for Waters-Pierce Oil Company, and he had considerable correspondence with Tilford.  Supplies were purchased through him.  This was previous to 1900.  Prior to the re-organization there was no commercial agent, so-called, at 26 Broadway, but the business transacted by McNall after the new company was formed was transacted by H. M. Tilford prior to its organization.

Prior to 1900 Standard Oil Company auditors came to St. Louis to audit the books of the company.

Says after the new company was incorporated and McNall, who had been a clerk in H. M. Tilford's office, was appointed commercial agent for Waters-Pierce Oil Company, located at 26 Broadway or 75 New street, New York City, the company corresponded with him in regard to supplies, refined and lubricating oils, purchase of crude oil for Mexico, purchase of machinery, etc., and all statements concerning the business of Waters-Pierce Oil Company were sent to him that he asked for.

Says he went to New York City three or four times since McNall was appointed and saw him about the business of the company. He would also see H. M. Tilford, but did not have much talk with him. McNall had his desk in the office of H. M. Tilford.

Following the appointment of McNall up to the fall of 1903, reports were mailed to him at 26 Broadway, and then changed at his request and mailed to 75 New street since. Says 75 New street is one entrance to 26 Broadway.

His recollection is that in 1904 he received a letter from McNall requesting that thereafter copies of letters written to McNall be enclosed—these copies to be without address or signature—for distribution.

When Tinsley came in April, 1904, he was vice-president, witness became president. Backus, who came about the same time as Tinsley, took J. P. Gruett's place. Says it was not agreeable to him for Tinsley to become vice-president, and witness protested to Mr. Pierce. Tinsley wanted to dictate and to run things his way. Says that while Tinsley was here running the Waters-Pierce Oil Company there was no change in the general course of the business. There was no change in the attitude of the company towards the Republic Oil Company.

Says his company first received quotations from refineries through McNall, and then when they made a

purchase from a refinery an invoice direct from the refinery would be sent them.

Says that the competition of his company with Republic Oil Company, St. Louis Oil Company, International Oil Works and other companies has been the same. They have all been treated alike and they went after the business of all of them.

Waters-Pierce Oil Company has owned the International Oil Works since 1900, and have been paying Grenner a salary to run it.

Affidavit of dissolution of Waters-Pierce Oil Company, organized May 7, 1878. Dissolved May 28, 1900.

Nineteenth Civil Appeal Reports (Tex.) from page 1 to 21—report of case against Waters-Pierce Oil Company.

Certificate of Incorporation of Waters-Pierce Oil Company, date May 29, 1900.

Abstract of blank reports used in making reports to 26 Broadway, New York City, by Waters-Pierce Oil Company since 1900, which reports show in a general way the business transacted by that company. These reports were mailed to R. H. McNall, commercial agent.

**JAMES A. MOFFETT:** Resides in New York City. He has been president of Standard Oil Company of Indiana for past three years. Prior to becoming president he was vice-president and general manager of the company. The last position he had held for twelve years or thirteen.

Prior to going with the above named company he had been with Pratt Manufacturing Company of Brooklyn, New York, which was a manufacturer of oil. He first became connected with the oil business in Virginia in 1869, and has been continuously in the same business ever since. The Pratt Manufacturing Company was connected with the Standard Oil interests.

When he became connected with the Standard Oil Company of Indiana in July, 1889, it was building a refinery at Whiting, Indiana, but did not begin operating it until about three months after that time. In the beginning it was only a manufacturing company. Its predecessor in marketing oils in Missouri was Consolidated Tank Line Company.

Says the Whiting refinery used the crude of Ohio, was very large and supplied the trade largely of the West, Southwest and Northwest, until oil was discovered in Kansas in 1890 or 1891. In 1897 his company built a small refinery at Neodesha, Kansas. Two or three years ago his company built a refinery near Kansas City, at Sugar Creek. These refineries buy the crude petroleum and manufacture it into naphtha, wax, gas oil, fuel oil, refined oil, lubricating oil and all the products of petroleum. Crude for Sugar Creek and Neodesha refineries comes from Kansas and Indian Territory fields. At this time the Whiting refinery gets its crude mostly from Kansas and Illinois fields, and they get none at all from Ohio. There is a pipe line extending from Kansas to Whiting. Says the business has been increasing every year since the refinery was built at Whiting.

Standard Oil Company always marketed oil as a wholesaler and in the fall of 1892 or spring of 1893 it began to market as a retailer or distributor. Prior to that time the distribution was done in Missouri by Standard Oil Company of Kentucky or Consolidated Tank Line Company. His company, however, did not begin to market in Missouri until about 1896, when it succeeded the Standard of Kentucky. He then found that company selling in one part of the State and Waters-Pierce Oil Company in another part. This condition was not changed but respected. He had no agreement whatever with Waters-Pierce Oil Company to maintain the division of territory. Says it was true and a general practice for orders to be transferred from one

company to the other. That is, orders received by one company from a merchant or buyer located in the territory of the other would be transferred to be filled by the company to whom the territory belonged. This was done because the Waters-Pierce Oil Company was a buyer and a marketer of the goods of Standard Oil Company of Indiana. There was never any agreement between Standard Oil Company of Indiana and Waters-Pierce Oil Company except to sell them oil from day to day.

Good equipments for doing business are tank stations established at intervals so that each station will supply a radius of twelve miles. Then goes on to describe the equipments of a tank station. Says it would cost about $200,000 to install a marketing station in Kansas City or St. Louis. In order to do business in Waters-Pierce Oil Company territory it would cost the Standard Oil Company of Indiana a very large amount of money, because it takes large expenditures to install stations, tanks, wagons, lands, leases, etc.

Their territory is divided up between agents and each agent is confined to certain limits within which he may do business. The dividing of a territory into sub-agencies, like Kansas City and St. Joseph, is a managerial question. While he was vice-president and general manager of Standard Oil Company of Indiana the general offices of the company were in Chicago.

In regard to the purchase of the stock of goods of Schofield, Shurmer & Teagle, says when he went to New York City in 1901, he assisted Mr. McDonald, John Teagle and Walter C. Teagle to agree upon a valuation of such stock. A company was formed to take over the business of Schofield, Shurmer & Teagle. Several names were suggested but finally "Republic Oil Company" was agreed upon. Says Mr. Drake recommended Turrell for secretary of the company, who came from Standard Oil Company of Indiana, at

St. Joseph, Missouri.   Schofield, Shurmer & Teagle
had a high-grade Pennsylvania oil called "Palacine,"
which did not come from any Standard Oil Company.
This was a higher priced oil than the ordinary grade
of Standard Oil brands.   Says he arranged with Wal-
ter C. Teagle, who had been connected with Schofield,
Shurmer & Teagle, to take charge of the business of
Republic Oil Company.   Wanted him in order to run
the business of the company as an independent busi-
ness.   Articles of incorporation of Republic Oil Com-
pany were signed by George B. Wilson, F. A. Turrell
and J. R. Taylor.   George B. Wilson was chief ac-
countant at that time of Standard Oil Company of
New York.   James R. Taylor was stenographer for
W. H. Tilford, who was one of the directors of the
Standard Oil Company of New Jersey.   F. A. Turrell,
whose correct name is L. H. Turrell, was a clerk in
Standard Oil Company's office at St. Joseph, Missouri.
Denies that he has any recollection of Turrell com-
plaining to him that the initials "F. A." in the articles
of incorporation of the Republic Oil Company were
wrong, but says that he may have cautioned him about
the business of the Republic; to keep quiet or some-
thing of that kind.

Never was any agreement or understanding be-
tween Waters-Pierce Oil Company, Republic Oil Com-
pany and Standard Oil Company of Indiana about fix-
ing or maintaining prices.

Says he never gave any information to any one
connected with Waters-Pierce Oil Company about the
facts connected with the organization of Republic Oil
Company.

There is a Standard Oil Company of Kansas, but
it has never been a marketer of oil—its sole business
has been that of refining.   It operates the refinery at
Neodesha.   Witness was president of that company
when first organized and remained such for several
years.   He ceased his connection with that company in

1901. In 1902 this refinery was enlarged very much and has extended its sales since—probably sells to Waters-Pierce Oil Company.

He came to New York City in 1901 and became president of Standard Oil Company of Indiana and a director in Standard Oil Company of New Jersey, with offices at 26 Broadway. Prior to that time he was located at Chicago.

When at Chicago the Standard Oil Company of Indiana made reports to 26 Broadway to some person, but he does not know whom. Full reports of the business were made covering the whole business of the company. H. M. Tilford was the sales agent of the company at 26 Broadway. He had charge of the export business and outside sales. He communicated with Tilford in relation to the general business of the Indiana Company. Tilford's title was "Sales Agent." Tilford at one time was a member of a committee at 26 Broadway, known as Trades Committee.

Standard Oil Company of New Jersey is a refiner of oils and holds stock in other companies.

At the time of the organization of the Republic Oil Company he understood that it was Standard Oil property.

Says Standard Oil Company of New Jersey held practically all of the stock of Standard Oil Company of Indiana, but it was carried in the name of individuals.

Says he was succeeded at Chicago by Mr. Drake and he by P. C. Crenshaw, as general managers of the business of Standard Oil Company of Indiana.

Says the board of directors of Standard Oil Company of New Jersey has general control of the business of that company and looks after the business of those companies in which it held a controlling interest, except, he says, that board had very little to do with the business of Waters-Pierce Oil Company.

Relative to the division in Missouri between Waters-Pierce Oil Company and Standard Oil Company,

says his company did not invade Waters-Pierce territory nor did that company invade the territory of his company.

Says when Republic Oil Company bought out Schofield, Shurmer & Teagle he sent out Mr. Conlin, then manager for his company at Kansas City, to inspect the properties purchased.

Schofield, Shurmer & Teagle did not market oils of Standard Oil Company, but the Republic Oil Company did.

Since 1901 thinks the Standard Oil Company of Indiana sold its oils in Missouri to Waters-Pierce Oil Company and H. A. Williamson & Co., and to no other companies to amount to much. H. A. Williamson & Co. market the oils of that company in a prescribed territory in the northwestern part of the State. Says there was a division of territory between his company and Williamson & Co., and his company and Waters-Pierce Oil Company, in Missouri, and that the division was respected by all three. He does not remember of his company selling oil to any other companies in Missouri, except Waters-Pierce Oil Company and Williamson & Co.

Says the "ealine" of his company was a Pennsylvania high-grade oil and corresponded to the "palacine" of the Republic Oil Company. Both these last oils were refined by his company.

At all times the general offices of Republic Oil Company have been located at 26 Broadway, and its officers have been Standard Oil men.

The board of directors of the Standard Oil Company of New Jersey considered the marketing and refining of oil by all interests that were owned by that company in a general way.

Says he did not establish tank stations at Joplin, Springfield and other points because the company was already selling there by selling to Waters-Pierce Oil Company.

From 1901 to March, 1905, there was no competition in Missouri between the Standard Oil Company of Indiana and Waters-Pierce Oil Company in Missouri.

There is a pipe line from Sugar Creek to Whiting, owned by Prairie Oil & Gas Company, a company owned by Standard Oil Company of New Jersey. Sugar Creek is not on the main line of this pipe line, but a branch connects it with the Sugar Creek refinery.

Standard Oil Company of Kansas is owned by Standard Oil Company of New Jersey.

The pipe line spoken of above connects the oil producing territory of Kansas and Indian Territory with Whiting and then extends on east to the sea-board.

Says there is about one million two hundred and fifty thousand dollars invested in the refinery at Sugar Creek, near Kansas City, and its capacity is from one thousand to twelve hundred barrels a day. It was located there because it was a point near the oil fields and Kansas City as a distributing point. The proximity of the Missouri river was another consideration. Says the Pennsylvania crude is more valuable because it produces more refined product than the crude of the West. The crude of the West will turn out just as good oil but not so much of it.

Says an order placed with Standard Oil Company of Indiana for oil by Waters-Pierce Oil Company would likely go to Chicago and it would there be determined from what refinery it would be shipped, depending on the place where it was wanted.

**WALTER C. TEAGLE:** He is now connected with the export department of Standard Oil Company at 26 Broadway. He was an employee of the firm of Schofield, Shurmer & Teagle—his father was a member of the firm—that is, John Teagle. Also Henry Teagle was a member of the firm. His experience in the oil business dated from 1899, when he took employment with Schofield, Shurmer & Teagle. That firm did a distributing business through the west and

sold to jobbers at various points in the United States. They had a small refinery at Cleveland with a capacity of from ten to fifteen thousand barrels of crude a month. There was also a refinery at Scio—the Scio Refining Company, which was owned principally by members of the firm of Schofield, Shurmer & Teagle. Also members of that firm owned the Cleveland Refining Company.

In Missouri the firm of Schofield, Shurmer & Teagle had main bulk stations at St. Louis and Kansas City and sub-stations at Springfield, St. Joseph, Clinton and Sedalia. The firm was in business in Missouri fifteen or twenty years. It had quite an extensive business and was the leading firm among independents. The leading brand was palacine, a high-gravity Pennsylvania oil, and was worth from three to four cents more than the ordinary oils of Standard Oil Company. They also had special brands of lubricating oil and gasoline which were sold higher than the ordinary product. Such as "red cross" gasoline, "ideal valve" oil, "ideal engine" oil and "golden axle" grease. These brands became well known in the trade. Says the sale of the business and assets of Schofield, Shurmer & Teagle was conducted by John Teagle, representing the firm, and Alexander McDonald. Witness says he negotiated the sale at the same time to the Republic Oil Company of the Scio Refining Company with Mr. Moffett.

Witness was made vice-president and general manager of Republic Oil Company when it was organized and he continued in that position until October 1, 1903. As such he had full charge of all the business in all its departments. After the unfinished products on hand were worked up the refineries at Cleveland were dismantled and the same thing was done with the Scio refinery. After this the Republic Oil Company bought the larger part of its supplies from Standard Oil Company. They continued, however, to get a large

portion of high grade oils from Pennsylvania refineries. About twenty-five or thirty per cent of their business was in high-grade oils. Says he not only held the business of Schofield, Shurmer & Teagle, but increased it. Republic Oil Company retained all the employees of Schofield, Shurmer & Teagle except three. The plant at Springfield, Missouri, was dismantled sometime after the organization of the Republic Oil Company, because it was not doing a great amount of business. They had plants at Clinton and Sedalia, not very far away, which were sufficient. The other plants in the State were continued and covered the same territory that was covered by Schofield, Shurmer & Teagle.

Says L. H. Turrell, who was sent to Cleveland with Republic Oil Company, was not competent to do the 'work he was sent there to do and as a result he resigned. Also says the work of H. C. Hardcastle was unsatisfactory and he was incompetent.

Does not remember giving instructions to Northrup, manager at St. Louis, to go after the business of independents but not the Standard Oil Company.

Shortly after Republic Oil Company was organized it was attacked by independents and accused of being a Standard Oil Company. Says he remembers the letters produced in the deposition of Northrup, dated June 12, 1901, in relation to the reports that Republic Oil Company was a Standard Oil Company, and that he never gave any other instructions other than those contained in his letter. At that time he says the Republic Oil Company was an independent company and he continued to run it for years as an independent company.

The negotiations for the sale of the property of Schofield, Shurmer & Teagle, Cleveland Refining Company and Scio Refining Company were made with

218 Sup—16

McDonald, Moffett and W. H. Tilford, all Standard Oil men at 26 Broadway. The purchase price was paid by Republic Oil Company, and was agreed to or fixed by Mr. Moffett. All the dealings that witness had with Moffett were at 26 Broadway. The negotiations were completed before the Republic was organized. It was understood that a corporation would be organized to take over the property. After the incorporation some months, he learned that the original incorporators were Standard Oil employees.

The consideration agreed on for all the properties sold to Republic Oil Company amounted to something over a million dollars. He was a stockholder in the Republic Oil Company as long as he was connected with the company. When his connection ceased he re-assigned his stock—never paid anything for it.

All communications to C. L. Nichols, president of Republic Oil Company, were addressed to him at 75 New street, New York City. Reports of the company were made there. Nichols had his office next to Mr. Jennings.

Wilson was first president of Republic Oil Company. Nichols became president in the fall of 1901.

When he quit Republic Oil Company in October, 1903, he became a member of the export department of Standard Oil Company, but does not remember which company, and still holds that position.

Says Republic Oil Company continued the business on the same plans and policies pursued by Schofield, Shurmer & Teagle—the distributing business was carried on in just the same way and they handled the same oils. Says this company was a very active competitor of both Standard Oil Company and Waters-Pierce Oil Company in Missouri.

Says that the reports that Schofield, Shurmer & Teagle had sold out to Standard Oil Company were not true; that the sale was made to Republic Oil Company. The Republic Oil Company was an independent

company and a competitor of the Standard, and agents were instructed to state that the company was independent.

He did not know that the Waters-Pierce Oil Company was a Standard Oil interest, but he assumed that there was a connection between it and the Standard Oil Company. He regarded the Standard Oil Company and Waters-Pierce Oil Company as competitors of the Republic Oil Company, and he instructed the agents of the latter company to get all the business of the other two companies they could.

The building at 26 Broadway, New York City, known as Standard Oil building, is fifteen stories high and extends from Broadway to New street. Where it faces on Broadway it is numbered 26, and where it faces on New street it is numbered 75.

When Republic first bought out Schofield, Shurmer & Teagle, Frank B. Northrup was manager at St. Louis and remained manager there for the company for about a year. He was succeeded by W. S. Heyer, who was there when he left the company.

As general manager of the Republic Oil Company he gave Mr. Northrup no special instructions more than to get all the business he could from Waters-Pierce Oil Company, as well as all other companies. So far as competition was concerned the same policies were pursued by the Republic as by Schofield, Shurmer & Teagle. Says he had no personal acquaintance with any of the officers of Waters-Pierce Oil Company and never had any correspondence with any of them. And the same competition was continued between the Republic Oil Company and Standard Oil Company of Indiana as had been carried on by Schofield, Shurmer & Teagle. Says when he quit the Republic they were getting twenty-five or thirty per cent of their oils from the Standard Oil Company. The matter of the purchase of oils was left largely to his discretion and he bought where he could do the best. Originally he

placed orders for Standard oils with C. L. Nichols at 26 Broadway and later with Bogardus at Chicago.

C. L. NICHOLS: Is president of Republic Oil Company and has been since October, 1901. He has had twenty-eight years experience in the oil business. Just prior to becoming president of the Republic he was assistant to Walter Jennings at 26 Broadway, New York City. Jennings was sales-agent for Standard Oil Company of New York. He was with Jennings about two years. Prior thereto he was with C. M. Coburn at the same place—he was the predecessor of Jennings —was with Coburn about five years. Prior to that he was in the field with Standard Oil Company of New York. He was with this company at Elmira, New York, for eighteen years.

His office as president of Republic Oil Company was 1002 Standard Oil building, or 26 Broadway. For a short time L. H. Turrell was secretary of the company and then W. T. McKee became secretary and has occupied that place since. As president he has performed such duties as devolve upon a president, but the business has been actually run by Walter C. Teagle.

Says the company did business in eight or nine Western States, including Missouri.

He ordered the station at Springfield, Missouri, dismantled in 1901, because it was a small, out-of-the-way place and not a paying station. In 1903 the station at Clinton was closed because the business of that station could be done from Sedalia, which was not very far away.

His company sold all grades of oil but made a speciality of "palacine"—high-grade Pennsylvania oil—in fact, the brand was copyrighted. Thirty or thirty-five per cent of illuminating oils sold by the Republic was palacine, which increased to fifty or sixty per cent in 1905.

Every effort was made to preserve the good will of Schofield, Shurmer & Teagle—that was their stock in trade, a part of their purchase. Says they had to sell common grades of oil in order to sell palacine, because all merchants had to handle a cheaper grade of oil, but special efforts were made to sell palacine.

The purchase of oils was left almost entirely to Mr. W. C. Teagle, but he was instructed to. apply to Bogardus when he bought oils from the Standard Oil Company. At first they got twenty-five or thirty per cent of their oils from Standard Oil Company and later a larger per cent, because it could be bought cheaper. They got the palacine as well as common brands from Pennsylvania—from independent refineries. Also bought from Atlantic Refining Company at Franklin— Standard Oil interest.

The affairs of the Republic Oil Company were conducted as a separate and distinct corporation absolutely, because it was necessary to conduct it that way in order to do the business of Schofield, Shurmer & Teagle, which had been an independent firm. The business of Schofield, Shurmer & Teagle had been built up so that it had a. very large business, and the principle value of its business consisted in its trade in high-grade oils. The independents made assaults on its high grade business. The cheaper oils were sold as a necessity to market the high grade oils.

No agreement or understanding between his company and Standard Oil Company of Indiana to maintain prices, nor as between it and Waters-Pierce Oil Company. No agreement as to territorial division, the Republic Oil Company operating as an entirely independent company.

He did not own the large amount of stock of his company which stood in his name, but he held it for the Standard Oil Company of New Jersey, and all the other stockholders of the company held the same way.

In addition to his work as president of Republic Oil Company he has been connected with Standard Oil Company of Indiana under L. J. Drake, who is New York sales-agent of that company, with offices at 26 Broadway.

While he was assistant to Jennings, the duties of Jennings were enlarged so as to take in Standard Oil Company of Indiana, and he was succeeded by L. J. Drake. Witness continued during the whole time of his presidency of the Republic Oil Company to be assistant to those gentlemen.

A sales-agent at 26 Broadway represents the various marketing interests of the Standard Oil Company. He has charge of a certain section of the country or territory. Mr. Jennings in a general way looked after the marketing of oils of Standard Oil Company of Indiana. He would be consulted about the establishment of a new station, etc.

George B. Wilson, whom he succeeded as president of Republic, had been chief clerk in the treasury department of Standard Oil Company of New York.

· Says J. R. Taylor, who was assistant secretary of Republic Oil Company and stenographer to W. H. Tilford, first notified him that he had been elected president of the company. W. H. Tilford was a member of the executive board at 26 Broadway. Jennings afterwards became a member of that board, when he was succeeded by L. J. Drake.

Says he does not know of a "Domestic Trade Committee," so-called, but there were gentlemen associated together who represented the different interests, of which Jennings was one, who would meet to consult. It has charge of the conduct of the business of all Standard Oil interests. It was the executive head of the Standard Oil Company. Says the Republic Oil Company was not represented on this committee; the Standard Oil Company was represented, but does not

know whether the Waters-Pierce Oil Company was or not.

He received reports from Republic Oil Company and showed them to Jennings and Drake. Says his salary was increased five hundred dollars a year when he became president of that company. It was a surprise to him when he was notified that he had been made president of the Republic Oil Company. He had discussed the matter some with Mr. Jennings, but he was not told he would be made president.

He received dividends on the one hundred and fifty shares he held in Republic Oil Company and turned them over to Standard Oil Company of New Jersey; that is, the treasurer, William G. Rockefeller.

After he became president of the Republic his name remained on the door just as before. The name of the company was not put on the door and mail for the company was directed to 75 New street. Does not know at whose instance that was done.

The general management of Standard Oil Company of Indiana and Republic Oil Company was centered in the office occupied by him and Jennings. At the same time the two companies were active competitors.

Says the station at Sedalia has been sold to Standard Oil Company, and that company is handling and selling high grade or palacine oils. They still maintain their stations at Kansas City and St. Louis, but have let out most of their employees. This has all been done since the institution of this suit. The purpose is to sell out to the Standard.

If an injunction had not been served the Republic Oil Company would now be out of Missouri entirely.

Says his company sold out all its business to the Standard Oil Company in all the States where it has been doing business. The papers have so thoroughly advertised this case and the admission that Standard Oil Company of New Jersey owns the stock of the Re-

public Oil Company that it has served its purpose. Its purpose was to increase its business and maintain and keep this palacine brand they purchased as a trade mark from Schofield, Shurmer & Teagle, and which was their principal feature in their business in refined oil. The sale was made to Standard Oil Company of Indiana for $231,000. The Republic has no existence now except at St. Louis and Kansas City in Missouri. These stations have not yet been sold. At place where his company has abandoned business, Standard Oil Company continues to sell the palacine brand oil.

At the time he became president of Republic Oil Company he did not know anything about Waters-Pierce Oil Company. Had no communication, either verbal or by letter, with anyone connected with that company in relation to the business of selling oil. There was no agreement between the two companies as to the sale of oil in St. Louis in any manner whatever.

During the time he was president of Republic Oil Company he knew that it was owned by Standard Oil Company of New Jersey and that that company owned a controlling interest of the Standard Oil Company of Indiana, but says that he did not know that the New Jersey Company owned any interest in the Waters-Pierce Oil Company.

Says he knew R. H. McNall at 26 Broadway well. He was commercial agent of Waters-Pierce Oil Company. His office was 1209 Standard Oil building, and he was assistant to H. M. Tilford. He did not change his office when he became commercial agent. Says he does not know what Tilford's position was, but he was looked upon as manager of agents and was a big man at 26 Broadway. Does not know what territory his jurisdiction covered.

Says there was no friendship between the Republic Oil Company and the Standard of Indiana and Waters-Pierce—they went after each other's business

vigorously. The Waters-Pierce Oil Company was a mean competitor.

Republic Oil Company bought oils from Warren Refining Company, and Lake Carriers Oil Company, both independent companies, having no connection with Standard interests.

Says he had no business connection whatever with R. H. McNall, commercial agent, and never discussed with him the question of competition with Waters-Pierce Oil Company.

He thinks the Standard Oil Company of Indiana is the largest marketing company among the Standard Oil companies.

**GEORGE B. WILSON:** He is not engaged in anything just now. He resigned from Standard Oil Company about two and a half years ago. Was chief accountant for New York Standard Oil Company, located at 26 Broadway. He had been in the Standard Oil offices for about twenty-seven years. He resigned on account of blindness—had no trouble with Standard people.

He was incorporator of Republic Oil Company and became its first president. He was acting simply as an accommodation president until some other person could be found. He was president for three or four months or until Mr. Nichols was elected. He remained a director for the company for a while. Thinks the stock issued to him remained in his name until 1903. He had no interest in the company—he, was holding the stock entirely for Standard Oil Company.

Remembers of meeting Turrell after the papers were signed—was merely introduced to him—had no conversation with him. When it was found out that Turrell had signed the initials F. A. when his correct initials were L. H., his resignation was requested and was filed in the name of F. A., and he was re-elected to the office he had held by his correct name, L. H. Turrell.

Lives at East Orange, New Jersey. Says Frank Wilson is an employee of Standard Oil Company but is not related to witness. He was in the office as a bookkeeper under witness.

When the Republic Oil Company stock was issued to him, he assigned it in blank, but just when Frank Wilson became a stockholder, or it was assigned to him, witness does not know. He did not retain the certificate. Three thousand shares stood in his name.

L. J. Drake first spoke to him about becoming an accommodation president of Republic Oil Company.

Says he thinks he signed the articles of incorporation up in Mr. Doremus's office, who was a notary public. Does not remember whether he saw either of the other two incorporators sign it or not.

**ARTHUR THEODORE DOREMUS:** At 26 Broadway, New York City, and is connected with Standard Oil Company. Says in 1901 he was a notary public, and took the acknowledgment of the incorporators of Republic Oil Company. Says Turrell came before him personally. Thinks that Turrell and Taylor were before him both at the same time and that Turrell was introduced to him by Taylor.

**WILLIAM S. MEYER:** Now resides at Baltimore, Maryland. He was at St. Louis about four years as manager of Republic Oil Company. He left St. Louis in November, 1906, to take a position with Standard Oil Company of New Jersey. Prior to going to St. Louis he had been manager of Cleveland Refining Company, when it belonged to Schofield, Shurmer & Teagle. He had also been with that firm as manager at Battle Creek, Michigan. When with Cleveland Refining Company he was marketing for them at Columbus, Ohio. Thinks he went to St. Louis as manager of Republic Oil Company in August, 1902. Before this he was with the Republic Oil Company at Columbus, a short time after it bought out the Cleveland Refining Company.

The special effort of the Republic Oil Company was on high-class oil, that is, they made a special effort to push the sale of palacine oil. At first this specialty business was not so large, but towards the last it run from fifty to sixty per cent of the business. Does not know from what companies his oils came, because the orders were placed at Cleveland, the headquarters of the company.

At St. Louis he sold to the city trade and had two traveling men going out of St. Louis. The ordinary oil sold by that company came from Whiting—at least, the large per cent of it.

Had no agreement with Waters-Pierce Oil Company or Standard Oil Company relative to prices, quantities or amounts of oil to be sold, or in any other manner respecting the trade.

In St. Louis, the St. Louis Oil Company, International Oil Works, George P. Jones & Co., Bell Oil Company, Waters-Pierce Oil Company and others were his competitors. Standard Oil Company of Indiana did not sell oil in St. Louis.

He succeeded Mr. Northrup in St. Louis as manager of Republic Oil Company. Northrup went to Chicago as an employee of the company there. He went to St. Louis at the direction of Walter C. Teagle, who was vice-president and general manager. Says he got a circular letter from Walter C. Teagle, not long after the organization of the company, denying the newspaper reports that Republic Oil Company was a Standard Oil interest. He competed with Standard Oil Company and represented to the trade that the Republic was an independent company and not connected with Standard Oil Company, and made the same claim with reference to the Waters-Pierce Oil Company.

During the time he was at St. Louis, the oil he got from Whiting, Indiana, was consigned to Republic Oil Company by R. M. Andrus, as consignor, and not by

the Standard Oil Company. He does not know why this method was followed.

His principal "drive" in St. Louis was on high grade Pennsylvania oil, which not only did he claim to be better oil than that sold by Waters-Pierce Oil Company, but was better oil. The Waters-Pierce Oil Company got oil from Whiting, also. Republic did not get its high-grade oil from Whiting.

All his competitors claimed they sold a high-grade oil, but it did not give the same satisfaction as that of Republic Oil Company.

Says they got some thirty or forty per cent of their oil from Whiting.

They did not pay for the oils that came from refineries from the St. Louis office. They did occasionally pay for what was called "fill-in" orders—oil purchased from a competitor whem they ran short and did not have time to await a shipment.

He would sometimes call up Von Harten, manager of the bulk department of Waters-Pierce Oil Company in St. Louis, over the telephone, and get from him the information of an advance or decline in prices, and he would follow a decline or advance, whichever it might be. As a rule, he was notified in advance of advances or declines in prices over the telephone by Von Harten. So far as the tank-wagon sales were concerned, the Waters-Pierce Oil Company fixed the prices of oils. The tank-wagon sales were the large part of the business of the company in St. Louis.

He was not restricted to any territory, but sold anywhere in the State that they could.

Says he did not communicate with any other company relative to the advance or decline in the prices of oils. The Waters-Pierce Oil Company made prices in St. Louis openly—they sent out cards announcing the changes to all the trade, so he understood. Says he had no arrangement or understanding with Von Harten that Republic would follow the price of Waters-

Pierce Oil Company, or that that company was to fix the prices.

On one occasion the St. Louis Oil Company made an underhand cut on prices and they met the cut, but this was the only instance when his company followed that company. The Waters-Pierce Oil Company reduced at the same time to meet the cut of the St. Louis Oil Company.

The Waters-Pierce Oil Company during the entire time that he was there was the largest seller and jobber of oil in the city, and, as such, controlled the market.

He had no consultation with Von Harten about the price at which the Republic Oil Company should sell oil in St. Louis.

Waters-Pierce Oil Company fixed the prices of oil for all the other companies in St. Louis, that is to say, the other companies followed its prices. Says in following the prices fixed by this company he was following his instructions from Cleveland to follow the market.

His company was an active competitor of Waters-Pierce Oil Company and drummed their trade the same as the trade of other companies.

But there was no competition between his company and Waters-Pierce Oil Company as to prices on tank-wagon sales.

Before he would follow the decline or cut made by St. Louis Oil Company, he referred the matters to headquarters at Cleveland—says he did this of his own accord.

He usually got telephone information from Von Harten from twelve to twenty-four hours in advance of printed card quotations, and followed these prices without referring to the Cleveland office.

He followed the prices made by Waters-Pierce Oil Company, but no other company. Changes made by Waters-Pierce Oil Company usually went into effect the next morning after he would get the 'phone notice

of the changes. That company was the only one in the city which issued cards giving quotations in prices.

Says he and Von Harten were personal friends and remained so during the time he was in St. Louis.

There was no executive board at St. Louis that met to fix prices for Republic Oil Company. He did not know the cost price of oil, simply got an invoice giving the kind of oil and gallonage without any price. Had nothing in his office at St. Louis as a basis on which he could fix the price of oil independent of Waters-Pierce Oil Company or other companies.

Their palacine in barrels was sold from a cent to two cents higher than the high grade of Waters-Pierce, but from tank wagons it was sold at the same price as that company's "eupion" brand.

Says he had met C. P. & C. L. Ackert, but had no business dealings with them. Never discussed prices with any officers of Waters-Pierce Oil Company.

One of the Ackerts called him up once about cutting prices at Perryville—accused his company of cutting prices down there—says they did not do so. Says he never intentionally cut prices as against Waters-Pierce Oil Company, nor gave rebates unless they gave them first. Says they did sell customers of Waters-Pierce Oil Company at Perryville. They may have offered some inducements because of the large sales, the merchants then buying a winter's supply to be shipped by river before the river froze up, but they did not purposely cut prices. There was quite a contest between the two companies for that business during several years.

P. C. CRENSHAW: He is general manager of the sales department of the Standard Oil Company of Indiana, with offices at Chicago. He has had twenty-one years' experience in the oil business in various capacities. He was at Kansas City as local manager of Standard Oil Company for a year in 1900. About May 1, 1901, he went to Chicago as assistant general man-

ager, and was made manager in October, 1901. He found that his company was selling as a distributor in a part of Missouri, and as a wholesaler in the remaining portion. The territory in which they had stations included Kansas City and vicinity and the northern part of the State. This condition he found when he went with the company. No agreement about this division so far as he knew.

Says they have fifty-nine tank stations in Missouri. To equip and furnish these stations, the Kansas City station would cost seventy-five to one hundred thousand dollars—eight or nine others, five or six thousand dollars each, and the remainder two or three thousand dollars each. Including oils and gasoline, the company sells some eight and a half million gallons of oil a year at its tank stations in Missouri. The refinery at Sugar Creek is very large—will compare with Whiting.

The business of the company is divided into divisions, and each division is separate and distinct from the others, and allotted certain territory. Says they have found this to be the most profitable and economical system of conducting the business—in fact, the only way to successfully operate it.

The company does not do business in Missouri other than in its own name, in other words, is not doing business through some other name or company.

Has no personal knowledge of rebates being paid by the company in Missouri or elsewhere, and it is decidedly contrary to the policy of the company.

No agreement between his company and the Republic Oil Company or Waters-Pierce Oil Company, to fix or maintain the prices of oil.

Says he did go to Kansas City and try to settle a difficulty between A. H. Gardner of the National Oil Company and Henry Teagle of Republic Oil Company, who had engaged in a war of rebates and demoralized the trade. Hurt the business of the Indiana Company

because they were taking its customers away. Says he had no more influence over one man than the other—simply intervened between them in the interest of peace and the oil business. Says he did not tell Gardner or intimate to him that he had any particular control over the Republic employees. All he did, he says, was to ask each of them as a friend to meet together and talk over the business—this was some time in 1902.

Says he thinks there was one or two new stations established by Standard Oil Company of Indiana in Missouri since 1901. This company had no "bogus" companies, or companies operating as a blind, in Missouri.

Speaking of the meeting in Kansas City in 1902, when he got Gardner of the National Oil Company and Teagle of the Republic Oil Company together to adjust, if possible, their rebate fight, says he got them together in a room at the Coates House, and when Teagle took out some papers and wanted to talk business, he asked him to put his papers up and not talk business there. Says he and Mayer, manager of Standard Oil Company of Indiana, who was also there, left Gardner and Teagle in the room and went below. Says he had no further conversation with Gardner about the rate troubles. They had, however, talked over the situation and troubles while at luncheon at the Baltimore Hotel. Does not remember of Gardner charging that Republic Oil Company was a part of the Standard Oil Company. Denied the conversation which Gardner testifies he had with him.

Says that with the exception of a very small per centage the Kansas City station got all its oils from the refineries of Standard Oil Company of Indiana.

Says he does not remember just what took him to Kansas City when he intervened between Gardner and Teagle, and he thinks the question of his intervention was suggested by himself or Mayer, manager of Standard Oil Company at Kansas City.

Says he thinks they sold some high-grade oils in Missouri, but not much—the high-grade Pennsylvania oil was not a special feature of the company's business.

**WALTER C. TEAGLE:** (re-called): Says prices at which oils of Republic Oil Company were sold were fixed at Cleveland, and a list of prices would be sent to the managers, including the St. Louis manager—this was a regular printed schedule showing cost F. O. B. at Cleveland and selling prices. This included everything that the company sold—such as all grades of refined oils, lubricating oils, greases, paints, lead, etc. Lubricating oils do not fluctuate much in prices. The fluctuation is in refined oils, naptha products and the lighter oils. The price lists sent to managers fixed a minimum price under which they could not sell without consultation with the Cleveland office. Says palacine oil sold usually from tank wagons at about two cents a gallon above the price of common oil.

**GEORGE W. MAYER:** Says he has been connected with Standard Oil Company for about twenty-eight years. Commenced with Consolidated Tank Line Company. It was succeeded by Standard Oil Company of Indiana. He was with the Indiana company at Kansas City from 1896 to 1899. Then he went with the same company at Detroit, Michigan, and then back to Kansas City in 1901, as manager of the company. He has been there since. His territory is mostly north of Missouri river. The St. Joseph station has the Northern part of Missouri, along the Iowa line, not a great amount.

Says his company has done no rebating at Kansas City territory since he has been there.

There has been no agreement or understanding between him or his company with the Republic Oil Company or Waters-Pierce Oil Company relative to fixing or maintaining prices.

Henry Teagle was manager of the Republic Oil Company for a while—he was succeeded by Cochran.

In 1902 both the Republic Oil Company and National Oil Company were rebating all over Kansas City. It demoralized the trade and his company lost trade. Teagle and Gardner were always at swords points, calling each other names, and the intention was to get then together and have a talk. Says, "We arranged with them to go to Mr. Crenshaw's room at the Coates House, and we took them up stairs—I think we sent down and got some cigars—and we went out and left both gentlemen there, and we went down in the lobby and stayed there probably an hour." Denies the statement made by Gardner that Crenshaw said if he had known those contracts were made by Teagle (of the Republic) he would not have permitted it. Said he did not take lunch with Gardner and Crenshaw, and did not go up to the hotel with them. Says he did not hear the statements testified to by Gardner that Crenshaw made.

So far as his territorial lines are concerned, they existed when he went there and have not been changed. Does not know how they came to be established where they are.

Says the gauge rods furnished to Morgan and other salesmen were for the purpose of measuring barrels of competitors. The gauges were correct and not furnished in order to deceive.

Relative to the testimony of Whelan, says that whenever the Republic Oil Company or any other company called up his office and asked for prices they would be given. No distinction was made between the Republic Oil Company and any other company, but says he did not instruct the Republic office to have its tank wagons fall in line.

Says prices for his company were fixed from Chicago—no change could be made without consulting the

Chicago office. Does not know who fixed prices for Republic Oil Company.

During the years 1902, 1903, 1904, and 1905, the Standard Oil Company did from seventy-five to eighty per cent of the business at Kansas City. As a result of the conference between Crenshaw, Teagle and Gardner and himself, the rate war of 1902 stopped within sixty days after. During the rate war referred to it was exclusively between the Republic and National—they were the companies giving rebates. Standard Oil Company did not engage in it.

**HAGGERT S. COCHRAN:** He is cashier for Republic Oil Company at Kansas City, and has held that position since January, 1903. Prior to that he was with the company at Cleveland, Ohio, as sales-manager— was in that position for about a year. Prior to that he had been manager for Republic a short time at Kansas City. He had been manager for Schofield, Shurmer & Teagle at Kansas City from 1892 to the time they sold out. The first he knew of the sale he saw in the newspaper where Schofield, Shurmer & Teagle had sold out to the Republic Oil Company.

Schofield, Shurmer & Teagle were competitors of Standard Oil Company at Kansas City. They got their oil from various points—Cleveland; they had a refinery there. Most of their oil came from there in Great Western oil cars.

Information came to him from the office of Schofield, Shurmer & Teagle, at Cleveland, that the firm, the Cleveland Refinery and Scio Refinery, had been consolidated under the name of Republic Oil Company, or had been sold to a New York corporation known as the Republic Oil Company.

Says Republic Oil Company gets its oils from Pennsylvania, Ohio, Missouri, and Indiana. About seventy-five per cent of their oil comes from Pennsylvania companies. Says they never got a shipment of oil in Union Tank Line cars—the shipments came in other

cars. Also got some cheap oils from Sugar Creek Refinery which came from a Bogardus agent.

Says he never bought any oil—it was all bought at Cleveland and shipped to them. Says he knows nothing about Bogardus as to who or what he is. He did not pay for any oil—it was paid for at Cleveland. They did not get a bill of the oil at Kansas City—simply got an invoice showing what the gallonage was.

The refinery at Sugar Creek is a Standard Oil refinery.

. Shipments of oil from Bogardus come in Republic Oil Company Cars.

The oil that came from Whiting was consigned to them by Andrus.

W. T. McKee is secretary, W. E. Judd, general manager, and C. L. Nichols is president, of Republic Oil Company.

Nichols is at 75 New street—does not know that to be an entrance to 26 Broadway. Made his reports to the Cleveland office.

Says a man by the name of Tinsley came out to Kansas City to check up the property of Schofield, Shurmer & Teagle when they sold. Also a man by the name of Stein came with Tinsley to assist him. Says he does not know where they came from. They had letters of introduction from W. C. Teagle. Neither Tinsley nor Stein had been connected with Schofield, Shurmer & Teagle to his knowledge.

J. H. Hart is the only auditor that ever checked up the business of Republic Oil Company since he has been with it at Kansas City.

Tinsley and Stein were working for a New York corporation as auditors.

He says it was reported in the newspapers at the time that Schofield, Shurmer & Teagle had sold out to the Standard Oil Company.

The refinery of Schofield, Shurmer & Teagle at

Cleveland, which had been their principal source of oil, was dismantled soon after they sold out.

Says the territory of Republic Oil Company at Kansas City is in Kansas, western Missouri and any place where shipments can be made consistent with freight rates. His company does not sell in Waters-Pierce territory.

Says he represents the Republic as an independent competing company of the Standard Oil Company, and has always claimed such to the public.

Finds people who are prejudiced against Standard Oil Company, and to them he claims his company is independent of the Standard.

Says there were some changes by the Republic when it began business in forms and methods of doing business, but whether they followed the Standard or not he does not know.

Says he got his prices for selling oil from Cleveland, and did not get them from the Standard Oil Company at Kansas City.

Competition between Standard Oil Company and Schofield, Shurmer & Teagle always existed—that firm was very aggressive as a competitor.   Each was trying to get the business of the other.

C. D. WEBSTER:   Lives at Humboldt, Kansas, and is in the business of refining oil.   Has been in the oil business twenty-eight years, and nearly all the time as a refiner.   He has had refineries in Pennsylvania and Ohio.   He began his works at Humboldt in 1903.

Says he is familiar with the costs and expenses incident to the refining of petroleum.

Oil was discovered in Kansas back in about 1889, but the production did not amount to much until within the past five years.  In 1905, there was something like twelve million barrels produced in the State.

The total production of petroleum in the United States in 1900 was sixty-three million barrels, worth about seventy-five million dollars. In 1905 the produc-

tion was one hundred and thirty-four million barrels, worth about eighty-four million dollars. The principal increase in the production came from Texas, Kansas, and the Territories. During that period the productions in Pennsylvania, Ohio and Virginia remained about stationary. The decrease of value has been in the Kansas, Texas and Territories fields—the price in the East has remained about the same.

For the last twenty years the price of crude petroleum in the eastern fields has not varied much. In 1903 the crude was worth $1.16 a barrel; afterwards it brought thirty-two cents to fifty-two cents, according to the gravity—that is, a barrel. This was after it was put on the gravity basis by the Standard Oil Company, it being the only purchaser in the field. Now the best brings thirty-nine cents—from twenty-six to thirty-nine cents a barrel.

There has been a marked decline in refined oil in Kansas—in 1904 it was selling to the grocers at fourteen and a half cents, and now it is selling at seven and a half cents. He thinks the cause of this was to injure the independent refineries. There has been very little change in refined oil in other parts of the country within the last four or five years, except where there has been competition. While the output in the United States has nearly doubled since 1900 the price of refined oils has changed very little except in Kansas. There is a law in Kansas providing that if oil is lowered in one place it must be lowered in other places.

The entire expense to him of refining a barrel of petroleum, including cost of oil, piping, etc., is about sixty-six cents and a quarter, or about a cent and a half a crude gallon. Says he would get about twelve gallons of refined oil, besides the gasoline, gas oil, asphaltum and coke as by-products.

There are about fourteen independent refineries in the Kansas field—they are small, average about two hundred barrels a day of crude petroleum.

Says he sells oil at his refinery at five cents a gallon—wholesale price—and makes a good profit. Sells it in St. Louis at six cents a gallon—costs about a cent a gallon to get it there. Says the Kansas crude is better than that of Indiana and Ohio, but not as good as some of the productions of Pennsylvania.

The actual cost of refining at his refinery at Humboldt, Kansas, not including cost of oil and transporting, is sixteen and a quarter cents a barrel.

Says he never refined any Texas or Indiana oils nor Ohio oils, except around Marietta.

Says he sells in tank wagons in Kansas at eight cents a gallon. This is because of the additional expense of maintaining wagons, horses, men, and selling in small quantities.

Says he has between sixty and seventy thousand dollars invested in his refinery. Has no oil wells.

Says that in the Kansas and Indian Territory fields the production of crude oil has increased from about 1,000 barrels in 1889, to 12,000,000 barrels in 1905.

The sales he makes at St. Louis and Joplin are made to the jobbers and not to the trade. He sells by tank-wagon delivery in Kansas at eight cents and the Standard sells at seven and a half cents, but says the Standard oil is inferior to his. Says the Standard sells higher grades there, for which they charge three or four cents more. The oil he sells at eight cents is one hundred-and-fifty fire-test water-white oil, and that is the grade of oil he gave the expense of refining.

Government statistics showing production of petroleum in Pennsylvania, New York, Ohio, West Virginia, Indiana, Kansas, Texas, Missouri and Indian Territory for years 1900, 1901, 1902, 1903, 1904 and 1905.

A. H. GARDNER (recalled) : Connected with National Oil Company at Kansas City. Says his company makes a difference between tank-wagon sales and sales

in barrels of from three and one-half to four cents a gallon—that is, the barrel oil is much higher. That much is charged for the package and expense of putting it into a package. These are wooden barrels.

In 1903, says his company was making about three and one-half cents per gallon on high-grade oils and about one-half cent on common or water-white oils.

Says his company has never tried to buy oil from any of the respondents, nor has any of them offered 'to sell to his company. His oils are obtained from independent refineries. His company sells the oils of National Refining Company. They are assigned certain territory and don't sell in other territory where the same oils are sold by other companies.

Tabulated statements showing the prices at which the National Oil Company sold its various brands of oil and gasoline at Kansas City, Missouri, during each month of the years 1903, 1904, 1905, and 1906. This statement was prepared from the records of the company at Kansas City and furnished and identified by witness Gardner.

A. L. STOCKE:    Says the prices of St. Louis Oil Company in St. Louis have been regulated by the prices fixed by Waters-Pierce Oil Company. The prices of Waters-Pierce Oil Company were followed.

The tabulated statement referred to below was made from the records of the St. Louis Oil Company, showing prices for last ten years at which that company has sold in St. Louis, being prices which followed the market price fixed at various times by Waters-Pierce Oil Company. This table gives only the price of water-white or prime white oil, which is the common oil or coal oil, sold by tank-wagon delivery in St. Louis. The price of this same oil in barrels would be about three cents a gallon more to cover cost of barrel and barrelling. There is more of this grade of oil sold than any other.

This water-white of St. Louis Oil Company cor-
responds to what the Waters-Pierce Oil Company calls
150 coal oil. Their grade of eupion is a high-grade oil.

The tabulated statement submitted by witness
merely represents the price at which the St. Louis Oil
Company sold water-white oil in St. Louis from tank-
wagons from 1896 to 1906.

Tabulated statement above referred to showing
average prices per month and by the year, for the
years 1896 to 1906, inclusive, at which the St. Louis
Oil Company sold water-white oil from tank wagons in
St. Louis.

Stocke says that about seventy-five per cent of the
tank-wagon sales of oil in St. Louis by St. Louis Oil
Company consists of the common grade of oil, water-
white.

**A. H. GARDNER:** Says his company at Kansas
City, National Oil Company, has, for the last seven
years, followed the prices fixed there by Standard Oil
Company. Had to do so because it was to the interest
of his company to do so, and because they could not
compete in the way of cutting prices. The Standard
was too large for them. During the last six or seven
years the Standard Oil Company and Republic Oil
Company have sold from eighty to ninety per cent of
the oil in Kansas City.

**A. L. STOCKE:** States that during the last ten
years the price of oil in the city of St. Louis has been
about normal with a tendency upward—there has not
been a gradual decline. Gives this as an opinion based
on the records of the St. Louis Oil Company.

**ARTICLES OF INCORPORATION OF STANDARD OIL COM-
PANY OF NEW JERSEY:** Dated August 1, 1882; capital
stock, $3,000,000. Nine trustees of Standard Oil Trust
are named as holding 29,996 shares of the thirty thou-
sand shares.

On June 14, 1899, the charter of the Standard Oil
Company of New Jersey was amended by increasing

its capital stock to $110,000,000, and among other new powers given by the amended charter it is given the further power "to purchase or otherwise acquire, hold, sell, assign and transfer shares of capital stock and bonds or other evidences of indebtedness of corporations, and to exercise all the privileges of ownership, including voting upon the stocks so held; to carry on its business and have offices and agencies therefor in all parts of the world, and to hold, purchase, mortgage and convey real estate and personal property outside the State of New Jersey."

Report of Standard Oil Company of New Jersey for year 1901 to State of New Jersey, showing names of directors and officers.

*Respondents here rested their case.*

Such additional documentary evidence, which was introduced before the master and which may be necessary for a proper consideration of the case, will be noticed in the course of the opinion.

The following is the finding of facts made by the master and reported to the court, to-wit:

## FINDINGS OF ULTIMATE FACTS.

Under this head the Commissioner has endeavored to collate and marshal the facts in as logical a manner as it was possible. Owing to the great diversity and wide range of the evidence, that the charge is virtually a conspiracy, and that very little direct testimony has been produced bearing on the issues, the Commissioner has been compelled to put together and consider all the many items and circumstances in evidence in order to arrive at a conclusion as to whether the respondents are guilty of entering into the combination or conspiracy charged.

A brief history of the organization and development of the respondents will first be given separately,

and, afterwards, the conduct of their business and rela-
tions towards each other, in so far as the conduct of
each has a bearing on the charge of a combination ex-
isting between them for the purposes set out in the in-
formation, will be considered under appropriate head-
ings.

Many things will be stated as facts without a cita-
tion to the record of the testimony, because such facts
are now conceded by counsel for all the respondents.
In fact, there is now but little variance between counsel
as to the facts proven; the real contention is as to the
inferences to be drawn from the facts, counsel for in-
formant maintaining that the facts show the respond-
ents guilty of entering into a combination, agreement,
conspiracy, etc., to fix, maintain and control the sale
and prices of the products of petroleum in the State of
Missouri, while counsel for respondents maintain that
such conclusions are not warranted by the evidence.
This, upon the facts, the court will find to be the main
contention between informant and respondents. Upon
the questions of law the contentions will take a broader
field. And first of the

## WATERS-PIERCE OIL COMPANY.

The Waters-Pierce Oil Company is a corporation
organized and existing at all times, under the laws of
the State of Missouri. It has always maintained its
principal office in the city of St. Louis, Missouri.    It
was first incorporated on May 7, 1878, with a capital
stock of one hundred thousand dollars.    In the year
1882 its capital stock was increased to four hundred
thousand dollars by a proper statutory proceeding.
On May 28, 1900, the Waters-Pierce Oil Company was
dissolved by filing with the Secretary of State the stat-
utory affidavit, and on May 29, 1900, the Waters-Pierce
Oil Company was incorporated with a capital stock of
four hundred thousand dollars.

Prior to 1878, W. H. Cobb & Co., a partnership, was in the oil business in St. Louis, Missouri. This firm was succeeded by H. C. Pierce & Co., which, in turn, was succeeded by Waters-Pierce & Co. When the Waters-Pierce Oil Company was organized in 1878, the firm of Waters-Pierce & Co. subscribed to forty per cent, Horace A. Hutchins and William P. Thompson, of Cleveland, Ohio, to forty per cent, and Chess, Carley Co., of Kentucky, to twenty per cent of the capital stock of said company. Sometime after the organization of the first Waters-Pierce Oil Company, the stock owned by Hutchins, Thompson and Chess, Carley & Co., amounting to sixty per cent of the whole capital stock, was placed in the hands of the Standard Oil Trust, which was organized about that time. The stock holding stood thus until 1890, when the Standard Oil Company of New Jersey acquired 2,750 shares of the four thousand shares of the Waters-Pierce Oil Company, and H. C. Pierce owned 1,250 of said shares, which relative ownership continued unchanged up to 1900, when the old Waters-Pierce Oil Company was dissolved. These shares from 1890 to 1900 were not held directly by the Standard Oil Company of New Jersey, but generally by individuals connected with Standard Oil interests for that company.

There is no question but that the cause of the dissolution and liquidation of the first Waters-Pierce Oil Company was caused by litigation and prosecutions in the State of Texas, growing out of the supposed control of that company by Standard Oil interests. As Mr. Pierce states, after a consultation with the executive committee of Standard Oil Company of New Jersey, the plan of disorganizing and reorganizing was agreed on for the purpose of enabling the Waters-Pierce Oil Company to continue business in Texas.

The new company under the same name and practically the same officers and employees, took over all the assets, consisting of equipments, oils, moneys, tank

stations, wagons, factories, refineries, etc., of the old company, and conducted the business exactly as it had been conducted before without any intermission. An examination of the minutes of the meeting of the stockholders and board of directors from 1900 to 1905 shows that the new company issued to the old company its notes for the purchase price, which notes were assigned to individuals whose identity are not disclosed by the evidence, and afterwards paid out of the earnings of the company. While all the stock of the new company, four thousand shares, stood on the books in the name of H. C. Pierce, except four shares; yet, as a matter of fact, the Standard Oil Company of New Jersey continued to own and control 2,750 shares, and H. C. Pierce 1,250 shares, which proportion of ownership continued from May 29, 1900, to the institution of this action. These facts are no longer disputed.

While H. C. Pierce testifies that he, by agreement at the organization of the Waters-Pierce Oil Company, in 1878, and with various persons representing Standard Oil interests following that date, was to, and did, have absolute control and management of the company, yet the evidence shows that from the time of the organization of the company in 1878 to 1900 persons representing Standard Oil interests, and holding stock either as a member of the trustees of the Standard Oil Trust or for the Standard Oil Company of New Jersey, were members of the board of directors of the Waters-Pierce Oil Company, and took part in its management.

The first Waters-Pierce Oil Company of 1878 was organized, as provided by its charter, for "dealing in naval stores and dealing in and compounding petroleum and other oils and all the products thereof, and buying and selling the same, in the State of Missouri and other States."

The Waters-Pierce Oil Company of May 29, 1900, was organized, as provided in its articles of incorpor-

ation, for the purpose of "dealing in naval stores, and dealing in and compounding petroleum and other oils, and all the products thereof, and buying and selling the same in the State of Missouri and elsewhere."

The company proceeded almost immediately to establish a large business in a part of Missouri, Arkansas, Texas, Louisiana, Indian Territory, Oklahoma and the Republic of Mexico. In the United States its business was confined to marketing the products of petroleum, while in Mexico it both refined and marketed the products of its refineries. Its oils, especially from 1900 to the present, which it sold in the United States, were obtained almost wholly from the Standard Oil Company of New Jersey or its allied interests. Its crude petroleum, which it refined and sold in the Republic of Mexico, was also obtained from Standard Oil interests.

The company has in the way of equipments, tank stations, from which oil of all kinds reaches customers by tank wagon delivery. These tank stations are erected and maintained at all important points where the population and amount of business will justify; that is, within the territory in which the company does business. Besides, a great amount of oil is delivered or shipped to customers in wood and iron barrels. The witnesses all agree that the company handling its oils through tank stations and wagon deliveries has quite an advantage over the dealer who is not similarly equipped. Mr. Wilhoit, an independent dealer in oils at Springfield and Joplin, a fair and very intelligent gentleman, says about tank-station competition: "It is hard competition. This tank competition is something hard to overcome." He further points out that the company using tank-stations can get from three to five cents more for oil per gallon than the company which ships in barrels. This is partly due to the fact that barrel shipments are local and more expensive, while the tank-station is supplied by tank-car ship-

ments at commodity rates. Every town and trade center in the territory of the Waters-Pierce Oil Company are reached by it either by means of tank stations and wagon, can or barrel or iron barrels. In the city of St. Louis, the company runs from twenty-five to thirty wagons, and in other towns and cities of the State where wagons are maintained, a smaller number.

The construction placed on the articles of incorporation of the Waters-Pierce Oil Company, by both counsel for informant and respondents, is that it had the power to produce and refine petroleum as well as/ to deal in and market its products.

Some twelve or fifteen years ago the company bought out the firm styled the International Oil Works, a company selling the products of petroleum in the city of St. Louis by tank-wagon deliveries. One Grenner was retained as the manager of that firm, who received a salary from Waters-Pierce Oil Company. Grenner got his oils from Waters-Pierce Oil Company and reported regularly to the latter company. The evidence shows that the two companies were competitors in the solicitation of trade, but not as to prices.

In the spring of 1904, 2,747 shares of stock in the company, assigned in blank by H. C. Pierce, shortly after the new incorporation in 1900, and delivered in New York to a representative of the Standard Oil Company of New Jersey, were presented to the secretary of Waters-Pierce Oil Company by one R. P. Tinsley, and were by the secretary assigned on the books of the company to M. M. VanBuren.

H. Clay Pierce, who has been president of the Waters-Pierce Oil Company most of the time from its original organization in 1878, and the principal manager and director of its affairs and policies during all the time of its existence, says that its equipments are worth five million dollars; tangible assets, twelve million dollars, and assets, equipments and good will combined from forty-five to fifty-five million dollars.

Minutes of meetings of boards of directors of Waters-Pierce Oil Company show that for five years beginning with June, 1900, including amounts paid out to liquidate notes given by the new company to the old company and dividends declared, the company earned on its capital stock an average of 471 per cent per annum. Mr. Pierce places the dividends of the company for the same time at from six to seven hundred per cent per annum.

The only other companies operating tank-stations and wagons in Waters-Pierce territory were Republic Oil Company, St. Louis Oil Company and International Oil Works at St. Louis, and E. M. Wilhoit at Joplin and Springfield.

The company markets ninety per cent of its oils by tank wagon sales and by iron-barrel deliveries, the remainder being sold and delivered in wood barrels.

### REPUBLIC OIL COMPANY.

This company was organized under the laws of the State of New York, with a capital stock of three hundred and fifty thousand dollars, on the 3d day of June, 1901, and was licensed to do business in the State of Missouri on July 8, 1901. It was organized for the express purpose, by officials of the Standard Oil Company of New Jersey, at 26 Broadway, New York City, of purchasing and taking over the assets, business, plants, stations, good will, etc., of the old independent firm of Schofield, Shurmer & Teagle, a partnership, located at Cleveland, Ohio, and which had been engaged in the sale of the high-grade products of petroleum of Pennsylvania production throughout the central west and southwestern portions of the United States for many years. The firm of Schofield, Shurmer & Teagle had established a wide reputation as dealers in high-grade oils and had established such a wide and growing demand for ''palacine,'' a high-grade illuminating oil, that it was impossible for other companies

to successfully put any other brand in competition with it.

This company was organized and all the stock subscribed for by three Standard Oil Company employees. Geo. B. Wilson was chief accountant of the Standard Oil Company of New York; James R. Taylor was a stenographer for W. H. Tilford, a director of the Standard Oil Company of New Jersey, and L. H. Turrell was chief clerk in the office of the Standard Oil Company of Indiana (one of the respondents). Neither of them paid anything for his stock, nor did they retain possession of it or draw any dividends. Turrell took a position with the Republic Oil Company as secretary; but the other two incorporators continued in the positions held by them before the organization of the company.

Besides purchasing the assets, good will, etc., of Schofield, Shurmer & Teagle, at the same time the same parties purchased a refinery located at Cleveland, Ohio, and one located at Scio, Ohio. Members of the Schofield firm were interested in these refineries and had marketed their products. Shortly after the purchase both refineries were dismantled.

This company sold oils principally in the same territory in which the Standard Oil Company of Indiana sold, and in addition had a station at St. Louis, in Waters-Pierce Oil Company Territory. It sold in St. Louis by tank wagon deliveries and had two barrel stations or warehouses in southwest Missouri, and sold some oil in Waters-Pierce territory from Kansas City, Sedalia and Clinton. The tank station at Springfield, sold to Republic Oil Company by Schofield, Shurmer & Teagle, was removed in the fall of 1901, yet it was shown that this was a good paying station.

The business of the company, so far as concerned managers and field agents, was transacted from Cleveland, Ohio, where the general manager was located.

218 Sup—18

The home office was located at 75 New street, New York City, which was one entrance to 26 Broadway, the home and central headquarters of Standard Oil interests. It is admitted that all the stock of Republic Oil Company is now held, and has been since its incorporation, for the Standard Oil Company of New Jersey. In other words, the Standard Oil Company of New Jersey is now and has at all times been, since the inception of the company, the sole owner of all its stock. The admission referred to is not quite as broad as the above, but the evidence shows the statement to be absolutely true.

In the fall of 1901, C. L. Nichols became president of the company. He was at the time a clerk or assistant to Walter Jennings, a leading Standard Oil official at 26 Broadway, New York, and sales-agent of the Standard Oil Company of New York. He continued to occupy that office as assistant to L. J. Drake, sales-agent of Standard Oil Company of Indiana, received reports from Republic Oil Company addressed to him at 75 New street, and received a part of his salary from the latter company and part from Standard Oil Company.

Since the disclosures made in this case of the ownership of the Republic Oil Company by the Standard Oil Company of New Jersey, the Standard Oil Company of Indiana has purchased the plants, assets, stations, etc., of the former located at all places except in the State of Missouri. The president, Mr. Nichols, says that this was necessary because the Republic Company had served its purpose—it had kept and maintained the "palacine" brand of oil. The Standard oil company of Indiana is now selling that famous brand except in Missouri, where the Republic has been prevented from going out of business and selling to the Standard by the action of the State authorities.

Sales by this company in the beginning of "palacine," the high-grade Pennsylvania oil, amounted to

from twenty-five to thirty-five per cent of total sales, which was gradually increased to from fifty to sixty per cent of its total sales.

### STANDARD OIL COMPANY OF INDIANA.

The respondent in this case, Standard Oil Company, is a corporation existing under the laws of the State of Indiana. It was organized on June 11, 1889, with a capital stock of five hundred thousand dollars. It was organized, as set out in its charter, to "manufacture the products of crude petroleum, to transport and sell the same, to manufacture barrels and packages for containing said products, to erect necessary buildings and manufacture the necessary machinery and to do all business found to be necessary or convenient in carrying on the business specified." On January 21, 1897, this company was licensed to do business in Missouri.

It was admitted that the Standard Oil Company of New Jersey owned a majority of the stock of this company since 1901 up to the present time. The evidence shows that from its inception the New Jersey Company owned practically all its stock, or that such stock was held for the New Jersey Company by individuals, connected with Standard Oil interests.

Prior to 1892, the Consolidated Tank Line Company, an Ohio corporation, and a Standard Oil interest, was engaged in marketing oil in Missouri. It was succeeded in Missouri by Standard Oil Company of Kentucky, another Standard interest, which, in turn, was succeeded in this State by the Standard Oil Company of Indiana, one of the respondents. The latter company and its predecessors in Missouri sold oil only in a certain part of the State, which question will be dealt with fully when the matter of territorial division is taken up.

When the respondent Standard Oil Company was first organized, it began as a refiner and constructed a

large refinery at Whiting, Indiana. It was not until some time afterwards that it also became a distributor; that is, a merchant by means of tank wagons, stations, etc. The Whiting refinery when first erected supplied Standard Oil interests with oil for distribution throughout the west and southwest until petroleum was discovered in Kansas. Then a refinery was built at Neodesha by Standard Oil interests and later ·on a large one was built at Sugar Creek, near Kansas City. At this time and for some time past the Whiting refinery has obtained its crude oil from the oil fields in Kansas, the Territories and Illinois. When the company was licensed to do business in Missouri in 1897 it then became a distributor in this State and now has and maintains some fifty-nine stations from which oil is distributed in various ways.

The equipments, tank stations, wagons, etc., used by this company were in every way similar to those in use in the territory of the Waters-Pierce Oil Company. In the territory in which it sold they were the largest and most extensive of any company.

Not only did this company manufacture the various products of petroleum and sell them, both at whole-sale to Standard Oil interest, and as a distributor, but it owned and operated oil wells and purchased large quantities of crude petroleum. The Standard Oil interests of the United States, according to John D. Archbold, produce one-ninth of the total production in the United States, but refine and sell of the total ·production seventy-five per cent. He claims that the independent refineries of this country are able to supply the demand, and on the other hand that Standard Oil interests are also able to refine and supply the total demand. This view, however, is not held by other witnesses—notably, H. Clay Pierce, of Waters-Pierce Oil Company.

The officers and directors of this company have always been men connected with 26 Broadway, New

York City, where the principal office of the company has been maintained.

The business carried on by Consolidated Tank Line Company at Kansas City was taken over and succeeded to by Standard Oil Company of Kentucky, and the same business, system, property, employees, brands of oil, etc., without any apparent change except in the name, were taken over by respondent Standard Oil Company. The firm of Chess-Carley & Co. was succeeded by the Standard Oil Company of Kentucky. Horace A. Hutchins and W. P. Thompson were connected with the latter company, and also at 26 Broadway. L. J. Drake was also a leading officer in both the Standard of Kentucky and of Indiana and was also connected with Standard interests at 26 Broadway. Alex McDonald, one of the original Standard Oil men, was also connected with all these interests.

### STANDARD OIL COMPANY OF NEW JERSEY.

This company was organized on August 1, 1882, under the laws of New Jersey, with a capital stock of three million dollars. As set out in its charter, its objects were the "refining of petroleum, the manufacturing of the various products thereof; the purchasing of the crude material and the sale of the manufactured products thereof, the manufacture of barrels, boxes, cans, and other packages, in which the manufactured products may be kept or transported; the manufacture and restoration of acids, and whatever other substances may be used in the manufacture of the products of petroleum." In June, 1889, the charter referred to was amended by increasing the authorized capital stock to one hundred and ten million dollars. By the amended articles the objects and powers of the company were increased and extended as indicated by the following language quoted from the amended charter, to-wit: "To do all kinds of mining, manufacturing and trading business; transporting

goods and merchandise by land or water in any manner; to buy, sell, lease and improve lands; build houses, structures, vessels, cars, wharves, docks and piers; to lay and operate pipe lines; to erect and operate telegraph and telephone lines for conducting electricity; to enter into and carry out contract of every kind pertaining to its business; to acquire, use, sell and grant licenses and patent rights; to purchase or otherwise acquire, hold, sell, assign and transfer shares of capital stock and bonds or other evidence of indebtedness of corporations, and to exercise all the privileges of ownership, including voting upon the stocks held; to carry on its business and have officers and agencies thereof in all parts of the world, and to hold, purchase, mortgage and convey real estate and personal property outside of the State of New Jersey." The corporation was further empowered to have its principal offices outside the State of New Jersey.

A brief outline of the formation and history of the respective respondents having been given, together with a sketch of the Standard Oil Company of New Jersey, the parent, owner and controlling spirit of all respondents, there will now be separate findings of facts under heads bearing more immediately upon the charges contained in the information, and first of

### GRADES AND BRANDS OF OIL.

All the companies selling the products of petroleum in Missouri have different brands; that is, different names for the same grade of oil. All sell what they term high-grade and common oils, both illuminating and lubricating. The Waters-Pierce Oil Company sells "Eupion" as its high-grade and "Water-White" as common or coal oil. All witnesses agree that much more illuminating oil is sold by the respondents and such companies as the National Oil Company at Kansas City and the St. Louis Oil Company at St. Louis, than of lubricating. Of the total sales of oil in the

State, the sales of illuminating and gasoline amount to · from sixty-five to seventy per cent, and lubricating from thirty to thirty-five per cent, while there is much more competition in the sale of lubricating because these oils are sold usually directly to the consumer and there are numerous companies dealing specially in such oils.

STANDARD OIL COMPANY DID NOT SELL TO INDEPENDENTS.

Throughout this case all companies, individuals or corporations selling the products of petroleum in Missouri, except the respondents and the International Oil Works, have been designated Independents. Such dealers as Wilhoit, of Springfield and Joplin, National Oil Company, of Kansas City, and St. Louis Oil Company of St. Louis, are the principal independent dealers in illuminating and gasoline oils. There are many other companies in the State selling lubricating oils, in the sale of which there is competition among nearly all companies, but the sales of these oils are not considered of very much importance in this case as they embrace only a small portion of the dealing in the products of petroleum. Moreover, the evidence shows that the respondents handle lubricating oils more as an incident to their business of selling the refined products of petroleum. The evidence develops the peculiar condition of the Standard Oil Company of Indiana and Waters-Pierce Oil Company buying practically all the products handled by them from the Standard Oil Company or its allied interests, and at the same time the independents buy all their goods from independent refineries. There is considerable evidence going to show that at times independent dealers tried to buy from Standard Oil interests, but could not do so. Stocke, of the St. Louis Oil Company, back in 1893, says he tried to buy of the Standard at East St. Louis, but its agent refused to sell him. G. J. Steigerwald, who was formerly with the firm of Schofield, Shurmer

& Teagle and afterwards purchasing agent for the Republic Oil Company, with headquarters at Cleveland, Ohio, but who is now with F. G. Clark & Co., wholesale dealers in the products of petroleum at Cleveland, Ohio, says that he sells for his house in many States and makes sales exclusively to independent jobbers. The Republic Oil Company in Missouri got its oils chiefly from Standard Oil refineries, but it purchased some high-grade refined oils from independent refineries. In the early days of the Republic Company, following a period immediately after taking over the property, business and brands and trade marks of Schofield, Shurmer & Teagle, it got a considerable portion of its oils from independent refineries in Pennsylvania. The Standard Oil interests were unable to furnish a brand of oil equal to the "palacine" of Schofield, Shurmer & Teagle. Mr. Moffett, president of the respondent Standard Oil Company, enumerates the Standard interests to which this respondent sold, and then added that its sales were generally to companies allied with those interests.

### TERRITORIAL DIVISION IN MISSOURI.

On this proposition there is only one fact now at issue. It is conceded that the respondents, Waters-Pierce Oil Company and Standard Oil Company, did not sell the products of petroleum at the same places in the State of Missouri and that they never have done so. Yet it is contended that this condition was not brought about by any agreement between these respondents, nor does it exist by virtue of any combination or understanding to control the trade or limit competition in the products of petroleum. H. C. Pierce says, that in 1878, upon the organization of the Waters-Pierce Oil Company, this division was made and established by agreement between his company and the Standard Oil Company of Ohio. All witnesses agree that the lines have from that time to this been respected, and that

neither the Waters-Pierce Oil Company, nor the Standard Oil Company of Ohio, Consolidated Tank Line Company, Standard Oil Company of Kentucky, nor Standard Oil Company of Indiana has ever trespassed beyond its assigned territory, except in some minor instances. The witnesses substantially agree upon the following dividing line: Beginning at a point on the Mississippi river on the southern boundary of Lincoln county; thence in western direction along the southern boundaries of Lincoln, Pike, Ralls, Monroe and Randolph counties; thence in a southwest direction along the eastern boundaries of Howard, Cooper, Pettis, Benton, St. Clair · and Barton counties, and thence west along the southern boundary of Barton county to the Kansas line. That part of the State lying north and west of this line constitutes Standard territory, and that part of the State lying south and east of the line constitutes Waters-Pierce territory. Mr. Pierce says his company had never done business in Standard territory, or beyond the line in Missouri, as above indicated, because the company did not desire to extend its business, and because of the original agreement to divide the State for trade purposes. All witnesses agree that the Standard Oil Company would not sell or ship oil into Waters-Pierce territory, nor would the Waters-Pierce Oil Company sell or ship into the territory of the Standard. Their salesmen and agents were informed as to the line of division and instructed not to go beyond it to solicit business. Orders for oil to one company from a person residing in the territory of the other were transferred and filled by the company in charge of the territory where the customer resided. When agents of either company passed over the line and made sales beyond the territorial line of his company, an accounting had to be made to the company in whose territory the sale was made, and that company reaped the profits. A map showing the divid-

ing line in Missouri was kept at 26 Broadway, New York City. It was the same kind of a map which was kept in the office of Waters-Pierce Oil Company in St. Louis.

### PRICES OF OIL, HOW FIXED.

Prices of the products of petroleum, especially refined oils, illuminating and gasoline, were fixed in Waters-Pierce Oil Company territory by that company. In the city of St. Louis, that company for the last ten years sent out to the trade and customers card quotations, giving tank, wagon and barrel prices. As a general rule these prices were followed by all other companies, including Republic Oil Company, International Oil Works, as well as independent dealers and companies. These prices would be cut and rebates would be given, but both the respondents and independents claim that the other did the first cutting of prices. Prices of the Waters-Pierce Oil Company varied at different points due to freight rates and the existence or non-existence of competition.

Waters-Pierce Oil Company prices were fixed by the officers of the company in St. Louis. Agents throughout its territory were furnished schedules of prices or special prices in cases of competition.

Wilhoit, of Springfield, who does an independent oil business at Springfield and Joplin, says that Standard Oil prices in Kansas are now lower than Waters-Pierce prices in Missouri, due to the recent action of the Legislature of Kansas, and at the same time the Kansas merchant cannot go over the Missouri line to buy oil from Waters-Pierce Oil Company, nor can the Missouri merchant drive a few miles over into Kansas and buy oil at cheaper prices from Standard Oil Company, although the oils are of the same grade. Before the action of the Kansas Legislature, the Standard sold at higher prices in Kansas than the Waters-Pierce in Missouri. Mr. Wilhoit, who was in the service of

the Standard Oil Company for many years, says that his experience is, in the independent business, that the Standard or Waters-Pierce base their prices on their nearest competitor. The further away they are from competition the higher prices are, or the nearer they approach regular prices. His prices are fixed regardless of Waters-Pierce, but he does not cut prices because he would be forced soon by low prices to quit business. In the territory in which he sells in competition with both Waters-Pierce Oil Company and Standard Oil Company (he doing business in the territory of both) the respondents do not maintain their regular prices but sell lower than at other points where he does not sell and where there is no other competition. His further experience has demonstrated that the independent dealer in competition with the Standard or Waters-Pierce will be permitted to sell up to a certain point without being seriously molested, but if the independent attempts to increase his business over ten per cent of the whole, then prices will be so lowered that he will be glad to drop back or quit business. Wilhoit has at several times suspended business altogether awaiting the readjustment of prices.

H. C. Pierce says the production of crude petroleum is the controlling element in fixing the price of its products. It is conceded that beginning with and prior to 1901 many new oil wells were discovered in Kansas, Indian Territory, Oklahoma, Texas, Illinois, and other points, yet the fact is as shown by the evidence that the price of the products of petroleum has tended upward during the past ten years.

The Republic Oil Company followed the prices of Waters-Pierce Oil Company in its territory. Its managers were instructed to follow those prices, therefore the only reasonable inference to draw from all the testimony on this question is that the Waters-Pierce Oil Company dictated its prices and that it was understood that it should do so. There was no authority in St.

Louis for making prices for the Republic except the Waters-Pierce market.

For the Missouri division of the Waters-Pierce Oil Company, which was separate from the St. Louis division, the general manager furnished prices as often as it was necessary, and monthly schedules of prices at all points were kept. The manager of the Missouri division furnished prices to tank-station agents and salesmen. It is claimed by officials of this company, who testified, that their better facilities for handling and delivering oils enabled the company to get and maintain higher prices than the independents.

When Andrew M. Finlay was vice-president of Waters-Pierce Oil Company, Maywood Maxon says Finlay told him that he (Finlay) fixed prices at which Republic Oil Company sold oils. While Mr. Finlay and other officers of the Waters-Pierce deny this statement was made, yet, notwithstanding the fact that the statement may not have been made, the evidence taken as a whole demonstrates that the facts embodied in the statement were true.

As to the respondent Standard Oil Company, the conditions as to fixing prices in its territory were almost exactly the same as those in Waters-Pierce territory, except that in Standard territory it occupied the commanding position and fixed and maintained prices for itself and all other oil dealers. There was no competition or cutting of prices between Republic Oil Company and Standard at Kansas City or any other point where the Republic operated in Standard territory. In 1902 there was a sharp rate fight between National Oil Company and Republic, and rebates were freely given by both companies, the Standard during the meantime taking no part and maintaining its prices. The manager of the Standard Oil Company at Kansas City regularly fixed the prices for Republic Oil Company, which were obtained by the manager of the Re-

public at any time, and he was always notified of a decline or increase.

All witnesses for respondent claim there was no agreement or understanding between any of the respondents to fix and maintain prices, and that they were independent competitive companies.

### REPORTS OF COMPETITIVE SHIPMENTS.

The evidence shows that both the Standard Oil Company and Waters-Pierce Oil Company resorted to every means available to keep up with the shipments into their respective territories of oils by independent dealers. Reports to the respondents were made by their traveling salesmen, tank-station agents and railroad employees. Their agents were then instructed to investigate such shipments, ascertain who were the purchasers, why the oil had not been sold by the respondent in whose territory the shipment had been made and to endeavor to get the trade of the customer from the independent. These practices did not apply to shipments made by the Republic Oil Company. In many instances purchasers of the independent shipment were induced to cancel the order. Rebates and other inducements were offered in such cases. An agent of either respondent who allowed such shipments into his territory was demerited, or a charge was entered up against him which detracted to a certain extent from his efficiency. This system of getting information of such shipments and heading them off or getting them cancelled whenever it was possible, begun at the time when the Consolidated Tank Line Company sold oil in the present territory of the Standard, was followed by the Standard Oil Company of Kentucky, and continued without abatement to the time this suit was instituted. E. M. Wilhoit says that at Springfield he was told by the managers of the Waters-Pierce Oil Company station that the Waters-Pierce Oil Company got a tip on all his shipments except those made in carload lots.

The plainly evident purpose of this system of espionage was to prevent the sale of the products of petroleum by the independent dealer.

### PERCENTAGE OF BUSINESS.

There is practically no contradiction of the fact that in the territory of Waters-Pierce Oil Company outside of St. Louis, it and the Republic Oil Company sold from 85 to 90 per cent of refined oils, that is, illuminating and gasoline. In the St. Louis division, including the city and suburbs and East St. Louis, the Waters-Pierce Oil Company and International Oil Works (which was owned by the W. P. O. Co.) sold at least 90 per cent of such refined oils. Of lubricating oils sold by these companies the per cent was not so large—it ran all the way from twenty-five to fifty per cent. In the territory of the Standard Oil Company, it and the Republic Oil Company sold from 90 to 95 per cent of all refined oils sold, and a much smaller proportion of lubricating oils. W. N. Davis, a well informed oil man, who testified at Kansas City, gave the following as reasons for this condition at Kansas City: "In my opinion, one of the reasons is that the facilities of the Standard Oil Company for controlling the illuminating trade is such that there are very few independents who could raise the money to successfully compete against them. In all towns from fifteen hundred inhabitants up they have tank stations established and they furnish oil in bulk, while the independents would be forced to ship in barrels. Then they have another advantage in the way of freight rates. I don't mean to say they get rebates—I don't know anything about that —but in shipping in tanks they save about thirty per cent on the rates. In other words, they get three hundred and fifty pounds for fifty gallons shipped in tanks whereas in barrels the Joint Western Classification rating is four hundred pounds. You see that is eighty-

five pounds, or twenty per cent, against shipping in barrels, that advantage in freight alone. That twenty per cent is very good profit. Then their system of dealing in tank wagons is such that the trade won't want to buy in barrels where they can possibly buy in bulk, and in order to compete with the Standard it would require vast sums of money."

The reasons that respondents do not sell a larger per cent of lubricating oils is because these oils are usually sold in packages and directly to the consumer, such as mill men, threshing machine men, mining companies, etc.

H. C. Pierce says that in former years the Waters-Pierce Oil Company sold from ninety-five to ninety-eight per cent of the refined oils sold in its territory and that from 1900 to the present time it has sold from eighty to eighty-five per cent of such oils. He claims that this nearly complete monopoly of the business of selling and distributing refined oil is due to the superior facilities of the company over other companies.

The facts are, as gathered from the whole testimony, that the Standard Oil Company of Indiana and Republic Oil Company together in the territory in which the Standard sold in Missouri, have sold, distributed and controlled at least ninety per cent of all the illuminating and gasoline oils sold in that territory since the year 1900, and that in the territory of the Waters-Pierce Oil Company in Missouri, that company, the Republic Oil Company and International Oil Works together have sold, distributed and controlled at least ninety per cent of all the illuminating and gasoline oils sold in that territory since the year 1900.

COMPETITION BETWEEN RESPONDENTS AND OTHERS.

Concerning the sale of lubricating oils the evidence shows that many companies, individuals and partnerships, both from in and out of the State, were engaged in its sale, and that legitimate and healthy com-

petition exists at most places in the State in that line of business.

As to the sale of refined oils, or the refined products of petroleum, that is, all grades of illuminating and gasoline oils, the conditions are quite different and have been so for many years.

The very fact that the respondents have monopolized ninety per cent of this business in the State indicates clearly that but little competition has existed or could possibly exist between them and other companies.

A line of intelligent witnesses and experienced oil men introduced by the State say there was no competition between the Waters-Pierce Oil Company and Republic Oil Company, nor between the Standard Oil Company and Republic. However, there was a rivalry at times at least between the agents of the Republic and Waters-Pierce, and agents of the Republic and Standard, for the sale of oils, which upon a few occasions was carried to the extent of giving rebates. The "rate war" in Kansas City in 1902 was between the Republic Oil Company and National Oil Company. The Standard did not take part in it.

At Kansas City the Republic Oil Company made particular effort to get the high-class trade and went after the business of the National Oil Company. Its agents were instructed to solicit all business, but to make special efforts to get the customers of National Oil Company. It gave rebates to the customers of that independent company, but not to the customers of the Standard. There was some competition there between the Republic and Standard in the sale of lubricating oils, but as a matter of fact neither company gave the sale of such oils much attention. This competition did not extend to cutting prices. A careful examination of all the evidence shows that there was no competition between these two respondents at Kansas City or any other place in Standard territory and that it acted, as

expressed by some of the witnesses, as a ''forerunner'' of the Standard.

The competition at Kansas City between the Standard and Schofield, Shurmer & Teagle had been sharp and active. After the Republic succeeded that firm the conditions changed and the fights for trade were then transferred to the Republic and the independents. The Republic at that place gave general instructions to its salesmen to make special efforts to get the trade of National Oil Company, it being the only independent company of any importance dealing in refined oils. The rebate system of the Republic as against the National Oil Company is testified to by a number of merchants of Kansas City. Other merchants were induced to buy from the Republic upon representations made by its agents that it was an independent company.

The Republic Oil Company did business at Springfield, Missouri, for a short time after succeeding Schofield, Shurmer & Teagle. There was no competition between it and Waters-Pierce Oil Company in southwest Missouri, that being Waters-Pierce territory. In that part of the State, the Republic handles ''palacine'' and sold to a class of trade who were loyal to the independents. The independent company had more competition from the Republic Oil Company than from the Standard or Waters-Pierce, because it posed as an independent and handled a higher grade of oil. Immediately following the organization of the Republic it did compete to some extent with the other respondents, but a decided change was made a year and a half later, when there ceased to be any show of competition. The purpose of removing the plant and tank station at Springfield by Republic was to withdraw competition. However, some of the officials of the Republic claim that it was moved because it was not a paying station, although the

evidence shows that Schofield, Shurmer & Teagle had a prosperous business there.

At St. Louis, the evidence shows that the Republic Oil Company, as in other places, was pushing the sale of high-grade oils, and yet it did considerable business in the way of tank-wagon sales of common oils. It is a significant fact that the only competition it had with the Waters-Pierce Oil Company was on common-grade oils which it sold as an incident to the sale of "palacine" and other high-grade oils. As expressed by one of its officials, common oils were handled by it only as a matter of necessity to forward the sale of its high-grades. Another significant fact is that the Republic never cut the tank-wagon prices of the Waters-Pierce in St. Louis, but got its prices from the latter company and nearly always sold at the same prices. The first manager of the Republic in St. Louis, Frank R. Northrup, says he received instructions from the general manager, W. C. Teagle, to follow the prices of the Waters-Pierce, and that he did so. Also says that as to independents he was given a discretion and could lower or raise prices to suit conditions. He was also furnished prices by Waters-Pierce officials a day ahead of card issued, in order that he could put in force any changes at the same time the Waters-Pierce did. From the principal office of Republic Company in Cleveland, instructions were sent out to the managers and field agents to make special efforts to get independent trade, which meant a special fight on independent companies. Mr. C. L. Ackert, general manager Waters-Pierce Oil Company, says his company and Republic Oil Company were active competitors, and that he gave instructions to solicit the business of the Republic. Says the same competition was carried on against the International Oil Works, located in St. Louis, and owned by the Waters-Pierce Oil Company. And so Mr. C. P. Ackert, manager of Missouri division, says that the Waters-Pierce and Republic were strong competitors

and that the same competition was had with International Oil Works. It is claimed that there was strong competition between the Republic and Waters-Pierce at Perryville and St. Genevieve in the falls of 1901, 1902 and 1903. Witnesses for Waters-Pierce Oil Company claim that the Republic agents cut the regular prices at those points and got the business during those three falls. On the other hand, Mr. Heyer, who was manager of the Republic at that time in St. Louis, denies that his company cut the regular price and claims that he made special prices on account of the large quantities sold to be shipped by river for winter supply. Mr. Crandall, assistant manager of Missouri division of Waters-Pierce Oil Company, during the full time of the existence of the Republic, says the cut in prices at Perryville and St. Genevieve were all he knew of. The facts to be gathered from this evidence is that at those times the merchants of St. Genevieve and Perryville bought their winter supply of oils in the fall and had shipments made before the river froze up. No railroads reached those towns at that time. These purchases were made in large quantities and the prices fixed by the Republic were special prices as a consideration of the quantities purchased. There was really no competition because the Waters-Pierce Oil Company did not attempt to sell at those points until after the Republic had made the sales. Mr. Crandall says the Republic Oil Company was one of its most aggressive competitors, yet he knew of no cutting of prices except in the one instance above noted, although he says it did give some secret rebates.

The general manager of Republic Oil Company, W. C. Teagle, says the company specially pushed the sale of high-grade Pennsylvania oils, and that competition continued between it and Standard Oil Company of Indiana, and Waters-Pierce Oil Company, the same as had been maintained by Schofield, Shurmer & Teagle, yet he says that the fight which the Republic

first met in the field was not with the respondents but with the independent dealers.

When the "rate war" between the Republic Oil Company and National Oil Company at Kansas City was raging in 1902, C. P. Crenshaw, general sales-agent of Standard Oil Company of Indiana, with headquarters at Chicago, went to Kansas City, and, acting in the capacity of peace-maker, patched up the troubles and stopped the slashing and rebating.

At all places where either of the respondents met competition from an independent of any strength, oils sold cheaper than at other points, although the independents all claim that they followed and adopted the prices of the respondents.

Rebating was common among all the companies, especially prior to 1900. The Waters-Pierce Oil Company gave many rebates as against the St. Louis Oil Company and Schofield, Shurmer & Teagle.

At that time prior to 1897, at Jefferson City, Missouri, when Mr. Lohman was handling and selling oils of independents, he had very active competition with Waters-Pierce Oil Company. The Standard Oil Company refused to sell him oils, although he was a jobber and buying from any company he could. At that time he could buy the oils of Waters-Pierce Oil Company cheaper from grocers and druggists in St. Louis than he could from the company. The Waters-Pierce would reduce the prices at Jefferson City by the time his car of oil reached East St. Louis and would keep the prices down until he had sold out, then prices would go up again. Finally, the railroad companies refused to deliver him oil in tank-car lots unless he would erect a tank station.

The old firm of Schofield, Shurmer & Teagle carried on a very aggressive competition against both the Standard and Waters-Pierce at all points in Missouri where the Schofield firm sold oil, but the aggressiveness of this firm was not continued by the Republic.

Not only do all the witnesses testify who had any information on the question, but it is a conceded fact, that there was no competition between the Standard Oil Company of Indiana and Waters-Pierce Oil Company. They did not sell oils at the same places at any points in the State, nor at the same points anywhere else. The division line between the two companies in Missouri was faithfully recognized and observed and when either company went beyond its limits it was merely by accident.

The methods used by the Consolidated Tank Line Company and Standard Oil Company of Kentucky at Kansas City and in the Standard territory to secure a monopoly of the sales of refined oils were more drastic than those of the Standard of Indiana. These first companies resorted to any tactics, means or methods to secure business. Secret rebating was practiced to a large extent. A complete system of espionage was in vogue by which agents followed the salesmen and wagons of Schofield, Shurmer & Teagle and National Oil Company, ascertained to whom they were selling oils and endeavored to take their customers from them. In later years the Standard Oil Company had become so firmly fixed in that territory and enjoyed such complete control of the trade in the refined products of petroleum, that such drastic methods appear not to have been longer necessary. Still, almost as extreme methods were practiced at Sedalia from 1897 to 1900 by Indiana Company. During that time Schofield, Shurmer & Teagle had a large trade at that point, something like fifty per cent of the business. One Morgan was sent there as agent and was given instructions to destroy all competition. The Waters-Pierce Oil Company sold oil within about eighteen miles of Sedalia but could not get nearer because of the division line. Morgan says he could deliver at points in Waters-Pierce territory more conveniently and sell cheaper than that company, owing to the competition between

him and the agent of Schofield, Shurmer & Teagle, but he was not permitted to do so. He regularly received information from Kansas City of outside or independent shipments and did all he could to head them off or get them countermanded by rebates, other inducements and representations as to the inferiority of the grade of the outside oils. He was given general authority in such cases to cut prices and get the trade in any way he could. He also obtained all information he could relative to outside oils shipped in his territory and made reports to Kansas City.

At Pierce City, in southwest Missouri, the agent at that point had charge of four or five counties for Waters-Pierce Oil Company. He was near the Kansas line where the Standard sold, but it never came into his territory. The firm of Schofield, Shurmer & Teagle was a competitor, but the Republic, when it succeeded that firm, did not compete with him. Says he sold oil from one and a half to three cents more than the same oil sold for at Joplin and Carthage, where the Waters-Pierce had competition with Wilhoit. He was told by the managers of the division that if he would keep Wilhoit out he could get from three to five cents more for oil.

Mr. Wilhoit, who has tank stations at Springfield and Joplin and ships oil to other points in Southwest Missouri, says he never knew of any competition between Standard Oil Company and Waters-Pierce Oil Company. He sells in competition with the Standard in Kansas and the Waters-Pierce in Missouri. The prices of Waters-Pierce Oil Company were affected by his sales, but not by proximity of Republic Oil Company or Standard Oil Company. In other words, the fact that the Republic Oil Company distributed oils for a few months from Springfield, where the Waters-Pierce Oil Company maintained a plant and tank station, and that the Standard Oil Company of Indiana was a distributor in Kansas just across the line, did

not cause the Waters-Pierce to vary from its regular prices at any point where there was not an independent dealer.

Schofield, Shurmer & Teagle had been strong competitors of Standard at St. Joseph; but after they were succeeded by the Republic there was but little business done from that point by independents, there was practically no competition there whatever.

The superior equipment of the Waters-Pierce Oil Company and Standard Oil Company and their excellent devices and system of delivery by tank wagons into the stores of customers gave these companies a great advantage over the independents whose equipments were not so extensive. By such means these respondents were able to control much trade without cutting prices, in fact they were able to command higher prices.

While the discovery of new oil fields in Kansas, the Territories and Texas has created more independent refineries and distributors of the products of petroleum, and as a consequence more competition should exist and lower prices prevail, yet it is a fact that prices have not been lowered in Missouri since 1900, the tendency being rather upward, and the respondents have continued to sell about the same percentage of refined oils in the State.

The general manager of Waters-Pierce Oil Company states that where the company had competition, lower prices usually prevailed than at other points. He also says his company never cut prices below others in the first instance; that prices were reduced only when it became necessary to meet cuts by competition; that it was not necessary to lower prices because with the superior facilities of the Waters-Pierce Oil Company prices could be maintained against ordinary competition. Still he says that the reason that prices were lower at Joplin than Jefferson City was due to the ex-

istence of competition at Joplin, while there was none at Jefferson City.

Mr. Von Harten, who was in charge of city sales department of Waters-Pierce Oil Company from 1891 to 1904, says that both his company and Republic Oil Company gave some rebates to some customers; that all competitors in St. Louis followed the prices of Waters-Pierce fixed by its regular quotations sent out to the trade, and that the competition of Waters-Pierce Oil Company was the same with all companies —the same with Republic Oil Company as with International Oil Works, which the Waters-Pierce owned. It is a fact that the Waters-Pierce Oil Company made a show of competition against all companies, but it controlled prices and sold a large percentage of refined oils without reducing prices.

After a careful consideration of all the evidence touching the question of competition between the respondents, the conclusion is irresistible that there never have been any substantial contests between them in the sale of the products of petroleum. It is conceded that the respondent Standard Oil Company, and respondent Waters-Pierce Oil Company, have never competed or sold oils at the same point in the State. Moreover, the evidence fully bears out the conclusion that such competition as has existed between the respondents and independent dealers has been limited to such an extent as to permit independents to sell only about one-tenth of the total refined oils distributed in the State of Missouri.

### COMMUNITY OF INTERESTS BETWEEN RESPONDENTS.

Under this head will be set forth facts which bear directly upon the charge of a combination or conspiracy. As a matter of fact all the facts might be embraced under this head, because a consideration of the evidence as a whole is necessary in order to de-

termine whether the respondents are guilty of entering into a combination, trust, agreement or understanding, for the purposes mentioned in the information. At the present only such facts will be found as bear immediately upon the subject of the paragraph. Afterwards an argument will be added by which the Commissioner will undertake to demonstrate the correlative connection of all the facts.

As a starting point it must be remembered that since the organization of the Standard Oil Company of New Jersey, in 1882, up to the present time, it has owned and controlled 2,750 shares of the four thousand shares of the capital stock of the Waters-Pierce Oil Company (incorporated in 1878 and 1900); it has owned and controlled practically all the capital stock of the Standard Oil Company of Indiana since its incorporation in 1889 up to the present time; and has owned and controlled all the capital stock of the Republic Oil Company since its organization in 1901. Beginning with 1897 and up to the present time the Standard Oil Company of Indiana has been doing business as a distributor of oil in certain well defined territory in Missouri, and during the same time the Waters-Pierce Oil Company has also been distributing oil in certain other well defined territory in Missouri. Since 1901 the Republic Oil Company has been selling as a distributor at certain points in Missouri, both in the territory of the Standard and of the Waters-Pierce.

The Waters-Pierce Oil Company has purchased all the refined oils it sold in this State and other States of the Union and nearly all the other products of petroleum sold by it, from the Standard Oil Company and its allied interests. The Standard of Indiana has handled oils mostly of its own refineries. Its predecessors in Missouri, Consolidated Tank Line Company and Standard Oil Company of Kentucky, purchased their supplies the same as the Waters-Pierce, from Standard Oil Interests. If any of these

companies ever purchased any manufactured products of petroleum from interests outside of those connected with 26 Broadway, New York City, the evidence fails to disclose the fact. Mr. Moffett, president of the Standard Oil Company of Indiana, which company operates one of the largest petroleum refineries in the world at Whiting, Indiana, a refinery at Neodesha, Kansas, and one at Sugar Creek, near Kansas City, says that his company sold only to Standard Oil interests in Missouri—that is, respondent in this case. When the Republic Oil Company was first incorporated in 1901 to take over the property, assets and good will of Schofield, Shurmer & Teagle, and especially the high-grade brand of illuminating oil called "palacine," this brand of oil and other high-class brands received by them from said firm were purchased from independent refineries in Pennsylvania. The evidnce shows that "palacine" was a higher grade of oil than any brands handled by either of the other respondents and that no such oil was manufactured by Standard Oil interests. The Republic continued to purchase this class of goods from Pennsylvania sources other than from Standard Oil interests, at the same time purchasing all of its common-grade goods from the Standard Oil Company, for about eighteen months. Then it began to purchase more from the Standard and its allied interests, because, as Mr. Nichols, its president, says, oils could be bought cheaper from these interests. The Atlantic Refining Company of Franklin, Pennsylvania, a company owned by the Standard Oil Company of New Jersey, began to furnish the Republic with "palacine." In the meantime, while the Republic was making some show of competition against the other respondents by selling common oil and soliciting some of their customers, its object and purpose of organization was being actively prosecuted by pushing the sale of "palacine" and its high-grade brands of gasoline and other products. This activity on the part of the Republic

did not create competition with the other respondents because the bulk of their sales consisted of common oils. The independents had built up a trade everywhere on high-grade Pennsylvania oils, hence the activity of the Republic in this line redounded to the detriment of the independents. By the year 1904 the Republic was purchasing practically all its oil of all grades from Standard Oil Interests. It has been clearly established that at and before the institution of this suit the respondents were all buying practically all their oils from Standard Oil interests.

The instructions given to agents and field managers of the Republic Oil Company were to make a special drive on high-grade oils and go after the business of the independent. Such instructions were given to managers and agents individually and they were also given at meetings of field managers at Cleveland, Ohio. Also it was shown that at Kansas City the Republic solicited business the Standard could not get and for the purpose of getting such business representations were made that it was an independent company. In southwest Missouri a field agent of Waters-Pierce Company was given to understand shortly after the Republic succeeded Schofield, Shurmer & Teagle that he would have no trouble with the Republic. One agent was told by the Cleveland authorities of the Republic to go after the independents and let the Standard alone.

The respondent Standard Oil Company succeeded to the business of the Standard Oil Company of Kentucky, and that company to the Consolidated Tank Line Company of Ohio. Each company took over the property, effects, territory, brands of oil, employees, etc., of the other. The only change made was in name. Each was a Standard Oil Company, owned either in the first instance by the trustees of the Standard Oil Trust or by the Standard Oil Company of New Jersey, which took over the interests held by the Trust

when it was dissolved in the State of Ohio. In view of these conceded facts the Commissioner admitted a long line of evidence bearing on the conduct of business in this State by all the companies named. And so with relation to the Waters-Pierce Oil Company; after it was shown that the incorporation of that company in 1900 was for the purpose of enabling the company to resume business in Texas, and that as a matter of fact the organization of the new company was merely a continuation of the old company under the same name, with the same property, management, system, equipment and ownership of stock, evidence of acts and doings of the company prior to 1900 was deemed competent.

The Republic Oil Company was placed in the State of Missouri without any authority anywhere in the State to make prices as against the other respondents. It was shown that at Kansas City prices on common oils at least sold by the Republic were made by the Standard Oil Company and communicated to the Republic agents by the Standard manager. Also, at St. Louis and in the Missouri division of the Waters-Pierce Oil Company, managers and agents of the Republic were instructed, some say, to follow the market which was fixed by the Waters-Pierce, and others say they were instructed to be governed in fixing prices by the Waters-Pierce prices. It is a fact that in Standard Oil territory Standard prices were the prices of the Republic and in Waters-Pierce territory the prices fixed by that company were the prices of the Republic. It is not shown that either of the other respondents fixed the price of "palacine" or other high-grade oils of the Republic. These prices were furnished from Cleveland, and some discretion was given agents to vary prices in their competition with independents.

The Union Tank Line Company was a Standard Oil interest with its general office at 26 Broadway, New York City. It furnished tank cars for transporting

oils of Standard interests only. No independent company used these cars. Oils from all the northern and eastern refineries of the Standard, including the refineries in Kansas, were shipped to all the respondents in these cars. They were also used by the Consolidated Tank Line Company of Kentucky.

The evidence shows that the respondents had control of and sold from eighty-five to ninety-per cent of all the refined oils sold in Missouri during the time laid in the information, and that practically all of this large percentage consisted of petroleum products obtained from, owned by and allied with the Standard Oil Company of New Jersey.

The evidence establishes the fact that it was finally admitted that during the time laid in the information, the Waters-Pierce Oil Company would not sell oil in Standard territory nor would the Standard Oil Company sell in Waters-Pierce territory, and that orders sent to one company from merchants or jobbers doing business in the territory of the other were not filled by the company from which ordered, but were transmitted to the company in whose territory the customer lived, and were filled by that company.

It is now conceded that there was a dividing line in the State on one side of which the Waters-Pierce Oil Company distributed oil, and on the other side oil was distributed by the Standard Oil Company. Maps showing this division line were kept in the office of the Standard at Kansas City, in the office of the Waters-Pierce at St. Louis, and at 26 Broadway, the home of the Standard Oil interests. The line was first established and agreed on in 1878, between the Waters-Pierce Oil Company and Standard Oil Company of Ohio, and while the evidence does not disclose any special or express agreements made concerning it since yet it was accepted by the Consolidated Tank Line Company, the Standard Oil Company of Kentucky, the respondents, and is still faithfully maintained. Jop-

lin, in southwest Missouri, is only about six or eight miles from Galena, in Kansas, yet the Standard (respondent), which sells in Kansas, will not sell at Joplin, or in Missouri, nor will the Waters-Pierce sell at Galena, in Kansas.    However, when the Standard runs out of oil at Galena it sends over its tank wagons and fills them from from the tanks of the Waters-Pierce Oil Company.  Mr. Pierce says one reason he has not gone beyond the line is because he agreed not to do so.

During the time laid in the information, or from 1900 to the present time, the Standard Oil Company of New Jersey has regularly drawn the dividends on 2,750 shares of the capital stock of the Waters-Pierce Oil Company.  Dividends on the whole amount of stock except, perhaps, four shares, were declared in the name of and paid to H. C. Pierce, the stock standing of record in his name, and he regularly paid out about two-thirds of the amount to the Seaboard National Bank, in New York City, or to some other representative of the Standard Oil Company of New Jersey.

Reference has already been made to the trade of Republic Oil Company in the high-class grades of petroleum products.  Its agents and managers were instructed to make such sales a special object.  Sales in high-class goods were greatly increased, while in the beginning something like twenty-five or thirty per cent of its sales consisted of such grades of oils, later on the percentage of such sales reached from fifty to sixty per cent.

An important fact to be considered in arriving at a solution of this case is the ownership of capital stock of the respondents by the Standard Oil Company of New Jersey.  Since the incorporation of the Republic Oil Company the New Jersey Company has owned all the stock of the Republic and Standard of Indiana, and sixty-eight and one-half per cent of the Waters-Pierce

Oil Company. Four shares of stock of the latter company have been held by individuals acting as officers.

When a change would be made and a new officer put in, the share of stock held by the retiring officer would be assigned, thus indicating that these shares were held for the purpose of officering the company. The significant fact is to be drawn from all the evidence that the Standard Oil Company of New Jersey and H. Clay Pierce were the only real stockholders in the respondent companies. By an original agreement made in 1878 with Standard Oil Company of Ohio, and subsequently with trustees of Standard Oil Trust and Standard Oil Company of New Jersey, H. Clay Pierce was to have absolute control of Waters-Pierce Oil Company and its management and the fixing of its policies. Mr. Pierce claims that he exercised such control and management from 1878 to the spring of 1904, when the 2,747 shares of stock indorsed in blank by Pierce to the Standard of New Jersey were caused by the last named company to be assigned of record to M. M. Van-Buren, and are now held by him for that company.

A significant custom which prevailed among these respondents was what was called the "transfer" of men from one company to another. When the Republic Oil Company began business, its original incorporators were all Standard Oil employees, two of them being clerks at 26 Broadway, New York City, and one being a clerk in the office of the Standard Oil Company of Indiana, at St. Joseph, Missouri. With the exception of the general manager, a number of field managers and quite a number of employees who had formerly been with Schofield, Shurmer & Teagle, who were retained by the Republic, its principal officers, accountants and other employees were "transfers" from the Standard Oil Company.

Such transfers were also made from 26 Broadway to the Waters-Pierce Oil Company, at St. Louis, Oklahoma, Texas and other points. In most instances the

men transferred from Standard Oil Company to the Republic or Waters-Pierce were instructed to say nothing about the fact that they came from the Standard Oil Company.

Prior to 1900, it is conceded that auditors working under Wade Hampton, general auditor of the Standard Oil Company, with offices at 26 Broadway, regularly audited the books of the Waters-Pierce Oil Company, reported to Hampton and were on his pay-rolls. After 1900 he continued to send auditors to St. Louis to audit the Waters-Pierce Oil Company books, but they were placed on the pay-rolls of the latter company during the time they were engaged, at a salary invariably fixed by Hampton. These auditors reported to Waters-Pierce Oil Company, but a copy of their report was sent to 26 Broadway. Hampton's auditors also audited the accounts of the Republic Oil Company at Cleveland, Ohio, in the same way. After the services of these auditors had ended with the Waters-Pierce or Republic they at once became employees of Hampton.

Hampton says it was his understanding that Standard Oil Company should audit accounts of Waters-Pierce Oil Company. He personally audited the books of Standard Oil Company of Indiana, his men reporting to him and he paying them for their services. After 1900 a number of letters were written by Hampton to J. P. Gruett, secretary of Waters-Pierce Oil Company, introducing various auditors whom he sent to audit the books of that company and fixing the salaries of such auditors. The conduct of Hampton in keeping a strict supervision over the accounts of the Waters-Pierce Oil Company, both before and after 1900 (the date of the new incorporation) was simply the exercise of good business judgment on the part of the majority stockholders in that company. The Standard Oil Company of New Jersey had the right and power (both of which were exercised) to do these things.

The Waters-Pierce Oil Company at all times made full reports regularly of its business transactions to 26 Broadway. Before 1900 these reports were sent to H. M. Tilford, at 26 Broadway. Tilford was an officer of the Standard Oil Company of New Jersey. After 1900 they were sent to R. H. McNall, at 75 New street, New York City, being an entrance to 26 Broadway, he being designated the commercial agent of the Waters-Pierce Oil Company. These reports embraced, among other things, sales and deliveries of refined oils, deliveries of lubricating oils, etc., comparative sales, deliveries of specialty oils, deliveries of outside oils, deliveries of wax candles, etc., tank-wagon and milk-can deliveries, sales and deliveries of naphtha, etc., marine sales, total sales and net results, semi-annual statement showing costs of barrelling and marketing all kinds of oils and products of petroleum. This is the character of the reports made to 26 Broadway by Waters-Pierce Oil Company. A daily cash statement was sent. Also Consolidated Tank Line Company and Standard of Indiana made similar full reports to 26 Broadway. The daily cash statements sent by Waters-Pierce Oil Company were turned over to the comptroller of the Standard of New Jersey. While the reports were all, after 1900, addressed to McNall, they were distributed among the various officers at 26 Broadway and were passed on by a committee at that place, which has not been definitely identified, some calling it a Domestic Trades Committee, some an Executive Committee, some an Association of Gentlemen or Experts, and some claiming it to be the directors of Standard Oil Company of New Jersey, who had their offices and held their meetings at that place. W. E. Bemis, an officer of Standard Oil Company, at 26 Broadway, in charge of the statistical department of Standard Oil interests, received reports from all Standard Oil interests.

218 Sup—20

R. H. McNall, who was commercial agent of Wat-
ers-Pierce Oil Company after 1900, succeeding H. M.
Tilford in that capacity upon the reincorporation of
that company in 1900, had been prior thereto and was
afterwards an assistant to Tilford. Tilford knew of
the reports coming to McNall and saw them. Mr.
Pierce says his company reported regularly to Stand-
ard Oil Company at 26 Broadway prior to 1900, and
that the same reports were sent afterwards through
McNall instead of mailing them directly to the heads
of departments. He says that it was through McNall
that the business of the Waters-Pierce Oil Company
was transacted with Standard Oil interests at 26
Broadway. Mr. Pierce further said: "McNall was
furnished anything and everything that he asked for
as the representative of the Standard Oil Company
and its various heads." Andrew M. Finlay, who was
vice-president and general manager of Waters-Pierce
Oil Company, says he was instructed by Mr. Pierce to
send any reports to 26 Broadway called for by McNall.
James A. Moffett, president of the Standard Oil Com-
pany of Indiana, says that company made full reports
of all its business to 26 Broadway.

Now the Republic Oil Company, through its gen-
eral officers, managers, agents and salesmen, posed and
represented the company to be independent of Stand-
ard Oil Interests, and Waters-Pierce Oil Company.
This position was taken wherever it sold the products
of petroleum. Yet shortly after its incorporation the
two refineries purchased in the deal with Schofield,
Shurmer & Teagle, the one at Cleveland and the one
at Scio, Ohio, were dismantled and discontinued and
oils purchased from Standard Oil Company. Reports
of all the business of the company were regularly made
to 26 Broadway through Nichols, the president, at 75
New street, New York City. It occupied and sold
identically in the same territory as the Standard Oil
Company, except at points where it sold in Waters-

Pierce territory. Its principal officers and employees were from the Standard Oil Company and sent to it by that Company. Its stock books and certificates of stock were kept at 26 Broadway, and all its capital stock was owned by the Standard Oil Company of New Jersey. The general manager, W. C. Teagle, says it was an independent company and yet he assisted in making the sale of the property of Schofield, Shurmer & Teagle to the Standard Oil Company at 26 Broadway. This same Teagle, as general manager, in circulars sent out to field managers, denied that the Standard had bought out the firm of Schofield, Shurmer & Teagle.

Mr. C. L. Nichols, president of Republic Oil Company, and at the same time assistant to L. J. Drake, sales-agent of Standard Oil Company of Indiana, at 26 Broadway, says it was necessary to conduct and represent the Republic as an independent company in order to control the trade in high-class brands of oil formerly controlled by Schofield, Shurmer & Teagle. The independent companies made heavy assaults on the Republic from the beginning, because it was specially pushing a class of trade which created more competition with them. The cheaper oils were sold by the Republic, says Nichols, only as a necessity and as a means of selling high grades. Nichols regularly consulted Drake and others at 26 Broadway about Republic reports. A part of the president's salary was paid by Republic Oil Company and part by Standard Oil Company, and all reports to him came addressed to 75 New street. Nichols says that after this action was brought it was necessary to dispose of the Republic because it had served its purpose and kept and maintained "palacine." The publicity of its ownership by the Standard Oil interests destroyed its usefulness and purposes. "Palacine" is now being sold by the Standard of Indiana.

In Texas, Oklahoma and Arkansas the same conditions, so far as the relations between the Waters-

Pierce Oil Company and Standard Oil Company were concerned, existed as in Missouri.

L. H. Turrell, who was the first secretary of Republic Oil Company, was requested by L. J. Drake, then general manager of Standard Oil Company of Indiana, to go to New York and become an incorporator in a *sub rosa* corporation. At New York he found that Moffett, who was connected with both the Standard of New Jersey and of Indiana, was the principal negotiator for the purchase of the property of the firm of Schofield, Shurmer & Teagle, and he was told that the Standard Oil Company was making the purchase. He was also told that he had been agreed on as secretary, treasurer and a director. He was directed by Mr. Moffett to the office of Mr. Dodd, general counsel of Standard Oil interests, where he was asked to sign articles of incorporation by name F. A. Turrell, his correct name being L. H. Turrell. He was told that the mistake in name would make no difference and he signed by the initials ''F. A.'' He was instructed by both Dodd and Moffett to use caution and not let it be known at Cleveland, where he went to work for the Republic, that he came from the Standard Oil Company. George B. Wilson, chief clerk of the Standard Oil Company of New York, became, as he expressed it, an accommodation president, and served for four months, when Nichols was elected. James R. Taylor, the other incorporator, was private secretary to H. M. Tilford. These three parties were the stockholders, officers and directors of the Republic Oil Company. They held meetings in the office of H. M. Tilford, director in the Standard Oil Company of New Jersey and a member of some committee at 26 Broadway. All their proceedings were directed and dictated by Tilford.

Between 1903 and 1905 letters were written by various heads of departments at 26 Broadway, New York City, to Waters-Pierce Oil Company and Republic Oil Company. Those to the Waters-Pierce were

sent to McNall, who signed them, and those to the Republic were signed by Nichols. These letters concerned all branches of oil business and called for various reports and numerous matters of information.

R. P. Tinsley, who, in 1904, became connected with the Waters-Pierce Oil Company at St. Louis, or was "transferred," had, prior to that time, been a general agent at 26 Broadway for all Standard Oil interests. Just what his exact duties were in that capacity has not been shown.

M. M. VanBuren, who holds 2,747 shares of the capital stock of Waters-Pierce Oil Company, is a son-in-law of John D. Archbold, vice-president of the Standard Oil Company of New Jersey. John D. Rockefeller is the president of that company.

H. M. Tilford, a director in the Standard Oil Company of New Jersey, and a director in Waters-Pierce Oil Company prior to 1900, says that McNall, the commercial agent of Waters-Pierce Oil Company at 26 Broadway or 75 New street, was his assistant both before and after he became such commercial agent.

Quite a number of letters were introduced during the examination of Tilford which tend to throw light on the questions being considered, some of which are to the following effect: From McNall to J. P. Gruett, secretary of Waters-Pierce Oil Company, in 1903, giving the information that R. P. Tinsley had succeeded Walter Jennings as agent at 26 Broadway; from McNall to J. P. Gruett in 1903, relating to salaries of employees of Waters-Pierce Oil Company; from McNall to Gruett, in 1903, about Waters-Pierce Oil Company dividends, in which McNall states that he seldom sees the daily cash report sent to his office; from H. M. Tilford to J. P. Gruett, in 1903, relating to the transfer of oils; from McNall to S. Johnson, in charge of lubricating and specialty department of Waters-Pierce Oil Company at St. Louis, in 1904, fixing the price of wax; from H. M. Tilford to J. P. Gruett, in 1902, relating to

sales' reports; from H. M. Tilford to J. P. Gruett, in 1902, relating to banks where funds of Waters-Pierce Oil Company are deposited; from McNall to A. M. Finlay, then president of Waters-Pierce Oil Company, that hereafter when letters were written him at 26 Broadway or 75 New street by Waters-Pierce Oil Company, to have a number of carbons made, without date, signature or address, for distribution to other offices; letter from H. C. Arnold, accountant at 26 Broadway, to R. P. Tinsley, then with Waters-Pierce Oil Company, relating to services of Preston, sent to audit for Waters-Pierce.

Mr. Pierce says that all the various brands of oil sold by Waters-Pierce Oil Company, although different in names to those used by Standard of Indiana, were manufactured by Standard Oil Company for his company. He also says that after stock held by Standard Oil Company of New Jersey in Waters-Pierce Oil Company was transferred to M. M. VanBuren on the books of the company in the spring of 1904, the Standard Oil Company then began in various ways, by discharging old employees and substituting their own, to interfere with and take the management from him. This continued until 1905, when he induced the Standard Oil authorities to again put the management into his hands; and his son, Clay Arthur Pierce, was elected president. Says he got both J. P. Gruett and R. P. Tinsley, the former had been secretary of Waters-Pierce Oil Company, and who was succeeded by Tinsley, from the Standard Oil Company. The Waters-Pierce Oil Company communicated with the various heads of departments at 26 Broadway through McNall, commercial agent. A list of all salaries of Waters-Pierce employees was sent to 26 Broadway once a year.

James A. Moffett, president of Standard Oil Company of Indiana, established his office as such president at 26 Broadway in 1901, about the time of the organization of the Republic Oil Company. He assisted in

the negotiations for the purchase of the property of Schofield, Shurmer & Teagle, and did caution L. H. Turrell not to talk too much when Turrell became secretary of the Republic Oil Company. He says that the Standard of Indiana sold almost exclusively to Standard Oil interests. He is also a director of the Standard Oil Company of New Jersey, and says that full reports come to 26 Broadway from the Standard of Indiana. He says unqualifiedly that the directors of Standard Oil Company of New Jersey control the companies in which it owns a majority of stock. In the State of Missouri the Standard of Indiana as a refiner and wholesaler sells only to Standard interests. He also says that Col. Dodd, general counsel of Standard Oil interests, with offices at 26 Broadway, had charge of the incorporation of the Republic Oil Company. "Eupion" oil, the high-grade of Waters-Pierce Oil Company, and "Eocene," the high-grade of the Standard Oil Company of Indiana (both illuminating oils) were both manufactured by the latter company. At all times the general offices of the Republic Oil Company were located at 26 Broadway. He always considered the Waters-Pierce Oil Company a Standard Oil interest.

C. L. Nichols, who became president of the Republic Oil Company in the fall of 1901, and is still president, says that during all that time he has occupied an office with L. J. Drake, sales-agent of the Standard Oil Company of Indiana, at 26 Broadway, as an assistant to Drake. As such, Drake had charge of certain territory, being the territory in which the Republic was doing business and carrying on a fierce competition with Mr. Drake's company. He says there was an association of gentlemen at 26 Broadway who would meet and discuss Standard Oil Interests in a general way. Nichols said he had consultations with Drake about reports he received from Republic Oil Company. His selection as president of the Republic was a sur-

prise to him—he was informed of his selection by J. R. Taylor, one of the stockholders.

The general officers of all the respondents either knew of their common ownership by the Standard Oil Company of New Jersey, or understood that they were Standard Oil interests and under the domination of the heads of departments at 26 Broadway. Most field managers and others occupying important positions and in direct touch with the trade and distribution of oils in the field had at least heard of the relationship of the respondents and surmised that they were all connected with Standard Oil interests.

All officers and employees who testified on the part of the respondents or either of them, say there was no agreement, or combination, or understanding between any or all of them to fix, maintain, or control prices of the products of petroleum, nor to control or limit the trade therein, nor to control, limit or prevent competition therein, in the State of Missouri. These denials are couched in general terms and go to all the charges contained in the information.

The Master made the following rulings regarding the admission and rejection of testimony:

### RULING UPON OBJECTIONS TO TESTIMONY.

[References are to pages of "Printed Record of the Testimony."]

On pages 307 and 312 the witness Hatfield was asked to state in a general way with reference to the similarity of the division of trade territory on the map that he saw at 26 Broadway and the one he afterwards saw at the Waters-Pierce Oil Company office in St. Louis. An objection to this question was sustained. It should have been overruled and the witness permitted to state if the two maps disclosed a similar division line of territory.

On page 1071 a ruling on the objection to the introduction of a certified copy of the charter of the Consol-

idated Tank Line Company was reserved by the Commissioner. This objection is now overruled.

The objection to the testimony given by witness Wheelan in an answer to the second question on page 595 should have been sustained in so far as it attempted to elicit the relations between the Republic Oil Company and Standard Oil Company, but the testimony was competent to the extent that it showed knowledge on the part of Cochran of such relations.

On page 1075 a ruling on the objection to the introduction of a certified copy of the charter of the Standard Oil Company of Kentucky was reserved by the Commissioner. The objection is now overruled.

The objection to the tabulated statement set out on page 2730 should have been sustained. It was not properly shown to have been correct and authoritative. The same information is given in a proper way by the witness Webster.

The objection to the compilation of prices of the National Oil Company set out on pages 2763 to 2765 should have been sustained.

The objection to the compilation of prices of St. Louis Oil Company set out on pages 2772 to 2773 should have been sustained.

All proper exceptions to the foregoing rulings by the Commissioner are now allowed.

The respondents requested the Master to declare the law as follows:

"Each respondent separately asks the Commissioner to make as a separate finding of fact each division and subdivision of the statement submitted with the brief of the Republic Oil Company and Standard Oil Company of Indiana.

"Each respondent separately asks the Commissioner to give each of the following declarations of law:

"1. On the pleadings and proofs the findings must be for the respondent.

"2. The information does not state facts sufficient to constitute a cause of action or to entitle the State to any relief in this action.

"3. There is no jurisdiction in this proceeding to inquire into any question of any alleged violation of sections 8965, 8966 and 8978 of the Revised Statutes of Missouri.

"4. There is no jurisdiction in this proceeding to inquire into the question of any alleged violation of section 8978 of the Revised Statutes of Missouri of 1899.

"5. Each of sections 8965, 8966, 8967, 8968, 8971, 8972 and 8978 is unconstitutional and void for each of the reasons mentioned in the second amended answers of the Standard Oil Company of Indiana and the Republic Oil Company, filed February 11th, 1906.

"Each constitutional objection there made and presented is now separately made and presented the same as if separately written out as a separate declaration of law.

"6. This respondent was not a party to or part of any pool, trust, agreement, confederation, combination or understanding to regulate, fix or control the price to be paid by the retail dealers and others in the State of Missouri for naphtha, benzine, gasoline, kerosene, lubricating oil or other products of petroleum offered for sale or sold in the State of Missouri.

"7. This respondent was not a party to or part of any pool, trust, agreement, confederation, combination or understanding to control or limit the trade in the products of petroleum in the State of Missouri.

"8. This respondent was not a party to or part of any pool, trust, agreement, confederation, combination or understanding to control, limit or prevent competition in the business of buying the products of petroleum in said State between themselves and others.

"9. This respondent was not a party to or part of any pool, trust, agreement, confederation, or understanding to deceive or mislead the public into the belief

that respondents were separate and distinct corporations, each pursuing an independent business as legitimate competitors in the purchase or sale of the products of petroleum.

"10.   The information charges that the three respondents have wilfully and flagrantly abused, perverted and misused their rights, authority and franchise and assumed and usurped authorities and privileges not granted by the law of Missouri in that they between the —— day of ——, 1901, and March 29th, 1905, created, entered into and became members of a pool, trust, agreement, confederation, combination and understanding among themselves and each other:

"(a).   To regulate, fix and control the price to be paid by the retail dealers and others in the State of Missouri for naphtha, benzine, gasoline, kerosene, lubricating oil and other products of petroleum offered for sale and sold in the State of Missouri;

" (b). To control and limit the trade in the products of petroleum in the State of Missouri;

"(c).   To control, limit and prevent competition in such business of buying the products of petroleum in said State between themselves and others;

"(d).   To deceive and mislead the public into the belief that respondents were separate and distinct corporations each pursuing an independent business as legitimate competitors in the purchase and sale of the products of petroleum.

"These, and these alone, constitute the issues of fact made by the pleadings.

"11.   After making the charges mentioned in the last request, the information alleges as overt acts that by said pool, trust, agreement, confederation, combination and understanding respondents did certain things. These, however, are not substantive acts and are not necessary parts of the pleadings.   They could be wholly rejected as surplusage, or, at most, treated

as specific allegations of the specific acts constituting the general combination alleged.

"12. So far as concerns oil and oil products, section 8965 only prohibits combinations to regulate or fix prices and maintain them when so fixed or to fix or limit the amount or quantity thereof.

"13. So far as section 8966 attempts to prohibit combinations designated or made with a view to lessen or which tend to lessen free and full competition, it is limited to such combination whereby or under which it is stipulated, provided, agreed or understood that any person, association of persons or corporation doing business in the State shall not deal in, sell or offer for sale in this State any particular or specified article, product or commodity and shall not during the continuance or existence of any such arrangement, combination or agreement deal in, sell or offer for sale in this State any competing article, product or commodity.

"14. So far as concerns any pool, trust, combination, confederation or understanding to control or limit trade or competition in such trade, section 8978 only prohibits such pool, trust, combination, confederation or understanding by refusing to buy or sell to another for the reason that such other was not a member thereof.

"15. A plain remedy is provided for violation of section 8978 by. the provisions found in sections 8979, 8980, 8981 and 8982, of the Revised Statutes of Missouri 1899, and for such a violation *quo warranto* will not lie.

"16. The fact that the majority of the stock of the three respondents was owned by the Standard Oil Company of New Jersey will not justify a finding of a violation of sections 8965, 8966, or 8978.

"17. An arrangement for a territorial division, if made or maintained as between the Waters-Pierce Oil Company and the Standard Oil Company of Indiana, was not a violation of section 8965, 8966 or 8978.

"18.   Unless there was a combination or agreement among two or more of the respondents to deceive and mislead the public into the belief that they were competing companies when they were not in fact, then there would be no finding against the Republic Oil Company simply because it may be that such company pretended to be a competitor of the other respondents when it was not such in fact.

"19.   The giving of rebates to purchasers of oil is not in violation of law."

The views taken by the Commissioner under the next sub-head which follows will answer all the propositions of law raised in the foregoing declarations.

The record fails to show whether these declarations of law were either given or refused, as asked.

The Master, however, made and returned the following:

## FINAL CONCLUSIONS UPON THE LAW AND FACTS.

### THE ISSUES.

It seems to be unnecessary to determine in this case whether the respondents have violated the common law of the State, or whether the common law in force in this State will sustain the charges in the information. The statutes, chapter one hundred and forty-three, Revised Statutes of 1899, are certainly. broad enough to cover the facts and conditions shown to exist between these respondents. Therefore, the first task to perform will be to ascertain the issues by applying the allegations of the information to the statutes.

An analysis of the information setting forth the substantial allegations of a combination or trust formed between the respondents, together with certain overt acts done in pursuance thereof, will be

given.   The Commissioner finds that the information charges the respondents with the following violations of the various provisions of chapter 143, to which charges he will direct the evidence produced in this case.

It is charged that the respondents, between the— day of ——, 1901, and 29th day of March, 1905, created, entered into and became members of a pool, trust, agreement, confederation, combination and understanding among themselves, and each other (following language in section 8965):

(1).   To regulate, fix and control the prices to be paid by retail dealers and others in the State of Missouri for the products of petroleum.   [Sections 8965, 8978.]

(2).   To control and limit trade in the products of petroleum in the State of Missouri.   [Section 8978.]

(3).   To control, limit and prevent competition in the business of buying and selling the products of petroleum in the State of Missouri, between themselves and others engaged in like business.   [Section 8966, not the language of the statute.]

These three specifications, manifestly based on the statutes, constitute the alleged purposes for which the combination was formed.   Then the information proceeds and alleges that the respondents have, by said pool, trust, agreement, confederation, combination and understanding,

(1).   Fixed and maintained the prices of the products of petroleum sold and offered for sale by them in the State of Missouri.   [Section 8978.]

(2).   Have controlled and limited the trade in said products in this State.   [Sections 8965, 8966.]

(3).   Have prevented and destroyed competition in the purchase and sale of said products of petroleum in this State.   [Sections 8965, 8966, 8978.]

(4).   Have deceived and misled the public into the belief that respondents were separate and distinct corporations.

What follows seems to be specifications of overt acts committed in pursuance to the purposes of the combination charged to have been entered into and existing between the respondents.   It is alleged that in pursuance of said pool, trust, agreement, confederation, combination and understanding, so entered into by said respondents as aforesaid, and for the accomplishment of the objects and purposes aforesaid,

(1).   The State of Missouri has been divided into two territories, in one of which the Standard ·Oil Company sells and Waters-Pierce Oil Company does not; in the other the Waters-Pierce Oil Company sells and the Standard does not, and that the Republic Oil Company sells in the territory of each of the other respondents to a class of trade who do not or will not buy of them.

(2).   The respondents appeared and represented themselves to be separate, independent and competing corporations, when they were not and when said secret combination existed between them, thereby deceiving and misleading the public into the belief that they are separate and distinct corporations.

(3).   The respondent, Standard Oil Company, as a refiner, sells the products of petroleum in Missouri only to itself and the other respondents.

(4).   The respondents have controlled and supplied to the retail dealers and the general public in Missouri from eighty-five to ninety per cent of the products of .petroleum sold in Missouri.

(5).   They have controlled the prices of the petroleum, have prevented competition among themselves, have secured control of the oil business and the purchase and sale of oil, have limited the trade therein and driven out competition, and the public have been

deprived of free, full and wholesome competition in the sale of the products of petroleum.

The language of the information, both in substance and words, embraces combinations formed to regulate, fix and control the prices to be paid by retail dealers and others in the State for the products of petroleum, and to control and limit the trade in such products as interdicted by section 8965 of article 1 and section 8978 of article 2, chapter 143, Revised Statutes 1899.

Also the language of the information is broad enough to embrace combinations formed for the purpose, or made with the view to lessen, or which tend to lessen, competition in the sale of petroleum, as prohibited by section 8966 of said chapter 143.

It is contended that a violation of section 8978 cannot be reached in this proceeding, because article 2, of which that section is a part, gives circuit courts jurisdiction and provides a special or additional remedy in those courts. The purpose of this article as provided in section 8982 is not to repeal any subsisting acts relating to combinations in restraint of trade, but to provide an additional remedy for the control and restraint of pools, trusts and conspiracies in restraint of trade and unlawful combinations. The additional remedy provided is by injunction in courts which alone have jurisdiction in such cases, and is expressly made to reach, not only the provisions of article 2, but those of article 1 as well. The Constitution of Missouri, section 3, article 6, gives the Supreme Court power to issue the writ of *quo warranto.* It must be conceded that it will issue against a corporation for the non-user or misuser of its corporate franchise, or for an infraction of its contract with the State by a violation of the anti-trust laws. As said by Judge SHERWOOD, in the case of State ex inf. v. Equitable Loan and Investment Co., 142 Mo. 325 (l. c. 337): "And the jurisdiction of this court being conferred by the Constitution, it is beyond the power of the Legis-

lature to take it away, and it will not be intended that a legislative enactment was designed to take such jurisdiction away, although such enactment should confer another and distinct remedy upon some inferior court or board.'' Article 2 of chapter 143 does not confer or create a distinct and independent remedy, but simply an additional remedy to those created by article 1, and other remedies, which are conferred by the Constitution, or are inherent in the courts. The general principles governing such proceedings as this are well expressed by Clark and Marshall in their work on Private Corporations, vol. 2, sec. 314b, in this language: ''As a general rule, however, the charter of a private corporation will be forfeited, in proper proceedings by the State, for any willful or fraudulent misuser or abuse of its franchises which injures or menaces the interests or welfare of the State or the community in which it transacts business, whether the misuser or abuse consists in the exercise of a franchise or power not conferred upon the corporation by its charter, or in the violation of prohibitions in its charter, or in the violations of prohibitions in general laws to which it is subject, or in the violation of established principles based upon the ground of public policy.'' [High on Extraordinary Legal Remedies, secs. 647, 648; State ex rel v. Gas Company, 153 Ind. 483; Terrett v. Taylor, 9 Cranch 43, 51; State ex inf. Hadley v. Jockey Club, 200 Mo. 34.]

Both articles 1 and 2 of chapter 143 declare pools, trusts, agreements, combinations, confederations and conspiracies, formed and entered into by corporations for the accomplishment of the purposes therein specified, to be illegal. These statutes are a declaration of the policy of the State, the violation of which by a corporation is a violation of its pact, entered into with the State when it was chartered as a domestic company, or licensed to do business as a foreign company, which

violations give the State the right to withdraw such charter rights or cancel such license privileges.

Respondents maintain that inasmuch as chapter 143 denounces pools, combinations, etc., therein described as "conspiracies to defraud," the information should be tested by the rules of pleading relating to charging conspiracies, and that it is, therefore, insufficient and states no cause of action. This action, although it does partake of the nature of a criminal prosecution in that heavy penalties may be imposed, yet it is a civil action and the rules of pleading in civil cases appertain. While the corporate rights of the respondents may be taken from them or fines or suspensions imposed, yet these are not regarded as punishments for the commission of crime, but as results which may follow the failure of a corporation to live up to the implied contract between it and its creator, the State. The respondents are charged with forming and entering into a combination or conspiracy to do an unlawful act. Conspiracies may be formed to do an unlawful act or to do a lawful act by unlawful means. The rule of pleading in such cases, even in criminal proceedings, is that: "If the act which the conspirators combined to perform is unlawful, it is unnecessary to set out in the indictment the means to be employed in accomplishing it. But if the end in view is lawful or indifferent, and the conspiracy only becomes criminal by reason of the unlawful means whereby it is to be accomplished, it becomes necessary to show the criminality by setting out such unlawful means." [4 Ency. Pl. & Pr., pp. 713, 714, 716, 717; Coal Co. v. People, 214 Ill. 421.] Respondents say, "The information does not show how and by what manner the combination was formed. The overt acts pleaded do not sufficiently show these details. They show what was done under the combination, not how the combination was effected." This is a very general objection without specifying the exact deficiencies of the information. Neither

in the printed nor oral arguments have any of the
counsel for respondents pointed out what omitted mat-
ter or allegation would have supplied the defects.   In
view of the fact that the sufficiency of the information
has not been brought to the attention of the court by
proper plea, and that in this case reported in 194 Mo.
l. c. 130, Judge LAMM said, ''The information proceeds
with due legal precision and particularity to inform this
court of the scope and tenor of the trust scheme and of
the specific methods claimed to have been employed
therein, and thereby to rivet upon the people of this
State, contrary to public policy and in the very teeth
of express law, an alleged odious monopoly,'' the Com-
missioner might have passed this question without
comment.   It is very clear that the information is suf-
ficient and it only remains to dispose of a few other
questions of law in a brief way and then proceed to a
consideration of the question of the guilt or innocence
of the respondents under the facts proven.

It is urged that the provision of chapter 143, Re-
vised Statutes 1899, are in conflict with the first section
of the fourteenth Amendment to the Federal Consti-
tution and other constitutional provisions.   So far as
the Commissioner is concerned all these constitutional
objections are disposed of by the following cases: State
ex. inf. v. Standard Oil Co., 194 Mo. 124; State ex. inf.
v. Firemen's Fund Ins. Co., 152 Mo. 1; State ex. inf.
v. Armour Packing Co., 173 Mo. 356; State ex inf. v.
Continental Tobacco Co., 177 Mo. 13; Finck v. Granite
Co., 187 Mo. 244.   .

The anti-trust laws of the State are penal in their
nature and should be strictly construed. [State ex. inf.
v. Insurance Co., 152 Mo. l. c. 41.] As said by Judge
Fox, ''It must be remembered that this proceeding
partakes of the nature of a criminal prosecution, severe
penalties are imposed, hence it is not sufficient to war-
rant a finding adverse to respondents that we may en-
tertain strong suspicions, or even strong probabilities,

of their guilt." [State ex. inf. v. Tobacco Co., 177 Mo. l. c. 37.] Yet, both the information and the facts should be given a reasonable and sensible construction, one which, on the one hand, will give effect to the material and well-stated charges in the information, and on the other such a construction and application of the facts as will elicit the truth and not mere suspicions and probabilities. As said by Judge LAMM in this case, "We feel, at least, on solid ground on the proposition that statutes leveled against monopolies are buttressed upon the wisdom of the common law, and this court, constrained and enlightened by events of current history, is not required and does not deem itself invited to approach the interpretation of such statutes, with a hostile or sour disposition, or to drive a coach-and-six through them but, on the other hand, while sedulously protecting the rights and liberties of the individual from insidious approaches, under whatever artful guise, we should at the same time not lose sight of the rights of the community, and should endeavor to advance the beneficent purpose underlying such laws where it can be done without doing violence to constitutional provisions." [State ex inf. v. Standard Oil Co., 194 l. c. 148.] In Jacobson v. Massachusetts, 197 U. S. l. c. 39, it was said by the Supreme Court of the United States that "all laws should receive a reasonable construction, and general terms should be so limited in their application as not to lead to injustice, oppression or absurd consequence. It will, therefore, be presumed that the Legislature intended exceptions to its language which would avoid results of that character. The reason of the law in such cases should prevail over its letter."

#### CONCLUSIONS UPON THE FACTS.

As, in this case, where the State charges an abuse or a misuse of the corporate franchise, or acts of corporations contrary to the Constitution and laws of the

State, the informant must prove the charges as laid in the information or enough of them to warrant the finding that the respondents are guilty. If the State has failed to do this, then nothing remains but to so pronounce. [State ex rel. Walker v. Talbot, 123 Mo. 69, 71.]

The charge is that the respondents, between the — day of ——, 1901, and the 24th day of March, 1905, created, entered into and became members of a pool, trust, agreement, confederation, combination and understanding, among themselves, and each other, to do certain things heretofore set out. The terms pool, trust, agreement, confederation, combination and understanding, in the sense used in the information and according to modern adjudications, are practically synonymous. [United States v. Addyston Pipe & Steel Co., 54 U. S. App. l. c. 764; Cook on Trusts, p. 4.] They are also denounced by the statute as conspiracies.

The respondents during the time laid in the information were separate and distinct corporations or entities, one organized under the laws of New York, one under the laws of Indiana and the other under the laws of Missouri. In 1882 the Standard Oil Company of New Jersey was organized and about that time the Standard Oil Trust was formed. In 1899 the capital stock of the New Jersey Company was increased from three to one hundred and ten million dollars. In 1878 the first Waters-Pierce Oil Company was organized with a capital stock of one hundred thousand dollars. In 1882 its capital stock was increased to four hundred thousand dollars. About this time the Standard Oil Trust became the holder for the Standard interests of 2,750 of the four thousand shares of this company. In about 1890, when the Standard Oil Trust was dissolved, the Standard Oil Company of New Jersey became the owner of the 2,750 shares of Waters-Pierce stock formerly held by the trustees

of the Standard Oil Trust and owned that number of shares up to May, 1900, when the Waters-Pierce Oil Company was again organized, the Standard of New Jersey continuing to own and control 2,750 shares of the four thousand shares of the new company. In 1889 the Standard Oil Company of Indiana was incorporated. Practically all of its stock from that time to the present was owned by the Standard of New Jersey. In 1901 the Republic Oil Company was incorporated and absolutely all its stock was owned then and continued to be owned ever since by the Standard Oil Company of New Jersey. The stock held by the New Jersey company in the respondent companies was held for it by individuals connected with Standard Oil interests at 26 Broadway. The management of the Waters-Pierce Oil Company by agreement was given to H. Clay Pierce, who was president or managing influence from 1878 to the spring of 1904, when the Standard Oil Company of New Jersey exercised its right and power as a majority stockholder and took the management from him for about a year. The business and affairs of the other two respondents were, at all times, absolutely managed and directed from 26 Broadway, New York City, where their principal offices were located. As to the managerial acts and directions emanating from 26 Broadway, more will be said later on. Thus it will be seen that a motive for a combination between the respondents existed in the common ownership of their capital stock. Of the total capital stock of the three respondents, amounting to one million seven hundred and fifty thousand dollars, the New Jersey Company owned a little more than one million five hundred thousand dollars thereof.

Counsel for respondent Waters-Pierce Oil Company, says there was no motive for any combination among the companies as to price. "If," says counsel, "the conclusion of combination is to be drawn

from the fact that the Standard Oil Company of New Jersey owned a controlling interest in all these companies, that inference is positively repelled by the fact that Mr. Pierce and his interests, which actu- ally controlled the operations of the Waters-Pierce Oil Company, would have enjoyed no benefits from any such combination." But is it not a fact that a combination of Pierce's interests with Standard Oil interests was of vast importance to him? It enabled the Waters-Pierce Oil Company to control the trade and prices in the products of petroleum in one-half of the State of Missouri, a good portion of Louisiana, all of Indian Territory, Oklahoma, Arkansas, Texas and the Republic of Mexico. Otherwise, Mr. Pierce's one-third interest in the Waters-Pierce Company might not have been able to withstand competition from Standard Oil interests.

In State ex inf. v. Standard Oil Company, 194 Mo. 124, Judge LAMM says: "Yet experience has shown that stockholdings showing a community of interest, while in some cases innocuous, might in given cases be the very root from which the trust agree- ment grows."

In People ex rel. v. Chicago Gas Trust Co., 130 Ill. l. c. 292, it is said: "The control of the four com- panies by the appellee—an outside and independent corporation—suppresses competition between them, and destroys their diversity of interest and all mo- tive for competition." Again, Noyes on Intercorpo- rate Relations, sec. 294, says: "A corporation which owns a majority of the shares of the capital stock of another corporation controls it." In Railroad v. Commonwealth, 7 Atl. l. c. 371, this plain and pointed language is used: "It is too plain to bear argument that the ownership of the stock of a corporation car- ries with it the control of the corporation." It is very true that the ownership of the stock does not carry with it the ownership by the stockholders of

the property of the corporation. The property belongs to the corporation and is managed by the proper agents selected for that purpose. [Humphreys v. McKissock, 140 U. S. 304.] That principle of law distinguishes this case from the case of State ex inf. v. Tobacco Co., 177 Mo. 37. There the Continental Tobacco Company purchased the tangible assets of a number of tobacco companies and converted them into the assets of the tobacco company and proceeded to transact business in its own name and with its own assets and not by means of a number of subsidiary companies, organized at different times, in different States and under different names, as in the case of the Standard Oil Company of New Jersey. "Every corporation is a person—artificial, it is true, but nevertheless a distinct legal entity. Neither a portion nor all of the natural persons who compose a corporation, or who own its stock and control its affairs, are the corporation itself; and when a single individual composes a corporation, he is not himself the corporation. In such case, the man is one person, created by the Almighty, and the corporation is another person, created by the law." [Exchange Bank v. The Macon Construction Co., 97 Ga. l. c. 5.] The Standard Oil Company of New Jersey, through the individuals at 26 Broadway, who held for it a large majority of the stock of all the respondents, had control by virtue of such ownership and did control. Even if Mr. Pierce did vote the stock of the New Jersey Company, elect the directors of and control the Waters-Pierce Oil Company from May, 1900, to February, 1904, no more can be said than that he was acting as the agent of the majority stockholder. That the New Jersey company had the power of control and that Pierce's authority was merely permissive, or that of an agent whose agency was subject to revocation at any time, was demonstrated in 1904 when his agency was revoked without consultation

with him, and he was told by the general counsel of the company that the action was regular. The conclusion cannot be escaped that the common ownership of the stock of respondents by an outside corporation is a strong circumstance tending to show them guilty of an agreement, combination or conspiracy to effect the objects stated in the information.

There was a division of territory between the Waters-Pierce Oil Company and the Standard Oil Company of Indiana, not only in Missouri, but the two companies did not sell the products of petroleum at the same place at any point in the United States. While it is true no formal agreement was produced showing a division of territory—such was not necessary. The evidence shows clearly that an understanding was had, that divisions were made as far back as 1878, and faithfully kept by the two respondents to the present time. It is safe to say that except for the combination or understanding which has always existed between these companies, together with their common stock ownership, such agreement would have been annulled long ago. It will not do to say that one company sold oil in one part of the State and the other in another part, and that, therefore, there was no competition. The charge against them was that they did not compete. If these two companies had not combined their vast wealth, it is reasonable to believe that both would have established and maintained stations at all important commercial points in the State. If there had not been a close business and common stock-ownership existing between them, orders received from the territory of the Waters-Pierce Oil Company to the Standard Oil Company would have been filled by the company receiving them. These orders were never transferred to other companies—to independent or outside companies—but they went from the one to the other of said respondents. Nor was the Waters-Pierce Oil Company a

marketer of the brands of oil of the Standard Oil
Company of Indiana. It posed to the public as a
marketer of its own special brands of oil, manufac-
tured, it is true, for it by the Standard Oil Company
and its allied interests. So far as the public knew
the "Eocene" of the Standard and "Eupion" of the
Waters-Pierce were entirely different oils, although
as a matter of fact they may have been the same.
If these two companies had been independent of each
other, a division of trade alone might not be sufficient
to convict them of a violation of the statute. But
it is an important circumstance to be considered in
this case in connection with all the other facts proven,
and especially in conjunction with the fact that for
all practical purposes the three respondents were ruled
and controlled from 26 Broadway, New York City,
the center from which Standard Oil interests draw
inspiration from one end of the United States to the
other.

The reserved dominating power of control over
the respondents was at 26 Broadway. To that place
all the companies made full reports of their entire
transactions. Prior to 1900, the Waters-Pierce Oil Com-
pany communicated with the various heads of depart-
ments of the Standard Oil Company of New Jersey
at 26 Broadway, and gave any and all information
called for. Matters of construction, salary lists and
all questions concerning the expenditure of money by
Waters-Pierce were passed on at that place. H. M.
Tilford, a director in the Standard of New Jersey, was
then the directing force of the Waters-Pierce Oil Com-
pany. After 1900—after the Waters-Pierce Oil Com-
pany was re-organized for the purpose of enabling the
company to resume business in Texas—one R. H. Mc-
Nall, a Standard Oil employee, and who continued as
such afterwards, was appointed as commercial agent
of the Waters-Pierce Oil Company. He continued in
the office of H. M. Tilford. Letters, daily cash reports

and many other reports covering the entire business of the Waters-Pierce Oil Company, were mailed to him, and he in turn distributed them to the proper departments. The Standard Oil Company of Indiana had its central office, that of president, at 26 Broadway. He was also a director in the Standard of New Jersey. Reports of this company were sent to him and he distributed them to the various departments representing Standard Oil interests. The president of the Republic Oil Company also had his office at 26 Broadway. He was an employee of the Standard Oil Company at that place, part of his salary being paid by each company. He occupied an office with L. J. Drake, sales-agent of the Standard Oil Company of Indiana. He was assistant to Drake, and testified that they carried on an active competition between their companies. All communications to 26 Broadway from the Waters-Pierce Oil Company and Republic Oil Company were addressed to 75 New street. The evidence discloses a great many detailed communications, letters and business transactions between all the respondents and 26 Broadway. The accounts of all the respondents were regularly audited by Wade Hampton, the general auditor of Standard Oil interests. Prior to 1900 these auditors were in the pay of Hampton and reported to him directly. After 1900, he sent the auditors out from his office, but, so far as the Waters-Pierce Company was concerned, they were directed by him to be placed on its pay-rolls, he fixing their salary, which was done, and reports made to the Waters-Pierce Company, a copy of which was sent to 26 Broadway.

The Republic Oil Company was organized for the purpose of taking over the assets of Schofield, Shurmer & Teagle. For a great many years this firm had been a thorn in the side of the Standard Oil Company. It was entirely independent of Standard Oil interests. It had built up large sales in the central and southwest portions of the country in high-grade illuminat-

ing oils and gasoline. Its special brand, the one which had gained the widest reputation of any other brands of illuminating oil on the market as the best burning oil was "palacine," a Pennsylvania product. That it was a better and higher grade of oil than any manufactured or sold by Standard Oil interests is conceded. At the same time all other independent companies procured their oils principally from Pennsylvania independent refineries, which fact enabled them to sell much oil in competition with the Standard and Waters-Pierce, because of its superior quality. Hence the purpose of the Standard Oil Company in buying the property, good will and brands of Schofield, Shurmer & Teagle. It was necessary to create an independent company which could handle and sell Pennsylvania products in competition with independent companies. That was the purpose of the Republic Oil Company, which fact was conceded by Mr. Nichols, its president. Since this case was begun the Republic, except in Missouri, has sold all its assets and brands of oil to the Standard Oil Company of Indiana, which is entirely owned by the Standard of New Jersey, which, in turn, owned entirely the Republic Oil Company. It amounts to a sale by the Standard Oil Company to itself. The sale was made, so Mr. Nichols says, because of the disclosures made in this case, its purpose had been served —it had maintained the "palacine" brand. The Republic Oil Company, while it claimed to be independent. and its managers and agents were directed to so represent it, which they did, began a fierce contention for business between itself and the independent companies. It never sold to any extent the class of oils handled by the Waters-Pierce Oil Company and the Standard Oil Company. Such oils were handled by it as an incident to its main business, the sale of high-class oils, and were invariably sold at prices fixed by one or the other of the other respondents. While it was, so far as the public was concerned, an apparent

independent company and made a show of competition with the Waters-Pierce Oil Company in isolated instances, yet, as a matter of fact, it greatly aided the other respondents in maintaining the prices of common oils which constituted the great bulk of their sales. If the Republic Oil Company had been a real independent company it would not have dismantled the two refineries purchased at the time of the sale of Schofield, Shurmer & Teagle to the Standard Oil Company. One of these refineries was located at Cleveland and the other at Scio, Ohio, and had furnished to Schofield, Shurmer & Teagle a large amount of their common oils.

Another significant fact bearing on the question of a combination and understanding between respondents was what was termed the "transfer" of employees from one company to the other. The employees of the Republic Oil Company, except the old employees of Schofield, Shurmer & Teagle retained, were practically all men transferred from Standard Oil interests. Some of the principal officers and many of the subordinate employees of the Waters-Pierce Oil Company came from the Standard Oil Company.

All the dividends of the stock of the Standard Oil Company of Indiana and Republic Oil Company, and the dividends on two-thirds of the stock of Waters-Pierce Oil Company, were paid into the treasury of the Standard Oil Company of New Jersey. The contention is made that Mr. Pierce derived no benefit from the dividends so paid, and as he was in control of the Waters-Pierce Oil Company that company should not be held responsible for this condition. Mr. Pierce as an individual might not have been responsible for this state of facts, yet the company, the corporate entity, through its controlling power, the majority stockholder, was undoubtedly responsible. And while the evidence does not show that Mr. Pierce participated in a division of the dividends paid to the Standard of New Jersey by respondents, yet it does show that by reason of

such ownership of stock and understanding existing between respondents he was enabled to draw, according to his own statement, from six to seven hundred per cent per annum as dividends on 1,250 shares owned by him.

Another strong circumstance tending to show a combination between respondents for the purposes alleged in the information is the fact that both the Standard Oil Company of Indiana and Waters-Pierce Oil Company purchased all the products of petroleum and brands of oil sold by them from the Standard Oil Company and its allied interests. The Republic Oil Company for the first year and a half purchased its high-grade oils from independent companies and its common oils from the Standard Oil Company. After that time and up to the present it purchased practically all its oils of all grades, including "palacine," from the Standard Oil interests. These oils were shipped in the tank cars of the Union Tank Line Company (a Standard Oil company), and it is a significant fact that no independent company got oils shipped in these cars. While there is testimony to the effect that the Standard Oil Company, as a refiner and wholesaler, would sell to any person who wanted to buy and pay their prices, yet the fact has been proven that it sold almost exclusively to companies allied and subsidiary to it.

Again the system in vogue throughout the territory of both the Standard Oil Company and Waters-Pierce Oil Company, since 1878, of espionage upon the shipments of outside or independent companies, and the efforts of their agents to head off and prevent such shipments being sold, tends to show an understanding between those respondents to monopolize the sale of products of petroleum.

The percentage of sales of refined oils by the respondents, amounting to at least ninety per cent of the whole amount of such oils sold in Missouri, was due to the power wielded by them, which, in turn, was

due to a combination of their vast strength and wealth.

Therefore, did the respondents form a combination as charged in the information? A few quotations from the law will be given. "The gravamen of the offense of conspiracy is the combination. Agreements to prevent competition in trade are, in contemplation of law, injurious to trade, because they are liable to be injuriously used. . . . If the validity of such an agreement was made to depend upon actual proof of public prejudice or injury, it would be very difficult in any case to establish the invalidity." [State ex inf. v. Armour Packing Co., 173 Mo. 1. c. 390.] In the same case it is further said: "It is not essential that its results should be a complete monopoly; it is sufficient if it really tends to that end and to deprive the public of the advantages which flow from free competition." In the case of State ex inf. v. Continental Tobacco Co., 177 Mo. 1. c. 32, Judge Fox uses language very pertinent to the facts of this case, as follows: "The statute contemplates the existence of at least two or more corporations, individuals or partnerships, so as to agree or combine with each other to do the prohibited acts mentioned in the statute. In other words, it is intended to operate upon two or more corporations or individuals, who, so far as the public are concerned, indicate that they are pursuing an independent business, legitimate competitors, when, in fact, there is a secret agreement by which the very things condemned by the statute are accomplished. The public has rights which the law contemplates shall be respected. Neither corporations, individuals, nor partnerships are permitted to deceive or mislead the public by an apparent competition, when in fact none exists." While it is true there was no competition between the respondents, Waters-Pierce Oil Company and Standard Oil Company, nor even apparent competition, yet they did pose to the public as separate and independent companies, while each was striving to enrich a common treasury, and by

an indefinite agreement as to time divided trade terri-
tory and did not compete.. Again Judge Fox says in
the above-cited case, and quoting from the Supreme
Court of Texas: "In order to constitute a trust,
within the meaning of the statute, there must be a
'combination of capital, skill or acts by two or more.'
'Combination,' as here used, means union or associa-
tion.    If there be no union or association by two or
more of their 'capital, skill or acts,' there can be no
'combination' and hence no 'trust.' " The respondents
constitute three separate and distinct corporate enti-
ties.    That the capital stock of each was working to
one common good, depositing their dividends in one
common treasury, there is no question.    The skill and
acts of all three were employed to one main mutual
purpose, the creation of earnings for the benefit of the
Standard Oil Company of New Jersey.    The Supreme
Court of Ohio, speaking of the Standard Oil Trust
which formerly held a majority of the stock of Waters-
Pierce Oil Company and was succeeded in such holding
by the Standard Oil Company of New Jersey, said:
"Its object was to establish a virtual monopoly of the
business of producing petroleum, and of manufactur-
ing, refining and dealing in it and all its products,
throughout the entire country, and by which it might
not merely control the production, but the price, at its
pleasure.    All such associations are contrary to the
policy of our State and void." [State ex rel. v. Stand-
ard Oil Co., 49 Ohio St. l. c. 185.] . In the case of State
ex rel. v. Gas Co., 153 Ind. l. c. 489, the Supreme Court
of Indiana said: "The authorities affirm, as a general
rule, that, if the act complained of, by its results, will
restrict or stifle competition, the law will regard such
act as incompatible with public policy, without any
proof of evil intent on the part of the actor or actual in-
jury to the public.    The inquiry is not as to the degree
of injury inflicted upon the public; it is sufficient to

know that the inevitable tendency of the act is injurious to the public.''

The evidence shows that in the territory of the Waters-Pierce Oil Company it fixed, controlled and regulated prices. The Republic Oil Company, through its field agents and employees instructed by its officers to do so, followed the prices fixed by the Waters-Pierce. As shown before, no real competition between the Republic Oil Company and that company existed, although it posed as an independent company and competitor of the Waters-Pierce. Its mission as has been shown was to divert the independent companies into a fight on the sale of high-class goods and give the Waters-Pierce a freer field on the principal products it handles, the common class of goods. The independents, as intelligently explained by · Mr. Wilhoit of Springfield, were powerless to undersell the Waters-Pierce Oil Company without taking chances of being driven entirely out of business. Anyway, the Waters-Pierce Oil Company dictated, maintained, regulated, fixed and controlled the prices to be paid by retail dealers in its territory. The same conditions existed in the territory of the Standard Oil Company in Missouri. While the Republic Oil Company made some show of competition against the Waters-Pierce Oil Company, it made no such show as against the Standard, except, as in the other territory, it made the claim everywhere that it was independent of the other respondents, had no connection with them and was a competitor of them. Prices at which the Republic sold in Standard territory were invariably fixed at Kansas City by the Standard Oil Company. That the trade in the products of petroleum, that is, illuminating oils and gasoline, was controlled by the respondents is made clear by the evidence showing that they sold ninety per cent of such products sold in Missouri. This evidence justifies the statement of Mr. Wilhoit that his

218 Sup—22

experience, both as an employee of the Standard Oil Company and as an independent dealer, was that the Standard Oil Company or Waters-Pierce Oil Company would suffer the independent to control about ten percent of the business, but if he attempted to go beyond and control more trade, prices were so reduced that the independent could not long exist. That prices were maintained is evident from the fact that during the last ten years they have tended upward, although large discoveries of oil fields have been made in States and territories bordering on Missouri. It is further clear from a consideration of all the evidence that a combination was formed between the respondents to control, limit and prevent competition in the business of buying and selling the products of petroleum in the State of Missouri.

Wherefore, after giving due and careful consideration to all the testimony, the Commissioner finds that the respondents, Standard Oil Company of Indiana, Waters-Pierce Oil Company and Republic Oil Company, on the 8th day of July, 1901, in the State of Missouri, created, entered into and became members of a pool, trust, agreement, confederation, combination and understanding among themselves and each other, which pool, trust, agreement, confederation, combination and understanding, created and entered into by respondents, as aforesaid, continued to exist and be maintained up to the date of filing the information in this case, and were created and entered into for the following purposes:

(1). To regulate, fix and control the prices to be paid by retail dealers and others in the State of Missouri for the products of petroleum;

(2). To control and limit trade in the products of petroleum in the State of Missouri;

(3). To control, limit and prevent competition in the business of buying and selling the products of

petroleum in the State of Missouri, between themselves
and others engaged in like business.

That said respondents, Standard Oil Company of
Indiana, Waters-Pierce Oil Company and Republic
Oil Company, during the above specified time, under
and by virtue of said pool, trust, agreement, confedera-
tion, combination and understanding, so created and
entered into have

(1). Fixed and maintained the prices of the re-
fined products of petroleum, sold and offered for sale
by them and others in the State of Missouri;

(2). Controlled and limited the trade in said
refined products of petroleum in the State of Mis-
souri;

That in pursuance to said pool, trust, agreement,
confederation, combination and understanding, so
created and entered into by the respondents, they have
controlled the prices of the refined products of petro-
leum, prevented competition among themselves, and
among themselves and others therein, secured con-
trol of the principal part of the refined products of
petroleum in the State of Missouri and of the pur-
chase and sale of such oils, limited the trade therein,
have driven competition out of the State, thereby de-
priving the people of the State of free, full and whole-
some competition in the sale of the refined products
of petroleum, and have under and in pursuance of
said pool, trust, agreement, confederation, combina-
tion and understanding, so created, entered into and
maintained, deceived and misled the public into the
belief that they were separate and distinct corpora-
tions pursuing an independent business.

All contrary to and in violation of the laws and
public policy of the State of Missouri. Done this 24th
day of May, 1907.

Upon the incoming of the report of the Master,
the respondents Standard Oil Company and the Re-

public Oil Company filed seventy-five exceptions thereto, and the Waters-Pierce Oil Company filed thirty additional ones.

It will serve no useful purpose to set out these exceptions in the statement of the case, for the reason that such of them as have been accentuated by discussion, in briefs of counsel, will be carefully considered under appropriate headings in the opinion.

## OPINION.

### I.

As elsewhere stated, this is an original proceeding, instituted in this court by the Attorney-General, on information, in the nature of *quo warranto,* against the respondents, to forfeit their charters and revoke their licenses to transact business in this State.

The contention of the informant is, that respondents are guilty of violations of the anti-trust laws of the State, as found in the common law and statutes.

The latter are found in articles 1 and 2 of chapter 143, Revised Statutes 1899, and the provisions thereof in so far as they are material to this controversy are sections 8965, 8966, 8971 and 8978.

Omitting such portions of the sections as are inapplicable to the questions involved in this case, and using the word "person" where the words "individual," "partnership," "corporation" or "association of persons" occur in the statute, those provisions are as follows:

"Section 8965. Any person . . . who shall create, enter into, become a member of or a party to any pool, trust, agreement, combination, confederation or understanding with any . . . person or persons, to regulate or fix the price of any article of manufacture, merchandise, commodity, etc., or to maintain said price when so regulated or fixed, or shall enter into, become a member of or a party to any

pool, trust, agreement, contract, combination or con-
federation to fix or limit the amount or quantity of
any article of manufacture, merchandise, commodity,
etc., shall be deemed and adjudged guilty of a con-
spiracy to defraud, and be subject to penalties as pro-
vided in this article.

"Section 8966.   All. arrangements, contracts,
agreements or combinations between two or more per-
sons designated or made with a view to lessen, or
which tend to lessen full and free competition in the
importation, manufacture or sale of any article, pro-
duct or commodity in this State, and all arrangements,
combinations, contracts or agreements, whereby, or
under the terms of which, it is proposed, stipulated,
provided, agreed or understood that any person or
persons doing business in this State, shall deal in,
sell or offer for sale in this State any particular or
specified article, product or commodity, and shall not
during the continuance or existence of any such ar-
rangement, combination, contract or agreement, deal
in, sell or offer for sale any competing article, pro-
duct or commodity, are hereby declared to be against
public policy, unlawful and void; and any person or
persons becoming a party to any such arrangement,
contract, agreement or combination, shall be deemed
and adjudged guilty of a conspiracy to defraud, and
be subject to the penalties provided for in this article.

"Section 8971.   Any corporation created or or-
ganized by or under the laws of this State, which
shall violate any of the provisions of this article, shall
thereby forfeit its corporate rights and franchises;
and its corporate existence shall, upon proper proof
being made thereof in any court of competent juris-
diction in this State, be by the court declared for-
feited, void and of non-effect, and shall thereupon
cease and determine; and any corporation created or
organized by or under the laws of any other State
or country, which shall violate any of the provisions

of the preceding sections of this article, shall thereby forfeit its right and privilege thereafter to do any business in this State, and upon proper proof being made thereof in any court of competent jurisdiction in this State, its right and privilege to do business in this State shall be declared forfeited; and in all proceedings to have such forfeiture declared, proof that any person who has been acting as agent of such foreign corporation in transacting its business in this State has been, while acting as such agent, in the name, behalf or interest of such foreign corporation, violating any provision of the preceding sections of this article, shall be received as prima-facie proof of the act of the corporation itself; and it shall be the duty of the clerk of said court to certify the decree thereof to the Secretary of State, and if it be an insurance company, also to the Superintendent of the Insurance Department, who shall take notice and be governed thereby as to the corporate powers and rights of said corporation.

"Section 8978. Every pool, trust, agreement, combination, confederation, understanding, or conspiracy entered into, or created, or organized by any . . . person or persons, to regulate, control or fix the price of any article or articles of manufacture, merchandise, commodity, etc., or to maintain said price or prices when so regulated, determined or fixed, and all agreements, combinations, confederations, conspiracies or pools made, created, entered into or organized by any . . . persons to fix the amount or limit the quantity of any article of manufacture, commodity, etc., are hereby declared illegal. If any two or more persons who are engaged in buying or selling any articles of commerce, merchandise, commodity, etc., shall enter into any pool, trust, agreement, combination, confederation, association or understanding to control or limit the trade in any such article or thing; or to limit competition in such trade, by refus-

ing to buy from or sell to any other person or persons any such article or thing aforesaid, for the reason that such person is not a member of or a party to such pool, trust, combination, confederation, association or understanding, . . . shall be guilty of a violation of this article.''

The gist of the complaint against the respondents is thus stated in the language of the Attorney-General, to-wit:

''That the respondents had, between the — day of — —, 1901, and the 29th day of March, 1905, created, entered into and become members of a pool, trust, agreement, confederation, combination, arrangement and understanding among themselves for the following purposes:

''First: To regulate, fix and control the prices to be paid by retail dealers and others in the State, of Missouri for the refined products of petroleum sold and offered for sale in this State.

''Second: To control and limit the trade in the refined products of petroleum in this State.

''Third: To control, limit and prevent competition in the business of buying and selling the refined products of petroleum in this State between themselves and others engaged in like business.

''Fourth: To deceive and mislead the public into the belief that said respondents were separate and distinct corporations, each pursuing an independent business as legitimate competitors in the purchase and sale of the products of petroleum.''

At the very threshold of this case, we are met with the contention of the respondents that this court has no jurisdiction of this cause by a proceeding in the nature of *quo warranto*.

They contend, first, that this is a criminal prosecution and that *quo warranto* cannot be used as a criminal procedure; and, second, that the statutes under which it is instituted provide the mode of pro-

cedure and designate the forum in which it is to be conducted, which is exclusive of all other modes of procedure.

If the respondents are correct in their contention that this is essentially a criminal prosecution within the meaning of the Constitution and criminal laws of the State, then there could be no escape from the conclusion that this court has no jurisdiction over the cause; and, if they are guilty of violating said statutes, then they are guilty of a crime; and should, first, be prosecuted upon an indictment or information, before a court and jury; and, if convicted, then, and not until then, could such a proceeding as this be maintained.

If respondents' major premise is correct, then, as before stated, this court is without jurisdiction over the cause.

In fact, we do not understand the Attorney-General to controvert that proposition; but, upon the other hand, he contends that this is not a criminal prosecution in any sense of the word, but is a civil proceeding on information in the nature of *quo warranto* to oust respondents from transacting business in this State, because of their alleged violation of the statutory and common law against combinations and trusts made in restraint of trade.

If this contention of the State is sound, then it cannot be successfully maintained that this court is without jurisdiction in the premises, for the reason that section 3 of article 6 of the Constitution of 1875, in express terms, confers power upon this court to issue, hear and determine writs of *quo warranto*.

This brings us to the point where we must determine whether or not this is a civil proceeding within the meaning of that section of the Constitution; if so, then, clearly, this court has jurisdiction of the cause; but, if not, then its jurisdiction should be denied.

The question of the proper procedure in this case and the nature of the complaint charged against respondents in the information are so closely allied and related to each other that it will be necessary to consider the two propositions somewhat together.

It would be useless and would serve no good purpose to go into the learning and distinctions between a proceeding by *quo warranto* and a proceeding by information in the nature of *quo warranto*. The demarcation is well defined and has been long established. Resort, however, is rarely ever had to the former, while the latter has grown into almost universal use. Long before the organization of this State, the writ of *quo warranto* had become almost, if not quite, obsolete; and when our Constitution was adopted, proceedings on information in the nature of *quo warranto* were well understood by the bench and bar; and the jurisdiction conferred by said constitutional provision has been construed to mean and include jurisdiction of an information in the nature of *quo warranto*. [State ex rel. v. Stewart, 32 Mo. 379; State ex rel. v. Vail, 53 Mo. 97.]

In the discussion of this question, in the case of State ex inf. v. Equitable Loan & Inv. Co., 142 Mo. 325, this court, speaking through that great jurist, SHERWOOD, J., said, l. c. 335-337:

"At common law, 'the old writ of *quo warranto* is a civil writ, at the suit of the crown; it is not a criminal prosecution. . . This was the true old way of inquiring of usurpations upon the crown, by holding fairs or markets, viz: by writs of *quo warranto*. Then informations in the nature of a *quo warranto* came into use and supplied their place.' These observations fell from Mr. Justice WILMOT in Rex v. Marsden, 3 Burr. 1817, in the year 1765. [See High, Ex. Leg. Rem., sec. 603.] In Blackstone, written in 1758, some seven years before the last-mentioned period, it is asserted that the proceeding by *quo warranto* 'is

properly a criminal method of prosecution.' [Cooley's Black., book 5, ch. 17, p. 262.] But whatever the origin of the writ, whether civil or criminal, it is certain now at the present time and for a long period anterior to this, it has been and is but a civil suit. There is a distinction, of course, to be taken, a distinction pointed out by SCOTT, J., in State v. Ins. Co., 8 Mo. 330, between a writ of *quo warranto* and an information in the nature of a *quo warranto,* but while this is true, yet it is also true, even in Blackstone's time, the issuance of the writ itself, owing to its cumbersome length, had long fallen into disuse, which resulted in the modern substitutionary and more speedy method of the filing of *ex-officio* informations by the Attorney-General. [Cooley's Black., book 3, chap. 17, p. 262.]

"Our Constitution provides, in the third section of its sixth article, that this court 'shall have power to issue writs of *habeas corpus, quo warranto, certiorari* and other original remedial writs, and to hear and determine the same.' Inasmuch as the issuance of a writ of *quo warranto* had not occurred in England for centuries; inasmuch as courts, lawers and text-writers had been accustomed for hundreds of years to use the expression *'writ of quo warranto'* as the legal equivalent and synonym of 'information in the nature of *quo warranto,'* it will be presumed that the framers of our Constitution were not unmindful or ignorant of such a common form of expression and the meaning which it bore, and, therefore, when they used the words 'writ of *quo warranto'* they intended thereby only to convey in abbreviated form the meaning that phrase had for so long a period and so continuously been employed to convey, to-wit, 'informations in the nature,' etc.

"Since writing the above it has been found that in other States possessing organic laws like our own, similar conclusions have been reached. [State v. Railroad, 34 Wis. 197, and cases cited; State v. Gleason,

State ex inf. v. Standard Oil Co.

12 Fla. 190, and cases cited; High's Ex. Leg. Rem., secs. 610, 611.]''

Continuing, in the discussion of the proposition as to whether or not an information in the nature of a *quo warranto* could be sustained against a corporation for misuse and abuse of its franchise by reason of its failure to comply with a statute, when the Legislature had prescribed certain penalties to be imposed in other proceedings for such violation, he said:

''And the jurisdiction of this court in this regard being conferred by the Constitution, it is beyond the power of the Legislature to take it away, and it will not be intended that a legislative enactment was de-. signed to take such jurisdiction away, although such enactment should confer another and distinct remedy upon some inferior court or board. [State ex rel. v. Allen, 5 Kan. 213; State ex rel. v. Messmore, 14 Wis. 115; Kane v. People ex rel., 4 Neb. 509; 19 Am. and Eng. Ency. Law, 664; People ex rel. v. Bristol Co., 23 Wend. 222; People v. Hillsdale Turnp. Co., Ib. 254; State ex rel. v. Baker, 38 Wis. 71; High, Ex. Leg. Rem., sec. 615; 2 Spelling, Ex. Rlf., secs. 1772, 1873.] In consequence of this well-recognized principle, sections 7 and 8 of the Laws of 1895, pages 31 and 32 in relation to the duties of the supervisor of building and loan associations, to institute proceedings in the circuit court against a delinquent building and loan association, and that such proceeding shall be conducted by the Attorney-General, cannot abate the jurisdiction conferred on this court by the Constitution nor deprive the Attorney-General of his common law and inherent powers to file *ex-officio* informations, as in the present instance.''

The statutes under. which the respondent in the case just mentioned was organized and doing business imposed upon it certain penalties for violating such statutes; and also provided that if any such company should violate the provisions of its charter

or laws of the State, the supervisor of building and loan associations ''shall institute proceedings in the circuit court of the city or county in which such association has, or had, its principal office, to enjoin or restrain such association from the further prosecution of its business, either temporarily or perpetually, or for such injunction and dissolution of such association and the settling and winding up of its affairs, or for any and all of said remedies combined, as the supervisor may deem necessary.'' [R. S. 1899, secs. 1385, 1392, and 1393.]

It is thus seen that those sections of the statutes are just as full and explicit, in prescribing penalties, forfeitures and remedies for their violation and in designating the court in which those penalties and forfeitures are to be imposed and adjudged, as are the anti-trust laws now under consideration. But, notwithstanding those ample statutory provisions, this court, in that case, held that an information in the nature of *quo warranto* would lie to oust the respondent therein of its charter rights for violating its charter powers. It was also held therein that this court derived its jurisdiction from the Constitution, and that even though the Legislature had attempted to deprive it of that jurisdiction, by express enactment, it could not have done so, for the reason that such a statute would be unconstitutional and void.

Mr. High, in his consideration of this subject, uses the following language: ''A corporate franchise is a species of incorporeal hereditament, in the nature of a special privilege or immunity, proceeding from the sovereign power and subsisting in the hands of a body politic, owing its origin either to an express grant, or to prescription which presupposes a grant. It follows, therefore, that the sovereign power has the right at all times to inquire into the method of user of such franchise, or the title by which it is held, and to declare a forfeiture for misuser or non-

user, if sufficient cause appears, or to render judgment of ouster if the parties assuming to exercise the franchise have no title thereto." [High, Ex. Leg. Rem., sec. 648.]

The same proposition is announced by Clark and Marshall in their work on Private Corporations, vol. 2, sec. 314b, in the following language: "As a general rule, however, the charter of a private corporation will be forfeited, in proper proceedings by the State, for any wilful or fraudulent misuser or abuse of its franchise which injures or menaces the interests or welfare of the State or of the community in which it transacts business, whether the misuser or abuse consists in the exercise of a franchise or power not confered upon the corporation by its charter, or in the violations of prohibitions in its charter, or in violations of prohibitions in general laws to which it is subject, or in the violation of established principles based upon the ground of public policy."

And in State ex rel. v. Gas Co., 153 Ind. 483, l. c. 486, 487, and 489, the right of the State to a forfeiture on account of the participation in a combination in restraint of trade, is announced in the following language:

"Where, however, the facts disclose that a corporation has failed in the discharge of its corporate duties by uniting with others in carrying out an agreement, the performance of which is detrimental or injurious to the public, it thereby may be said to offend against the law of its creation, and consequently forfeits its right longer to exercise its franchises, and is subject to a judgment of ouster. . . .

"Corporations are recognized as creatures of the law and they certainly owe obedience thereto, and when they fail to perform duties which they were created to discharge, and in which the public have an interest, or where they do unauthorized or forbidden acts, the State unquestionably has the right, and it is its duty,

to object, and it may interpose by information, and wrest from the offending corporations its franchises. [Beach, Pr. Corp., secs. 840 and 841; Cook on Stock and Corp. Law, sec. 635; People ex rel. v. Dashaway Assn., 84 Cal. 114.] . . .

"The authorities affirm, as a general rule, that, if the act complained of, by its results, will restrict or stifle competition, the law will regard such act as incompatible with public policy, without any proof of evil intent on the part of the actor or actual injury to the public. The inquiry is not as to the degree of injury inflicted upon the public; it is sufficient to know that the inevitable tendency of the act is injurious to the public. [Salt Co. v. Guthrie, 35 Ohio St. 666; Swan v. Chorpenning, 20 Cal. 182; State ex rel. v. Standard Oil Co., 49 Ohio St. 137; Gibbs v. Smith, 115 Mass. 592; Richardson v. Buhl, 77 Mich. 632; Pacific Co. v. Adler, 90 Cal. 110; Beach on Monop. and Ind. Trusts, sec. 82.]"

In the case of State ex inf. v. Delmar Jockey Club, 200 Mo. 34, this same question came before this court. In that case a forfeiture of the charter was asked by the Attorney-General, because the club had so conducted its affairs as to violate the criminal laws of the State against book-making and pool-selling. In that case, as in the case at bar, counsel for respondent contended that in view of the fact that the statutes prescribed penalties for their violation, that constituted the sole remedy for their redress, or that there must be a conviction under the statute for its violation before a judgment of forfeiture could be declared against the corporation. In the discussion of that case this court said, l. c. 50, 51 and 55:

"It is apparent that this decision is not an authority for the contention that a corporation is not subject to an action of *quo warranto* to oust it of the franchises conferred upon it for a misuse or perversion of them, or that a corporation is exempt from the consequences

of unlawful or wrongful acts committed by its agents in pursuance of the authority derived from its charter. The information charges that respondent, 'acting through its officers, agents, employees and representatives in charge of its business,' engaged in the acts of misuser charged against it in the information. It will thus be seen that the unlawful act charged is not against the officers, agents, employees and representatives of the corporation, but against the corporation itself. There can be no doubt that a corporation may be proceeded against by *quo warranto* for a misuse or perversion of the franchises conferred upon it by the State, notwithstanding its officers and agents may at the same time be amenable to the criminal law for offense committed by them in the perversion of such franchises. If a corporation, through its servants and agents, may be guilty of such abuses of its franchises as will subject it to ouster by *quo warranto,* we can conceive of no reason why such servants and agents, if the acts and abuses committed by them be in violation of the criminal statutes, may not at the same time be prosecuted by indictment or information. The one is not a bar to the other proceeding. Nor are we prepared to give assent to the contention that the defendant corporation could not be held to answer for such wrongful acts until its agents, guilty of the criminal offense, be tried and convicted.

"It is argued by defendant that forfeiture will not lie for an illegal act committed by a corporation. It is true that not for every illegal act will the charter of a corporation be forfeited; but the charter of the defendant is a contract with the State that it will use the franchise therein granted; that it will not misuse or pervert those franchises, and that it will not engage in the doing or carrying on any business which is unlawful or immoral. . . .

"It is alleged in the information and admitted by the demurrer that during the time indicated defendant

sold pools to and registered bets with minors, which was a violation of law, it having no authority to do so. To make and sell pools and book-bets to minors is expressly prohibited by statute, and any person doing so may be punished as for a misdemeanor. [Sec. 2193, R. S. 1899.] So that defendant was without authority from any source to sell pools to or register bets with minors, and in doing so it was exercising a power which it did not possess, the tendency of which was immoral and to encourage minors in dissipation and vicious habits. Defendant now contends that the portion of the petition which relates to such sales does not state violations of law, because it is not alleged that the respondent knew at the time that such persons were in fact minors. The statute is an absolute inhibition against selling pools or book-bets to minors, and it was entirely unnecessary that the petition should allege that such sales were made to minors, knowing such persons to be minors. It was the defendant's duty to know when sales were made that they were not made in violation of law."

So in the case of Terrett v. Taylor, 9 Cranch 1. c. 51, Mr. Justice Story said: "A private corporation created by the Legislature may lose its franchises by a misuser or *nonuser* of them; and they may be resumed by the government under a judicial judgment upon *quo warranto* to ascertain and enforce the forfeiture. This is the common law of the land, and is a tacit condition annexed to the creation of every such corporation."

To the same effect are: High on Ex. Leg. Rem., secs. 648 and 649; 2 Spelling on Injunctions and other Ex. Rem., secs. 1812 to 1815; People v. Dispensary Co., 7 Lans. (N. Y.) 304; Bank v. State, 1 Blackf. (Ind.) 267; 5 Thompson on Corps., pp. 6615-16; 10 Cyc. p. 1281; Angell and Ames on Corps., sec. 774.

It is thus seen that a corporation can so offend against the laws of the State as to justify the Attorney-

General in proceeding against it by information in the nature of *quo warranto* to forfeit its corporate franchise; and those offenses may be against the common law as well as against the statute laws of the State.

[And it is wholly immaterial, and the corporation cannot justify or defend its conduct in that regard by a plea, that such conduct was a violation of the criminal laws of the State, by which it and its officers and agents are rendered amenable to the penalties and punishments thereof. ]

In other words, the laws of the State authorize and direct the Attorney-General to institute civil proceedings by information in the nature of *quo warranto* against any corporation to annul its charter and forfeit its franchises whenever it has by misuser, nonuser or usurpation of power so conducted itself as to violate the laws of its being or the criminal laws of the State. If, upon trial, the corporation is found guilty, a decree of forfeiture must go, and the court has the power, in addition, to impose penalties for such violations of the laws as it may deem proper. This, however, does not proceed upon the theory that the corporation has been guilty of a crime and that it is being punished therefor; but upon the idea that there is an implied or tacit agreement on the part of every corporation, by accepting its charter and corporate franchises, that it will perform its obligations and discharge all its duties to the public, and that by failing to do so it commits an act of forfeiture which may be enforced by the State in the manner before suggested. [State ex inf. v. Delmar Jockey Club, 200 Mo. 1. c. 70.]

In addition thereto the Legislature has the unquestionable power and authority to declare the acts which will work a forfeiture of the charter shall also constitute a crime, and subject the corporation and its agents and servants to punishment under the criminal laws of the State. [Stockwell v. United States, 13

Wall: 531; Waters-Pierce Oil Company v. State of Texas (Texas Court of Civil Appeals), 106 S. W. 918; State ex inf. v. Delmar Jockey Club, 200 Mo. 1. c. 50 to 55.]

It must, therefore, follow from what has been said, that this is not a criminal prosecution as contended for by respondents; nor is the procedure provided for in section 8971, Revised Statutes 1899, the exclusive remedy available to the State to correct abuses and usurpation of powers by corporations doing business in this State.

We are, therefore, clearly of the opinion that this court has jurisdiction over the cause, and to hear and determine the same.

## II.

It is insisted by the informant that a violation of section 8978 by a corporation constitutes a misuse, abuse or usurpation of franchises, notwithstanding the fact that the law fixes penalties and provides a mode of procedure for such violation.

This proposition is closely related in some respects to the one disposed of in paragraph one of this opinion, and much of what was there said applies with equal force in support of the proposition now in hand, especially that portion holding a corporation will forfeit its franchises by a continuous violation of any of the laws of the State.

But, independent of that holding, it is also clear from reading articles 1 and 2 of chapter 143, Revised Statutes 1899, together, that it was the intention of the Legislature to have the franchises of all corporations declared forfeited if they should violate either or both of said articles.

This court, in the case of Sales v. Barber Asphalt Paving Co., 166 Mo. 1. c. 677 and 678, held, and quoted with approval the following language from Mr. Sutherland:

" 'All consistent statutes relating to the same subject, and hence briefly called statutes *in pari materia*, are treated *prospectively* and construed together as though they constituted one act. This is true whether the acts relating to the same subject were passed at different dates, separated by long or short intervals, at the same session or on the same day.' [Sutherland, Stat. Construct., sec. 283.]

"And 'A statute must be construed with reference to the system of which it forms a part. And statutes on cognate subjects may be referred to though not strictly *in pari materia.*' [Id., sec. 284.]

"Further on, the learned author discussing and discoursing upon the same subject, says: 'Where enactments separately made are read *in pari materia*, they are treated as having formed, in the minds of the enacting body, parts of a connected whole, though considered by such a body at different dates, and under distinct and varied aspects of the common subject. Such a principle is in harmony with the actual practice of legislative bodies, and is essential to give unity to the laws, and connect them in a symmetrical system. Such statutes are taken together and construed as one system, and the object is to carry into effect the intention. It is to be inferred that a code of statutes relating to one subject was governed by one spirit and policy, and was intended to be consistent and harmonious in its several parts and provisions. For the purpose of learning the intention, all statutes relating to the same subject are to be compared, and so far as still in force brought into harmony, if possible, by interpretation, though they may not refer to each other even after some of them have expired or been repealed.' [Ib., sec. 288.] "

This same canon of construction was approved and adopted by this court, In Banc, in the case of State ex rel. v. Patterson, 207 Mo. 129, 1. c. 143.

In Dowdy v. Wamble, 110 Mo. l. c. 283, it was said: "There are few guides to construction more useful than that which directs attention to the prior condition of the law to aid in determining the full legislative meaning of any statutory change thereof."

In Gabriel v. Mullen, 111 Mo. l. c. 123, it was said: "In construing any statute it is proper and often useful to consider the state of the law existing at its enactment as casting light on the intended scope of the change made by it."

In the case of Humphries v. Davis, 100 Ind. l. c. 284, it was said by ELLIOTT, J.: "A statute is not to be construed as if it stood solitary and alone, complete and perfect in itself, and isolated from all other laws. It is not to be expected that a statute which takes its place in a general system of jurisprudence shall be so perfect as to require no support from the rules and statutes of the system of which it becomes a part, or so clear in all its terms as to furnish in itself all the light needed for its construction. It is proper to look at other statutes, to the rules of the common law, to the source from which the statute was derived, to the general principles of equity, to the object of the statute, and to the condition of affairs existing when the statute was adopted [Citing authorities.] As it was said in, . . . . 'Construction has ever been a potent agency in harmonizing the operation of statutes, with equity and justice.' Statutes are to be so construed as to make the law an uniform system, not a collection of divers and disjointed fragments. When this principle of construction is adopted, 'an enactment of to-day had the benefit of judicial renderings extending back through centuries of past litigation.' [Bishop, Written Laws, sec. 242b.] 'A statute,' says the author just referred to, 'must be construed equally by itself and by the rest of the law. The mind of the interpreter, if narrow, will stumble.' 'The complete doctrine, resulting from a bringing together of its parts, is, that

all laws, written and unwritten, of whatever sorts and at whatever different dates established, are to be construed together, contracting, expanding, limiting, and extending one another into one system of jurisprudence, as nearly harmonious and rounded as it can be made without violating unyielding written or unwritten terms.' [Bishop, Written Laws, secs. 113a, 86.]''

If we apply this rule of statutory construction to said articles one and two, then the legislative intent regarding this matter is made perfectly clear. Those two articles are two of the four articles which constitute chapter 143, Revised Statutes 1899, and the title is, "Pools, Trusts and Conspiracies," and the respective title of each article is as follows:

I. "Pools, Trusts and Conspiracies."

II. "Agreements to Regulate Prices and Limit Trade."

III. "The Testimony in Proceedings Against Trusts, etc."

IV. "Taking Testimony Before Institution of Proceedings."

All of these articles are germane to the title of said chapter 143, and each and every word, line and section thereof are directed against the formation and maintenance of pools and trusts and providing a mode for their destruction.

Section 8965 is intended to prohibit combinations to regulate or fix prices and to maintain them when so fixed; while section 8966 prohibits combinations to lessen competition by dealing in one article under an agreement that no competing article shall be dealt in.

Section 8971 prescribes a mode by which corporations created or doing business in this State shall forfeit their charters and licenses to do business herein by violating any of the provisions thereof, and is substantially as follows:

"Section 8971. Any corporation created or organized by or under the laws of this State, which shall violate any of the provisions of this article, shall thereby forfeit its corporate rights and franchises; and its corporate existence shall, upon proper proof being made thereof in any court of competent jurisdiction in this State, be by the court declared forfeited, void and of non-effect and shall thereupon cease and determine; and any corporation created or organized by or under the laws of any other State or country, which shall violate any of the provisions of the preceding sections of this article, shall thereby forfeit its right and privilege thereafter to do any business in this State, and upon proper proof being made thereof in any court of competent jurisdiction in this State, its right and privilege to do business in this State shall be declared forfeited; and in all proceedings to have such forfeiture declared, proof that any person who has been acting as agent of such foreign corporation in transacting its business in this State has been, while acting as such agent, and in the name, behalf or interest of such foreign corporation, violating any provision of the preceding sections of this article, shall be received as prima-facie proof of the act of the corporation itself; and it shall be the duty of the clerk of said court to certify the decree thereof to the Secretary of State, and if it be an insurance company, also to the Superintendent of the Insurance Department, who shall take notice and be governed thereby as to the corporate powers and rights of said corporation."

And section 8978 declares every pool, trust and agreement made and entered into to fix and maintain prices to be illegal, and is substantially as follows:

"Section 8978. Every pool, trust, agreement, combination, confederation, understanding or conspiracy entered into, or created, or organized by any . . . person or persons to regulate, control or fix the price of any article or articles of manufacture, merchandise,

commodity, etc., or to maintain said price or prices
when so regulated, determined or fixed, and all agree-
ments, combinations, confederations, conspiracies or
pools made, created, entered into or organized by any
. . . person to fix the amount or limit the quantity
of any article of any kind whatsoever, or of any article
of manufacture, commodity, etc., are hereby declared
illegal. If any two or more persons who are engaged
in buying or selling any articles of commerce, mer-
chandise, commodity, etc., shall enter into any pool,
trust, agreement, combination, confederation, associa-
tion or understanding to control or limit the trade in
any such article or thing; or to limit competition in
such trade, by refusing to buy from or sell to any other
person or persons any such article or thing aforesaid,
for the reason that such person or persons is not a
member of or a party to such pool, trust, combination,
confederation, association or understanding, shall be
guilty of a violation of this article.''

If, according to the rule of construction hereinbe-
fore quoted, section 8971 is to be ''treated prospective-
ly'' and construed together with section 8978, ''as one
act,'' then we must read the former section into the lat-
ter, and by so doing we have express statutory author-
ity for holding that respondents would be guilty of
misuse, abuse and usurpation of power, by entering
into agreements to regulate prices, control or limit
trade, as denounced by section 8978.

This construction is in harmony with a long and
unbroken line of decisions in this and other States.
[State ex rel. v. Patterson, supra.]

The respondents contend that the statutes under
consideration are highly penal, and should for that
reason be strictly construed, and that the contention
of the informant should not be concurred in by the
court; and they cite many authorities in support of
their contention. While it is true these sections of the
statute provide for forfeitures of charters and the re-

vocation of licenses of corporations to do business in this State, yet they are not in derogation of the common law, as the authorities heretofore cited firmly establish, but are intended to be in aid of and supplementary thereto, highly salutary and remedial in their purpose; and the mere fact that heavy losses may be sustained by respondents in consequence of an adjudication of ouster should not influence or deter the court from declaring the intention of the Legislature as contained in those articles. [State v. Williams, 8 Tex. 265; In re Greene, 52 Fed. 104; State ex inf. v. Standard Oil Co., 194 Mo. 124; Railroad v. Commonwealth, 35 So. 129; United States v. Freight Assn., 166 U. S. 290; Heim Brewing Co. v. Belinder, 97 Mo. App. 64; Northern Securities Co. v. United States, 193 U. S. 197.]

This court and many others have held that remedial and salutary statutes, though in derogation of the common law, should be construed and enforced according to the plain intention of the Legislature, although heavy damages were prescribed and penalties imposed for their violation. [Yall v. Snow, 201 Mo. 511, and cases cited; Johnson v. Snow, 201 Mo. 450.]

And as said by GRAVES, J., in the Delmar Jockey Club case, supra, l. c. 70: "These proceedings are no longer recognized as criminal proceedings and have not been so recognized since the early days of the common law, but we have continually imposed what are called 'fines,' a term no doubt coming down from the time when the proceeding was looked upon as a criminal proceeding. The implied contract with the State, when the charter was given respondent, was that it would exercise and use the granted rights; that it would use none other, or, stated otherwise, that it would not usurp other rights; that it would rightfully use the powers granted, and not misuse them. A willful failure of either of these covenants with the State will authorize a forfeiture, and why not a fine? We forfeit

for nonuser, and why? Because there has been failure to perform the obligations to the State; because there has been a violation of the contract with the State. Misuser is likewise a violation of the implied agreement with the State. So is usurpation. Each are but violations of the implied contract with the State, and for these violations we declare forfeitures. Why not fix penalties and punishments in the one as in the other? The gist of each in *quo warranto* is the willful violation of the rights of the State under the implied contract, and not the violation of some criminal law, for we do not try criminal cases and affix criminal punishments in *quo warranto* proceedings. The violation of a corporation's contract with the State by misuser or usurpation may be evidenced by the fact of the violation of some statute, criminal in character, but in this kind of proceeding we try the right of the corporation to further hold its franchises, not the question of finding its guilt or innocence under the statute and fixing punishment permitted by the statute. It is the only way the State has of preventing the abuse of the confidences it has reposed in these corporate creatures which are of its own making. This abuse may be by nonuser, misuser, or usurpation, but, in our judgment, the State has the same rights in each event, both as to the forfeiture and the fine.'' [Also see State ex inf. v. Equitable Loan & Inv. Assn., 142 Mo. 325; State ex inf. v. Armour Packing Co., 173 Mo. 356; Waters-Pierce Oil Co. v. State of Texas (Texas Civ. App.), 106 S. W. 918; Stockwell v. United States, 13 Wall. 531.]

The Texas case just cited was predicated upon statutory provisions very similar to the statutes of this State regarding pools, trusts and combines made in restraint of trade. There, a civil suit was instituted by the State against the Waters-Pierce Company, seeking to recover penalties prescribed for violating the statutes, and also praying for a forfeiture of the company's

license to do business in the State. The defendant there, as in this case, contended that the violation of the statute constituted a crime and that it should be prosecuted therefor under an indictment or information, and that a civil action would not lie against it in the first instance for such violation. The court did not sustain that contention, but, upon the other hand, expressly held that the action was a civil suit, and assessed the penalties at $1,625,900, and rendered a judgment revoking defendant's license to do business in the State, as prayed.

We are, therefore, of the opinion that this is a civil suit and not a criminal proceeding, and that full force and effect should be given to the statutes and not emasculated by technical constructions placed upon them by the courts.

## III.

Respondents contend that there is a misjoinder of parties defendant in this cause.

Their position is, that one corporation cannot be joined with another when charged in *quo warranto* proceedings with abuse or usurpation of corporate rights, for the reason that such a charge relates to the individual contract between it and the State.

That is no longer an open or debatable question in this State. It has been fully and firmly determined against respondents' contention in the following cases: State ex inf. v. Firemen's Fund Ins. Co., 152 Mo. 1; State ex inf. v. Armour Packing Co., 173 Mo. 356; State ex inf. v. Continental Tobacco Co., 177 Mo. 1.

## IV.

The next contention of respondents is, that the information does not charge them with forming a combination to maintain prices of their commodities, but only charges them with combining to regulate, control and fix prices.

If we correctly understand respondents, their position is, that there is a difference between a combination to *maintain* prices and a combination to *fix and control* prices. They seem to concede the former is within the inhibition of the statute, and that such a combination would be unlawful, but deny that the latter is within its purview, and, therefore, such a combination is not prohibited by sections 8965 nor 8966.

While it is true neither of those sections prohibits combinations to fix, regulate or control prices, yet section 8978 does in express terms prohibit all such combinations and agreements; and, if we are correct in the conclusions reached in paragraph two of this opinion, wherein we held that all of these statutes must be construed together, as one act, then it is wholly immaterial whether the inhibition mentioned is contained in sections 8965, 8966 or in 8978. If contained in any one of the three, that would be sufficient; and if violated by the respondents, they would be subject to the forfeitures therein prescribed. This is so plainly the meaning of the statutes, it is not deemed necessary to review the number of authorities cited by opposing counsel in support of their respective positions.

The Legislature was dealing with a grave question of great importance, one that had challenged the minds of the ablest and best men of the country, both in and out of legislative halls, and one which affected the prosperity and welfare of the entire people; and, if unrestrained, might have threatened the very foundations of our form of government. With that aspect of the question before the minds of the law-makers, it is not to be presumed, in the absence of express legislation to the contrary, that they intended to enact laws which mean and are susceptible of the refined and technical construction which has been placed upon them by the able and learned counsel for respondents. No fair-minded, unbiased man can read chapter 143 of Revised Statutes of 1899, without logically coming to

the conclusion that it was the intention of the Legislature to smite with a mail hand all corporations and individuals doing business in this State which persistently or knowingly violated any of the provisions thereof; and pointed out to the courts in no uncertain terms what to do in case they found any such corporation or persons offending against the law.

It is also contended by counsel for respondents that the allegations of the information of the existence of the combination complained of are not sufficient to constitute a cause of action against them. If we correctly understand counsel, their contention is that the information in this case should be drawn with the same rules of strictness which are applicable to criminal indictments and informations. In other words, they contend that the information should state the facts which constitute the pool, trust or combination, and not make the charge in general terms.

It is the formation of and entering into the pool, trust or combination that constitutes the usurpation of corporate powers; and in such cases, according to the text-writers and adjudications, all that is necessary to be stated in the information is a general allegation of the facts constituting the misuser, non-user or usurpation.

When the State challenges the authority of a corporation to do certain things, it must either deny the charge, or, if it is exercising the authority complained of, then it must justify its conduct by showing that it possesses that power and authority under its charter; and the State is not required to allege and prove the facts in detail constituting the mode or manner in which it is violating the law and usurping powers not granted to it by its charter.

In the case of State ex inf. v. Mo. Pac. Ry. Co., 206 Mo. l. c. 40, this court said:

"In overruling the demurrers in these cases the court does not decide any of the questions touching

the merits, which were discussed in the oral argu-
ments. The only point decided is that these informa-
tions are sufficient to require the defendant to answer
the charges made by the Attorney-General against
them, either by specifically denying the charge or stat-
ing the facts which in the opinion of the defendants
justify them in doing what they are charged with
doing.

"The pleadings in a proceeding of this nature are
not governed by the rules of pleading stated in the
Code of Civil Procedure; the only provision of the
code that is extended to a proceeding in *quo warranto*
is contained in section 675, Revised Statutes 1899, re-
lating to amendments.

"An information in the nature of *quo warranto*
filed by the Attorney-General is not of the character
of a petition in an ordinary case either in law or equity;
it is the official call of the Law Officer of the State on
the corporation or individual to show by what author-
ity it or he is assuming to exercise a particular fran-
chise. The rules of pleading in such case are thus
stated in 17 Ency. Pl. and Pr., 457-8: 'The office of
an information in the nature of a *quo warranto* is not
to tender an issue of fact, but simply to call upon the
defendant in general terms to show by what warrant
or charter the privilege, franchise, or office is held or
exercised. Where the State calls upon one to show
cause by what authority he exercises a corporate fran-
chise or public office, the allegation by the Attorney-
General of intrusion or usurpation may be of the most
general character, while the defendant is required to
set forth particularly the grounds of his claim and the
continued exercise of his right, except where by statute
the pleadings are more nearly assimilated to those in
other civil actions.' In this State we have no such
statute. The same author, at page 467, says: 'When
one is called upon by the State to show warrant or
authority for the exercise of a franchise or office per-

taining to the State, the defendant must, by his plea, answer or return, disclaim all right to the franchise and deny its usurpation, or allege facts which, if true, will invest him with the legal title of pleading the charter or legislative grant of the franchise sought to be forfeited or seized, or by pleading directly and positively all the facts necessary to establish the title to the office which the defendant is called upon to justify; and in the absence of such an answer the State will be entitled to a judgment of ouster.' There is no such plea as a general denial in a case of this kind.

"If these defendants are not doing what the Law Officer of the State, in a general way, charges them with doing, let them specifically deny the charge; if they are doing it or doing something like it and think they are justified in so doing, let them specifically state it in their answers.

"These demurrers go mainly on the idea that the informations are not sufficiently specific in detailing the facts which constitute the charge of usurpation; that idea is out of place in this kind of proceeding; the State calls on these corporations to answer, and the duty of pleading specifically the facts rests on them.

"In these cases the Attorney-General has (doubtless induced by a practice heretofore tolerated), made more statements of facts than necessary, but they are treated as surplusage." [2 Spelling on Extra Legal Rem., secs. 1851, 1853, 1855; People ex rel. v. Railroad, 12 Mich. 389; 17 Ency. Pl. and Pr., pp. 457, 458; Commonwealth v. Eastman, 1 Cush. 189; State v. Parker, 43 N. H. 83; State ex inf. v. Delmar Jockey Club, 200 Mo. l. c. 55; United States v. Gardner, 42 Fed. 831; Landringham v. State, 49 Ind. 186; Hazen v. Commonwealth, 23 Pa. St. 364; Cole v. People, 84 Ill. 216.]

And especially is this rule applicable in this State when such proceedings are civil in their nature; and

which are not required to be stated with the same technical strictness with which crimes must be charged. [State ex inf. v. Equitable Loan & Inv. Co., 142 Mo. 325; State ex inf. v. Delmar Jockey Club, 200 Mo. 34.] But waiving that point for the present and conceding that this proceeding is in the nature of a criminal prosecution, and that the pleader should be held to the same strict rules of pleading as is required in charging a criminal conspiracy, still we are of the opinion that the information states a good cause of action, for the reason that acts with which the respondents are charged are unlawful.

In such cases the rule is, that, "If the act with which the conspirators combine to perform is unlawful, it is unnecessary to set out in the indictment the means employed in accomplishing it. But if the end in view is lawful or indifferent, and the conspiracy only becomes criminal by reason of the unlawful means whereby it is to be accomplished, it becomes necessary to show the criminality by setting out such unlawful means." [4 Ency. Pl. and Pr., pp. 713, 714, 716, 717; Coal Co. v. People, 214 Ill. 421.]

Besides this, there are no specific objections made to the sufficiency of the information; all of them are general in their character, and leave the court in the dark to conjecture as to what are the infirmities. But after a careful reading and re-reading the information, and testing its sufficiency by all known rules of pleading, we have been unable to detect any defect in any of its charging parts.

The sufficiency of the information was sustained when the case was here before, 194 Mo. l. c. 130, and we have no reasons to change our minds upon the question.

We are, therefore, of the opinion that the information states a good cause of action.

## V.

The constitutionality of the statutes upon which this proceeding is predicated is challenged by counsel for respondents for several reasons, which will now receive consideration.

(a)   Their position is that those sections are in violation of the first section of the fourteenth Amendment to the Constitution of the United States, in that while they denounce the same acts, whether committed by individuals or individuals and corporations, they impose upon the latter a greater and different punishment from that imposed upon individuals.

In one sense that may be true, but it is not true in a legal sense.

A corporation is a legal fiction—a creature of the law.   It accepts its charter and corporate franchises with a tacit agreement or understanding that it will exercise the powers granted to it by the State, and none other; and that if it misuses those powers, or usurps powers not so granted, it will surrender or forfeit its charter, with all corporate franchises.   That the State has the power to enforce this agreement, or law of forfeiture, is not questioned by respondents, but they insist that it is a different and greater punishment than is imposed upon an individual for the commission of the same offense.   In answer to that, it may be said that an individual is a natural person, created by his Maker, and not by law, and, therefore, has no franchises to exercise or to forfeit, consequently the same punishment, if you so term it, could not, in the very nature of things, be measured out to the individual which should be measured unto a corporation.

While it is true, to forfeit the charter of a corporation for usurpation of power is equivalent to taking its life, as it were; but we suppose it will not be seriously argued that, because the statute does not demand the life of the individual, as it does that of the corporation,

as a punishment for his violation of the law, the law should and must be declared unconstitutional and void upon that ground. And, upon the other hand, where a statute denounces certain acts, whether committed by individuals or corporations, or both, it should not be declared unconstitutional because it provides for imprisonment of the former and a fine, or forfeiture of the latter's charter, as punishments for their violation of the statute. But if the contention of counsel for respondents is sound, then any individual could form an unlawful combination in restraint of trade with any corporation, and when proceeded against for such unlawful conduct either one or both of them could interpose the unconstitutionality of the statute, because the punishment prescribed against each is not the same but different. And we might add that, if their position is tenable, then the Legislature would be powerless to provide for the imprisonment of the one because it could not imprison the other; nor could it provide for the forfeiture of the charter of the corporation, because the individual would have none to forfeit, *ergo* there is no punishment the Legislature could provide, excepting a fine against each. Such a contention regarding the proposition here involved if followed to its logical conclusion would lead to an absurdity, and, at the same time, shows the unsoundness of respondents' contention.

Nor do said sections of the statute deny respondents' equal protection of the law within the meaning of the fourteenth Amendment of the Federal Constitution.

It is not the object or purpose of that provision of the Constitution to prevent legislation which embraces within its provisions all persons or things which naturally and reasonably belong to the same class and similarly situated and where the statute must

operate equally and uniformly upon all such persons or things of that class. [Andrus v. Ins. Assn., 168 Mo. 151; Waters-Pierce Oil Co. v. State of Texas, 19 Tex. Civ. App. 14; Railroad v. Mackey, 127 U. S. 209; Barbier v. Connolly, 113 U. S. 31; Railroad v. Mathews, 165 U. S. 25; Plessy v. Ferguson, 163 U. S. 550; Railroad v. Ellis, 165 U. S. 150.]

The purpose of that provision was to prevent legislation which embraces within its provisions persons or things which affect only a portion of the persons or things which rationally belong to the same class and who are similarly situated. [Railroad v. Ellis, 165 U. S. 150.]

Nor do we agree with respondents in their contention that those statutes are violative of that constitutional provision, in that they unjustly discriminate against property by embracing commodities only and not including labor, which, it is contended, may also become the subject of a pool or combination.

While it is true those statutes are limited in their scope and operation to persons and corporations dealing in commodities, and do not include combinations of persons engaged in labor pursuits, yet it must be borne in mind that the differentiation between labor and property is so great that they do not belong to the same general or natural classification of rights, or things, and have never been so recognized by the common law, or by legislative enactments. They stand upon entirely different footings, and the laws pertaining to the one are entirely different from those pertaining to the other.

Labor has always been considered in the nature of an attribute to man, and partakes more or less of his individuality, and personal liberty, and is inseparable from his person. Labor and labor organizations are controlled and protected by laws enacted to operate largely upon the individuals personally, and not so much as upon the products of their labor, called com-

modities; while, upon the other hand, commodities are nothing but property, and have no personal connection with the owner whatever.

Legislation affecting property and property rights will in no manner interfere with the personnel of the owner. But that is not true of laws regarding labor, for the reason that the moment you enact laws affecting labor, that moment and by that law you affect the personnel of the laborer. I am not speaking of those laws which are enacted to secure the wages due for labor, but I am referring to the laws that are applicable to labor itself; such as those guaranteeing to the person the right to labor, the right to contract to labor, and the right to agree upon prices to be paid therefor, as well as those which prevent involuntary servitude, etc.

This classification of the laws regarding labor and property has always been recognized, by all nations, in all ages; and those laws which apply to the one have never been considered or looked upon as being special and class-legislation, because they do not embrace both.

Mr. Blackstone, in his masterly treatise upon the common law, starts out by classifying the laws into the rights of persons and the rights of things, and then he treats the laws applicable to each class separately. Our laws are in this day based upon that same classification, and this is the first time I have ever heard it contended that the laws enacted for the one class must embrace the other, otherwise the act would be unconstitutional and void.

Respondents have cited no authority sustaining their contention, and we assume there is none.

In the very nature of things a law could not be enacted which would be equally applicable to persons and things without interfering with the personnel and liberty of the laborer.

The Legislature in enacting these anti-trust laws well knew of this natural classification of commodities

and labor, and enacted laws only embracing the former, which in no manner deprives their owners of any of their legal or personal rights, while if they had also embraced labor combinations, they would have entrenched upon the personal rights of the labor.

While the Legislature might have included labor combinations, yet it did not do so, and the reason, above stated, alone was a sufficient justification for the omission to include labor combinations in the act; to say nothing regarding the general and natural classification of persons and things, which has always been recognized by the law-making powers.

There is nothing new that can be said upon this subject which would throw any additional light upon it. The authorities above cited are but a few of the many which support the conclusions above stated.

These sections of our statutes embrace all persons and corporations who naturally belong to the same class, and they do not arbitrarily and capriciously, without reason, divide classes or distinguish between classes existing under similar conditions.

(b)   The constitutionality of sections 8983 and 8984 is also vigorously assailed by counsel for respondents.

In pursuance of those sections, respondents were required by this court to produce certain books and papers belonging to and in their care and custody, before the Master, to be used as evidence in this proceeding; and the latter provides that if the officers or agents of the corporation do not appear to testify and do not produce the books and papers ordered produced by the court, or by the officer authorized to take the evidence, then it shall be the duty of the court, upon proper motion, to strike out the answer, motion, reply, demurrer or other pleadings of said corporations whose officers or agents are in default, and proceed to render judgment by default against said corporations.

When the order was made upon said respondents to produce the books and papers, they then assailed the constitutionality of both of these sections of the statutes. In a very clear and able opinion written by LAMM, J., this court ruled against the contentions of respondents as regards section 8983, and held it to be constitutional; but declined to pass upon the constitutionality of section 8984, because it was not properly before the court, because none of the respondents had disobeyed the order of the court. [State ex inf. v. Standard Oil Co., 194 Mo. 146 to 150.] We have re-examined the questions there presented and which are renewed here. In so far as what is there said regarding section 8983, it is sufficient to say that we are perfectly satisfied with the reasoning and conclusions there reached; but the objections urged against section 8984 demand further consideration.

In pursuance to the order above mentioned, the respondents produced the books and papers designated therein, and they were introduced and used as evidence in the case. They now renew their objections to the validity of that section, and say it is violative of both the State and Federal Constitutions, in that they produced the books and papers under the threatened penalty of having a judgment of ouster rendered against them.

Counsel for respondents have not pointed out or suggested in what manner, nor have we been able to see how, a threatened judgment of ouster could or did in any conceivable way deprive any of the respondents of their property without due process of law, either within or without the meaning of the State and Federal Constitutions. They were clearly served, and were in court, appeared and resisted the right and authority of the court to make the order. This was a "hearing," and due process of law within those constitutional provisions. And if, after such hearing, respondents had seen proper to disobey the order and thereby have

suffered judgment by default to have been rendered against them, that would have been their privilege and fault, and not the fault of the law; and, if upon the other hand, they should obey the order, as they did in this case, then the trial would proceed in due course to final judgment upon the merits, as was done here.

In each case they had a trial according to due process of law, which means according to the laws of the land. [Naylor v. Harrisonville, 207 Mo. 341.]

Similar statutes to the one under consideration are in force in this State and apply to all litigants, and they may thereby be compelled to testify as witnesses before the court or referee, and be required to produce books and papers in their charge or under their control relative to the issues involved, under penalty of having their pleadings stricken out and judgment rendered against them for disobeying any such order of the court. [R. S. 1899, secs. 709, 710, 737, 738, 739 and 740.]

These statutes were first enacted shortly after the organization of the State; and similar statutes exist in almost all the States of the Union, and our attention has not been called to any case which has held any such statute to be unconstitutional.

Independent of what we have here said, the reasons assigned by this court when this case was formerly here for holding section 8983 to be constitutional apply with equal force and logic to section 8984. If the former is valid and authorizes the court to make the order, then it must follow as a necessary corollary that the latter, which empowers the court to enforce its orders by striking out the pleadings, must also be valid. It would be a foolish thing to argue or hold that the court has the authority under the statutes to make the order and then hold that the court has no authority thereunder to enforce the obedience of such order after it is made. [State ex inf. v. Standard Oil Co.,

194 Mo. 1. c. 151; State ex inf. v. Continental Tobacco Co., 177 Mo. 1.]

(c)  Respondents' next insistence is, that because they were compelled by the process of the court to produce testimony against themselves, they must be discharged in this proceeding.  This contention is untenable.

(1)  Section 8989, Revised Statutes 1899, granted immunity to all the witnesses who were produced by respondents and who testified in compliance with the order of the court.  No witness can avail himself of section 23 of article 2 of the Constitution of 1875, nor of the Fifth Amendment of the Constitution of the United States, as to giving oral testimony, because said statute grants him immunity from prosecution; nor can he set those constitutional provisions up against an order for the production of books and papers, as the same statute would equally grant him immunity in respect to matters provided thereby.  [Hale v. Henkel, 201 U. S. 1. c. 69 to 73.]

(2)  Nor was it intended by section 11 of article I of the Constitution, nor the Fourth Amendment of the Constitution of the United States, known as the search-and-seizure clauses, to interfere with the power of courts to compel the production upon trial of documentary  evidence under a subpoena *duces tecum*. [Hale v. Henkel, supra, 1. c. 73.]

(3)  While an individual may lawfully refuse to answer incriminating questions unless protected by an immunity statute, a corporation is a creature of the State, and there is a reserved right in the Legislature to investigate its contracts and find out whether it has exceeded its powers.

There is a distinction between an individual and a corporation; the latter, being a creature of the State, has no constitutional right to refuse to produce its books and papers in court for examination in the trial of a proceeding by the State against it; nor can the

officer in charge of the corporation charged with a violation of the statutes plead the criminality of the corporation as a refusal to produce the books. [Hale v. Henkel, supra, pp. 74 to 76.] The rule above announced has the sanction of the highest court in the land and was applied in a criminal prosecution, and *a fortiori* should the same rule apply to a civil proceeding like the case at bar.

(d) It is also contended that these anti-trust statutes violate the provisions of section 8 of article I of the Constitution of the United States, which gives Congress the power to regulate commerce with foreign countries and among the several States and Indian tribes.

It was not the intention of the Legislature, by the enactment of those statutes, to interfere with interstate commerce, but the clear intention was to prevent the formation and maintenance of pools, trusts and combinations in restraint of interstate commerce.

The Legislature has no power or authority to prevent respondents from carrying on interstate trade, for the reason that power is vested in and rests with Congress; but it does possess the power to authorize the courts to forfeit the charters of all corporations organized and existing under the laws of this State for the usurpation of powers not granted to them, or for misuser or nonuser of those granted; and it is wholly immaterial whether those corporations are engaged in interstate commerce or not.

The Legislature also possesses the undoubted authority to revoke or forfeit the license issued to any foreign corporation authorizing it to do an interstate business in this State. The revocation of such a license in no manner interferes with interstate commerce. The authority to conduct such business is obtained under the acts of Congress and not by virtue of the laws of the State. A license from the State can neither confer nor take away the authority or right of

a foreign corporation to carry on interstate commerce; and, that being true, we are unable to see in what possible manner the forfeiture of such a license, that is, a license which only authorizes a foreign corporation to do an interstate business, can possibly offend against section 8 of article I of the Federal Constitution, which only applies to interstate commerce.

We are, therefore, of the opinion that this contention of respondents is not well founded.

(e)   Nor are we able to concur with the learned counsel for respondents in their contention that sections 8965, 8966, 8967, 8971, 8972 and 8978, Revised Statutes 1899, are void for the reason that they violate section 10 of article I of the Constitution of the United States which provides that no State shall enact any law which will impair the obligations of a contract.

Clearly that section of the Constitution has no application to a license issued by the State to a foreign corporation to do business herein, for the reason that when it accepted the license, it impliedly, at least, agreed to transact such business under and in obedience to the laws of this State in the same manner as a domestic corporation should transact similar business, and that if it violated the laws of the State, then it would thereby forfeit its rights to such license, in the same manner that the domestic corporations would forfeit their charter rights by offending against the laws.   [Orient Ins. Co. v. Daggs, 172 U. S. 1. c. 566; Hooper v. California, 155 U. S. 648.]

The mere fact that the licenses granted to the Indiana and Republic Companies were issued prior to the enactment of some or all of those sections does not change the legal aspect of the question, because the enactment of those statutes was but the exercise of the police power of the State, which cannot be contracted away or surrendered by legislation.   As shown by the numerous authorities before cited, the police power of the State is an inherent power of sovereignty and can-

not be contracted away. [Mugler v. Kansas, 123 U. S. 653.]

(f)   It is finally contended by respondents that sections 8965, 8966, 8971 and 8978 are all unconstitutional and void because they contravene section 1 of the Fourteenth Amendment to the Constitution of the United States, in this, that they abridge the privileges and rights of respondents to make valid contracts with respect to their business and property.

In support of that contention learned counsel for respondents argue that under that section of the Federal Constitution they had the legal right to make contracts in reasonable restraint of trade, and that the sections of the statute mentioned prohibit the making of all contracts in restraint of trade, those that are reasonable as well as those that are unreasonable and unjust, consequently the statute must fail.

In answer to that contention it may be said that counsel do not correctly state the rule of law regarding such contracts. The universal rule is that two or more parties may enter into any lawful contract regarding any matter, and if that otherwise legal contract only incidentally limits trade or fixes prices, then that legal contract will not be held void on the ground that it incidentally operated in restraint of trade. [Shawnee Compress Co. v. Anderson, 209 U. S. 423, 434; Phillips v. Iola Cement Co., 61 C. C. A. l. c. 20; Whitwell v. Continental Tobacco Co., 60 C. C. A. l. c. 299.] But if the primary purpose of the contract was to limit and restrain trade, then the contract would be void at common law, and would not be protected by the constitutional provision mentioned, however slight that interference or restraint might have been.

But even if that was not the common law, yet there is nothing in either the State or Federal Constitution which prevents the enactment of a statute prohibiting the making of all contracts in restraint of trade whether reasonable or unreasonable. The Supreme Court of

the United States in discussing that question in the case of Shawnee Compress Co. v. Anderson, 209 U. S. l. c. 434, used this language: "And it has been decided that not only unreasonable but all direct restraints of trade are prohibited, the law being thereby distinguished from the common law." [Horner v. Graves, 7 Bing. C. P. 735; Northern Securities Co. v. U. S., 193 U. S. 197; United States v. Addyston Pipe & Steel Co., 85 Fed. l. c. 282; State ex inf. v. Firemen's Fund Ins. Co., 152 Mo. 1.]

The same is true and may be said of the statutes under consideration. They prohibit the making of all contracts and combinations which have for their object and purpose the restraint of trade or the fixing and maintaining of prices; but those sections in no manner denounce as illegal any contract regarding trade which has for its object a legitimate purpose and which only incidentally stifles trade.

While the Fourteenth Amendment prevents illegal infringements upon the liberty of the citizen to contract, and deprive him of his property and impose restraints and burdens upon him without due process of law, yet that amendment has never been held to prevent the Legislature from the exercise of the general police power of the State. This power extends to many subjects, which need not here be enumerated, which affect the general welfare and public interest within the purview of that power. In the absence of such power, the citizen would have the absolute authority to contract and the power to hold property as he might deem proper; but under that power the State may enact valid laws requiring each citizen to so conduct himself and so use his property as not to unnecessarily injure others. And as said by the Supreme Court of the United States in the case of Munn v. Illinois, 94 U. S. l. c. 124, "This is the very essence of government, and has found expression in the maxim, *sic utere tuo ut alienum non laedas.*" Chief Justice

TANEY in discussing the scope of the police powers of the State, in the License Cases, 5 How. 1. c. 583, said: "They are nothing more or less than the powers of government inherent in every sovereignty; . . . . that is to say, . . . . the power to govern men and things. Under these powers the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when such regulations become necessary for the public good."

"The State can now, as before, prescribe regulations for the health, good order and safety of society, and adopt such measures as will advance its interests and prosperity." [Railroad v. Beckwith, 129 U. S. 29; State v. Moore, 104 N. C. 714.]

The Court of Appeals of New York, in the case of Bertholf v. O'Reilly, 74 N. Y. 1. c. 521, said: "All property is held subject to the power of the State to regulate or control its use, to secure the general safety and the public welfare. 'We think it is a settled principle,' says Chief Justice SHAW, in Com. v. Alger, 7 Cush. 84, 'growing out of the nature of well-ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. All property is held subject to those general regulations which are necessary to the common good and general welfare.' Judge RED-FIELD, in a passage often cited with approval, speaking of the police power, says: 'By this general police power of the State, persons and property are subject to all kinds of restrictions and burdens, in order to secure the general comfort, health and prosperity of the State; of the perfect right of the Legislature to do which, no question ever was, or upon acknowledged general principles can be, made.' [Thorpe v. Railroad, 27 Vt. 140.]

The police power, so called, inheres in every sovereign-
ty and is essential to the maintenance of public order
and the preservation of mutual rights from disturbing
conflicts.''

And as said by the Supreme Court of Texas in
the case of Waters-Pierce Oil Co. v. State of Texas,
19 Tex. Civ. App. l. c. 11 and 12, ''The State in the
exercise of this power in the selection of remedies
looking to the suppression of evils harmful to its peo-
ple, may apply them to the most sacred contracts and
to the uses of property of every description, not in the
way of an arbitrary spoliation or confiscation under a
capricious exercise of the police power, but a useful
regulation in the interest of the public welfare. [Cool-
ey, Const. Lim. (6 Ed.), 707-720.] In enumerating
the subjects which may be acted upon by the State in
the exercise of its police power, Mr. Tiedeman, in his
valuable work on Limitations of Police Powers, names
combinations in restraint of trade, section 96; and as
said in United States v. Freight Association, 166 U. S.
322, 'Manufacturing or trading companies may also
affect prices by joining together in forming a trust or
other combination, and by making agreements in re-
straint of trade and commerce which, when carried out,
affect the interests of the public.' This is certainly a
just acknowledgment of the power, for there are few
acts which individuals may engage in that are more
harmful in their effects upon the interests of the people
generally than trusts and combinations concerning the
commodities useful to mankind. The rights of the in-
dividual must yield to the public wants, and his conduct
and all property held by him is subject to the control
of the State, to the end that he shall so demean himself
and use his property with as little hurt and injury to
the public as possible. 'As said in Munn v. Illinois, 94
U. S. 113, while power does not exist with the whole
people to control rights that are purely and exclusively
private, government may require each citizen to so

conduct himself, and so use his own property, as not unnecessarily to injure another.' [Mugler v. Kansas, 123 U. S. 660.]''

The statutes in question are bottomed upon those police powers which are inherent rights of sovereignty; and in pursuance thereof the Legislature enacted them for the purpose of suppressing the many evils which had grown up under the widespread system of trusts and combinations extending over the entire country, including this State, and to the great injury and detriment of the people.

The necessity and wisdom of such statutes are vouched for by their enactment in almost every State in the Union, as well as by the Congress of the United States, and by the many decisions of the various courts throughout the country sustaining their constitutionality and giving force and efficacy thereto. Such statutes are enacted for the purpose of restraining the unbridled liberty of the citizen in his conduct and use of his property, and no such reasonable restraint imposed by statute has ever been held unconstitutional because it deprived the citizen of his life, liberty or property without due process of law; but, upon the other hand, the courts have uniformly held all such laws to be a wise, just and valid exercise of the police powers of the State.

In the case of Mugler v. Kansas, 123 U. S. 653, the Supreme Court of the United States went so far as to hold a statute of that State valid which deprived the citizen of all rights to manufacture and sell intoxicating liquors in the State. In that case this question was reviewed at great length and discussed with great learning and ability, and it was there held that the statute was a reasonable and a valid exercise of the police power of the State, and that absolute prohibition did not deprive him of his rights without due process of law.

Legal regulations and restraints imposed upon the use of property and the authority to contract in reference thereto do not deprive the owner of his property or contract-rights without due process of law. [Railroad v. Mathews, 165 U. S. 23; Railroad v. Humes, 115 U. S. 519; Barbier v. Connolly, 113 U. S. 31; Walston v. Nevin, 128 U. S. 582; Railroad v. Gibbes, 142 U. S. 386; State ex inf. v. Firemen's Fund Ins. Co., 152 Mo. 1; State ex rel. v. Schlitz Brewing Co., 104 Tenn. 715.]

It was contended in the case of State ex inf. v. Firemen's Ins. Co., 152 Mo. l. c. 46, 47, that the anti-trust law was unconstitutional because it prohibited "a reasonable adjustment and maintenance of rates of premium to be charged for insurance." The court, after discussing the purpose and object of such legislation, says, l. c. 46-7: "Such laws have not only been adjudged constitutional by the Supreme Court of the United States, but the principles they announce have been expressly sanctioned by the Supreme Courts of many other States." [Citing cases from most of the States of the Union.] In answer to the contention that such acts restrain the defendant's right of contract, the court said, l. c. 47: "There is no such thing in civilized society as the unrestrained power to contract. Every man surrenders some of his individual rights when he associates with or becomes a part of any society or government, and the power of the government to legislate is complete, so that, while according to every man the fullest possible liberty to do what he pleases with his own, he must not interfere with the similar rights of others. This principle underlies and runs through all governments and societies, and it is the corner stone of the police power of the State."

The constitutionality of our anti-trust laws was further recognized in the Beef Trust case and was expressly affirmed in State ex inf. v. Continental Tobacco Company, 177 Mo. 1. [See also State ex rel. v.

Brew. Co., 104 Tenn. 715; Waters-Pierce Oil Co. v. State, 19 Texas Civ. App. 1.]

The construction of such statutes should be made in a liberal spirit. As is said by this court in the case of State ex inf. v. Standard Oil Company, 194 Mo. l. c. 148: "We feel at least on solid ground on the proposition that statutes leveled against monopolies are buttressed upon the wisdom of the common law, and this court, constrained and enlightened by events of current history, is not required and does not deem itself invited to approach the interpretation of such statutes with a hostile or sour predisposition to drive a coach-and-six through them, but, on the other hand, while sedulously protecting the rights and liberties of the individual from insidious approaches under whatever artful guise, we should at the same time not lose sight of the rights of the community and should endeavor to advance the beneficent purpose underlying such laws (State ex inf. v. Armour Packing Company, 173 Mo. 356) where it can be done without doing violence to constitutional provisions."

While there may be some provisions in said articles one and two of chapter 143, which, if considered alone, might lend color and plausibility to respondents' contention, that they prohibit the making of certain contracts which are proper; but when all the sections of those articles are read and construed together, then that objection to their validity fades away and there is not a vestige of color remaining upon which to base such a contention.

Any strained or extreme construction placed upon a statute might lead to a holding that it was unconstitutional, but no statute should receive such a construction. As is said by the Supreme Court of the United States in Jacobson v. Massachusetts, 197 U. S. 11, l. c. 38-9, in discussing a similar question: "Extreme cases can be readily suggested, but ordinarily such cases are not safe guides in the administration of

the law. . . . . 'All laws should receive a sensible construction, and general terms should be so limited in their application as not to lead to injustice, oppression or absurd consequence. It will, therefore, be presumed that the Legislature intended exceptions to its language which would avoid results of that character. The reason of the law in such cases should prevail over its letter.' "

The conclusions above reached are supported by the following cases: Heim Brewing Co. v. Belinder, 97 Mo. App. 64; United States v. Joint Traffic Association, 171 U. S. 505; United States v. Freight Assn., 166 U. S. 290; State ex inf. v. Armour Packing Co., 173 Mo. 356; Finck v. Granite Co., 187 Mo. 244.

We are, therefore, of the opinion that none of the sections under consideration are vulnerable to any of the constitutional assaults made upon them.

## VI.

On June 11, 1907, after the time for taking testimony had expired, the Republic Oil Company presented for filing in the office of the Secretary of State, the following affidavit:

"Whereas heretofore, to-wit, on the 8th day of July, A. D. 1901, the Republic Oil Company, being a corporation organized and existing under the laws of the State of New York, did file in the office of the Secretary of State, of the State of Missouri, authenticated evidence of its incorporation, and in all respects complied with the requirements of the law of said State governing foreign corporations, and designating an agent or representative in said State on whom service of process against said corporation could be made; and

"Whereas, the said Republic Oil Company has disposed of all of its property and business interests in said State and ceased doing business therein:

"Now, therefore, the said Republic Oil Company does hereby abolish any and all offices or places of

218 Sup—25

business it may have in said State and does hereby revoke and cancel the authority of its present agent, H. C. Cornforth, of Kansas City, in said State, and does hereby withdraw itself from the State of Missouri.

"In witness whereof the said Republic Oil Company does hereby, by its proper officers, cause its name to be signed and its corporate seal to be attached at the city of New York, State of New York, this 3d day of June, A. D. 1906.

"REPUBLIC OIL COMPANY.

"By C. L. NICHOLS, President.

"(Corporate Seal.)

"Attest: CHARLES T. WHITE, Asst. Secretary.

"*State of New York, County of New York, ss.*

On the 3d day of June, A. D. 1907, before me personally came C. L. Nichols to me known, who being by me duly sworn did depose and say that he is the president of the Republic Oil Company, the corporation described in and which executed the above instrument; that he knew the seal of said corporation; that the seal affixed to said instrument was said corporate seal; that he signed his name to the same for said corporation, and that all of the statements contained in said instrument are true.

"A. T. DOREMUS,

"Notary Public, Richmond County.

"[L. S.]         Certificate filed in New York County."

The Secretary of State refused to file said affidavit of withdrawal for the following reasons, stated by him:

"I, John E. Swanger, Secretary of State, do hereby certify that the original affidavit of withdrawal of the Republic Oil Company, of which the attached is a copy, was presented to me and left at my office by Frank Hagerman, the attorney of said company, upon June 11th, 1907, with the request that the same be filed in my office, and the only reason that the same was not then

actually filed was that I desired the advice of the Attorney-General as to whether in view of the pending litigation it should be permitted to be filed.

"Witness my hand and seal this 22d day of July, 1907.

JOHN E. SWANGER,

"Secretary of State."

Said company contends that, under and by authority of section 1018, Revised Statutes 1899, upon offering to file the affidavit, it had the legal right to retire from doing business in the State. Said section is as follows:

"The president or secretary of every domestic incorporated company in this State, when it shall dissolve, and the principal officer of every foreign corporation when it shall retire from business in this State, is hereby required to file with the Secretary of State an affidavit to that effect, and any failure to comply with the provisions of this section shall subject such company or the officers thereof to a penalty of from fifty to five hundred dollars, to be collected as is provided for the collection of penalties and remuneration of prosecuting officers in section 1017 of this article."

Counsel, therefore, contend that when they presented the affidavit to the Secretary of State for filing, that act was equivalent to filing it within the meaning of the statute, and that when so filed it retired from the State and ceased to do business herein, and has in all respects voluntarily performed all the matters and things which the informant prays this court to compel it to do by its judgment and decree, which, it is insisted, disposes of the subject-matter of the suit in so far as it is concerned, and for that reason this proceeding as to it is at an end, and the cause should be dismissed as to it.

The informant vigorously resists this contention upon two grounds: first, because, he says, there is no proper evidence in the record which shows that company has voluntarily retired from the State; and, sec-

ond, because it is answerable to the court for offenses which are so closely interwoven with and forming a part of the compact or conspiracy charged in the information that it is not entitled to have the cause dismissed against it, but that the cause should proceed regularly to a final determination, and, at that time, a decree should be entered which will properly and justly dispose of the withdrawal question.

As to the first proposition, we have no hesitancy in saying that as an abstract legal proposition under ordinary circumstances any defendant in a suit may abate the same, by voluntarily doing all the things which the pleadings in the cause pray the court to compel him to do; and this may be done on motion at any stage of the litigation, before or after trial, or before or after an appeal is granted.

This question came before the Supreme Court of Massachusetts in the case of In re Franklin Telegraph Co., 119 Mass. 447, which was a proceeding to forfeit a charter because of an illegal lease of its telegraph line to another line. Prior to the trial the lease was canceled and the court dismissed the proceeding because "the only injury alleged as a sufficient reason for the dissolution has therefore ceased to exist by the abrogation of the lease."

In State v. Centerville Bridge Co., 18 Ala. 678, 681, the State instituted proceedings to forfeit a franchise because of a non-compliance with the statute. Pending the litigation the Legislature passed an act authorizing an assignee of the company to comply with the statute, but providing "that nothing herein contained shall be so construed as to affect any suit or suits now pending in favor of or against said company." The court said: "Both plaintiff and defendant have united in vesting the subject-matter of the controversy in a third person; the suit must therefore end, for further prosecution would be vain and fruitless. It is said to be a rule that a title to an office will

not be tried by *quo warranto,* when at the time of the trial the term of office is expired. [State ex rel. v. Jacobs, 17 Ohio 143; Ang. & Ames. on Corp., 626.] . . . We think the proviso was intended to apply only to suits brought by the company against individuals, or by individuals against the company. It could not have been the design of the Legislature to give to Maberry a privilege for the mere purpose of taking it from him by a suit then pending, and without regard to any act of his.''

In Hurd v. Beck (Kan.), 45 Pac. 92, it was said: ''If we had then decided, or should now decide, the case in favor of the plaintiff, it is evident he would obtain no substantial right thereby; and the time of this court ought not to be occupied by the consideration of abstract questions of law, however important and interesting they may be.''

This rule of practice is not confined to this class of cases, but extends to and includes all kinds of litigation; and the court may make the order at any time, upon its own motion, as will appear from the following authorities: Groves v. Richmond, 53 Ia. 570; Ditch v. Sennott, 116 Ill. 288; Hoskins v. Lord Berkeley, 4 Term R. 402; In Re Elsam, 3 Barn. & Cres. 597; Block v. Barton, 27 La. Ann. 89; York County v. Fewell, 21 S. C. 106; State v. Brown, 1 Mo. App. 449; State v. Railroad, 74 N. C. 287; Kidd v. Morrison, Phil. Eq. (N. C.) 31; Dakota County v. Glidden, 113 U. S. 222; Foucher v. Grass, 60 Ia. 507; San Mateo County v. Railroad, 116 U. S. 38; Atkinson v. Tabor, 7 Colo. 195, 197; Wood-Paper Co. v. Heft, 8 Wall. 333; Cleveland v. Chamberlain, 1 Black 419.

We now approach the second proposition mentioned, and it is not so free of doubt, nor so easy of solution. In fact, the adjudications upon this question are very few and meager in so far as our attention has been called to them. But the case of State ex rel. v. Philips, 97 Mo. 331, bears closer resemblance as to the

facts and law to the question now under consideration than any we have been able to find. In that case the relator brought a suit in the circuit court of Jackson county against William Taylor and the Armour Brothers Banking Company, asking for judgment declaring null and void two taxbills issued by the city engineer . .of the City of Kansas against property owned by relator to Taylor in payment for the construction of a district sewer, and held by the banking company as collateral security. Relator claimed in his suit that the taxbills were invalid because the city had no authority under its charter to cause the sewer to be built, but that they were nevertheless an apparent lien against the property and a cloud upon its title. The circuit court dismissed the petition upon a hearing of the case, and relator appealed to the Kansas City Court of Appeals. Errors were assigned and joined in by the parties, and the case was duly submitted to the court for its decision, and was taken under advisement. While the case was in that position, the respondents, Taylor and the banking company, filed in court, against the objections of relator, their suggestions and motion, stating that they had caused the taxbills, regarding which complaint was made in the suit, to be cancelled by the engineer in his office and had deposited them, marked paid, with the clerk of the court for the use of relator, and had paid all the costs which had arisen or might arise in the suit, and moving the court to abate and strike from the docket relator's appeal. Relator resisted the motion, and showed by affidavits that he had not paid the taxbills, and that he rejected and refused to accept the proffered satisfaction; that he was prosecuting the suit in the interest of other property-owners against whose property similar bills had been issued, and who were contributing to the expenses of the suit, as well as in his own behalf, for the purpose of obtaining an adjudication upon the legality of the proceedings under which the sewer was built;

that the object of his suit was to have the bills cancelled as void *ab initio,* and that he was entitled to an adjudication upon that issue, and that the recent offer of satisfaction was not equivalent to such adjudication, and that he had, during the pendency of the suit, conveyed the property, and covenanted generally that the same was subject to no incumbrance whatever, and he demanded that the court proceed and decide the case. The court, however, sustained the motion, and dismissed the appeal.

The relator then applied to this court for a writ of mandamus, by which it was sought to compel the Kansas City Court of Appeals to reinstate the cause and to proceed with the hearing thereof. After reviewing many of the authorities above cited in disposing of that case, this court, speaking through SHERWOOD, J., said: "None of them, however, are exactly parallel to the case under discussion. This is no colorable appeal, no moot case, no case which has been compromised or settled; but a case where an offer has been made to the plaintiff by parties defendant; an offer which does not go the whole length of the plaintiff's demand, but an offer which falls far short of that; an offer which virtually confesses that he is right in his contention, but which seeks to head him off, to preclude him from attaining all he demands. After great consideration of the subject, the conclusion has been reached that the offer made was insufficient, and did not, therefore, extinguish the plaintiff's ground of equitable relief. Nothing short of that will answer. *The plaintiff had the right to have the full measure of the relief he claimed, or else, by a solemn adjudication of the court, to know the why and the wherefore of the refusal which denied him redress in full of his demand.* He had the right to make the demand he did, and it was out of the power of the defendants to prevent adjudication of the matters demanded, except by a confession as broad as that demanded. In that event, and that event only,

would the issues in the cause be dead.  It would be making a precedent of most dangerous consequence to rule otherwise; in short, it would be sanctioning a *colorable dismissal.*"

The same argument is equally applicable to the contention of the Republic Oil Company. This is not a colorable proceeding against it, no moot case, no case which has been compromised or settled; but a case where an offer has been made to the informant by respondent, an offer which has been rejected; an offer which does not go the whole length of the informant's demand, but an offer which falls far short of that; an offer which virtually confesses that he is right in his contention, but which seeks to head him off, to preclude him from attaining all he demands.  The informant charges the Republic Oil Company with entering into an unlawful pool, trust or combination with its co-respondents in restraint of trade and to fix and maintain prices on commodities handled by them to the great damage and detriment of the public.

It is the formation of and entering into the pool, trust, or combination which constitute the usurpation and abuse of corporate power complained of, and which constitute the gist of this action, and the judgment of ouster is only the incident thereto; and the informant has the right to have the full measure of relief claimed, and the voluntary withdrawal of the respondent from the State does not determine the question of the existence of the pool, trust or combination it is charged with, nor satisfy the full demand of the informant. If it does, then all the other two respondents would have to do to get rid of this litigation would be to file similar affidavits with the Secretary of State, and move for a dismissal of the cause, and thereby prevent an adjudication of the questions involved, and, at the same time, escape the penalties of past sin, if guilty, and then, on the morrow, re-enter the State and continue the business as of yore in defiance of all law and good

morals. No, the issues of this proceeding are not settled, and it is out of the power of the Republic Oil Company and beyond the power of all the respondents to prevent an adjudication of the matters demanded, except by a *confession as broad as are the charges* contained in the information. In that event, and in that event only, would the issues in the cause be dead. The State of Missouri and the entire people thereof are entitled to have the questions involved herein fully and finally settled. It would be making a precedent of most dangerous consequence to rule otherwise, and it would sanction not only a *"colorable dismissal"* but would afford an impenetrable retreat and perfect immunity for such corporations as might see fit to violate the laws of the State.

The prayer of the informant for a judgment of ouster against the Republic Oil Company is but one of the things asked for, but, since it has voluntarily offered to comply with that part of the complaint, that fact should be duly considered in entering the decree should the judgment of ouster go against the respondents.

For the reasons above stated, we are of the opinion that the Republic Oil Company is not entitled to have the cause abated or dismissed as to it.

## VII.

This brings us to the consideration of the main question involved in this proceeding, and that is, was there an unlawful combination or agreement existing between respondents in restraint of trade and in fixing and maintaining prices, as charged in the information? The State contends that such combination exists, while the respondents deny its existence. The Master found that issue for the State, and respondents except to that finding for various reasons.

The following facts are virtually undisputed:

The Standard Oil Company of New Jersey, which will hereafter be called the New Jersey Company, is

a corporation organized under the laws of New Jersey, with a capitalization of $110,000,000.

The Waters-Pierce Oil Company is a corporation organized under the laws of this State, with a capitalization of $400,000.

The Standard Oil Company of Indiana is a corporation organized under the laws of Indiana, capitalized at $1,500,000.

The Republic Oil Company is a corporation organized under the laws of New York, with a capital of $350,000.

The New Jersey Company owns practically all of the stock of the Indiana Company; sixty per cent of the stock of the Waters-Pierce Company, and all of the stock of the Republic Company. The New Jersey Company also owns practically all of the stock of several other oil companies, organized under the laws of various States. Mr. H. Clay Pierce owns the remaining forty per cent of the stock of the Waters-Pierce Company.

Practically all the officers and directors of the Indiana Company and of the Republic Oil Company are either officers, directors or employees of the New Jersey Company; and a majority of those of the Waters-Pierce Company bear the same relation to the New Jersey Company.

The main office of the New Jersey Company is located at 26 Broadway, New York City; that of the Indiana Company is located at the same place; that of the Republic Company is located in Cleveland, Ohio; and that of the Waters-Pierce Company is in St. Louis.

The three latter companies kept books, papers and records at their main offices, showing full and complete transactions of each day's business, and each of them made full and complete reports of all of their business transactions to the New Jersey Company, even to the smallest detail. The business, books and accounts of each of those three companies are regularly inspected

and audited by an auditor of the New Jersey Company twice a year.

These reports embraced, among other things, the sales and delivery of refined oils, deliveries of lubricating oils, comparative sales, deliveries of special oils, deliveries of outside oils, deliveries of wax candles, tank, wagon and milk-can deliveries, sales and delivery of naphtha, marine sales, total sales and net results, semi-annual statements showing costs of barreling and making all kinds of oils and products of petroleum.

A daily cash statement was sent. These cash statements were turned over to the comptroller of the Standard Oil Company of New Jersey.

All of said companies deal in petroleum and the various by-products thereof. The New Jersey and Indiana Companies are producers and refiners of oil and are manufacturers of- the various by-products thereof. The Republic Company for a year or so after its organization was also a producer and refiner of petroleum and a manufacturer of various by-products thereof, but was not refining or manufacturing at the time this suit was instituted. The Waters-Pierce Company has never produced or refined oil in this country, but is doing so in the Republic of Mexico.

The Indiana Company owns and operates a large refinery in Indiana and one at Kansas City, Missouri, and a third in the State of Kansas.

The Indiana, Waters-Pierce and Republic Companies are all vendors of refined oils and the by-products of petroleum. The two latter procure all of their supplies from the former.

There are several other oil companies doing business in this State, called "independent companies."

In 1878, by agreement between the Standard Oil Company and Waters-Pierce Company, there was the following division of territory made between them: Beginning at a point on the Mississippi river on the southern boundary of Lincoln county; thence in a

western direction along the southern boundaries of Lincoln, Pike, Ralls, Monroe and Randolph counties; thence in a southwest direction along the eastern boundaries of Howard, Cooper, Pettis, Benton, St. Clair and Barton counties; and thence west along the southern boundary of Barton county to the Kansas line.

Under that agreement the Indiana Company took the territory lying north of that dividing line, and Waters-Pierce took that lying south of it. The latter company was also given Arkansas, Indian Territory, Oklahoma, Texas, Louisiana and the Republic of Mexico. This division of territory has been respected from the time it was made to the present, and neither the Waters-Pierce Company, upon the one hand, nor the New Jersey Company, upon the other hand, nor any of its subsidiary corporations, which include the Indiana Company, Standard Oil Company of Ohio, Consolidated Tank Line Company, Standard Oil Company of Kentucky, and the Standard Oil Company of Iowa, have ever invaded each other's territory in quest of trade, except as will now be stated.

The Republic Company was the successor of the Schofield, Shurmer & Teagle Oil Company of Cleveland, Ohio, which was one of the independent companies, and the most active competitor the Indiana and Waters-Pierce Company had in this State. It had its own refineries, and refined and sold high grades of oil in all parts of the State and throughout the Middle West generally. After the New Jersey Company acquired the Schofield, Shurmer & Teagle interests, it caused the Republic Company to be organized, which took over the assets and property of the former, and continued to refine oil for a short time, and sold it in the same territory its predecessor had done. Not long after the organization of the Republic Company it ceased to refine oil, and its refineries were dismantled, and, after

that, it procured all of its oil and supplies from the Indiana Company and continued to sell oil in Missouri, as before, with this limitation—it would compete vigorously for the trade of all of the independent companies but never competed for the trade of the Indiana company, nor for that of the Waters-Pierce Company, except upon three or four occasions, whereupon vigorous protests were entered by the Waters-Pierce Company to the New Jersey Company, which resulted in smothering out all competition between the Waters-Pierce and Republic companies. And it may not be out of place to here state that the latter company, from its organization up to the time of the institution of this suit, masqueraded under and sold oils as one of the independent companies, and thereby caused the public to believe that it was an independent company.

The Indiana Company sells in the territory lying north of the dividing line, and not south of it, while the Waters-Pierce Company sells south of that line, and not north of it. All orders for oil received by the Indiana Company to be delivered in the Waters-Pierce Company's territory are turned over to the latter and by it filed; and all orders received by Waters-Pierce for oil to be delivered in the territory of the Indiana Company are turned over to the latter, and by it filled. Whenever through mistake or design the agents of either of those companies sell oils within the territory of the other, the transaction is turned over to that company and it reaps the benefits thereof.

Neither the Indiana Company nor the Waters-Pierce Company will sell to the independent companies except at retail prices; and both of them have waged a most relentless war against the independents by a system of espionage and rebates given upon sales of goods.

The oil for the Indiana Company, and all other subsidiary companies of the New Jersey Company, is transported through pipe lines and tank cars belonging

to the latter company; while the oil for the Waters-Pierce Company is transported in tank cars, about one-half of which are owned by it and the other half is owned by the New Jersey Company, which aggregate, if we correctly understand the record, about one hundred and thirty cars. But neither of the said companies will permit any of the independent companies to transport oil through the pipe lines or in their tank cars.

The Indiana Company, Waters-Pierce Company and the Republic Company all sell the same oils and grades of oil under different names or brands; each company having its own names or brands for the oils sold by it.

Prices for the products of petroleum, especially refined oils, illuminating and gasoline, are fixed by the Waters-Pierce Company.

It sends out to the trade card quotations, giving tank, wagon and barrel prices. As a rule those prices are followed by all other oil companies, including the independent companies, doing business in this State. As long as the independent companies do not reduce prices or increase the aggregate amount of their sales above ten or fifteen per cent of the entire amount of the sales made in the State, there is no war made upon them regarding prices; but whenever any independent company reduces prices below those fixed by Waters-Pierce or whenever their aggregate sales exceed fifteen per cent of all sales made in the State, a vigorous warfare is waged against them, chiefly through the Republic Company, by means of an elaborate system of espionage in their business and cutting prices or giving rebates until the independents are glad to throw up their hands and say "enough" and be contented to sell oil at the prices and in the quantities prescribed by the Waters-Pierce Company and acquiesced in by the Indiana and Republic Companies. And as a result of this method, the Waters-Pierce Company fixes the prices

for which all such oils are sold in the State, by all dealers, including the independent companies, and at the same time and by the same means it controls and monopolizes for itself and the Indiana and Republic Oil Companies from eighty-five to ninety-five per cent of the entire oil business of the State.

The large capital, the means of transportation and the capacious and convenient storage capacity, taken in connection with the almost perfect and far-reaching delivery systems owned, possessed and controlled by the Indiana, Republic and Waters-Pierce Companies, enable them to carry out the business methods above mentioned.

All of the dividends of the Indiana, Republic and Waters-Pierce Companies were paid either directly or indirectly into the treasury of the New Jersey Company, except, however, those which were paid on the forty-per cent of the stock of the Waters-Pierce Company owned by Mr. Pierce—those dividends were paid to Mr. Pierce, which were about seven hundred per cent per annum on the capitalization of $400,000. This $400,000, however, was not the entire assets of the Waters-Pierce Company. Its total assets amounted to about $12,000,000, which sum if added to the estimated value of the "name and good will" of the concern, the total assets would be swollen to the sum of $45,000,000.

The record seems to be silent as to the value of the assets of the New Jersey, Indiana and Republic Companies; nor does it disclose the amount of the annual dividends which have been paid by those companies.

It was a common and frequent occurrence that officers, directors and employees of the New Jersey Company and all its allied corporations, including the Waters-Pierce Company, were transferred from one of said companies to another, either by election or contract of employment.

Auditors working under Mr. Wade Hampton, general auditor of the New Jersey Company, regularly

audited the books and accounts of all these companies and reported results to him at 26 Broadway, New York City. The salaries of these auditors were fixed by Mr. Hampton, and charged to the Waters-Pierce Company by him, when auditing for that company, which were paid by it, including all of their expenses. Mr. Pierce, however, testified that he had no knowledge of that fact, and that if he had known of it he would not have permitted it. This only emphasizes the fact that the New Jersey Company exercised control over the Waters-Pierce Company without even consulting him.

Mr. H. M. Tilford, and succeeding him, Mr. R. H. McNall, was the commercial agent of the Waters-Pierce Company, in New York, and his office was in the same rooms with the New Jersey Company, and it was through him that the business of the former company was transacted with the latter.

Mr. C. L. Nichols, president of the Republic Company, was also assistant to Mr. L. J. Drake, sales-agent of the Indiana Company, both of whose offices were located at 26 Broadway, with the New Jersey Company. Mr. Nichols instructed all officers, agents and employees of the Republic Company to inform the trade that said company was an independent company and had no connection whatever with the New Jersey Company. This was done in order that it might sell oils to all persons who would not deal with the New Jersey, Waters-Pierce or other Standard Oil Companies. The bringing of this suit exposed the relations existing between the New Jersey and Republic Company, which destroyed its usefulness and necessitated its going out of business.

The same relations and conditions existing in this State between the Waters-Pierce Company and the New Jersey Company and its subsidiary corporations also existed between them in Texas, Oklahoma and

Arkansas, with the exception that Waters-Pierce had those States as its exclusive territory.

The officers of all the respondents knew the stock of their respective companies was either owned or controlled by the New Jersey Company, as before stated.

We have thus stated the most salient facts of the case, as shown by the evidence and the Master's report, to be true. Those facts, with certain incidents thereto, taken in connection with certain inferences deduced therefrom, as shown by this report, constitute the reasons assigned by him for finding that the respondents are guilty of the combination and conspiracy charged against them in restraint of trade and in fixing and maintaining prices of commodities handled by them.

The respondents make a most vigorous assault upon that finding of the Master, and insist that those facts, taken in connection with all the reasonable deductions that may be drawn from them, do not establish their guilt.

The position of the Master is, that he had the legal right to and did consider all the facts and circumstances shown by the evidence, and the relation they bore to each other, in connection with the reasonable inferences to be drawn therefrom, and, that, when so viewed and weighed, they pointed with an unerring finger to the guilt of the respondents. While, upon the other hand, counsel for respondents separate each factor of the alleged combination and trust, and each method of doing business in pursuance thereof, from each other. Then they proceed at great length to a consideration of the legality of each part and phase of the alleged combination and each of the different acts, agreements and things done in furtherance thereof, and, as found by the Master, for the purpose of showing the legality of all the transactions and methods employed by them in the conduct of their business.

In pursuance of that line of defense, the respondents, while conceding the New Jersey Company owns practically all of the stock of the Indiana and Republic Companies, and a majority of that of the Waters-Pierce Company, yet they advance the legal proposition that such ownership does not constitute an unlawful combination between them in restraint of trade, as charged in the information.

The position of counsel for informant upon that question is not entirely clear, yet they cite authorities which sustain the proposition, that where the stocks of several corporations engaged in the same line of business are placed in the hands of a trustee or in the possession of a holding company, with power and authority in the trustee or holding company to conduct and carry on the business of the several corporations, such placement of stocks and business management constitute, as a matter of law, a trust and combine in restraint of trade within the meaning of the statutes. Finck v. Granite Co., 187 Mo. 244; State ex rel. v. Standard Oil Co., 49 Ohio St. 137; Northern Securities Co. v. United States, 193 U. S. 197.]

But in each of those cases the information was predicated upon those facts, and when the evidence disclosed that those allegations were true, then those courts held as a matter of law that they constituted a trust or combination within the meaning of the anti-trust statutes. While in the case at bar the cause of action stated is that they, *the three companies,* have unlawfully and fraudulently entered into a conspiracy, combine or agreement in restraint of trade in violation of their corporate rights; and it is not alleged that a trustee was appointed or a holding corporation was organized for the purpose of taking over the stock of the respondent corporations, or that the stock and business management were turned over to such trustee or corporation for the purposes mentioned.

Under that state of the pleadings, we are not inclined to lend our assent to the proposition that the ownership of the stock alone, by the New Jersey Company, is conclusive evidence of an unlawful combination between the three respondents, as charged in the information.

But, notwithstanding the last mentioned proposition, counsel for informant insists that such ownership is admissible in evidence as a fact or circumstance tending to show the existence of the unlawful combination charged.    That was one of the questions presented to this court for determination when the case was here on a former occasion; and in passing upon that question LAMM, J., speaking for the court, said: "It may be admitted that under some circumstances corporations with no community of interest as holders of stock in each other, or even where the stock was not in the hands of a holding company as trustee, might be guilty of a violation of our anti-trust law. It might further be admitted that a trust or combination might be proved by the overt acts of the agents of respondent corporations sufficiently distinctive and significant and of such long continuance as would tread back and tend to establish the obnoxious pact or trust agreement. [State ex inf. v. Firemen's Fund Ins. Co., 152 Mo. l. c. 36, et seq.] Yet, experience has shown that stock holdings showing a community of interest, while in some cases innocuous, might in given cases be the very root from which the trust agreement grows. On principle, why may not this root be got at? In an investigation intended to lead up to the establishment of a fraudulent conspiracy between individuals, taking for illustration a fraudulent disposition of property, it could not be denied that kinship or close business intimacy would be relevant  matter, for what it was worth, be that worth much or little, and we can perceive no good reason why this investigation may not

commence at the very groundwork of these corporations, showing, if fact it be, a close relationship in stock holdings and in the personnel of officers and agents, the use of the same instrumentalities and methods, simultaneous in time and originating in the same radiating center—a sort of prenatal, natal or else postnatal disposition to combine, as it were—to be followed, of course, by sufficient proof indicating that the community of stock interest, if any, had been used as a foundation upon which to build the illegal structure denounced by the statute.'' [State ex inf. v. Standard Oil Co., 194 Mo. l. c. 155, 156.] That was one of the main questions then presented to this court for determination, but since it has been so earnestly urged again upon our attention, we have re-examined it, and, after due consideration, we are unable to see any good reason for changing our views regarding the conclusions there reached.

It is next insisted by respondents that the division of territory between the Indiana and Waters Pierce Company is not a combination in restraint of trade, and, therefore, is not illegal. Their contention is that this division of territory is not like the case where two independent mercantile companies divide a State for selling purposes, each agreeing not to sell in the other's territory. They differentiate the two cases by saying that the Indiana Company was a producer, as well as a vendor of oils, and that it had a perfect legal right to divide the State into two or more divisions, and to enter into a contract with a dealer in each of said divisions, and thereby bind itself to sell oil exclusively to each of said dealers in each of said divisions, and thereby bind each of said dealers to purchase oil exclusively from it. In other words, the Indiana Company contends that if it had confined itself to refining oil, and if by contract it had bound itself to sell exclusively to one purchaser in the northern

half of the State, and to another in the southern half, then there could have been no valid, legal objection urged against such contracts.

In the consideration of a similar question, arising under the Anti-trust Acts of Congress, SANBORN, J., in the case of Phillips v. Iola Cement Co., 61 C. C. A. 19, used the following language:

"It is now settled by repeated decisions of the Supreme Court that the test of the validity of a contract, combination, or conspiracy challenged under the anti-trust law is the direct effect of such a contract or combination upon competition in commerce among the States. If its necessary effect is to stifle competition or to directly and substantially restrict it, it is void. But if it promotes, or only incidentally or indirectly restricts, competition in commerce among the States, while its main purpose and chief effects are to foster the trade and enhance the business of those who make it, it does not constitute a restraint of inter-state commerce within the meaning of that law, and is not obnoxious to its provisions. This act of Congress must have a reasonable construction. It was not its purpose to prohibit or to render illegal the ordinary contracts or combinations of manufacturers, merchants, and traders, or the usual devices to which they resort to promote the success of the business, to enhance their trade, and to make their occupations gainful, so long as those combinations and devices do not necessarily have a direct and substantial effect to restrict competition in commerce among the States. [Hopkins v. U. S., 171 U. S. 578, 592, 19 Sup. Ct. 40, 43 L. Ed. 290; Anderson v. U. S., 171 U. S. 604, 616, 19 Sup. Ct. 50, 43 L. Ed. 300; U. S. v. Joint Traffic Assn., 171 U. S. 505, 568, 19 Sup. Ct. 25, 43 L. Ed. 259; Addyston Pipe & Steel Co. v. U. S., 175 U. S. 211, 245, 20 Sup. Ct. 96, 44 L. Ed. 136; U. S. v. Freight Assn., 166 U. S. 290, 339, 340, 342, 17 Sup. Ct. 540, 41 L. Ed. 1007; U. S. v. Northern Securities Co. (C. C.), 120 Fed. 721, 725.] The application of

this rule to the facts of the case in hand leaves no doubt that there was nothing in the contract before us obnoxious to the provisions of the anti-trust law of 1890. The Iola Cement Company had no monopoly of the manufacture or sale of cement in the United States. It was surrounded by competing manufacturers, and the contract which it made with Parr & Co., of Galveston, had no direct or substantial effect upon competition in trade among the States. It left the manufacturers who were competing with the plaintiff for the trade of the country free to select their customers, to fix their prices and to dictate their terms for the sales of the commodities they offered, so that in this regard no restraint whatever was imposed. If it had the effect to restrain Parr & Co. from using the product which they purchased to compete with other jobbers or manufacturers in the country beyond the limits of the State of Texas, this restriction was not the chief purpose or the main effect of the contract of sale, but a mere indirect and immaterial incident of it. The agreement of sale imposed no direct restriction upon competition in commerce among the States, did not constitute a restraint of that commerce, and was not obnoxious to the provisions of the act of July 2, 1890. For a more extended consideration of the principles upon which this decision is based, for a citation, review and analysis of the authorities which sustain them and which compel the ultimate conclusion which we have reached in this case, reference is made to the opinion of this court in Whitwell v. Continental Tobacco Co. (which is filed herewith), 125 Fed. 454. A repetition of the citation and review of authorities, and of the more exhaustive discussion of principles there indulged in, would be useless here, and it is omitted.''

In Oregon Steam Navigation Co. v. Winsor, 20 Wall. 64, 22 L. Ed. 315, 318, the right of a territorial division was distinctly recognized, Mr. Justice BRADLEY saying: ''In accordance with these prin-

ciples, it is well settled that a stipulation by a vendee of any trade, business or establishment that the vendor shall not exercise the same trade or business, or erect a similar establishment within a reasonable distance, so as not to interfere with the value of the trade, business or thing purchased, is reasonable and valid. In like manner a stipulation by the vendor of an article to be used in a business or trade, in which he is himself engaged, that it shall not be used within a reasonable region or distance, so as not to interfere with his said business or trade, is also valid and binding." Again, he said: "Suppose the case of two persons associated in business as partners, and engaged in a manufacture by which they supply the country with a certain article, but the process of manufacture is a secret; and they agree to separate, and one of the terms of their separation is, that one of the parties shall not sell the manufactured article in Massachusetts, where the other resides and carries on business; and that the latter shall not sell the article in New York, where his associate is to reside and carry on business. Can there be any doubt that such an agreement would be valid and binding?"

In Whitwell v. Continental Tobacco Co., 60 C. C. A. 290, 125 Fed. 454, 459, 460-63, the facts were: "A manufacturer, a corporation, and its employee restricted the sales of its products to those who refrained from dealing in the commodities of its competitors by fixing the prices of its goods to those who did not thus refrain so high that their purchase was unprofitable, while it reduced the prices to those who declined to deal in the wares of its competitors so that the purchase of the goods was profitable to them." This was held not to be, within the meaning of the Sherman Act, an arrangement to lessen competition. Judge SANBORN said: "The right of each competitor to fix the prices of the commodities which he offers for sale, and to dictate the terms upon which he will dispose of

them, is indispensable to the very existence of com-
petition. Strike down or stipulate away that right,
and competition is not only restricted, but destroyed.
. . . In the contract, combination, or conspiracy
which is charged against the defendants in this case
there is nothing of this character. The tobacco com-
pany is a manufacturer and trader, and McHie is its
employee. Conceding, for the purpose of the argu-
ment only, but not deciding, that there may be a con-
tract, combination, or conspiracy in restraint of trade
between an employer and his employee, no such con-
tract, combination, or conspiracy between them can be
a violation of this law unless it is in restraint of inter-
state commerce; and the only combination charged
against the defendants is in their combination to make
sales of the commodities of the tobacco company profit-
able to purchasers to those persons only who refrain
from dealing in the wares of their competitors. The
two defendants in this case have never been and never
intended to be competitors. There has never been any
competition, actual or possible, between them, and
hence no competition between them is or can be re-
strained by their combination to conduct the trade of
the tobacco company. The contract, combination, or
conspiracy charged against them did not restrict com-
petition between them and the independent manufac-
turers or dealers, who, according to the complaint,
were their competitors, because it left the latter free
to select their purchasers and to fix the prices of their
goods and the terms at which they would dispose of
them to all intending purchasers. The tobacco com-
pany and its competitors were not dealing in articles
of prime necessity, like corn and coal, nor were they
rendering public or quasi-public service, like railroad
and gas corporations. Each of them, therefore,
had the right to refuse to sell its commodities
at any price. Each had the right to fix the prices at
which it would dispose of them, and the terms

upon which it would contract to sell them. Each of them had the right to determine with what person it would make its contracts of sale. [In Re Greene (C. C.), 52 Fed. 104, 115; In Re Grice (C. C.), 79 Fed. 627, 644; Walsh v. Dwight (Sup.), 58 N. Y. Supp. 91, 93; Brown v. Rounsavell, 78 Ill. 589; Com. v. Grinstead (Ky.), 63 S. W. 427; Allgeyer v. Louisiana, 165 U. S. 578, 589, 17 Sup. Ct. 427, 41 L. Ed. 832]. There is nothing in the Act of July 2, 1890, ch. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), which deprived any of these competitors of these rights. If there had been, the law itself would have destroyed competition more effectually than any contract or combinations of persons or of corporations could possibly have stifled it. The exercise of these undoubted rights is essential to the very existence of free competition, and so long as their exercise by any person or corporation in no way deprives competitors of the same rights, or restricts them in the use of these rights, it is difficult to perceive how their exercise can constitute any restriction upon competition or any restraint upon interstate trade. The acts of the defendant which are alleged by the complaint in this action to constitute an unlawful restraint upon interstate commerce are nothing more than the lawful exercise of these unquestioned rights which are indispensable to the existence of competition or to the conduct of trade. The tobacco company and its employee fixed the prices of its commodities so high that the plaintiff could not profitably buy them. This was no restriction upon free competition, because it left the rivals of the company free to sell their competing commodities at any price which they elected to charge for them. It would have been no violation of the law under consideration if the tobacco company and its employee had combined to refuse to sell any of its commodities at any price, and to retire from the business in which they were engaged entirely. Much less could it be a violation

of this act for them to fix their prices too high for pro-
fitable investment by the plaintiff. The tobacco com-
pany and its employee sold its products to customers
who refrain from dealing in the goods of its competitors
at prices which rendered their purchases profitable.
But there was no restriction upon competition here, be-
cause this act left the rivals of the tobacco company
free to sell their competing commodities to all other
purchasers than those who bought of the defendants
and free to compete for sales to the customers of the
tobacco company by offering them goods at lower prices
or on better terms than they secured from that com-
pany.    The tobacco company and its employee were
not required, like competitors engaged in public or
quasi-public service,  to  sell  to  all  applicants  who
sought to buy, or to sell to all intending purchasers at
the same prices.  They had the right to select their cus-
tomers, to sell and refuse to sell to whomsoever they
chose, and to fix different prices for sales of the same
commodities to different persons.  In the exercise of
this right they selected those persons who would re-
frain from handling the goods of their competitors as
their customers, by selling their products to them at
lower prices than they offered them to others.  There
was nothing in this selection, or in the means employed
to effect it, that was either illegal or immoral.  It had
no necessary effect to directly and substantially re-
strict free competition in any of the products of to-
bacco, and it did not unlawfully restrain interstate com-
merce, because it in no way restricted the exercise of
the rights of the competitors of the tobacco company to
fix the prices of their goods and the terms of their sales
of similar products according to the dictates of their
respective wills.  It is contended, however, that this
selection by the defendants of customers who refrained
from selling the goods of their competitors violated
section 2 of the Anti-Trust Act, because it was an
'attempt to monopolize  .  .  .  part of the trade or

commerce among the several states.' It is admitted that the practice of the defendants was not only an attempt, but a successful attempt, to monopolize a part of this commerce. But is every attempt to monopolize any part of interstate commerce made unlawful and punishable by section 2 of the Act of July 2, 1890, ch. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200)? If so, no interstate commerce has ever been lawfully conducted since that act became a law, because every sale and every transportation of an article which is the subject of interstate commerce is a successful attempt to monopolize that part of this commerce which concerns that sale or transportation. An attempt by each competitor to monopolize a part of interstate commerce is the very root of all competition therein. Eradicate it, and competition necessarily ceases —dies. Every person engaged in interstate commerce neccessarily attempts to draw to himself, and to exclude others from, a part of that trade; and, if he may not do this, he may not compete with his rivals, all other persons and corporations must cease to secure for themselves any part of the commerce among the States, and some single corporation or person must be permitted to receive and control it all in one huge monopoly. The purpose of the Act of July 2, 1890, was, however, to prevent the stifling of competition, not to destroy it or to foster monopoly, and any construction of any of its provisions which would give it such an effect is unreasonable and inconsistent with the object and spirit of the law. It is an interpretation which fosters the mischief it was passed to remedy, and destroys the remedy provided to abate the evil, while a sound construction would tend to abate the mischief and to promote the remedy. It cannot, therefore, be the true meaning of the second section of this law that every attempt to monopolize any part of interstate commerce is illegal. The act must, as the Supreme Court has twice declared (Hopkins v. U. S.,

171 U. S. 578, 600, 19 Sup. Ct. 40, 43 L. Ed. 290; U. S. v. Joint Traffic Ass'n, 171 U. S. 505, 568, 19 Sup. Ct. 25, 43 L. Ed. 259), have a reasonable construction. The purpose of the second section is the same as that of the first—to prevent the restriction of competition—and the two sections ought to receive similar interpretations. The Supreme Court has declared that the true construction of the first section is that no contract, combination, or conspiracy is denounced by it unless its necessary effect is to directly and substantially restrict competition in commerce among the States. By a parity of reasoning, the correct interpretation of the second section must be that no attempt to monopolize a part of the commerce among the States is made illegal or punishable by the provisions of that section unless the necessary effect of that attempt is to directly and substantially restrict commerce among the States. The acts of the defendants had no such effect. They evidenced nothing but the legitimate efforts of traders to secure for themselves as large a part of interstate trade as possible, while they left their competitors free to do the same. It was not—it could not have been— the purpose or the effect of the second section of this law to prohibit or punish the customary and universal attempts of all manufacturers, merchants, and traders engaged in interstate commerce to monopolize a fair share of it in the necessary conduct and desired enlargement of their trade, while their attempts leave their competitors free to make successful endeavors of the same kind. The acts of the defendants were of this nature, and they did not violate the second section of the law. An attempt to monopolize a part of interstate commerce, the necessary effect of which is to stifle or to directly and substantially restrict competition in commerce among the States, violates the second section of this act. But an attempt to monopolize a part of interstate commerce which promotes, or but indirectly or incidentally restricts, competition therein, while its

main purpose and chief effect are to increase the trade and foster the business of those who make it, was not intended to be made, and was not made, illegal by the second section of the act under consideration, because such attempts are indispensable to the existence of any competition in commerce among the States.''

In Dueber Mfg. Co. v. Watch and Clock Co., 14 C. C. A. 14, 66 Fed. 637, 643, 645, 652, Judge LACOMBE said: ''The phrase used in the Act of 1890, viz: 're-straint of trade,' is no new one. It had heretofore been used by courts applying the doctrines of common law in determining the validity of contracts. It is to be presumed that the lawmakers, when they chose this phrase, intended that it should have, when used in the statute, no other or different meaning from that which had always been given to it in judicial decisions and in the common understanding. The title indicates that the phrase is so used for the act is described as one 'to protect trade and commerce against unlawful re-straints and monopolies;' and, though the title to an act cannot control its words, it may furnish some aid in showing what was in the mind of the legislator. [U. S. v. Palmer, 3 Wheat. 610]. The 'restraint of trade' which is obnoxious to the provisions of the first section must be of such kind as was, before the passage of the act, recognized as unlawful. [In re Greene, 52 Fed. 104; U. S. v. Freight Ass'n, 58 Fed. 58, 7 C. C. A. 15.] It may be assumed that the total amount of any given commodity which will be purchased by a community is limited, and when several sellers of such commodity enter into a combination in the form of a partnership, and by ingenious advertising, or by the devices of bus-iness competition, or by the offer of favorable terms to buyers, enlarge their own trade in such commodity, they restrain to some extent trade of one or more of their competitors therein. But no one, not even the plaintiff in error, contends that the statute forbids any such acts, although, if the words be taken with absolute

literalness, the phrase 'restraint of trade' is broad enough to cover them. . . . An individual manufacturer or trader may surely buy from or sell to whom he pleases, and may equally refuse to buy from or sell to anyone with whom he thinks it will promote business interests to refuse to trade. That is entirely a matter of his private concern, with which governmental paternalism has not as yet sought to interfere, except when the property he owns is 'devoted to a use in which the public has an interest;' and such public interest in the use has as yet been found to exist only in staple commodities of prime necessity. [Munn v. Illinois, 94 U. S. 113; Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468.] It is a business device, probably as old as business itself, to seek to increase the number of one's customers, and the extent of their purchases, by treating more favorably those who become exclusive customers. Certainly there is nothing unlawful or unfair in the statement to the trade by the maker of any kind of merchandise, 'My goods are for sale, only to those who will buy from me exclusively, not to others.' "

Judge WALLACE also said: "I do not question the right of the defendants to combine for their own protection against unfair competition, and in that behalf, their commodity not being one of prime necessity, to agree not to sell to those who do not buy exclusively of them, or who buy of the complainant or some other obnoxious competitor." In Vandeweghe v. Brewing Co. (Tex. Civ. App.), 61 S. W. 526, 527, it was said: "The only fact relied upon to show a trust is an agreement by the plaintiff not to sell beer to anyone else within a certain designated territory, contributory to the defendant's place of business. We think the case is distinguishable from the cases heretofore held to violate the anti-trust law, and within the doctrine announced in Gates v. Hooper, 90 Tex. 563, 39 S. W. 1079."

In Park & Sons Co. v. Nat. Druggists Ass'n, 54 App. Div. 223, 66 N. Y. Supp. 615, it was said: "It

cannot be denied that each manufacturer has the right to refuse to sell to anyone if he sees fit. If he chooses to make his goods, and sell them, he has the right to fix any price he chooses upon them. Not only so, but he has the right to select his own customers. He may agree to dispose of all his goods to one person, or he may be willing to supply the whole trade except one person; and whatever he chooses to do is a matter with which the law has no concern, because the goods are his, to be kept or sold, as he pleases. So he may not only fix his own price, but he may impose such terms as he sees fit, or can exact from his customers. These matters are absolutely within his own control. If each manufacturer is at liberty thus to control the sale of his goods, undoubtedly all may, if they see fit, agree together to enforce conditions which each one seeks to impose upon the dealing with the article which he makes. The action of each manufacturer in fixing prices and imposing conditions of sale is undoubtedly legal.''

In Fowle v. Park, 131 U. S. 88, 33 L. Ed. 67, 74, it was decided: ''A contract, by which defendants, for a valuable consideration, agreed not to sell a certain medicinal preparation, within the territory which it was covenanted complainants should occupy exclusively, nor sell to others for sale there, nor promote such sales, is valid.''

Mr. Chief Justice FULLER said: ''The vendors were entitled to sell to the best advantage, and in so doing to exercise the right to preclude themselves from entering into competition with those who purchased, and to prevent competition between purchasers, and the purchasers were entitled to such protection as was reasonably necessary for their benefit.''

In 1 Eddy on Combinations, section 224, it is said: ''Agreements which have for their object the realization of a fair price for the product manufactured and sold are not against public policy, even though in some respects they operate in restraint of trade.''

This rule was applied to the Anti-Trust Act of New York (Cohen v. Envelope Co., 56 N. Y. Supp. 588, 589), in this language: "Agreements which have for their purpose the realization of a fair price for the product manufactured and sold do not contravene any rule of public policy, even though in some respects they operate in restraint of trade."

So in Ontario Salt Co. v. Merchants Salt Co., 18 Grant's Ch. 540, it was said: "I think a distinction would be found in the consideration that here the article, the price of which was to be regulated, was not to be purchased in the market, but was actually to be produced by the parties themselves, and this product they could not be compelled to part with except on their own terms."

It will be observed by reading the foregoing cases, cited by respondents in support of their contention, that they refer to a manufacturer, and in each of said cases the manufacturer sold its merchandise to a dealer, and that manufacturer entered into a contract with that dealer, by which it bound itself to sell its goods and merchandise to him, and no one else within a designated territory, and by which the dealer also bound himself to purchase exclusively from that manufacturer during the lifetime of the contract. It is thus seen that the manufacturer and dealer only bound themselves to do that which they had a perfect legal right to do. The manufacturer had a perfect right to sell his wares to only one dealer in each town, if he saw proper to do so, or he could decline to sell to every one, in any or all of such towns, if he so chose; while, upon the other hand, the dealer also had a perfect legal right to purchase exclusively of the manufacturer, or the right to refuse to purchase from all manufacturers. It must be conceded that both of those propositions are true; and that being so, then we are unable to see any valid or legal objection that can be logically presented against such a contract as above supposed. It in no

manner prevents other manufacturers from selling the same class of goods to other dealers in the same towns in competition with those sold under the supposed contract.    There is nothing wrong legally or morally in such a contract and arrangements.    No manufacturer, in the absence of express legislation to the contrary, should be required to place his own fabrics in competition with each other.    The law is satisfied in that regard if the different manufacturers of goods are left in reasonable and fair competition with each other. It will also be observed by reading those cases, that there was no contract or agreement between different manufacturers by which they bound themselves not to sell their respective fabrics in the same towns or cities, and thereby prevent competition in the sale of their goods and wares.

But the contract involved in the case at bar, dividing the State into the north and south territory, and assigning the north half to the Indiana Company and the south half to the Waters-Pierce Company, with an agreement that they were not to sell in each other's territory, presents quite a different proposition from that just considered.

In the case at bar, the Indiana Company was not only a manufacturer of the products of petroleum, but it was also a large dealer, as large if not larger than was the Waters-Pierce Company.  Now, instead of eliminating the fact that the former was a dealer, as respondents contend we should and consider it only as a refiner of oils, we should consider it just as it is. It is both a refiner of and dealer in oils, both at retail and at wholesale; while the Waters-Pierce Company is a dealer and not a refiner.  But when we consider the fact that both of those companies are dealers in oils, and that they have divided the State into two parts, with an agreement by which they bind themselves not to sell to the trade in each other's territory,

218 Sup—27

coupled with the further fact that the Indiana Company bound itself to sell as a refiner to the Waters-Pierce Company exclusively, in that territory, with the corresponding agreement on the part of the Waters-Pierce Company to purchase exclusively from the former, presents quite a different question from that supposed by counsel for respondents, and from those considered by the courts in the cases before considered. And especially is this true when we consider the further fact that neither of said companies would sell to any other dealer except at retail prices.

In discussing a similar question which arose under the Sherman Act regarding restraint of interstate commerce, the Supreme Court of the United States in the case of Montague & Co. v. Lowry, 193 U. S. 38, 47, used this language: "It was not a combination or monopoly among manufacturers simply, but one between them and dealers in the manufactured article, which was an article of commerce between the States. United States v. E. C. Knight Company, 156 U. S. 1, did not therefore cover it." This is a complete answer against the contention of counsel for respondents. To the same effect are the cases of Northern Securities Co. v. U. S., 193 U. S. 197, 329; Swift & Co. v. United States, 196 U. S. 375, 396; Loewe v. Lawlor, 208 U. S. 274.

And in the consideration of this proposition we should not lose sight of the important position occupied by the Schofield, Shurmer & Teagle Oil Company in the oil market, and its sharp competition with respondents prior to the time it was acquired and taken over by the New Jersey Company, and the subordinate position it has occupied, and the almost total lack of competition that has existed between them since that time. These facts possess greater probative force tending to show a combination in restraint of trade when thus viewed than when considered separate and distinct from each other.

The only cases cited by counsel for respondents which, in our judgment, support their contention are the following:

In the case of Wickens v. Evans, 3 Younge & Jervis 327, the court said: ''This question, as it appears to me, is confined within a narrow compass; and, as we have all formed the same opinion, I shall state my views of it very shortly. The principles upon which the decisions upon subjects of this nature are founded have been accurately stated; and, indeed, have so frequently and so long been acted upon that they are now indisputable. A general, universal restraint of trade, inasmuch as it affects the public property, and the interest of the community, is bad . . . . But it is submitted that there may be, upon a good consideration, a partial restraint of trade; and that an agreement for that purpose is sustainable and has been sustained. The legality of partial restraint of trade has been established in a variety of cases; and the general transactions of mankind furnish daily instances of its existence. Without resorting to the aid of black cotton lines in order to divide all England into districts, there is no man engaged in trade who does not, in effect, impose some restraint upon himself, in point of practice, by confining himself within a particular district and circumscribing his trade within certain bounds. It has been supposed that the public are interested in precluding the parties from entering into the agreements now in question; but I think it very doubtful whether the benefit of the public would be best consulted by these three persons continuing to travel over the whole country, or by each confining himself to the district marked out in the map. Let us see what is the case now presented. It appears, according to the recital in the agreement, that these three persons, in carrying on their business of box-makers, had traveled into various parts of the country to vend their boxes and

trunks, and had sustained great loss and inconvenience by reason of exercising this trade in the same places. This is the mischief and evil recited in the agreement— and what is the remedy they propose? Not a monopoly, except as between themselves, because every other man may come into their districts and vend his goods. All they propose is, that they shall not carry on rivalry, nor continue any longer to trade throughout the country. This, then, is only a partial restraint of trade. But it is said that, admitting that to be so, there is no consideration extrinsic of the agreement itself; and that agreement is illustrated by the cases of a master giving up his business to his apprentice or to his journeyman. It strikes me, however, that in the present case there is as good a consideration as in either of those alluded to. Each party here, before the agreement entered into, has a trade in all the districts and he agrees to retire and to relinquish that trade in two of those districts, in order to secure the other in undisturbed possession. An objection is then made to that part of the agreement by which it is stipulated that, in case other persons shall begin to trade as boxmakers in any of the districts, the parties shall meet to devise means to promote their own views. What those means may be it is unnecessary to surmise, but we can not presume that they will be illegal; and, therefore, the stipulation does not affect the validity of the agreement.''

In Hearn v. Griffin, 2 Chitty 407, the following colloquy took place between court and counsel:

''Abbott, for defendant, argued in support of a demurrer to a declaration which stated that plaintiff was the proprietor of the one coach and the defendant of another, and that an agreement was made between them that they should not run in opposition to each other, but should each charge the same price to passengers, and this stipulation, it was urged, was in restraint of that competition in trade which is so con-

ducive to the interest of the public, and was consequently void.

"ELLENBOROUGH, C. J.: How can you contend that it is in restraint of trade? They are left at liberty to charge what they like, though not more than each other, and, by agreement, particular days and times for each to run in the week are fixed. This is merely a convenient mode of arranging two concerns which might otherwise ruin each other.

"Abbott then observed that there was a stipulation not to be engaged in other coach concerns or in any other coach. The whole deed upon oyer was before the court, and the court will not support this contract. There is no consideration but the mutual restraint. There is no averment that they continued to run their coach. There was no partnership interest between the plaintiff and the defendant, and they were proprietors of different coaches, and the covenant was in restraint of the other coach, though the parties covenanting might cease to run."

"BAILEY, J.: If one cease to run, is not the contract then at an end? And if you do not perform your part of the contract, you should show your excuse. A general restraint is bad."

"ELLENBOROUGH, C. J.: If this argument could be sustained, then a covenant in an indenture of partnership, that neither of the parties should be engaged in any other business with any other persons would not be good, because it might prevent the public from having the industry in another business. Each contracting party here has one day to work his particular coach, nor is there any limitation as to the size of the coach; the defendant may have a long coach. This agreement does not preclude a third or more persons from starting in opposition to plaintiff and defendant."

Gale v. Reed, 8 East 80, was as follows:

Defendant made a contract with plaintiffs, by the terms of which, among other things, he agreed to transfer his business of cord-making to plaintiff—he further agreed not to engage in such business during his lifetime, except for the government, or any public board. The breach assigned is: "That after the making of the indenture the defendant carried on the business of a rope-maker, and made cordage for divers persons other than by virtue of any contract which the defendant had entered into after the making of the said indenture, to make cordage, i. e., for government, contrary to his covenant."

"ELLENBOROUGH, C. J.: It has been contended on the part of the defendant, that the covenant on which the breaches have been assigned is void, as being a contract made in particular restraint of trade, without adequate consideration to the party restrained upon the authority of Mitchell v. Reynolds, 1 P. Wms. 181, and other cases. . . . . Laying, therefore, this objection of form out of the case, it remains to be considered whether the covenant in question be void, upon the ground already mentioned, viz: as being a particular restraint of trade, without adequate consideration. And the object and intention of the parties to this indenture appears to have been to devolve upon and exclusively to appropriate to the Gales, the plaintiffs, all the beneficial private trade of the defendant in this business of rope-making; leaving him at liberty to make and execute on his own account such contracts for cordage as he had made or might enter into with the government or any of the public boards. The indenture uniformly contemplates this trade as a trade carried on upon credit only. The only compensation which the indenture provides for the defendant as the consideration for his restraint, and for the benefit to be derived for the plaintiffs in this respect, is a payment and allowance of two shillings on every hundred weight of cordage. . . . .

"Supposing the former part of this covenant to be, for the reason given, properly narrowed by the terms of dealing to which it refers, it will hardly be contended that the more general words to be found in the latter part of the same covenant shall not be restrained and qualified by the same context. The words are 'and shall not nor will employ any other person or persons whomsoever to make any other cordage, or any part thereof, under any pretense whatsoever.' To construe them according to the strict letter would impose a restraint without compensation to the party restrained, and to the possible prejudice of the public. Whereas to construe them with reference to the immediately antecedent words of the covenant in question, and the true scope and object of the whole indenture, renders the sense uniform and consistent throughout, makes the compensation and restraint commensurate with each other, and obviates the possible inconvenience, both public and private, which might result from a different construction. And this mode of construction is agreeable to the received rules and maxims, as well as to the authorities of law; for as is said in Plowd. 18: 'The scope and end of every matter is principally to be considered; and if the scope and end of the matter be satisfied, then is the matter itself and the intent thereof also accomplished.' . . .

"Feeling ourselves therefore warranted, by these and other authorities of law, in narrowing, according to the intention of the deed, the general words of the restrictive covenant to those cases of restraint only in which the party restrained can have the stipulated benefit for his restraint, and the party in whose favor the restraint is created, shall choose to avail himself of the restraint imposed upon the other, the covenant in question will stand clear of the objection made to it, as being a particular restraint of trade without adequate consideration, and that objection being removed out of the way (as for

the reasons above stated we think it is), the plaintiff is entitled to judgment."

In Central Shade-Roller Co. v. Cushman (143 Mass. 353) 9 N. E. 629, it was held that where several parties, severally engaged in the business of manufacturing and selling balance shade-rollers, for the purpose of avoiding competition, organize themselves into a corporation, and severally enter into an agreement with the corporation, so organized, that all sales of the shade-roller shall be made in the name of the corporation, and at once reported to it; that, when either party shall establish an agency in any city for the sale of a roller made exclusively for that purpose, no other party shall take orders for the same roller in the same place; and that the prices for rollers of the same grade, made by different parties, shall be the same, and shall be, according to a schedule contained in the contract, subject to changes which may be made by the corporation upon recommendation of three-fourths of the stockholders, the agreement is valid, and not void as in restraint of trade.

These two last cases seem to fully support the contention of respondents; but there are two reasons why they are not controlling authorities in the case at bar:

FIRST. Because they arose at a time when the industrial, commercial and transportation institutions of the country were not numerous, comparatively small, with limited means and restricted trade. Under those conditions the effects of such combinations as those mentioned in those cases were so small and insignificant, the common law seemed to have ignored them, the rules of which were not near so stringent as are the provisions of our anti-trust statutes. But the extraordinary growth of those institutions in modern times, with capitalizations and assets reaching up into the hundreds of millions of dollars, few in number, driving and consuming small competitors as the prairie fire consumed the dry grass, with business girdling the

globe and extending from pole to pole, presents a totally different trade condition in this country from that which existed then. Let three or four of those gigantic institutions enter into such combinations as those mentioned in those cases, regarding any line of commodities, and the effect would be instantly felt by the entire country, monopolies would spring up, production and distribution would be curtailed, commerce would be restrained, prices would go up, and living expenses would increase; while, upon the other hand, the smaller industrial institutions would decrease in numbers; laborers would be thrown out of employment; the smaller producer and dealer would be crushed by sheer force of capital; and stagnation and starvation would befall all who were so unfortunate as not to belong to the combinations. Under these changed conditions, in my judgment, even the common law rules against restraint of trade are fully ample to abate and prohibit such combinations. Clearly those cases are not in harmony with the great mass of authority upon that subject in this country and in England.

SECOND. Because, conceding the common law was not ample to control such combination, yet our trust statutes were enacted for the purpose of aiding and supplementing the common law along those lines; but the common law rule as announced by those decisions is in direct conflict with our statutes upon that subject. It is perfectly apparent by reading those cases and then by reading our anti-trust statutes, that they are diametrically opposed to each other. Those cases sustain contracts made in restraint of trade, while the statutes declare all such contracts to be null and void. The Massachusetts case seems to have gone off on the ground that the shade-rollers were not articles of prime necessity; but our statutes make no distinctions as to the kind of goods affected by the trust agreement. But suppose it did, it cannot be contended

that the products of petroleum are not articles of prime necessity for the people.

We are, therefore, of the opinion that the Master properly considered all of these facts in connection with all the other facts and circumstances disclosed by the evidence in the case.

It is next contended by counsel for respondents, that at common law they had the legal right to cut prices on sales of oils, or to give rebates from those prices, in order to secure the trade from their competitors. This contention calls for a review of the authorities upon that question.

Mogul Steamship Co. v. McGregor (L. R. 21 Q. B. D. 544), affirmed in the Court of Appeals (L. R. 23 Q. B. D. 598), and in the House of Lords (L. R. App. Cas. [1892] 25), is the leading case upon the subject. The facts as stated in the syllabus were: ''The defendants, who were firms of ship-owners trading between China and Europe, with a view of obtaining for themselves a monopoly of the homeward tea-trade and thereby keeping up the rate of freight, formed themselves into an association, and offered to such merchants and shippers in China as shipped their tea exclusively in vessels belonging to members of the association a rebate of five per cent on all freights paid by them.''

Lord COLERIDGE, C. J. (L. R. 21 Q. B. D. 544, 552, 553, 554), at *nisi prius,* said: ''The defendants are traders with enormous sums of money embarked in their adventures, and naturally and allowably desirous to reap a profit from their trade. They have a right to push their lawful trade by all lawful means. They have a right to endeavor by lawful means to keep their trade in their own hands and by the same means to exclude others from its benefits, if they can. Amongst lawful means is certainly included the inducing by profitable offers customers to deal with them rather than with their rivals. It follows that they may, if they think fit;

endeavor to induce customers to deal with them ex-clusively by giving notice that only to exclusive custom-ers will they give the advantage of their profitable of-fers. I do not think it matters that the withdrawal of the advantages is out of all proportion to the injury inflicted on those who withdraw them by the customers, who decline to deal exclusively with them, dealing with other traders. It is a bargain which persons in the position of the defendants here had a right to make, and those who are parties to the bargain must take it or leave it as a whole. Of coercion, of bribing, I see no evidence; of inducing, in the sense in which the word is used in the class of cases to which Lumley v. Gye (2 E. & B. 216), belongs, I see none either. One word in passing only on the contention that this combination of the defendants was unlawful because it was in re-straint of trade. It seems to me it was no more in re-straint of trade, as that phrase is used for the purpose of avoiding contracts, than if two tailors in a village agreed to give their customers five per cent off their bills at Christmas on condition of their customers' dealing with them and with them only. Re-straint of trade, with deference, has in its legal sense nothing to do with this question. . . . . It must be remembered that all trade is and must be in a sense selfish; trade not being infinite, nay, the trade of a particular place or district being possibly very limited, what one man gains another loses. In the hand to hand war of commerce, as in the conflicts of public life, whether at the bar, in Parliament, in medicine, in engineering (I give examples only), men fight on with-out much thought of others, except a desire to excel or to defeat them. Very lofty minds, like Sir Philip Sidney with his cup of water, will not stoop to take an advantage, if they think another wants it more. Our age, in spite of high authority to the contrary, is not without its Sir Philip Sidneys; but these are counsels of perfection which it would be silly indeed to make

State ex inf. v. Standard Oil Co.

the measure of the rough business of the world as pursued by ordinary men of business. The line is in words difficult to draw, but I cannot see that these defendants have in fact passed the line which separates the reasonable and legitimate selfishness of traders from wrong and malice. In 1884 they admitted the plaintiffs to their conference, in 1885 they excluded them, and they were determined, no doubt, if they could, to make the exclusion complete and effective, not from any personal malice or ill-will to the plaintiffs as individuals, but because they were determined, if they could, to keep the trade to themselves; and if they permitted persons in the position of the plaintiffs to come in and share it they thought, and honestly, and, as it turns out, correctly thought, that for a time at least there would be an end of their gains.''

In affirming this view (L. R. 23 Q. B. D. 598, 614, 616, 620, 625) in the court of appeal, BOWEN, L. J., said: ''They have done nothing more against the plaintiffs than to pursue to the bitter end a war of competition waged in the interest of their own trade. To the argument that a competition so pursued ceases to have a just cause or excuse when there is ill will or a personal intention to harm, it is sufficient to reply (as I have already pointed out) that there was here no personal intention to do any other or greater harm to the plaintiffs than such as was necessarily involved in the desire to attract to the defendants' ships the entire tea freights of the ports, a portion of which would otherwise have fallen to the plaintiff's share. I can find no authority for the doctrine that such a commercial motive deprives of 'just cause or excuse' acts done in the course of trade which would but for such a motive be justifiable. So to hold would be to convert into an illegal motive the instinct of self-advancement and self-protection, which is the very incentive to all trade. To say that a man is to trade freely, but that he is to stop short at any act which is calculated to harm other tradesmen,

and which is designed to attract business to his own shop, would be a strange and impossible counsel of perfection. But we were told that competition ceases to be the lawful exercise of trade, and so to be a lawful excuse for what will harm another, if carried to a length which is not fair or reasonable. The offering of reduced rates by the defendants in the present case is said to have been 'unfair.' This seems to assume that, apart from fraud, intimidation, molestation, or obstruction, of some other personal right *in rem* or *in personam*, there is some natural standard of 'fairness' or 'reasonableness' (to be determined by the internal consciousness of judges and juries) beyond which competition ought not in law to go. There seems to be no authority, and I think, with submission, that there is no sufficient reason for such a proposition. It would impose a novel fetter upon trade. The defendants, we are told by the plaintiffs' counsel, might lawfully lower rates provided they did not lower them beyond a 'fair freight,' whatever that may mean. But where is it established that there is any such restriction upon commerce? And what is to be the definition of a 'fair freight?' It is said that it ought to be normal rate of freight, such as is reasonably remunerative to the ship owner. But over what period of time is the average of this reasonable remunerativeness to be calculated? All commercial men with capital are acquainted with the ordinary expedient of sowing one year a crop of apparently unfruitful prices, in order by driving competition away to reap a fuller harvest of profit in the future; and until the present argument at the bar it may be doubted whether ship owners or merchants were ever deemed to be by law bound to conform to some imaginary 'normal' standard of freights or prices, or that Law Courts had a right to say to them in respect of their competitive tariffs, 'Thus far shalt thou go and no further.' To attempt to limit English competi-

tion in this way would probably be as hopeless an endeavor as the experiment of King Canute. But on ordinary principles of law no such fetter on freedom of trade can in my opinion be warranted. A man is bound not to use his property so as to infringe upon another's right. *Sic utere tuo ut alienum non laedas.* If engaged in actions which may involve danger to others, he ought, speaking generally, to take reasonable care to avoid endangering them. But there is surely no doctrine of law which compels him to use his property in a way that judges and juries may consider reasonable; see Chasemore v. Richards (7 H. L. C. 349). If there is no such fetter upon the use of property known to the English law, why should there be any such fetter upon trade? . . . In the result, I agree with Lord COLERIDGE, C. J., and differ, with regret, from the Master of the Rolls. The substance of my views is this, that competition, however severe and egotistical, if unattended by circumstances of dishonesty, intimidation, molestation, or such illegalities as I have above referred to, gives rise to no cause of action at common law. I, myself, would deem it to be a misfortune if we were to attempt to prescribe to the business world how honest and peaceable trade was to be carried on in a case where no such illegal elements as I have mentioned exist, or were to adopt some standard of judicial 'reasonableness' or of 'normal' prices, or 'fair freights,' to which commercial adventurers, otherwise innocent, were bound to conform.''

FRY, L. J. said: ''The defendants did not aim at any general injury of the plaintiffs' trade, or any reduction of them to poverty or insolvency; they only desired to drive them away from particular ports, where the defendants conceived that the plaintiffs' presence interfered with their own gain. The damage to be inflicted on the plaintiffs was to be strictly limited by the gain which the defendants desired to win for themselves.''

In the House of Lords (L. R. App. Cas. (1892) 25, 40, 43, 48, 49, 50, 51, 54, 58-59), Lord HALSBURY, L. C., said:   "I am of opinion, therefore, that the whole matter comes round to the original proposition, whether a combination .to trade, and to offer, in respect of prices, discounts, and other trade facilities, such terms as will win so large an amount of custom as to render it unprofitable for rival customers to pursue the same trade is unlawful, and I am clearly of the opinion that it is not."

Lord WATSON said: "I cannot for a moment suppose that it is the proper function of English courts of law to fix the lowest prices at which traders can sell or hire, for the purpose of protecting or extending their business,  without committing a legal wrong which will subject them in damages.  Until that becomes the law of the land, it is, in my opinion, idle to suggest that the legality of mercantile competition ought to be gauged by the amount of the consideration for which a competing trader thinks fit to part with his goods or to accept employment.  . . . .  The only means by which they endeavored to obtain shipments for their vessels, to the exclusion of others, was the inducement of cheaper rates of freight than the appellants were willing to accept."

Lord BRAMWELL said: "If there were two shopkeepers in a village and one sold an article at cost price, not for profit therefore, but to attract customers or cause his rival to leave off selling the article only, it could not be said he was liable to an action.  I cannot think that the defendants .did more than they had a legal right to do.  I adopt the vigorous language and opinion of FRY, L. J.: "To draw a line between fair and unfair competition, between what is reasonable and unreasonable, passes the power of the courts.' "

Lord MORRIS said: "It is not illegal for a trader to aim at driving a competitor out of trade, provided the motive be his own gain by appropriation of the

trade, and the means he uses be lawful weapons. Of the first four of the means used by the defendants, the rebate to customers and the lowering of the freights are the same in principle, being a bonus by the defendants to customers to come and deal exclusively with them. The sending of ships to compete, and the indemnifying other ships was 'the competition' entered on by the defendants with the plaintiffs. The fifth means used, viz., the dismissal of agents, might be questionable according to the circumstances; but in the present case, the agents filled an irreconcilable position in being agents for the two rivals, the plaintiffs and the defendants. Dismissal under such circumstances became, perhaps, a necessary incident of the warfare in trade. All the acts done, and the means used by the defendants were acts of competition for the trade. There was nothing in the defendants' acts to disturb any existing contract of the plaintiffs, or to induce any one to break such. Their action was aimed at making it unlikely that any one would enter into contracts with the plaintiffs, the defendants offering such competitive inducements as would probably prevent them. The use of rhetorical phrases in the correspondence cannot affect the real substance and meaning of it. . . . I cannot see why judges should be considered specially gifted with prescience of what may hamper or what may increase trade, or of what is to be the test of adequate remuneration. In these days of instant communication with almost all parts of the world competition is the life of trade, and I am not aware of any stage of competition called 'fair' intermediate between lawful and unlawful. The question of 'fairness' would be relegated to the idiosyncrasies of individual judges. I can see no limit to competition, except that you shall not invade the rights of another.''

Lord FIELD said: "It is absolutely. unnecessary to consider whether these grounds were morally or com-

mercially justifiable. They were not unlawful, and they were of a nature legitimately, if not necessarily, to be taken into account in carrying on the respondents' business with profit.''

Lord HANNEN said: ''The object of every trader is to procure for himself as large a share of the trade he is engaged in as he can. If then the object of the defendants was legitimate, were the means adopted by them open to objection? I cannot see that they were. They sought to induce shippers to employ them rather than the plaintiffs by offering to such shippers as should, during a fixed period, deal exclusively with them the advantage of a rebate upon the freights they had paid. This is, in effect, nothing more than the ordinary form of competition between traders by offering goods or services at a cheaper rate than their rivals.''

In Lough v. Outerbridge (143 N. Y. 282, 38 N. E. 292, 296) it was said of the right to grant rebates when not prohibited by statute:

''The monopoly which the law views with disfavor is the manipulation of a business in which the public are interested in such a way as to enable one or a few to control and regulate it in their own interest, and to the detriment of the public, by exacting unreasonable charges. But when an individual or a corporation has established a business of a special and limited character, such as the defendants in this case had, they have a right to retain it by the use of all lawful means. That was what the defendants attempted to do against a competitor that engaged in it, not regularly and permanently, but incidentally and occasionally. The means adopted for this purpose was to offer the service to the public at a loss to themselves whenever the competition was to be met, and, when it disappeared, to resume the standard rates, which, upon the record, did not at any time exceed a reasonable and fair charge. I cannot perceive anything unlawful or against the public good in seeking by such means to retain a business

which it does not appear was of sufficient magnitude to furnish employment for both lines."

In Walsh v. Dwight (40 App. Div. 513, 58 N. Y. Supp. 91, 92, 93, 94), it was, as stated in the syllabus, decided: "An agreement by a manufacturer with his customers to give them a rebate if they should refuse to sell his article, or other similar articles, at less than a certain price, is not a restraint of trade."

INGRAHAM, J., said: "The defendants simply offered to parties purchasing their goods to make a reduction in the prices of goods sold, in consideration of the purchasers agreeing not to sell the goods at a less price than that named, and not to sell the goods of other manufacturers at a less price than that at which they agreed to sell the defendants' goods. It is difficult to see upon what ground it can be claimed that such a contract is illegal. That the defendants would have the right to establish agencies for the sale of their goods, or to employ others to sell them, at such prices as the defendants should designate, cannot be disputed. Nor can it be that a manufacturer of merchandise cannot agree to sell to others upon condition that the vendees, in selling at retail, should charge a specified price for the goods sold, or should sell only the manufactured products of the manufacturer. If a dealer in articles of this kind, for his own advantage agrees to confine his business to a particular line of goods, or agrees with the manufacturer to charge a particular price for the articles which he sells in his business such an agreement is not illegal, as in restraint of trade or as tending to create a monopoly, as there is nothing in the agreement to prevent others from engaging in the business or the manufacturers of other articles from selling their products to anyone who is willing to buy. There is nothing to prevent an individual from selling any property that he has at any price which he can get for it. . . . . There is nothing in this contract that restrains or pre-

vents competition in the supply or the price of any art-
icle or commodity. The act is entitled, 'An Act to
prevent monopolies in articles of general necessity,'
and it makes illegal a contract or combination whereby
competition in the State of New York in the supply or
price of any article or commodity of common use may
be restrained or prevented for the purpose of advanc-
ing prices. This act did not have the effect of prevent-
ing a manufacturer from fixing the price at which his
articles should be sold, or from making an agreement
with those persons who acted as the jobbers or retail-
ers of his manufactured articles that they would deal
exclusively in his merchandise, or 'would not sell the
merchandise of other persons at a less price than that
for which his product was sold. The act was evident-
ly intended to prevent manufacturers or dealers in any
article or commodity of common use from combining
together to advance the price of such article or com-
modity, by which competition in the supply or price of
the same would be restricted or regulated; but a con-
tract by a single manufacturer as to the price at which
his goods, when manufactured, should be sold by those
selected by him for the purpose of sale or distribution,
would not be a contract by which competition in the
supply or price of the commodity would be restrained
or prevented. All of the manufacturers could com-
pete with these defendants in the sale of these goods,
or the making of a contract such as was made by the
defendants. The contract in question simply gave to
such of their customers as chose to make the agree-
ment with them an advantage as to price for which the
goods were purchased which those who refused to come
to such an understanding did not share. That such an
agreement is not illegal has been settled by a long line
of authorities."

In In Re Greene, 52 Fed. 104, 116, 117, 118, Mr.
Justice Jackson said: "Was the arrangement with the
Boston purchasers, as to making them a rebate upon

the conditions stated, an attempt to monopolize any part of the trade and commerce among the States in distillery products? It is not alleged, nor is it to be inferred from anything that is set forth, that said purchasers bound themselves, or entered into any contractual obligations or understanding, to buy their distillery supplies exclusively from distributing agents of said Distilling & Cattle Feeding Company. They were left at perfect liberty to purchase when, where, or from whom they pleased. No contractual or other restraint was placed upon them. Upon certain conditions, which it was entirely optional with them to comply with or disregard, a rebate was promised by the seller. Such an arrangement does not amount to a contract to purchase exclusively from said distilling company or its distributing agents. But, suppose it did, there was nothing in such an agreement unlawful or in contravention of the statute. The promise of a rebate, as an inducement for exclusive trading, certainly does not constitute an 'attempt to monopolize,' when the purchaser is left at liberty to buy where he pleases, and when all other sellers of the article are left unrestrained in offering the same, or greater, inducements. As to the remaining condition upon which the rebate was to be payable, the same observation may be made. The purchasers were placed under no contractual or other restraint in respect to the price at which they should sell. They were simply offered a rebate, as an inducement not to undersell the vendor's distributing agents, two of whom were located at Boston, Mass. The arrangement relied on, considered either in detail or as a whole, involved no 'attempt to monopolize any part of the trade or commerce among the States.' The rebate promised, upon condition of exclusive purchases and not underselling the vendor's distributing agents, was a legitimate method of inducing trade; but the means thus employed in no way operated to prevent or restrain others from offering the same, or greater, in-

ducements. The condition as to not selling at lower prices than those of the distributing agents may have had a tendency to maintain prices, but that would not have been an attempt to monopolize trade. The inducements offered for the exclusive trade, and to sell at no lower prices than the price list of the distributing agents, was not prejudicial to the public. It was in no way contrary to public policy, or an unlawful restraint of trade, as will be seen from the authorities hereinafter referred to. '. . The matter of the promised rebate upon the same conditions as set forth in the second count, which is charged to have been a contract in restraint of trade and commerce among the States, and between the State of Massachusetts and other states, does not constitute any offense against the United States, or in any way contravene the first section of the Act of July 2, 1890, because there was actually no contract which bound, or attempted to bind, the Massachusetts purchasers of alcohol, as to where or from whom they could make further purchases during the period stated, nor as to the price or prices at which they should sell. They were simply offered an inducement in respect to those matters, which they were at perfect liberty to comply with or decline. They were not restrained by any contractual obligation during the stipulated period. The agreement was wholly unilateral during that period. Upon compliance with the conditions as alleged in the fourth count, they were entitled to the rebate; but such compliance had no retroactive operation to create a valid and subsisting contract between the parties prior thereto, or during the period intervening between the date of the promise and the full compliance with the conditions on which the rebate was to be paid. During that period there was between the parties no contract in restraint of trade. But suppose the arrangement could by any possibility be construed into a contract between the parties from the date of the promise, or during the stipulated period,

it could not be held to be a contract in restraint of trade. It is not deemed necessary to review the authorities upon the subject of contracts in restraint of trade, nor would it be at all profitable."

In Re Corning, 51 Fed. 205, 211, involved the question, the Government contending that the granting of rebates was a violation of the Sherman Anti-Trust Act. Judge RICKS, in denying the contention, said: "Such dealers were offered the rebate as an inducement to purchase exclusively from the defendants, and to sell at the prices defendants fixed; but there is no contract averred by which the dealers obligated themselves to do so. In what respects, then, are these acts charged different from the customary efforts of manufacturers or dealers to increase the sale of their products and push their business by the many artifices of trade? There are no contracts averred, as between the defendants and their customers, which are in restraint of trade. Their acts are rather intended to increase their trade, but not by restraining the liberty of the customer to deal with others, if he wishes to, or can do so, with advantage to himself. If these acts are illegal and in restraint of trade, and if they constitute a monopoly under this act, it may well be denominated an act to restrain legitimate enterprise, and limit and qualify the ownership in property. The acts charged are common and frequent to many branches of manufacture and trade, and if the defendants are guilty in the manner of making sales of their products as set forth in the indictment, the act is more sweeping in its provisions than ever contemplated by Congress, as manifestly appears from the debates in the Senate when the act was before it for consideration."

In Re Terrell, 51 Fed. 213, 215, was a like case. Judge LACOMBE said: "The points of law arising upon this indictment were all carefully considered by Judge RICKS in his opinion (filed June 11, 1892, N. Dist. Ohio) on application for a removal in In Re Corning, 51 Fed.

205. In that opinion I entirely concur. . . During
that period they bought such products only from cer-
tain named dealers in a limited number of States, and
sold only at prices fixed by the defendants; but they
did so only because they chose to—because the offer
of a rebate to purchasers who would thus conduct their
business was an inducement operating upon their self
interest. No obligation of any kind constrained them
to do so during that entire period, certainly, no con-
tract restrained them, for there was no contract
in existence. They were entirely free to buy from
whom they pleased, and to sell at any price they chose.
The statute does not prohibit the offering of special
inducements to such purchasers as shall make all their
purchases from a single concern, and shall sell only at
the prices fixed by it, even though those inducements be
so favorable as to accomplish their object."

In Ex Parte Benson & Co., 18 S. C. 38, 44 Am.
Rep. 564, 567, 568, it was said: "Independent of stat-
utes and provisions in their charters restricting cor-
porations within certain limits, they stand in the com-
munity as other individuals invested with the power
to contract and be contracted with, and the validity
of their contracts depends upon the same principles
which govern in contracts between natural persons.
It is too vague to say, in general terms, that the con-
tract is inequitable and against public policy, and
therefore not enforceable. To be void on such grounds
it must run counter to some known principle of equity
or contravene some well established doctrine of pub-
lic policy forbidding it. We do not know that this
contract was obnoxious to any of these objections; nor
in the face of the testimony of the experienced superin-
tendent who gave it, can we say that it was unnecessary.
The cotton which he brought to the head of his road
at Anderson Court House was grown in the State of
Georgia, at a distance from Anderson. The Savannah
river, running between Anderson and Hartwell, was its

natural outlet to market, and, no doubt, afforded cheaper transportation. With these obstacles in the way, it required some inducement to be held out so as to bring this cotton to the Greenville road. And so long as the charges against others were not unreasonable, and in no way increased by the rebate offered to it, what ground is there for the courts to interfere? It is the province of the court to enforce contracts, not to destroy them.''

In dealing with this subject it was, in Cowden v. Pacific C. S. S. Co., 94 Cal. 470, 29 Pac. 873, 874, 875, said: ''The fundamental and statute law of the various States upon this subject appears to have been founded upon the principles embodied in the early acts of parliament pertaining to the conduct and control of railways as common carriers, rather than upon the common law of England. Indeed, we have been able to obtain but few direct adjudications from English courts upon this question, owing to the fact that it would seem the business of inland common carriers in that country was not a matter of great concern until railroads were operated; and, immediately subsequent to that great epoch in the world's progress, statutory enactments followed, entirely taking away from the courts the necessity of any further application of the common law rights and remedies. If the common law were as appellant here contends it to be, there would have been no necessity for parliament to have enacted these stringent 'equality clauses,' as they were termed. . . . . During the progress of the argument in Baxendale v. Railroad, 4 C. B. (N. S.) 78, Justice BYLES said: 'I know no common law reason why a carrier may not charge less than what is reasonable to one person, or even carry him free of all charge.' ''

What has been said is peculiarly applicable to a private business as distinguished from a public employment. Thus, in Beale & Wyman on Railroad Rate Regulation, section 1, it is said: ''In private business-

es, one may sell or not, as one pleases, manufacture
what qualities one chooses, demand any price that can
be got, and give any rebates that are advantageous.
But in public businesses one must serve all that apply
without exclusive conditions, provide adequate facili-
ties to meet all the demands of the consumer, exact only
reasonable charges for the services that are rendered,
and between customers under similar circumstances
make no discriminations."

In Whitwell v. Continental Tobacco Co., 60 C. C.
A. 290, 125 Fed. 454, 461, Judge SANBORN said: "The
tobacco company and its employee were not required,
like competitors engaged in public or quasi-public ser-
vice, to sell to all applicants who sought to buy, or to
sell to all intending purchasers at the same prices.
They had the right to select their customers, to sell and
to refuse to sell to whomsoever they chose, and to fix
different prices for sales of the same commodities to
different persons. In the exercise of this right they
selected those persons who would refrain from hand-
ling the goods of their competitors as their customers,
by selling their products to them at lower prices than
they offered them to others."

These authorities clearly sustain the proposition
that, at common law, traders, manufacturers and com-
mon carriers have the right to give rebates to their
patrons and customers in order to secure and retain
their business. But it will be seen by reading those
cases that the rebates were given in order to secure
business and not for the purpose of stifling competi-
tion, or as a means by which to control, fix and main-
tain prices.

It has not and cannot be seriously contended that
the Legislature does not possess the power to enact
laws preventing all rebates being made the object of
which is in restraint of trade or which tends to fix and
maintain prices.

If therefore rebates are used as a means in pursuance of a combine or agreement in restraint of trade, or for the purpose of fixing and maintaining prices, then such combination or agreement is prohibited by the statutes, and is, of course, void on that account. [State ex inf. v. Armour Packing Co., 173 Mo. 356.]

Respondents, however, contend that there is no evidence in this record which tends to show that the rebates were made for any such purposes. We are unable to lend our concurrence to that contention.

When we consider the system of espionage established and maintained by them, over the business of their competitors, the independent oil companies, and by which they acquired perfect knowledge of their business; and then, as the evidence tends to show, by the means of rebates, prevented all of them from doing more than ten to fifteen per cent of the aggregate oil business of the State, and by the same means fixed and maintained the prices at which all oils were sold in the State—not only by themselves but also by all of the independent companies—then it is difficult to see how it can be logically contended that the rebate system maintained by respondents does not tend to prove the unlawful conspiracy and combination, in restraint of trade, complained of in the information.

We are of the opinion that the rebates made in the manner disclosed by the evidence in this case tends to show there was a combination or agreement existing between respondents, which is violative of the anti-trust statutes of this State.

When we view this case as an entirety, we are unable to see how the Master could have honestly reached any other conclusion than that found in his report filed herein.

Let us take a birds-eye view of this case.

The Standard Oil interests of this country are represented by some eight or ten subsidiary corporations, diffused throughout the States, and are matrixed

in, if I may so use that word, and operated from the Standard Oil Company of New Jersey, with a capitalization of $110,000,000. These minor companies, including the respondents, are but parts of, and derive their power, character and business policies and directions from, that mother company.

The New Jersey Company either owns all or the majority of the stock of all of said minor companies. It elects their officers and directors, and formulates and outlines their business policies. The officers and directors thus chosen carry out those policies to the letter, with daily, monthly and annual reports of their stewardship. The office of the New Jersey Company is located at 26 Broadway, New York City; and each and all of these minor companies have a representative located in that same office who conduct all business transactions which take place between them and that company. That company also has located in the office mentioned representatives who inspect and audit the books and papers of all of said companies and otherwise assist and participate in the arrangement and control of their business. In other words, the New Jersey Company keeps in touch with and is constantly informed of the business policies and transactions to the minutest detail.

The New Jersey Company, either through itself or through some one of its subsidiary companies, furnishes to all of said companies all the oils and the products of petroleum handled by them; and neither it nor they will sell any of such commodities to any other, or independent company, except in a few instances where they have offered to make such sales at retail prices.

The New Jersey Company also furnishes the pipe lines and tank cars through which and in which all of the oil handled by those companies is transported, from one point to another, with the exception of the Waters-Pierce Company; it owns and uses about one-half of the tank cars required to transport its oils, and the

New Jersey Company furnishes the remainder. The record also discloses the fact that none of these companies will transport or permit their cars to be used for the transportation of oils for any independent company.

This record also discloses the fact that there has never been any genuine competition for trade between any of these companies, nor cutting of prices; while, upon the other hand, they have waged the most relentless war and competition against each and all of the independent companies. In order to drive out all competitors and to monopolize the entire trade, they inaugurated and carried on a perfect system of espionage, by which they acquired complete knowledge of their competitors' business, and followed almost every barrel of independent oil shipped over a railroad to the very door of the dealer, and there, by means of cutting prices, offering rebates, misrepresentation and deception, attempted to have the sale countermanded and to prevent him from purchasing independent oil in the future. In furtherance of that system the New Jersey Company purchased the Schofield, Shurmer & Teagle Oil Company, and had it reorganized under the name of the Republic Oil Company, whose chief office was to follow up the business of the independent companies, and under the guise of being an independent company and by means of rebates, fraud and deception, waged a most vigorous competition against them, in all districts where they competed with the other respondents, while the latter refused to compete for business against each other, or to reduce prices to meet those made by the Republic Company, as a means of fighting the independents.

In other words, the Indiana Company and the Waters-Pierce Company maintained their territorial division of the State, and thereby indirectly agreed not to compete with each other for business herein, which was equivalent to entering into a contract in re-

straint of trade, and thereby enabled them to fix and maintain prices at which they sold oils in this State. If the independents encroached upon the business of either, and reduced the aggregate amount of its sales, or reduced the price of oils, then the Republic Company was set upon the offending independents, and practically drove them out of business by selling their customers oils at reduced prices or by giving rebates.

While this vigorous competition was going on between the independents and the Republic Company, the Indiana Company and Waters-Pierce Company were living up to their understanding and agreement and pursuing their fixed business policies in the even tenor of their way, maintaining prices at which they sold oils, and declining to compete with each other for business. And when the Republic Company had sufficiently chastised the independents, and thereby curbed their desire and ambition to increase the volume of their business, by the reduction of price of oils or otherwise, it would then practically retire from the field of operation and eagerly await the next combat with the independents, if, perchance, any one of them was so timorous as to challenge the monopoly of those two companies by seeking any portion of their trade. The office and the important part played by the Republic Company in the scheme is made more apparent by the declaration of one of its officers, to the effect that this suit exposed the ownership of the company, and it had to go out of business, because it had served its purpose, and there was nothing left for it to do; meaning, of course, that the Standard interest could no longer deceive and impose upon the public by the means of that company. And as a necessary sequence to that condition, the Republic Company attempted to voluntarily retire from the State, and moved the Master to dismiss the cause as to it, which he refused to do, and it has renewed that motion here, which has

received consideration in another portion of this opinion.

When the foregoing facts are viewed in the light of the common ownership of the stock of all the Standard Oil companies, it does not require a very great stretch of the imagination to see why such close and intimate business schemes and relations have existed so long and harmoniously among them.

The common interest running through all of those companies is responsible for their formation and business schemes and policies, and lead up to and induce the Standard interest, including the respondents, to divide the State in twain; to furnish oil and transportation for each other; to decline to sell to or transport oils for the independents; and to fight them with the Republic Company by a system of espionage and rebates. The direct and inevitable effect of those facts, which are not seriously disputed, was to create, by indirection, a pool, trust and combination in restraint of trade, and to fix and maintain prices at which respondents sold the products of petroleum in this State. There is no logical escape from the conclusion that it was the intention of respondents and of the other Standard Oil companies that those things agreed to among themselves should and would have the effect of producing a trust and combination among them in restraint of trade and in violation of our anti-trust statutes.

It stands out admitted in bold relief that the Indiana and Waters-Pierce Companies are both engaged in the sale and delivery of the same kind and grades of oils; that they are not competitors for business, notwithstanding the fact that both are well equipped and amply able financially to vigorously compete therefor. This lack of competition between these two gigantic institutions is not due to the fact that they are destitute of competitive instincts, or indifference as to the expansion of their trade, because they abundantly show both of

those admirable qualities in their business contacts with the "independents"; but it is confessedly due to an agreement made and entered into between them, by which one sells in the north and the other in the south half of the State. If that agreement is not in restraint of trade and in violation of the letter and spirit. of the anti-trust laws, then words have lost their meaning, contracts their potency, and the law its majesty. This combination confessedly was conceived in and born of the common interest of those two companies, and for the very purpose of preventing competition between them, and to maintain prices and enhance the profits of each, which it has done beyond the fondest dreams of either. Their business has grown from almost nothing in 1878 to gigantic proportions. The Waters-Pierce Company has assets worth $12,000,000, and the name and good will of the concern is valued at about $35,000,000, and is paying dividends of six or seven hundred per cent upon a capitalization of $400,000. It is clearly inferable from this record that the Indiana Company has fared equally as well if not better. than has the Waters-Pierce Company.

Can it be supposed for a moment that such phenomenal results could have been accomplished by them if they had been engaged in open competition with each other? Certainly not. They knew that, and their object and purpose in entering into the combination was to monopolize the trade and maintain prices, which they did against all other competitors.

The Waters-Pierce Company fixed and maintained the prices not only for itself but also for the Republic Company and for all the independent dealers, and monopolized from eighty-five to ninety-five per cent of the volume of the oil business within its territory; while the Indiana Company did a little better in the north half of the State. It sold in that territory from ninety to ninety-eight per cent of the oil consumed therein, and fixed the prices for all dealers.

If the statutes were not intended to apply to this and similar combinations, then I would like to see a combination stated to 'which they do or could apply.

This combination is but one link in a chain of combinations, which include all of the Standard Oil interests, which control practically all of the crude oil of the country. That fact enabled it to fix the prices at which the Indiana and the Waters-Pierce Companies had to pay for refined oils; and upon those prices they based and fixed prices at which they and all others sold oils to the trade and consumers. Yet it is argued that they do not fix and maintain prices.

Not only that, but the record discloses the fact that within the last decade the production of crude oil has about doubled, caused by the discovery and development of new oil fields in Kansas, Texas, Oklahoma and Indian Territory; yet notwithstanding that fact, the price of refined oils has been upward during that period, and the price of crude oils has fallen more than fifty per cent.

And this record conclusively shows that the respondents absolutely fix and maintain the prices at which refined oils sell in this State, and that they and their allies control and fix the prices at which all crude oils are sold.

Their purpose in forming the combination by those means, rather than by an express contract, was clearly to escape the provisions of the common law and the statutes of the State in which they operated or conducted business.

Every contract made by them; their business policies and its management; their treatment of others; and the mode and manner of acquiring and holding trade, are but the footprints leading from the office of the New Jersey Company, No. 26 Broadway, New York City, through the various subsidiary companies, to the very hearthstone of the smallest consumers, throughout the country, including this State; and every im-

print bears strong evidences of agreements and combines in restraint of trade.

No man can run faster than he makes tracks, and, in this case, as in all others, when carefully followed, the maker of them can be traced from his starting point to his place of destination.

In the case at bar we have traced every step and carefully considered every act of each and all of those companies, from the time of their organization down to the close of the evidence of this case, and they all point to guilt, and are inconsistent with all theories of innocence.

But it is finally insisted by counsel for respondents that Mr. Pierce of the Waters-Pierce Company had complete charge and control of that company, and directed its business independent of all other Standard influences. In one sense that is true. He does manage and control its business within the scope and bounds of the policies marked out by the Standard Oil Company of New Jersey, but no further. He and his company are but two of the many agents of the New Jersey Company in carrying out its monopolistic schemes and combinations in restraint of trade throughout the entire country. When we lay aside the corporate guise of these companies, and view the interested parties, their objects and purposes, it is perfectly apparent that they have a common interest; all working in harmony to that end, and are not competing with each other in any sense of the word. Look at the Waters-Pierce Company from any viewpoint you may, and it is clearly seen that it is just as much a party to the trust and combine as is the Indiana Company or the Republic Company. What the one does the other does; they work hand in glove with each other, and for their mutual protection and benefit, and all of them work in harmony with the policies and for the best interest of the New Jersey Company.

218 Sup—29

In discussing a similar question this court said, in the case of State ex inf. v. Armour Packing Co., 173 Mo. l. c. 385: "It is quite too plain for doubt that persons or companies who are engaged in the same line of business, in the same place, do not . . . . . maintain an uniform selling price, etc. . . . . . unless there has been an unlawful pool, trust or combination to fix and maintain prices. Such acts and circumstances and practices speak as loudly, as directly and as certainly, and tell as strong and conclusive a tale of wrongdoing in those regards as any witness could possibly testify to it or any resolution formally adopted by the directors or stockholders could prove it. Independent, therefore, of any admissions or statements of the managers of the coolers or of the solicitors, which, however, were clearly admissible, the State has made out a case against the respondents under the facts and circumstances of the case. . . . . So long as the law puts the stamp of condemnation on all arrangements, agreements, pools, trusts and conspiracies to fix and maintain the price of articles of prime necessity, the courts have no option but to enforce the law."

Quoting with approval from People v. Sheldon, 139 N. Y. 251, the court says: "A combination between independent dealers to prevent competition . . . is, in the contemplation of law, an act inimical to trade or commerce, without regard to what may be done under and in pursuance of it, and although the object of such a combination was merely the due protection of the parties against ruinous rivalry, and no attempt was made to charge undue or excessive prices; where it appears that the parties acted under the agreement, an indictment for conspiracy is sustainable." Quoting further from the same case, the court says: "The question is, was the agreement, in view of what might have been done under it and the fact that it was an agreement, the effect of which was to prevent competition among the coal dealers, one upon which the law

affixes the brand of condemnation? . . . . The grava-
men of the offense of conspiracy is the combination.
Agreements to prevent competition in trade are, in
contemplation of law, injurious to trade, because they
are liable to be injuriously used. . . . . If agree-
ments and combinations to prevent competition in
prices are or may be hurtful to trade, the only sure
remedy is to prohibit all agreements of that character.
If the validity of such an agreement was made to de-
pend upon actual proof of public prejudice or injury,
it would be very difficult in any case to establish the
invalidity, although the moral evidence might be very
convincing.'' Quoting, with approval, from the de-
cision in People v. Sugar Refining Co., 121 N. Y. 582,
the court says, l. c. 391:

''As corporate grants are always assumed to have
been made for the public benefit, any conduct which de-
stroys their functions, maims and cripples their sepa-
rate activity, and takes away free and independent
action, affects unfavorably the public interests.'' The
court quotes again with approval the same passage
from the decision of Chief Justice FULLER in United
States v. E. C. Knight Co., 156 U. S. l. c. 16, quoted in
the insurance trust case, to the effect that, in order to
establish a combination, ''it is not essential that its
results shall be a complete monopoly; it is sufficient if
it really tends to that end and to deprive the public of
the advantages which flow from free competition.''

And what was said by this court in the case of
State ex inf. v. Continental Tobacco Co., 177 Mo. l. c.
32, is particularly applicable to the role played by the
Republic Oil Company in this case, which is as follows:
''The statute contemplates the existence of at least two
or more corporations, individuals or partnerships, so
as to agree or combine with each other to do the pro-
hibited acts mentioned in the statute. In other words,
it is intended to operate upon two or more corpora-
tions or individuals, who, so far as the public are con-

cerned, indicate that they are pursuing an independent business, legitimate competitors, when, in fact, there is a secret agreement by which the very things condemned by the statute are accomplished. The public has rights which the law contemplates shall be respected. Neither corporations, individuals, nor partnerships are permitted to deceive or mislead the public by an apparent competition, when, in fact, none exists.'' In the discussion of the question as to whether the evidence in that case showed that a trust or combination in violation of the statute or common law had been effected the court quotes with approval from the Supreme Court of Texas in Gates v. Hooper, 39 S. W. 1079, as to what constitutes a combination in restraint of trade or competition, l. c. 36: ''In order to constitute a trust, within the meaning of the statute, there must be a 'combination of capital, skill or acts by two or more.' 'Combination,' as here used, means union or association. If there be no union or association by two or more of their 'capital, skill or acts,' there can be no 'combination,' and hence no 'trust.' When we consider the purpose for which the 'combination' must be formed, to come within the statute, the essential meaning of the word 'combination,' and the fact that a punishment is prescribed for each day that the trust continues in existence, we are lead to the conclusion that the union or association of 'capital, skill or acts' denounced is where the parties in the particular case designed the united co-operation of such agencies, which might have been otherwise independent and competing, for the accomplishment of one or more of such purposes.''

And the St. Louis Court of Appeals, in discussing this same question, in the case of National Lead Co. v. Grote Paint Store Co., 80 Mo. App. 247, l. c. 266, said: ''That the predecessor of the plaintiff, the 'National Lead Trust,' was an unlawful combination, both in purpose and fact, is sufficiently established by the na-

ture of the agreement under which it was created and
the methods and practices resorted to in furtherance
of that agreement. . . . . While the conclusion of
the illegal purpose of the trust agreement is irresist-
ible upon a consideration of its several provisions, and
the manner in which they were carried out, it will ap-
pear from an examination of the cases that this result
has been declared by every court called upon to review
that agreement, or others substantially like it. [State
ex rel. v. Standard Oil Co., 49 Ohio St. 137; Distilling,
etc., Co. v. People ex rel., 156 Ill. 448; Bishop v. Am.
Preservers' Co., 157 Ill. l. c. 311; People v. Sugar Re-
fining Co., 121 N. Y. 582; Unckles v. Colgate, 148 N. Y.
529; U. S. v. Freight Assn., 166 U. S. 290; U. S. v. Joint
Traffic Assn., 171 U. S. 505.] But the illegality of the
organization and operation of the National Lead Trust
does not involve the conclusion that the purchaser of
its assets, whether a natural or artificial person, suc-
ceeded also to the status of that illegal combination
under the laws enacted in this State for the punishment
of pools, trusts and conspiracies. For the mere pur-
chase by one of the assets which another has employed
for an illegal purpose, does not of itself imply that
they will be used by the purchaser for the purpose of
effectuating the objects to which they had been de-
voted by the seller. Such an intent on the part of the
purchaser, if inferable, must be gathered from proof
of all the circumstances characterizing the transaction,
as well as his subsequent conduct. As to these sources
of proof, the record in the case under review shows that
the beneficial owners of the property were the sub-
scribers to the National Lead Trust and holders of its
certificates, and that these same persons remained the
beneficial owners of the same property after it was
converted into the capital of the plaintiff corporation,
the only difference being that each holder of a trust
certificate received in lieu thereof shares of stock in
the new corporation at an agreed rate of exchange,

and the further fact that the legal title to the prop-
erty was put into a corporate entity of a body of nine
trustees appointed under the trust agreement.    The
sale itself was titular rather than real.    The corpora-
tion was professedly created to acquire the assets of
the preceding trust.    It was formed by the express
authorization of the members of the trust, and required
to have 'such purposes' and 'such powers' as should
be approved by the agents of the trust. . . . . It
was actually created and organized in the strictest con-
formity with the requirements of said resolution, and
under a charter empowering it to carry on the business
of manufacturing lead and its kindred products with-
out restriction, and which expressly authorized it 'to
purchase . . . . all such stocks, bonds, securities and
obligations of other companies or corporations' as
might be convenient in the prosecution of its business.
By the obtention of the latter and other grants of
power (in its charter) the plaintiff corporation secured
for itself every faculty possessed by its predecessor
(the National Lead Trust) for engrossing the entire
business of the country in the commodities in which it
was authorized to deal. . . . . If, therefore, the
preceding trust was an unlawful combination under the
laws of this State, as declared in the Acts of 1891 (then
in force), it must follow that the plaintiff corporation
is equally amenable to said acts, if, as the record shows
the fact to be, it actually engaged through the same
methods and for identical objects in a similar business
to that of the former trust, unless there is something in
the mere fact of the plaintiff's corporate character
which exempts it from the application of the law pro-
hibiting combinations to fix the price or quantity of
products, or to restrain trade.    The learned counsel for
respondent seems to claim such an exemption for the
plaintiff.    In discussing the question thus presented,
we will concede, for argument only, that a private busi-
ness or manufacturing corporation, which has no im-

plied power as such to purchase shares of stock in rival corporations, may acquire such a right under the laws of New Jersey, if provided for in the articles of incorporation.''

In the case of Heim Brewing Co. v. Belinder, 97 Mo. App. 64, l. c. 68, the Kansas City Court of Appeals used this language: ''It would not be contended, at least it ought not, that a lawful agreement could be made that but one member of the whole number could sell to certain persons or classes of persons. Yet the effect of the agreement is as broad as that. When the others agree not to sell to the debtor of the creditor member, they deprive the debtor of the right to buy of any other than the creditor. . . . . The effect and tendency of such agreements are wrong and are not only under the ban of the statute aforesaid, but they are against public policy. . . . . Any one may exercise a choice as to whom he will sell his goods, but he cannot enter into a contract whereby he binds himself not to sell, for in such instance he barters away his right of choice and destroys the very right he claims the privilege of exercising. After entering upon such agreement he is no longer a free agent. [L. c. 69.] The question is, what is the tendency of the agreement, and what are the opportunities for oppression which the statute is designed to suppress? It does not affect the character of the agreement proven that the brewers only intended a worthy purpose. Intention will not avail when the effect is within the statute. And it has been held by the highest authority that though no imposition was consummated by the raising of prices; and even though the agreement was necessary to curb unjust or ill-advised competition, yet if the effect of the agreement was within the prohibition of the law, it was void (United States v. Addyston Pipe & Steel Co., 54 U. S. App. 747); and that 'in order to vitiate a contract or combination it is not essential that its result should be complete monopoly; it is suf-

ficient if it really tends to that end and to deprive the public of the advantages which flow from free competition.' [United States v. E. C. Knight Co., 156 U. S. 16.] And that, the necessary effect of the agreement is the criterion 'no matter what the intent was on the part of those who signed it.' [United States v. Freight Assn., 166 U. S. 342.] . . . . The members of the combination would perhaps deny that they entered into the agreement with a view to lessen competition, and we will assume that they did not. But does it, in fact, lessen or tend to lessen competition? Competition is the struggle between rivals for the same trade at the same time. It is self-evident that there cannot be competition unless there is trade, and so though the popular saying is that 'competition is the life of trade,' yet it is quite certain that trade is the mother of competition, for the latter springs from the former. So, therefore, whatever restrains trade restrains competition in exact degree. One of the reasons given by the Supreme Court of Massachusetts why contracts in restraint of trade were void, was that 'they prevent competition.' [Alger v. Thacher, 19 Pick. 51.] And so the same thing is said in Beach on Monopolies and Trusts, section 36. We have already seen that the agreement and combination in question were in restraint of trade and, therefore, we must hold they tended 'to lessen full and free competition.' "

Not only this, the Standard Oil Company of Indiana and the Waters-Pierce Oil Company possess even greater power to fix and regulate the prices of crude oil and of the refined products thereof than the evidence discloses they have exercised in the past. It is obvious from an inspection of this record that they dominate the oil industry of America, if not of Europe also. The independent producers are widely scattered over the entire country and do not co-operate together, and, consequently, they are in no position to initiate and fix

prices, but must follow those fixed by respondents, through the Standard Oil Company of New Jersey.

And in discussing a monopoly, Mr. Justice McKenna, in National Cotton Oil Co. v. Texas, 197 U. S. 129, said: "Its dominant thought now is, to quote another, 'the notion of exclusiveness or unity;' in other words, the suppression of competition by the unification of interest or management, or it may be through agreement and concert of action. And the purpose is so definitely the control of prices that monopoly has been defined to be 'unified tactics with regard to prices.' It is the power to control prices which makes the inducement of combinations and their profit. It is such power that makes it the concern of the law to prohibit or limit them."

It is the consensus of the authorities that a monopoly within the meaning of the anti-trust laws is created when as a result of any contract or combination previously competing businesses are so concentrated into the hands of a single individual or corporation or of a few individuals or incorporations acting in concert, that they thereby have the power to practically control the prices of commodities, and thus practically suppress competition. [National Cotton Oil Co. v. Texas, supra; Northern Securities case, 193 U. S. 197; Swift v. United States, 196 U. S. 375; United States v. E. C. Knight Co., 156 U. S. 1; Pocahontas Coke Co. v. Powhatan Coal & Coke Co., 60 W. Va. 508; Richardson v. Buhl, 77 Mich. 658; Harding v. American Glucose Co., 182 Ill. 615; Mowing Co. v. Hardware Co., 75 S. C. 383; Lough v. Outerbridge, 143 N. Y. 271; Herriman v. Menzies, 115 Cal. 16.]

The chief consideration in determining whether a monopoly exists is not that prices are raised and competition is destroyed, but does the power exist in the combine to raise prices or to destroy competition at pleasure? In discussing such a combination in the case of Pocahontas Coke Co. v. Powhatan Coal & Coke

Co., supra, the Supreme Court of West Virginia said: "It is not to be tested by what has been done under it, but by what may be done under it; not by its performance, but by its power of performance when fully exercised."

What has been said in the foregoing cases so clearly and correctly states the law of this case that there remains nothing new or additional to be said upon the subject; and by applying the law as there enunciated it seems to us that there is no logical escape from the conclusion that the respondents are guilty as charged in the information, and have usurped powers not granted by their charters or authorized by their licenses.

But somewhere in some one of the numerous briefs filed herein, it has been intimated that if there exists between respondents an unlawful pool, trust, or conspiracy in restraint of trade, it was formed in some other State, and for that reason neither the parties to it nor the conspiracy so formed are amenable to the laws of this State. In reply to that suggestion it might be said our anti-trust laws denounce as illegal all contracts, agreements and conspiracies entered into between two or more persons which have for their object limitations upon the commerce of the State, and for the purpose of fixing and maintaining the prices of commodities bought and sold therein. Those laws embrace within their provisions all persons whether natural or artificial, and whether residents of this State or residents of other States or foreign countries. Such contracts when entered into, whether by express agreement or by implied understanding of the parties, become affirmative and vital elements of the business of each and every person who is a party to the contract or conspiracy, and all business conducted in pursuance thereof draws to it those illegal elements wherever transacted; and if such business is carried on in this State, then that business is illegal and is not protected

by the laws of the State, but is, upon the other hand, as before stated, prohibited by law and declared to be unlawful. Not only that, but all persons or corporations who conduct such business in this State, in pursuance to such contract or conspiracy, wherever entered into, violate the laws of this State and are amenable thereto. It goes without saying that if the contract or conspiracy is entered into and formed in another State, or foreign country, then the parties thereto could not be punished under the laws of this State for entering into and forming the conspiracy, any more than a man could be punished here for stealing a horse in another State; but if he should bring the stolen horse into this State, then he could be punished for the latter act under the laws of this State, for the obvious reason that the illegal act committed in the foreign State would follow the man and horse into this State, which would enter into and form an illegal element in his possession of the horse, and thereby subject him to penalties of our law. The same is true with reference to commodities sold in violation of our anti-trust laws. It is wholly immaterial where the unlawful conspiracy was entered into, or the means by which it was formed, if, as a matter of fact, the commodities are sold in this State in pursuance to such conspiracy—then the vendors are violators of our law and are punishable as such.

In the case at bar, the New Jersey, the Waters-Pierce, the Indiana and the Republic Companies were all parties to the conspiracy charged in the information, and whether formed in this State or not is wholly immaterial, for clearly all of them, except the New Jersey Company, sold the products of petroleum in this State in pursuance to that conspiracy, and in violation of our anti-trust laws, and are thereby rendered amenable to the penalties thereof.

In the consideration of the foregoing legal propositions, and in arriving at the conclusions stated, we have not lost sight of the vast financial interest in-

volved, nor the magnitude of the business institutions to be affected thereby. Nor are we unmindful of the fact that an assault made upon those vast interests is also a serious assault inflicted upon the material welfare of the State itself, by banishing so much capital therefrom and otherwise disturbing the financial and business interests of the country; but, if, upon the other hand, such abuses as those complained of are permitted to continue untrammeled, then it would be only a question of time until they would sap the strength and patriotism from the very foundations of our government, overturn the republic, destroy our free institutions, and substitute in lieu thereof some other form of government.

The Congress of the United States, the Legislatures of the various States, and the courts throughout the country have seen the growing, far-reaching and disastrous evils and consequences incident to such pools, trusts and combinations, and have not hesitated to destroy them, root and branch, when made in restraint of trade, or for the purpose of fixing and maintaining prices. But it is, however, truly regrettable that such useful and beneficial institutions, when properly directed, should be guilty of such grievous misconduct and usurpation of power as to require the enforcement of the drastic legislation found upon our statutes regarding such matters; but, if not restrained in their unwise cupidity, they will inevitably pull down the temple upon their own heads, as well as upon all others who worship therein, and thereby add another incident to those where history has repeated itself.

We greatly regret that it becomes our duty to adjudge the charter of the Waters-Pierce Oil Company, and the licenses of the other two respondents to do business in the State, forfeited, and to enjoin all of them from further transacting business intrastate therein; but by doing so we are following the plain mandates of the law.

This court said, in the case of State ex inf. v. Armour Packing Co., supra, l. c. 387: " 'Competition is the life of trade.' Pools, trusts and conspiracies to fix or maintain the prices of the necessaries of life, strike at the foundation of government; instil a destructive poison into the life of the body politic; wither the energies of competitors, blight individual investments in legitimate business; drive small and honest dealers out of business for themselves, and make them mere 'hewers of wood and drawers of water' for the trust; raise the cost of living and lower the price of wages; take from the average American freeman the ability to supply his family with necessary, adequate and wholesome food; force the boys away from school, and into the various branches of trade and labor, and the girls into workshops and other avenues of business, and make them breadwinners while they are yet almost infants, because the head of the house cannot earn enough to feed and clothe his family. The people are helpless to protect themselves. The powers that be must protect them, or as surely as history records the story of republican government in Rome, so surely will the foundation of our government be shaken and its perpetuity threatened. Missouri (State ex inf. Atty.-General v. Insurance Co., 152 Mo. 1); New York (People v. Sheldon, 139 N. Y. 251); Pennsylvania (Coal Co. v. Coal Co., 68 Pa. St. 173); Ohio (Salt Co. v. Guthrie, 35 Ohio St. 666); Kentucky (Anderson v. Jett, 89 Ky. 375); Iowa (Chapin v. Brown, 83 Iowa 156); Illinois (Craft v. McConoughy, 79 Ill. 346, and More v. Bennett, 140 Ill. 69); Wisconsin (Builders Assn. v. Niezerowski, 95 Wis. 129); California (Vulcan Powder Co. v. Powder Co., 96 Cal. 510); Texas (Texas Standard Oil Company v. Adoue, 83 Tex. 650); Louisiana (India Bagging Co. v. Kock, 14 La. Ann. 168), and the Supreme Court of the United States (U. S. v. Trans-Missouri Freight Association, 171 U. S. l. c. 558) have held statutes which prohibited such com-

binations or trusts to be constitutional, and further, that all such combinations or agreements are against public policy and void at common law, and as a matter of American common law, irrespective of whether there is any statute on the subject or not.'' Continuing the court said, 1. c. 392: ''The wisdom and experience of all ages and all people have demonstrated the necessity for such laws, and for the rigid enforcement of them. And even after so many years of unfailing enforcement of such laws, the terrors and consequences thereof have not been sufficient to deter people from violating them.''

This record is a fulfilment of the prophetic remarks above quoted, because it abounds in instances where this unlawful combination has, by the means hereinbefore stated, withered the energies of competitors, blighted individual investments in legitimate business; driven small and honest dealers out of business for themselves, and have made them ''hewers of wood and drawers of water'' for the trust; and have reduced the price of petroleum and at the same time have raised the cost of the various products thereof to the great detriment of the producers of the raw material, and to the consumer of the manufactured products thereof.

We have devoted much time to the consideration of this case, and have carefully gone through the unprecedented record and briefs on file herein, which cover almost four thousand printed pages, and we have carefully considered all the objections made to the admission and rejection of evidence; the giving and refusing of instructions; as well as the exceptions made to the report of the Master. Those which were specially urged upon our attention we have discussed at much length in this opinion; while those not discussed are incidental or subordinate to those which we have discussed, but could not change the conclusions reached by the Master and by the court. We, therefore, deem

it unnecessary to still further prolong this opinion by expressing our views upon those matters.

We are, therefore, of the opinion that the respondents are guilty of the charges of usurpation complained of, in this, that they have "created, entered into and become members of a pool, trust, agreement, confederation, combination, arrangement and understanding among themselves for the following purposes:

"First. To regulate, fix and control the prices to be paid by retail dealers and others in the State of Missouri for the refined products of petroleum, sold and offered for sale in this State.

"Second. To control and limit the trade in the refined products of petroleum in this State.

"Third. To control, limit and prevent competition in the business of buying and selling the refined products of petroleum in this State between themselves and others engaged in like business.

"Fourth. To deceive and mislead the public into the belief that they were separate and distinct corporations, and pursuing an independent business as legitimate competitors in the purchase and sale of the products of petroleum."

We are also of the opinion that respondents, by means of said pool, trust, combination, etc., between the dates stated in the information, have:

First. Fixed, controlled and maintained prices at which they sold the refined products of petroleum to the retail dealers in this State.

Second. That they controlled and limited the trade of refined products of petroleum in this State.

Third. That they controlled, limited and prevented competition in the business of buying and selling the refined products of petroleum in this State between themselves and others engaged in that business.

Fourth. That they did deceive and mislead the public into the belief that they were separate and distinct corporations, pursuing an independent business

as legitimate competitors in the purchase and sale of the products of petroleum.

The charter of the Waters-Pierce Oil Company does not authorize or empower it to do any of the things before enumerated.

And we are, therefore, of the opinion that a judgment of forfeiture should be entered dissolving the Waters-Pierce Oil Company, and that an additional fine of fifty thousand dollars should be imposed against it as a punishment for its violation of the laws of this State, as before stated, which sum is to be paid into the State Treasury for the use and benefit of the State of Missouri, within sixty days from the rendition of this judgment.

But being satisfied from the evidence disclosed by this record that the minority stockholders in said company objected to entering and becoming a member of the so-called "Oil Trust," and did everything within their power to prevent the same, and exerted every influence within their command to act independent of it, but to no avail. And the evidence also discloses that the majority interests in the company, which are owned by the New Jersey Company, displaced the president of the company, who was a minority stockholder, because of his persistent efforts to conduct the affairs of the company independent of the New Jersey and Indiana companies. Those facts being true, the punishment to be inflicted upon that company should not be so severe as that imposed upon the other two respondents, and thereby we recognize the good faith of the minority stockholders, and at the same time impose a punishment upon the company which is commensurate with the offense committed against the State.

We are, therefore, of the opinion that the fine of fifty thousand dollars should be paid into the Treasury of the State on or before March 1, 1909, and that a stay of execution should be ordered as to the decree

of forfeiture of the charter until further ordered by the court.

And it is so ordered.

We are also of the opinion that the licenses heretofore granted by the State to the Standard Oil Company of Indiana and to the Republic Oil Company of New York do not authorize or empower either of them to do any of the things before stated; and that by reason of the usurpation of those powers and privileges said companies have violated the laws of this State, and have thereby forfeited their licenses and authority to conduct and carry on intrastate business in the State of Missouri. And we are also of the opinion that each of said companies should be fined in the sum of fifty thousand dollars for the use and benefit of the State of Missouri, to be paid into the State Treasury within sixty days from this date. All of which is so ordered.

The following are the judgments and decrees in full rendered against each of the three respondents which were drawn by GANTT, C. J.

All concur, except LAMM, J., who dissents as to certain portions of the decree as stated in a separate opinion; GRAVES, J., concurs in separate opinion.


## PROVISIONAL DECREE.

ENTERED DECEMBER 23, 1908.


State of Missouri, *ex informatione* Herbert S. Hadley, Attorney-General, Informant, vs. Standard Oil Company of Indiana, Republic Oil Company of New York, and Waters-Pierce Oil Company of Missouri, Respondents.

And now on this day, this court having fully considered the evidence in this cause, and announced and filed its opinion that the said respondents and each

218 Sup—30

of them are guilty as charged in the information of
the Attorney-General of a violation of the statute of
this State, entitled, "Pools, Trusts and Conspiracies;
Unlawful Combinations," approved March 24, 1877,
and an act of the General Assembly of this State, ap-
proved April 2nd, 1891, and entitled, "An act provid-
ing for the punishment of pools, trusts and conspira-
cies to control prices and as to evidence and prosecu-
tion in such cases," and now known as chapter 143 of
the Revised Statutes of Missouri, 1899, come now the
State of Missouri, by Herbert S. Hadley, the Attorney-
General, and the said respondents by their respective
counsel, and it is now here considered, ordered and
adjudged by the court that the said respondents and
each of them are guilty of violating the said acts of the
General Assembly of this State, in that at the dates
and times set forth in the information of the Attorney-
General they did form and enter into a pool, trust,
combination and conspiracy, to regulate, fix and con-
trol the prices to be paid by retail dealers and others
in the State of Missouri, for naphtha, benzine, gaso-
line, kerosene, lubricating oil and other products of
petroleum, and to control and limit the trade in the
articles aforesaid and to prevent competition in said
business of buying and selling naphtha, benzine, gaso-
line, kerosene, lubricating oil and other products of
petroleum, in this State, between themselves and others
engaged in like business, and to deceive and mislead the
public, and did control, fix and maintain the prices for
said articles and have prevented and destroyed compe-
tition in the purchase and sale of said products of
petroleum in this State as charged in the informa-
tion, and thereupon, it is now considered, ordered and
adjudged by the court that by reason of the violation of
said statutes of this State, in forming and entering
into and maintaining said unlawful combination, con-
spiracy and pool, the said Standard Oil Company,
organized under the laws of the State of Indiana and

heretofore licensed to do business in this State, and the said Republic Oil Company, organized under the laws of the State of New York and licensed to do business in this State, have each and both forfeited their respective licenses heretofore granted them by the Secretary of State of Missouri, and it is further considered, ordered and adjudged that said license of the said Standard Oil Company of Indiana, and the said license of the said Republic Oil Company of New York, be and the same are hereby forever forfeited, annulled and cancelled and the said Standard Oil Company of Indiana and the said Republic Oil Company of New York are hereby ousted of any and all rights and franchises granted to them, under the laws of this State, to further do business in this State, and it is further considered and ordered and adjudged that the said Standard Oil Company of Indiana and the said Republic Oil Company of New York, each for the violation aforesaid of the laws of this State, in forming, entering into and maintaining the conspiracy and combination to regulate, control and fix the prices of said products of petroleum in this State and to control and limit the trade in said products in this State and to prevent competition in said business, be fined fifty thousand dollars, and that each of said respondents, the said Standard Oil Company of Indiana, and the said Republic Oil Company of New York, pay each the said sum of fifty thousand dollars to the clerk of this court, on or before the first day of March, 1909, to be by said clerk paid into the treasury of the State, and upon default and failure so to do, that the State of Missouri have execution therefor, to be levied and enforced according to the laws of this State, in such cases made and provided; and it is further considered, ordered and adjudged by the court, that the said respondent, the said Waters-Pierce Oil Company, by its violation of the said laws and statutes of this State, against "Pools, Trusts and Conspiracies" and

known as chapter 143 of the Revised Statutes of Missouri of 1899, has forfeited its charter to do business in this State and it is therefore considered, ordered and adjudged by the court that the right and franchise heretofore granted to said Waters-Pierce Oil Company, to be a body corporate and to do business and contract as such, with all other rights acquired by its certificate of incorporation, be and the same are hereby forever forfeited, annulled and set aside and said Waters-Pierce Oil Company is hereby ousted of its corporate rights and powers and franchises heretofore granted to and enjoyed by it under the laws of this State, subject however to the further provisions of this judgment; and for the violation of its said franchises, by forming, entering into and maintaining the said pool, combination and conspiracy, to regulate, control and fix the prices of the products of petroleum, as hereinbefore specifically found and set forth and to prevent competition in the business of buying and selling said products in this State, it is considered, ordered and adjudged by the court that in addition to said ouster, said Waters-Pierce Oil Company be fined fifty thousand dollars, and that it pay said fine of fifty thousand dollars, to the clerk of this court, on or before the first day of March, 1909, to be by said clerk paid into the treasury of this State, and upon default and failure to pay said fine on or before said date, the State of Missouri have execution therefor to be levied by the marshal of this court and enforced according to the laws of this State in such cases made and provided. But it is further considered, ordered and adjudged by this court, that if the said Waters-Pierce Oil Company shall pay said fine to the clerk of this court on or before the first day of March, 1909, and shall immediately cease all connection with the said other respondents herein in continuing or maintaining said pool, trust and conspiracy to fix, control and regulate the prices of

naphtha, benzine, gasoline, kerosene, lubricating oil and all other products of petroleum, and shall refrain from all pools, trust and combinations to control the prices of said products of petroleum and all combines and conspiracies to prevent competition in the trade of buying and selling said products and shall furnish this court with satisfactory evidence of its compliance with this judgment and of its intention in good faith to cease all connection with its said co-respondents herein and all other parties or companies whatsoever and in the future maintain and carry on its business as an independent corporation in obedience to the laws of this State and its charter then the judgment of ouster herein shall be and is hereby suspended and the writ of ouster herein will not issue until expressly directed by order of this court, and the said Waters-Pierce Oil Company is hereby given until the fifteenth day of January, 1909, to file the proofs of its willingness to comply with the judgment of this court and until that date in no event will the writ of ouster be awarded. And it is further considered, ordered and adjudged by the court that if it shall be shown to the satisfaction of this court hereafter, that notwithstanding the promises and assurances of the said Waters-Pierce Oil Company to abide by this judgment, it has violated the conditions of this judgment and has violated the said statute against "Pools, Trusts and Conspiracies," then and in such case, the suspension of the writ of ouster shall be removed by this court and absolute ouster be enforced as directed and adjudged herein. It is further ordered and adjudged that the State of Missouri at the relation of the Attorney-General have and recover its costs herein paid and expended, including the allowance of the special commissioner and the stenographer in taking and certifying the testimony herein and the fees of the witnesses, and have execution therefor, against all of said respondents.

## SEPARATE CONCURRING OPINION.

GRAVES, J.—To my view, there is more than one
side to this case. From a legal standpoint, it may be
admitted, and I do so admit, that the evidence shows
a conspiracy and combination to violate the anti-trust
laws of Missouri. For the sake of the argument, it may
be and should be conceded that the Waters-Pierce Oil
Company, as a corporation, was a party thereto. We
emphasize the words, ''as a corporation,'' because the
evidence discloses a protest against the very things for
which this action was brought by the owner
of a very large part of the minority stock.
From the evidence it appears that Mr. Pierce
owns a large part of the stock of the com-
pany, after you have taken therefrom the majority
part thereof, which is owned and held by the Standard
Oil Company of New Jersey. This latter company, and
in my judgment, the real offending party, is not before
the court in this proceeding. The learned Attorney-
General no doubt has good and sufficient reasons for
not including it and that I may not be misunderstood,
will suggest that there is no evidence, that it, as a cor-
poration, was doing any business in this State. It is
not a domestic corporation, and as a foreign corpora-
tion has never taken out a license to do business in
Missouri. This fact precludes the Attorney-General
from making it a party to this action, and in this as a
question of law his judgment accords with well recog-
nized legal principles. From the evidence before us
so strong was the opposition of the minority stock
ownership in the Waters-Pierce Company against the
violations of law charged in this information, that Mr.
Pierce through the majority of the stock ownership
was deposed from the management of the company
which he organized, and which bears his name, for the
period of a year or more. As to the other two respond-
ents, the Standard Oil Company of New Jersey owns

practically all their stock.  The fact is that except through stock ownership in subsidiary corporations, the real offender is not before this court at all:  That real offender is the Standard Oil Company of New Jersey, the parent of the oil trust, if there be such a trust, and we think there is.  We cannot punish that company directly, because it is not before us.  Its charter we cannot take, because not granted by Missouri.  Its license to do business we cannot take, because it, as a corporation, is not doing business in Missouri and has no license.  The Standard Oil Company of Indiana we can reach because of its license to do business in Missouri.  Likewise, we can reach the Republic Oil Company.  Both are foreign corporations and the most we can do is to revoke their license to do business in this State, and if in the judgment of the court, thought proper, add a fine or penalty.  Their charter or corporate life is not in our hands.  We can say to them, "We will take your license to do business in Missouri," but they are left to roam at large outside of Missouri.  For their offenses against our laws, we can say to them that we will take their license and in addition thereto affix a fine.  This is as far as we can go.  Their *existence* as a corporation we cannot reach. Their corporate life we cannot take.  Contracts which they have made and business which they have outside of Missouri, they can proceed to transact.  Now, to the point we have in mind.

The Waters-Pierce Company is a Missouri corporation.  It is true that, as a matter of law, we can take its corporate franchise for the violation of our laws. We can go even further and add a fine as penalty.  We can do one or both, and herein I dissent from the opinion of my learned brother Woodson.  In his opinion he simply cancels the licenses of the Standard Oil Company of Indiana and the Republic Oil Company to do business in Missouri.  He suggests no fine.  The only punishment such companies receive is a prohibition to

do business in this State. I think that they should not only have their licenses taken from them, but that there should be a substantial fine imposed against them.

As to the Waters-Pierce Company, I am of opinion that it should not be punished more than the other respondents. The opinion of my learned brother forfeits the corporate life of the company. We can't go thus far as to the other two respondents, because we have no such power. To take the corporate franchise of the Waters-Pierce Company, and thus prohibit it from doing business elsewhere, would be a punishment absolutely excessive as compared with what we can inflict upon the other respondents, and this too in the face of the evidence that a large minority stockholding had been battling against the violation of law. We should have some consideration for minority stockholders. They should not have their property rights slaughtered absolutely, because a majority interest in the corporation could control them. If it were not so patent that Mr. Pierce, the minority stockholder, had even lost his place with his own company, because of his opposition to the methods of the Standard Oil Company of New Jersey, there might be some excuse for inflicting, by way of judgment, a punishment which would be commensurate with the combined act of the stock-holding interests in the corporation. We do not wish to be understood that the act of the corporation, whatever difference there may be between the minority and majority stock ownership, should not be adjudged and punished, but what we do desire to urge is that in cases of this kind the judgment of the court is within the discretion of the court. We have always so held from the earliest time up to and including the Delmar Jockey Club Case, 200 Mo. 34. With this discretion and with the evidence in the record before us, to my mind the judgment indicated by my brother Woodson's opinion should be modified in two ways.

State ex inf. v. Standard Oil Co.

The opinion calls for but one judgment as to all respondents, that of ouster. Ouster as to the Standard Oil Company of Indiana and the Republic Oil Company is but slight punishment, for they can continue in business elsewhere. In my way of thinking, these companies should not only be ousted of their license to do business in this State, but that a substantial fine should be added. I also think that as to the Waters-Pierce Company, the judgment of ouster should not go. As to it, a judgment of guilt should be entered, and a reasonable fine fixed. Even this would be harsh upon the minority stock ownership in the corporation, but as the corporation has violated the law in our discretion we should fix a reasonable punishment. That of ouster, called for by the opinion of my brother, is more than a reasonable punishment. We have full precedents in this court in the Insurance Trust Case, as in others decided by this court.

I, therefore, concur in the opinion of my brother as to a general judgment of guilty, but think the punishment as to two of the respondents as indicated by the opinion, is insufficient, and that of the other, the Waters-Pierce Company, is excessive.

And when I suggest that the punishment of the two is not sufficient, I do not mean to say that courts should become crazed upon any subject or against any interest, but should be governed by that calm judicial judgment that has always characterized the decrees of unbiased judicial tribunals. Popular crazes have no place in the judicial opinion. With these views firmly fixed, I feel that I should insist upon a modification of the judgment indicated by the opinion to the extent herein stated. Otherwise, I concur.

The foregoing was prepared before consultation on the case and before the original opinion was modified to its present form, but I file it herewith as expressive of my reasons on this case, and because, in one particular, my views differ from those of the majority.

## SEPARATE OPINION.

LAMM, J., concurs in part and dissents in part. He is one of the opinion that all of the defendants are guilty as charged. Further, that the license of the Republic Oil Company to do business in Missouri is properly forfeited absolutely, and once for all. The business life of the company in this jurisdiction would seem to show that it was born in original corporate sin and begotten in corporate iniquity. The record shows that it is a rover, flying a flag of fair trade only as a decoy—wearing the livery of a fair trader the more easily and effectually to strike down all fair trade in oils, the more effectually to fasten the yoke of an odious monopoly upon the State. It is here to-day and gone to-morrow. It has no fixed business abode in Missouri and is not rooted in this State by any vested interest. Therefore, he concurs in what is said about it and in the punishment adjudged against it. Nothing in its career in this State is to be so commended as its exit by the action of the law.

As to the Standard Oil Company of Indiana, the case is somewhat different. That corporation has vested interests in the State in a plant of great value and a great business in the useful line of refining oils. To the extent that it is pursuing the refining of oils, it is subserving a legitimate business purpose useful to our people. In so far as it voluntarily entered into a conspiracy to suppress competition and fix arbitrarily the price of oils in the teeth of our anti-trust statutes and the common law and to establish a trade monopoly contrary to both, it deserves punishment. But in accordance with the usage of this court in the Beef Trust Case, the Trust Company Case and the Insurance Companies Case, we should temper justice with mercy by using a flexible power in our judgment. In the Beef Trust Case and in the Insurance Companies Case we went to our anti-trust statutes, to our *quo warranto* statutes and to the common law to get at

our powers in punishment. We should do so in this case; so long as we have ruled we have the right. Therefore, the ouster against the Standard Oil Company of Indiana, bottomed upon a forfeiture of its license to do business in Missouri, should conditionally protect its general business in refining oils—this primarily, to protect our own citizens against the dismantling of a useful business plant. He is of opinion further that the judgment of ouster should be suspended during good behavior, on its making a sufficient showing of compliance with the law. This metes out to it the same degree and character of punishment administered to to the Waters-Pierce Company. We have provided a *locus poenitentiae* for that company, why not for this one?

As to the Waters-Pierce Company he does not concur in the stress laid in the principal opinion on the sometime wishes and desires of the minority stockholders not to enter into the unlawful combination in restraint of trade found to exist. If the court in administering punishment may look within the body corporate and see the individual stock-holders and comment on their tentative positions, in the inception of corporation enterprises, and mete out justice, not as it may affect the body corporate, which is a party to the litigation, but the individual shareholders who are not parties, then at least it should not be lost sight of that the same record that shows the minority stockholders of the Waters-Pierce Company at first protested, also shows that they finally consented. Did these minority stockholders invoke judicial aid in any court open to them to prevent a consummation of the unlawful purpose of the alleged wicked majority? Not at all. Did they even give open cry to their protest and call to their aid the force of wholesome public opinion? No. Did they refuse to take an even *pro rata* of the illicit, fabulous gains arising from the unlawful combination? No. Have they got those gains in pocket

now? Yes. Do they offer restitution? No. When the corporation was sued in this proceeding did these minority stockholders enter their appearance or ask to have an appearance entered for them in order to protect their minority holdings by placing themselves *rectus in curia?* No. In such condition of things, he is of opinion that the minority stockholders are not objects of especial judicial sympathy, no more than was the Empress Maria Theresa in a certain historical event. "What," asked one of Frederick the Great, "was the attitude of the Empress toward the partition of Poland?" "She *weeps,*" dryly remarked Frederick, "but she takes her share." Until such time as it be written as a precept of law that the allowable way to defeat temptation is to give way to it, or until it be written in the law that the alluring enticement of great gains *forces* the tempted one into doing an illegal act and takes the edge from a willing participation in an illegal act, he is not willing to extend such judicial sympathy. To suspend the judgment of ouster on payment of a fine, conditionally, upon a showing of corporate fidelity to law is well enough, but in his opinion the punishment is too light for such conspicuous, profitable, defiant and long-drawn-out violation of our anti-trust statutes. Justice should not be spectacular or capricious, but as this defendant made millions of illegal profits, its fine should be measured by its own standard, in order to be felt and appreciated.

He is therefore of the opinion that the amount of its fine should be fixed at one million of dollars. He is of the further opinion that the fine of the Standard Oil Company of Indiana should be increased and the ouster changed from an absolute one to a conditional one.

## ORDER SUSPENDING JUDGMENT.

### ENTERED MARCH 9, 1909.

Now at this day, the court having seen and fully understood the motions heretofore filed by the Standard Oil Company for a rehearing and to modify the judgment herein, and the motion heretofore filed by the Republic Oil Company for a rehearing herein, doth order that said motions be, and the same are hereby overruled. (LAMM, J., dissenting; WOODSON, J., expresses his views in separate opinion.) And the court having seen and fully understood the motion heretofore filed by the Attorney-General, to make absolute the judgment of ouster against the Waters-Pierce Oil Company, respondent herein, doth order that said motion be, and the same is hereby overruled. (LAMM, J., dissenting; WOODSON, J., expresses views in separate opinion.) And the court having seen and fully understood the proofs of compliance with the requirements of the judgment of December 23, 1908, heretofore filed by the Waters-Pierce Oil Company, respondent herein, doth order that said proofs be approved, and that the said judgment of ouster be suspended, in accordance with the said judgment of December 23, 1908, in said cause. (LAMM, J., dissenting; order filed; opinion by WOODSON, J.)

## FINAL DECREE.

### ENTERED MARCH 9, 1909.

The Waters-Pierce Oil Company having tendered into court the amount of the fine imposed on it by the judgment of this court, and having given satisfactory evidence of its purpose to henceforth so conduct its business as not to violate the law of this State in regard to pools, trusts and conspiracies, it is ordered by the court that the clerk of this court receive the

money so tendered and pay the same into the State Treasury and it is further ordered that the judgment of this court of date December 23, 1908, ousting the Waters-Pierce Oil Company of its charter and adjudging all its rights and privileges thereunder forfeited and annulled, be and the same is hereby suspended until otherwise ordered by the court, but the court will retain jurisdiction of the cause for the purpose of setting aside and annulling this order or modifying the same if the court should hereafter on motion of the Attorney-General or its own motion become satisfied that the Waters-Pierce Oil Company is at that time or has been conducting its business in a manner forbidden by the law of this State in relation to pools, trusts and conspiracies.

## DISSENTING OPINION.

WOODSON, J.—The opinion in this cause was handed down on December 23, 1908, wherein it was found that the Standard Oil Company of Indiana and the Republic Oil Company of New York had forfeited their respective rights to their licenses to do business in this State; and it was also found that the Waters-Pierce Oil Company of this State had forfeited its right to be a corporation.

In pursuance to those findings this court by decree adjudged a revocation of the licenses of the two former to transact business in this State, and by the same decree revoked and forfeited the charter of the Waters-Pierce Oil Company; but ordered a suspension of the decree and a stay of execution in the latter upon certain conditions therein stated. Said judgment and decree is in words and figures as follows:

"And now on this day, this court having fully considered the evidence in this cause, and announced and filed its opinion that the said respondents and each of them are guilty as charged in the information

of the Attorney-General of a violation of the statute of this State, entitled, 'Pools, Trusts and Conspiracies; Unlawful Combinations,' approved March 24, 1877, and an Act of the General Assembly of this State, approved April 2, 1891, and entitled, 'An Act providing for the punishment of pools, trusts and conspiracies to control prices and as to evidence and prosecution in such cases,' and now known as chapter 143 of the Revised Statutes of Missouri, 1899, come now the State of Missouri, by Herbert S. Hadley, the Attorney-General, and the said respondents by their respective counsel, and it is now here considered, ordered and adjudged by the court that the said respondents and each of them are guilty of violating the said acts of the General Assembly of this State, in that at the dates and times set forth in the information of the Attorney-General, they did form and enter into a pool, trust, combination and conspiracy, to regulate, fix and control the prices to be paid by retail dealers and others in the State of Missouri, for naphtha, benzine, gasoline, kerosene, lubricating oil and other products of petroleum, and to control and limit the trade in the articles aforesaid and to prevent competition in said business of buying and selling naphtha, benzine, gasoline, kerosene, lubricating oil and other products of petroleum in this State, between themselves and others engaged in like business, and to deceive and mislead the public, and did control, fix and maintain the prices for said articles, and have prevented and destroyed competition in the purchase and sale of said products of petroleum in this State as charged in the information; and thereupon, it is now considered, ordered and adjudged by the court that by reason of the violation of said statutes of this State, in forming and entering into and maintaining said unlawful combination, conspiracy and pool, the said Standard Oil Company, organized under the laws of the State of Indiana, and heretofore licensed to do

business in this State, and the said Republic Oil Company, organized under the laws of the State of New York, and licensed to do business in this State, have each and both forfeited their respective licenses heretofore granted them by the Secretary of the State of Missouri, and it is further considered, ordered and adjudged that said license of the said Standard Oil Company of Indiana, and the said license of the said Republic Oil Company of New York, be and the same are hereby forever forfeited, annulled and cancelled, and the said Standard Oil Company of Indiana and the said Republic Oil Company of New York are hereby ousted of any and all rights and franchises granted to them, under the laws of this State, to further do business in this State; and it is further considered, ordered and adjudged that the said Standard Oil Company of Indiana and the said Republic Oil Company of New York, each, for the violation aforesaid of the laws of this State, in forming, entering into and maintaining the conspiracy and combination to regulate, control and fix the prices of said products of petroleum in this State, and to control and limit the trade in said products in this State, and to prevent competition in said business, be fined fifty thousand dollars, and that each of said respondents, the said Standard Oil Company of Indiana, and the said Republic Oil Company of New York pay, each, the said sum of fifty thousand dollars to the clerk of this court, on or before the the first day of March, 1909, to be by said clerk paid into the treasury of the State, and upon default and failure to do so, that the State of Missouri have execution therefor, to be levied and enforced according to the laws of this State, in such cases made and provided; and it is further considered, ordered and adjudged by the court, that the said respondent, the said Waters-Pierce Oil Company, by its violation of the said laws and statutes of this State, against 'Pools,

Trusts and Conspiracies' and known as chapter 143
of the Revised Statutes of Missouri 1899, has forfeited
its charter to do business in this State and it is there-
fore considered, ordered and adjudged by the court
that the right and franchise heretofore granted to said
Waters-Pierce Oil Company, to be a body corporate
and to do business and contract as such, 'with all other
rights acquired by its certificate of incorporation, be
and the same are hereby forever forfeited, annulled
and set aside, and said Waters-Pierce Oil Company
is hereby ousted of its corporate rights and powers and
franchises heretofore granted to and enjoyed by it
under the laws of this State, subject, however, to the
further provisions of this judgment; and for the vio-
lation of its said franchises, by forming, entering into
and maintaining the said pool, combination and con-
spiracy, to regulate, control and fix the prices of the
products of petroleum, as hereinbefore specifically
found and set forth and to prevent competition in the
business of buying and selling said products in this
State, it is considered, ordered and adjudged by the
court that in addition to said ouster, said Waters-
Pierce Oil Company be fined fifty thousand dollars,
and that it pay said fine of fifty thousand dollars to
the clerk of this court, on or before the first day of
March, 1909, to be by said clerk paid into the Treasury
of this State, and upon default and failure to pay
said fine on or before said date, the State of Mis-
souri have execution therefor, to be levied by the
marshal of this court and enforced according to the
laws of this State in such cases made and provided.
But it is further considered, ordered and adjudged
by this court, that if the said Waters-Pierce Oil Com-
pany shall pay said fine to the clerk of this court on
or before the first day of March, 1909, and shall im-
mediately cease all connection with the said other
respondents herein in continuing or maintaining said

218 Sup—31

pool, trust and conspiracy to fix, control and regulate the prices of naphtha, benzine, gasoline, kerosene, lubricating oil and all other products of petroleum, and shall refrain from all pools, trusts and conbinations to control the prices of said products of petroleum, and all combines and conspiracies to prevent competition in the trade of buying and selling said products, and shall furnish this court with satisfactory evidence of its compliance with this judgment and of its intention in good faith to cease all connection with its said co-respondents herein and all other parties or companies whatsoever, and in the future maintain and carry on its business as an independent corporation in obedience to the laws of this State, and its charter, then the judgment of ouster herein shall be and is hereby suspended, and the writ of ouster herein will not issue until expressly directed by order of this court, and the said Waters-Pierce Oil Company is hereby given until the fifteenth day of January, 1909, to file the proofs of its willingness to comply with the judgment of this court, and until that date in no event will the writ of ouster be awarded.

"And it is further considered, ordered and adjudged by the court that if it shall be shown to the satisfaction of this court hereafter, that notwithstanding the promises and assurances of the said Waters-Pierce Oil Company to abide by this judgment, it has violated the conditions of this judgment and has violated the said statute against 'pools, trusts and conspiracies,' then and in such case the suspension of the writ of ouster shall be removed by this court and absolute ouster be enforced as directed and adjudged herein. It is further ordered and adjudged that the State of Missouri at the relation of the Attorney-General have and recover its costs herein paid and expended, including the allowance of the special commissioner and the stenographer in taking and certifying the testimony herein and the fees of the wit-

nesses and have execution therefor against all of said respondents.''

Within ten days after the opinion was handed down, the Standard Oil Company of Indiana and the Republic Oil Company filed their motions for a rehearing; and subsequently thereto the same companies filed another motion suggesting that the decree as to them be modified so as to suspend the decree and stay the execution of ouster upon such terms as the court might think just and equitable.

On January 15, 1909, this court made an order extending the time thirty days for the respondent, Waters-Pierce Oil Company, to comply with the conditions upon which the judgment and the writ of ouster would be stayed.

On February 15, 1909, the respondent, Waters-Pierce Oil Company, filed in this court a document containing the proofs required by the decree, showing, as the company contends, its compliance with the conditions upon which a suspension of the judgment and stay of writ of ouster would be ordered.

On the same day, but subsequent thereto, the Attorney-General filed a motion in the cause, asking the court to order the issuance of the writ of ouster against the Waters-Pierce Oil Company, because the evidence furnished by it does not show a compliance with the requirements of the judgment.

In the disposition of these motions, I will consider the Waters-Pierce motion first, for the reason that it may be summarily disposed of, as it has no motion pending for a rehearing.

The written document before mentioned, which purports to contain the proofs required by the decree to be furnished to satisfy the court that the Waters-Pierce Oil Company had in good faith complied with the conditions upon which a suspension of the judgment and a stay of a writ of ouster would be ordered, is in words and figures as follows (caption omitted):

"Comes now the Waters-Pierce Oil Company in the above entitled cause, pursuant to the order and judgment rendered herein, and files herewith a duly certified copy of a resolution of its board of directors, passed February 13, 1909, wherein and whereby it agrees to accept, and does accept the conditions of the aforesaid decree and agrees to abide by the same, and does hereby respectfully submit itself to the further orders, judgments and decrees of this Honorable Court in and concerning the premises.      .

"And the said, the Waters-Pierce Oil Company, deposits herewith a certified check in the sum of fifty thousand dollars to the order of the clerk of this court in payment of the fine imposed upon this defendant by virtue of said judgment and decree.

"WATERS-PIERCE OIL COMPANY,

"By BOYLE & PRIEST, J. D. JOHNSON,

"Its Attorneys. .

" 'State of Missouri, City of St. Louis, ss.

" 'The undersigned, C. A. Pierce, president of the Waters-Pierce Oil Company, a corporation organized under the laws of the State of Missouri, hereby certifies that the following is a true and correct copy of the minutes of the adjourned regular monthly meeting of the Board of Directors of said Company, held at the Company's office in the city of St. Louis on the 13th of February, 1909, as the same appears of record in the regular minute book in which is entered the minutes of meetings of the board of directors of said company, to-wit:

" ' "OFFICE OF WATERS-PIERCE OIL COMPANY,

" ' "No. 420 Olive street, St. Louis, Mo.

February 13th, 1909.

" ' "At the adjourned regular monthly meeting of the Board of Directors of the Waters-Pierce Oil Company, held at the Company's office in the City of St.

Louis, Missouri, this, the 13th day of February, 1909, there were present and participated in the meeting, H. C. Pierce, Chairman of the Board, C. A. Pierce, President, C. M. Adams, Secretary and Treasurer, and Walter F. Taylor, directors.

" ' "The meeting was called to order by H. C. Pierce, Chairman of the Board, and Mr. Adams acted as Secretary. The minutes of the special meeting of the Board, held on the 14th day of January, 1909, and of the regular monthly meeting of the Board, held on the 1st day of February, 1909, were read and approved.

" ' "The following resolution was then offered and, on motion duly seconded, was unanimously adopted, to-wit:

" ' "Resolved, that this company, protesting that it has never consciously or knowingly violated any of the provisions of the laws of this State, nevertheless, does hereby accept the terms and conditions of the order or decree of the Supreme Court of Missouri, entered in the cause of the State upon the information of Herbert S. Hadley, Attorney-General, against the Standard Oil Company of Indiana, the Republic Oil Company and the Waters-Pierce Oil Company, and does hereby express its willingness to abide by the same.

" ' "There being no further business to transact the meeting adjourned.

" ' "H. C. Pierce, Chairman of the Board. " ' "Attest:    C. M. Adams, Secretary."

" ' 'In witness whereof, the said C. A. Pierce, President of said company, has hereunto set his hand, and C. M. Adams, Secretary of said company, has attested these presents and affixed the corporate seal of said corporation thereto. All done at the City of St. Louis, State of Missouri, this the 13th day of February, 1909.

" ' '(Seal.)        Clay Arthur Pierce, President. " 'Attest:    C. M. Adams, Secretary.' "

## OPINION.

### I.

The Attorney-General, in his motion for a writ of ouster, contends that the evidence furnished by the Waters-Pierce Oil Company wholly fails to show that it has severed its trust relations with its co-respondents and with all other parties and corporations whatsoever; and that it entirely fails to show to this court that it intends in good faith to obey the judgment of the court, and to conduct its business as an independent corporation according to the laws of this State and within the scope of its charter, rights and powers, as required by the judgment.

By reading the foregoing judgment it will be seen that this court found the Standard Oil Company of Indiana, the Republic Oil Company of New York, and the Waters-Pierce Oil Company of this State guilty of violating the laws of this State prohibiting pools, trusts and conspiracies, and all unlawful combinations to regulate, fix and control the prices to be paid by retail dealers and others in this State for naphtha, benzine, gasoline, kerosene, lubricating oil and all other products of petroleum, and to control and limit the trade in the articles aforesaid and to prevent competition in said business of buying and selling any and all of said products of petroleum in this State between themselves and *others engaged in like business,* and to deceive and mislead the public, etc., in that they did form said combinations and maintained the prices for said articles and did destroy competition in the purchase and sale of all of said products of petroleum in this State, etc.

And it is further seen from said judgment that it was considered, ordered and adjudged by the court that by reason of the violation of said laws, in forming and entering into and maintaining said unlawful combination, conspiracy and pool, the said Standard Oil Company of Indiana, and the Republic Oil Company of

New York had each forfeited their respective licenses to do business in this State; and it was further ordered and adjudged that they were thereby ousted of any and all rights granted to them under the laws of this State to further do business herein.

Then follows the assessment of a penalty of $50,-000 against each of those companies, and execution was ordered, etc.

The decree then proceeds to order, adjudge and decree that the Waters-Pierce Oil Company had, by its violation of the laws of this State prohibiting pools, trusts and conspiracies, etc., forfeited its charter and right to do business herein; and it was further ordered and "adjudged that the right and franchises heretofore granted to the Waters-Pierce Oil Company to be a body corporate and to do business and contract as such with all other rights acquired by its certificate of incorporation, was thereby *forever forfeited, annulled and set aside,* and the said Waters-Pierce Oil Company was thereby *ousted of its corporate rights, powers and franchises heretofore granted to it under the laws of this State.*"

The decree then provides that the same may be suspended in its operation, as to the Waters-Pierce Oil Company, upon certain conditions precedent therein stated. It then requires the company to furnish the court with satisfactory proof that it has performed those conditions, which conditions I will again briefly state and number for the purpose of accentuating them:

First: That the company pay to the clerk of this court on or before the first day of March, 1909, the sum of $50,000.

Second: That said company should immediately cease all connection with the other respondents herein in continuing or maintaining said pool, trust and conspiracy to fix, control and regulate the prices of the products of petroleum, and shall refrain from all

pools, trusts and combinations to control the prices of said products.

Third: That said company should refrain from all combines and conspiracies to prevent competition in the trade of buying and selling said products, and in deceiving the citizens of the State as to whom they are purchasing said products from.

And fourth: That said company should "furnish this court with satisfactory evidence of its compliance with this judgment and of its intention in good faith to cease all connections with its said co-respondents herein, and with *all other parties or companies whatsoever,* and in the future maintain and carry on its business as an independent corporation in obedience to the laws of this State and its charter, *then the judgment of ouster herein shall be and is hereby suspended and the writ of ouster herein will not issue until expressly directed by order of this court,* and the said Waters-Pierce Oil Company is hereby given until the fifteenth day of January, 1909, to file the proofs of its willingness to comply with the judgment of this court, and *until that time in no event will the writ of ouster be awarded.*"

The meaning and scope of the judgment must be gathered from its terms when read in the light of the statutes governing pools, trusts and conspiracies, and the opinion upon which the judgment is based.

When we so read the judgment there can be, in my opinion, not a shadow of doubt but that the judgment of forfeiture of the charter of the Waters-Pierce Oil Company was absolute and unconditional after the said 15th day of January, 1909, which decree is in strict compliance with the mandate of the statute applicable to such cases; and the writ of ouster can be suspended only upon the *express order of this court* after said satisfactory proofs have been furnished; nor' can there be any doubt but what it was the intention of the court, as expressed in the judgment, that the decree

of forfeiture of the charter was to be suspended and the writ of ouster was to be stayed when the company furnished the court satisfactory proof of its compliance with the requirements thereof, and not otherwise.

We will now come to the consideration of the question, first, has the Waters-Pierce Oil Company severed its trust relations with its co-respondents and all other "parties and companies whatsoever?" And, second, are the proofs furnished satisfactory evidence to the minds of the court that the company has severed all said trust relations? For convenience we will discuss these two questions in the inverse order stated:

Omitting all formal parts, the following is all the evidence the company has furnished to this court of its compliance with the conditions upon which a suspension of the judgement would be ordered, to-wit:

"And the said, The Waters-Pierce Oil Company, deposits herewith a certified check in the sum of fifty thousand dollars to the order of the clerk of this court, in payment of the fine imposed upon this defendant by virtue of said judgment and decree."

Then follows a resolution duly adopted by the board of directors of the company, at a meeting held on February 13, 1909, which is in words and figures as follows:

"Resolved that this company, protesting that it has never consciously or knowingly violated any of the provisions of the laws of this State, nevertheless, does hereby accept the terms and conditions of the order or decree of the Supreme Court of Missouri, entered in the cause of the State upon the information of Herbert S. Hadley, Attorney-General, against the Standard Oil Company of Indiana, the Republic Oil Company of New York, and the Waters-Pierce Oil Company, and does hereby express its willingness to abide by the same."

The entire evidence and proofs furnished by the company of its compliance in good faith with the judg-

ment of the court are embraced within the two quotations last-above stated.

That evidence is not responsive to the requirements of the judgment except in the payment of the $50,000 penalty imposed, but is at total variance therefrom, and tends strongly to disprove the company has severed its trust relations with any of the parties referred to in the judgment.

In passing we might state that in entering the decree of forfeiture against the Waters-Pierce Oil Company, we endeavored to temper justice with mercy toward it, because of the domination and management of the latter by the Standard Oil Company of New Jersey, by offering it an opportunity to escape the judgment of ouster by requiring it to do the things stated therein, and grouped under the four headings before mentioned.

According to the grouping, the first requirement the court exacted of the company was that it pay to the clerk of this court the sum of $50,000 for the use and benefit of the State on or before the 1st day of March, 1909. That requirement has been fully complied with, and the company has furnished the court with satisfactory proof that it has paid said sum to the clerk of this court for the uses and purposes therein stated.

The second requirement was that it should immediately cease all connection with the other respondents herein in continuing or maintaining the pool, trust and conspiracy to fix, control and regulate the prices of the products of petroleum, and should refrain from all pools, trusts and combinations to control the prices of said products. Has the company complied with that requirement? If so, it has furnished this court with no evidence whatever of that fact. The only evidence filed herein for all purposes is as follows: "This company [naming the Waters-Pierce Oil Company] protesting that it has never consciously or knowingly

violated any of the provisions of the laws of this
State, nevertheless, does hereby accept the terms and
conditions of the order or decree . . . entered in
the cause . . . and does hereby express its will-
ingness to abide by the same."

At most that statement, which is contained in a
resolution adopted by the board of directors of the
company, only expresses a "willingness to abide by
the same" (meaning the judgment of forfeiture) in
the future, but not one word is found therein which
even remotely indicates that the company has severed
any or all of its trust relations with its corespondents,
or with any other persons. Clearly, the company does
not by the use of that language intend to convey the
idea to the court that it has in fact severed its trust
relations with any one; but, upon the contrary, it
states that it has "never consciously or knowingly
violated" the anti-trust laws of this State. That is
equivalent to saying it has not complied with that
requirement of the judgment for the reason that if
it is ignorant of ever maintaining a pool, trust or
combination in restraint of trade, then, of course, it
would be nonsense to contend that it has severed its
trust relations with its corespondents and other per-
sons. In other words, if it did not belong to the trust
and combination, it could not sever its relation with
those trusts or combinations—that is a self-evident
proposition. Not only that, that statement is not true
in point of fact, for it has not only violated the anti-
trust laws of this State, as was found to be true by
the unanimous opinion of the court, heretofore handed
down, in this case, but it also had knowledge thereof,
for the reason that the record in this case conclusively
shows that for years it has been violating not only
the laws of this State but has been violating similar
laws of other States, and has during all that time been
engaged in scheming and working out plans and means
by which those laws could be violated with impunity,

and at the same time conceal that fact from the officers of the law, and thereby escape just punishment. The record in this case conclusively shows, and we so found in express terms, that the scheme of conspiracy adopted in this case was entered into for the very purpose of concealing its lawlessness, and it was upon that conspiracy and knowledge the information of the Attorney-General, Herbert S. Hadley, was based, and upon which respondents were found and adjudged guilty, and at this late date to again advance that false and threadbare plea of not guilty, in order to escape the judgment of ouster rendered therein, is, to say the least, a most unique proceeding in our jurisprudence.

We found that plea to the information to be untrue, and adjudged the respondents guilty, and in consequence thereof rendered the judgment of forfeiture against this company and its corespondents, and to now permit it to come in and successfully interpose the same pleas in order to escape that same judgment would be unwise on the part of the court. Such argument if sound could do credit to a ring-maker, because of its circular form.

But that is not the only view to be taken of the evidence filed in this case as proof that this company has complied with the judgment and severed all trust relations with all parties and companies. It is evasive—neither denies nor affirms that fact. It is characteristic of the evasion and deceit which has been practiced by the Standard Oil Company of New Jersey for many years past, as is disclosed by the record in this case; and one of the strongest evidences in the case which shows the unlawful conspiracy which existed between respondents and the New Jersey Company has not been dissolved is the so-called proof of compliance with the decree of the court filed herein. It shows that the Waters-Pierce Oil Company is still dominated by the former, and cannot

on that account separate itself from the unlawful combination into which it was forced to enter, and by which it is detained as a helpless victim, powerless to either affirm or deny its compliance with the requirements of the judgment, and the New Jersey Company there hanging with death-like tenacity to the unlawful conspiracy, the organization and construction of which is the most gigantic and perfect piece of mechanism I have ever read or heard of, with the lingering and fond hope that it may still reap the golden harvest sowed, not with its own, but by other hands.

One would judge from the character of the evidence produced that the company was laboring under the erroneous impression that it was conferring a great favor upon this court by producing the proofs filed herein, and was totally ignorant of the fact that the offer made to it by the court to suspend the judgment of forfeiture upon condition that it would furnish satisfactory proof of the dissolution of the trust, was made for its benefit.

But independent of all this, can any intelligent, fair-minded, disinterested person believe for a moment that these respondents have severed their trust relations with each other or with the Standard Oil Company of New Jersey? We think not; but if possibly we are mistaken in that fact, then let them come into this court and produce sworn testimony showing the withdrawal of respondents from the trust and the dissolution of that unlawful conspiracy and combination in order that there may be no doubt or uncertainty in that regard. If it is a fact, then that fact is susceptible of direct and positive proof; and should now be made certain, before it is too late.

Clearly the simple declaration of the Waters-Pierce Company of its acceptance of the terms of the decree and a bare expression of its "willingness to abide by the same" is in no sense a performance of the conditions imposed upon it by the terms of the

decree, or that the unlawful conspiracy to which it belonged had been dissolved, or that it had in good faith determined to refrain from re-entering such an unlawful combination in the future. The decree requires action on the part of the company, and not simply the adopting of a meaningless resolution by its board of directors. That resolution shows no act performed whatever, but consists simply of a bold declaration of its willingness to abide by the decree, without declaring it had withdrawn from the pool, trust, or combination, or expressing its intention to do so in the future. The most dignified thing that can be truthfully said of the so-called proofs filed, when read in the light of the decree, is that they are deceptive and meaningless, wholly foreign to the requirements of the decree and not responsive thereto.

We, therefore, hold that the Waters-Pierce Oil Company has furnished this court no proof whatever tending to show that it has, in good faith, severed all trust relations with its corespondents and with all other persons who belong to unlawful combinations in restraint of trade.

What we have before stated regarding proofs furnished as to the requirements of the decree, grouped under the second division thereof, applies equally well to those stated under the third subdivision of the decree, before mentioned, and for that reason I will not further notice those requirements.

That portion of the fourth subdivision of the decree, expressed in the following language: "and shall [the Waters-Pierce Oil Company] furnish this court with satisfactory evidence of its compliance with this judgment and of its intention in good faith to cease all connections with its said corespondents herein *and all other parties or companies whatsoever,* and in the future maintain and carry on its business as an independent corporation in obedience to the laws of this State and its charter; then the judgment of ouster

herein shall be suspended," etc., was intended to compel the Waters-Pierce Oil Company not only to sever its trust relations with its corespondents herein, but also to sever such relations with the Standard Oil Company of New Jersey, and all of its subsidiary companies and all other persons, copartnerships, companies and corporations whatsoever and wheresoever situated.

The very object and purpose of the Attorney-General in bringing this suit was to destroy the "Oil Trust" existing in this State, and thereby restore competition between the dealers in the products of petroleum. He knew that by revoking the licenses of the Indiana and Republic companies, and by forfeiting the charter of the Waters-Pierce Oil Company, who constituted all of the parties to the trust who were doing business in this State, the "Oil Trust" would thereby be killed and completely destroyed, with every root and branch thereof, in so far as it affected this State. With that purpose in view he instituted this suit, and this court found all three of the respondents guilty, as charged in the information, and by the judgment herein the court revoked the licenses of the two former companies and forfeited the charter of the Waters-Pierce Oil Company for the express reason that they had formed and entered into a pool, trust and combination in restraint of intrastate trade; and when the court found them guilty of that offense, and entered the decree revoking the licenses of the two former companies, and forfeiting the charter of the Waters-Pierce Company, the decree, of necessity, not only severed the relations of respondents with that pool, trust and combination, but in addition thereto, as regards the latter company, the decree also destroyed its *trust,* and all other relations for that matter, with all trusts, pools and combinations in restraint of trade, whether natural persons, copartnership, companies or corporations, what-

soever, situate in this State or elsewhere, for the obvious reason that the forfeiture of the charter took away the very life of the Waters-Pierce Oil Company and completely destroyed its very being, as completely and effectually as would the taking the life of a natural person destroy his existence and business relations with all persons whomsoever.

In the trial of this case, in proving the existence of the pool, trust and conspiracy existing between the respondents herein, the evidence introduced by the Attorney-General also uncovered and proved beyond cavil that there existed not only a pool, trust and conspiracy between the three respondents herein, but that there also existed between them and numerous other persons, companies and corporations similar pools, trusts and combinations, and among others who were parties thereto was the Standard Oil Company of New Jersey, and all of its subsidiary corporations named or mentioned in the opinion heretofore handed down. And the evidence conclusively shows, and said opinion finds and holds, that the combination existing between these respondents also existed between them and those companies, and was but a part of said larger conspiracy and combination which existed between them and the said Standard Oil Company of New Jersey and all of its said subsidiary corporations. And, as before stated, the forfeiture of the Waters-Pierce Oil Company's charter destroyed its very being, and of necessity, incidentally but completely, severed and destroyed all of its relations, trust and otherwise, with its co-respondent, the Standard Oil Company of New Jersey, and with all of the latter's subsidiary corporations; and the language of the decree last quoted was employed and was inserted therein for the express purpose of compelling the Waters-Pierce Oil Company to sever its relations with its co-respondents and with *"all other parties or companies whatsoever,"* which, of course, was intended to and did include the Stan-

dard Oil Company of New Jersey and all of its subsidiary companies, for the reason that the evidence preserved in this record fails to show that there were any other persons or corporations belonging to the pool, trust and combination charged in the information except the New Jersey Company and its subsidiary companies.

The last opinion handed down in this case unanimously held that the Standard Oil Company of New Jersey was the parent of the respondents in this case, and of all its other subsidiary corporations mentioned therein; and that the pool, trust and combination charged in the information filed herein was but a part of the "Oil Trust" which was composed of the New Jersey Company and all of its subsidiary companies. The first opinion, herein, written by LAMM, J., which was concurred in by all members of the court, also held in effect that the "Oil Trust" was headed by the New Jersey Company, and that it was composed of that company, the respondents herein and all of the former's subsidiary companies. Not only that, but the undisputed evidence in the case shows that the trust relation existing between the New Jersey Company and the subsidiary companies was based upon and traceable through the common ownership of the capital stock of said various companies by the New Jersey Company; and both of said opinions delivered herein so found the facts to be, and the judgment rendered in pursuance to the last opinion revoked the licenses of the Indiana and Republic companies, and forfeited the charter of the Waters-Pierce Company, because of the existence of those facts. And since the undisputed testimony in the case shows that the New Jersey Company owns sixty-two per cent of the capital stock of the Waters-Pierce Company, and thereby completely dominates and manages the latter's business, and then under that view of the case should we exclude from the

State the two former companies, without compelling the Waters-Pierce Company to sever its stock and all other trust relations with the New Jersey Company, that would have the effect to intensify and strengthen the "Oil Trust" in the State by giving the New Jersey Company a complete monopoly, through its one creature and agent, the Waters-Pierce Oil Company, over not only that part of the State now controlled by the Waters-Pierce Company, but would extend its business over all that part of the State now controlled by the Indiana and Republic companies. In other words, instead of the judgment of the court destroying the "Oil Trust" existing in the State, as commanded by the express letter of the statute, and for which object this suit was brought, it will virtually and for all practical purposes substitute the Standard Oil Company of New Jersey in the place of the excluded companies, with permission and authority of this court, in violation of the express terms of the statute of the State, to not only continue to transact its monopolistic business over the north half of the State, as it is now doing, through the Indiana Company, but will, through its agent and figure-head, the Waters-Pierce Oil Company, which it completely dominates, extend its business over the south half of the State also; or the New Jersey Company may in the exercise of its pleasure have the Waters-Pierce company extend its business, which is owned and controlled by it, over the north half of the State, and conduct the same business the New Jersey Company has been and is now conducting in that part of the State, in the names of the excluded companies, the Indiana and Republic companies.

In my judgment this court should not under that flimsy, gauzy makeshift perpetuate and strengthen the "Oil Trust" now existing in this State, which has proven so injurious to the people hereof, and which will prove to be of greater damage to them

in the future, if this illegal, unjust and iniquitous scheme is permitted to go through.

. The judgment of ouster heretofore entered against the respondents completely destroyed the "Oil Trust" of this State, and it should not be resuscitated under any conditions or pretexts whatsoever; and to do so would work an irreparable injury upon the people of the State, and would be absolutely inexcusable and indefensible.

While I fully realize the fact that the Waters-Pierce Oil Company is completely controlled and dominated by the Standard Oil Company of New Jersey, and for that reason I naturally presume the former is laboring under great difficulties in trying to comply with the requirements of this court in freeing itself from the clutches of the latter, and in furnishing us with satisfactory proofs that it has severed all stock and other trust relations with the latter, yet that very domination shows that if the judgment of forfeiture heretofore entered against the Waters-Pierce Company should be suspended without first requiring a complete severance of their trust relations, it would continue to violate the anti-trust laws of this State, through the Waters-Pierce Oil Company, just as it is now doing through the Indiana and Republic Oil companies. But this severance can be completely made without injury to the property or the legitimate business interests of either the Waters-Pierce Oil Company or to the Standard Oil Company of New Jersey; and because of my dislike to uselessly damage property rights and business interests, I am in favor of giving the Waters-Pierce Company another opportunity to sever its stock and other trust relations with its corespondents and with the Standard Oil Company of New Jersey, and with all other persons and companies whatsoever; and thereby enable it to carry on, in the language of the decree of ouster, an independent business, according to the laws of this State and of

its charter granted thereunder. But if it should turn out that the Waters-Pierce Oil Company should be unable to sever its stock and trust relations with the New Jersey Company and all of its subsidiaries because of its inability to induce or persuade the latter company to dispose of its stock and voluntarily retire from all illegal pools, trusts and combinations existing between them, then clearly it would be the New Jersey Company and not this court which would inflict the injury upon the Waters-Pierce Company, and through the latter injure itself, for the reason it owns sixty-two per cent of the capital stock of the latter, and, consequently, whatever damage might result to the latter, sixty-two per cent thereof would ultimately fall upon the New Jersey Company. If these considerations are not sufficient inducements to cause the latter to liberate the former and thereby enable it to sever its stock and other trust relations with all persons, copartnerships, companies and corporations wheresoever, then it will be the misfortune of the Waters-Pierce Company for having been found in bad company, and for having entered into an unlawful pool, trust and conspiracy from which it is unable to extricate itself. If that condition should present itself before the court, then this court should not shrink one iota in the discharge of its duty, but should promptly and fearlessly refuse the request to suspend the judgment of forfeiture which was entered against respondents on December 23, 1908. To suspend the judgment of ouster heretofore entered without first requiring the Waters-Pierce Company to sever all its stock and other trust relations with all parties would be inexcusable, for it would bring back to life and again put into operation the "Oil Trust," the greatest octopus of all the trusts, which hang like so many black clouds over this fair land of ours.

But, as before stated, and for the purpose of avoiding injury to property rights and the large busi-

ness interests of the Waters-Pierce Oil Company, I
am willing to suspend the judgment of forfeiture
heretofore rendered against it upon condition that it
perform the following specified things and require-
ments and furnish to this court, on or before April
1, 1909, the character of evidence hereinafter specified,
showing that it has, in good faith, performed those
things, namely:

First.    The Waters-Pierce Oil Company must,
in good faith, withdraw and completely sever all its
trust relations with the pool, trust and combination
charged in the information and of which it now stands
convicted by the judgment of this court.

Second.    It must, in good faith, sever its stock
and all other trust relations with the Standard Oil
Company of New Jersey and with all of its subsidiary
companies and corporations, as well as all other per-
sons, companies and corporations which are owned,
controlled or managed by said New Jersey Company,
or by any of said subsidiary companies.

Third.    That it will sever all its stock and other
trust relations, if any exist, between it and all of the
stockholders, officers and agents of the New Jersey
Company; and any and all of the stockholders, officers
and agents of any and all of said subsidiary com-
panies.

Fourth.    That it will sever all its stock and other
trust relations, if any exist, between it and all other
persons, copartnerships, companies and corporations
whomsoever and wheresoever located.

And said facts must be proven to the complete
satisfaction of this court by the following character
of testimony:

First:    By the affidavits of the president, secre-
tary and treasurer of the Waters-Pierce Oil Company,
stating that it has, in good faith, withdrawn from
and completely severed all of its trust relations with
the pool, trust and combination charged in the in-

formation filed in this cause, and of which it stands convicted by the judgment of this court.

Second: By the affidavits of the same officers of the Waters-Pierce Company, stating that neither the Standard Oil Company of New Jersey, and none of its subsidiary companies, and none of the stockholders, officers or agents of it, or of any or all of said companies, own, control or manage any of its stocks, to the best of their knowledge and belief; also the affidavits of any and all purchasers, owners or holders of said stocks, stating that they are the owners and holders, or whatever interest they may have in the same, and that neither the Standard Oil Company of New Jersey, nor any of its subsidiary companies, and none of its or their stockholders, officers or agents own or have any interest whatever in said stocks.

Third: The affidavits of the same officers of the Waters-Pierce Company, stating that there are no stocks or other trust relations existing between it and any or all of the stockholders, officers and agents of the New Jersey Company, or between it and any or all of the stockholders, officers or agents of any or all of said subsidiary companies thereof.

Fourth: By the affidavits of the same officers of the Waters-Pierce Company, stating that there exists no stock or other trust relations of any character whatever between it and any person, corpartnership, company or corporation whatsoever.

The words "pool, trust, combination" and "conspiracy" used herein are used in the sense in which they are used in chapter 143 of Revised Statutes of 1899, as construed by this court and the Court of Appeal of this State, and the affiants in making said affidavits must state therein that they use those words in that sense.

The subsidiary companies and corporations herein referred to are all of those which are owned or controlled by the Standard Oil Company of New Jer-

sey by any or all of its stockholders, officers or agents.

The affidavits before mentioned and required to be filed herein must be subscribed and sworn to in this State and before some officer thereof who is by law authorized to administer oaths.

Upon the performance of the foregoing conditions and requirements, I am willing to vote to suspend the judgment of forfeiture heretofore rendered by the court against the Waters-Pierce Oil Company, and which is now in full force and effect, but until those conditions and requirements are strictly performed and complied with I dissent from the court's order, judgment and decree suspending said judgment of forfeiture, or to in any manner interfere with, prevent, hinder, or further delay the issuance of the writ of ouster in pursuance to said judgment. And if those conditions are not performed within the time before designated, then, in my judgment, the writ of ouster should go, and that the clerk of this court should be ordered to return to the company the $50,000 deposited by it with him, and that execution should be ordered to issue on the judgment for the purpose of collecting the $50,000 assessed against it as a penalty for its violation of the laws of this State. Since writing the above the majority of the court have overruled the motion of the Attorney-General for a writ of ouster, to which I dissent for the reasons before stated.

## II.

My views regarding the application of the Standard Oil Company of Indiana to have the court to make an order suspending the judgment herein revoking its license to do business in this State in order that it may conduct and carry on an independent legitimate business herein are expressed in the following paragraphs:

First.    While I recognize the fact that this company is owned by and is the right arm of the Standard Oil Company of New Jersey and has done as much and perhaps more than any other agency of that company in fostering the "Oil Trust" upon the people of this State and country, yet I can see no sound reason for totally excluding it from doing business in this State, provided it will confine itself to the transaction of legitimate business, free and independent of all pools, trusts and combinations of whatsoever character; and will completely sever all of its stock and other trust relations with the Standard Oil Company of New Jersey, with all of its subsidiary companies hereinbefore mentioned, and with all of the stock-owners, officers and agents of all of said companies; and also with all other persons, copartnerships, companies and corporations whatsoever and wheresoever situate.

Second.    If this company, would, in good faith, conduct its business free and independent of all pools, trusts and combinations as indicated and stated in the previous paragraph, then the company would be capable of doing and could, in fact, render great and valuable services to the entire people of the State, and would at the same time avoid the great damage and injury which will be entailed upon the vast property and business interest of the company located in this State and elsewhere, if the judgment of ouster is permitted to stand unsuspended.    If, upon the other hand, the court can shear the business of the company of its illegal and harmful features by compelling the company to sever all of its stock and other trust relations with all persons whomsoever, as before indicated, and at the same time preserve the good features of its business which would be of vast benefit to the material welfare of the State; and also justly punish the company commensurately with the great wrongs and injuries it has perpetrated against the State and upon

State ex inf. v. Standard Oil Co.

her people, then, in my judgment, the court should do so; or rather should make an order suspending the judgment of revocation during good behavior, upon the same terms and conditions as hereinbefore stated regarding the suspension of the judgment of forfeiture rendered against the Waters-Pierce Oil Company, and the performance of those conditions and requirements be established to the perfect satisfaction of the court by the same quantity and character of evidence there indicated and there required to be furnished by that company.

While this court has no power or authority to compel the Standard Oil Company of New Jersey to sell and dispose of its stock in the respondent companies, yet we have the unquestionable power to do just what has been done, namely, to revoke the license of the Standard Oil Company of Indiana, and to absolutely forfeit the charter of the Waters-Pierce Oil Company; and we also have the same unquestionable authority to decline and refuse to suspend said judgment of revocation and forfeiture without the Standard Company of New Jersey will first sell and dispose of its stock and other holdings in the Standard Oil Company of Indiana and the Waters-Pierce Oil Company of this State, and completely sever all its other trust relations in those two companies in the manner before indicated; and this court would do itself and the people of the State an irreparable injury by suspending said judgment without first requiring the New Jersey Company to voluntarily dispose of its stock in said companies and completely sever all of its other trust relations with respondents, as before indicated.

Third. The order, if made, suspending the judgment or revocation should be so drawn as to authorize and permit the court at any time upon motion of the Attorney-General or upon its own motion to set aside and nullify the order suspending the judgment of revo-

cation, and thereby leave the judgment in full force and effect as completely and effectually as though the order of suspension had never been made; and said order should expressly provide that this court reserves the exclusive right to say and determine what is sufficient cause and justification for the court to revoke the order suspending the judgment of revocation, and authorize it to order the writ of ouster to issue.

Fourth. In my judgment it is fairly deducible from the record in this case, that, after allowing this company six per cent interest per annum the cash value of all of its property and assets located in this State from May 28th, 1900, the day when the Waters-Pierce Oil Company was incorporated, the same being the date upon which the pool, trust and combination charged in the information was formed and entered into by the respondents herein, down to this time, and then deduct the amount thereof from the amount of the total net profits realized by the company from the people of this State, then there would remain more than $1,000,000 of net illegal profits exacted and illegally collected from the people of this State. By depriving this company of those illegal profits the court would thereby largely remove the incentive and temptation for it to again violate the laws of this State.

I am, therefore, of the opinion that before this court would be justified in making an order herein suspending the judgment of revocation, the Standard Oil Company of Indiana should be required to pay to the clerk of this court for the use and benefit of the State of Missouri the sum of $1,000,000, and be required to strictly comply with the conditions and requirements before mentioned herein and as stated in paragraph one hereof in relation to the Waters-Pierce Oil Company.

Fifth. If the Standard Oil Company of Indiana will, within ten days from this date, file with the clerk of this court a written statement expressing its willing-

ness and intention to comply strictly with all the foregoing conditions and requirements, then I would be in favor of giving the company until April 1st, this year, in which to perform the conditions imposed, and in which to furnish to the court the evidence of that performance; and if it should then satisfactorily appear to the court from that evidence that it had in good faith performed those conditions and requirements, then I would be willing to vote for an order suspending the judgment of revocation heretofore rendered against it upon the conditions before stated.

By adopting the policy above pointed out the court would enforce the laws of the State against respondents, destroy the "Oil Trust" existing in this State, do justice to respondents and the State, and at the same time permit said companies to carry on an independent, legitimate business in the State, both of which are strong and are capable of contributing largely to the material welfare of the State, and to the people thereof.

Sixth. If said company does not file a statement within ten days indicating its intention of performing the foregoing conditions and requirements, then, after the expiration of that time, the courts should take up and pass upon its motion for a rehearing, heretofore filed herein.